**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE THE RESERVE PRIMARY FUND SECURITIES & DERIVATIVE CLASS ACTION LITIGATION | No. 08-cv-8060-PGG<br><br>(Class Action)<br><br>Hon. Paul G. Gardephe<br><br>ELECTRONICALLY FILED |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
John C. Browne (JB-0391)
Lauren A. McMillen (LM-1687)
Sean O'Dowd (SO-4170)

*Attorneys for Lead Plaintiff Third Avenue*
*Institutional International Value Fund, L.P*

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ........................................................................... 1

II.  JURISDICTION AND VENUE ...................................................................... 6

III. PARTIES ......................................................................................................... 7

     A.    Lead Plaintiff ........................................................................................ 7

     B.    Non-Parties .......................................................................................... 7

     C.    Defendants ............................................................................................ 8

IV.  CLASS ACTION ALLEGATIONS ............................................................... 9

V.   STATEMENT OF FACTS ............................................................................ 11

     1.    Defendants' SEC Filings Portrayed the Primary Fund As a
Conservative Money Market Fund Focused On The Preservation of
Capital and Liquidity ......................................................................... 11

     2.    Defendants Marketed the Primary Fund to Investors as Safe and
"Boring" ............................................................................................. 18

     3.    Defendants Caused the Primary Fund to Make Increasingly  Risky
Investments, Which Attracted Capital, Increased The  Management
Fees Collected By Defendants, and Enticed Potential Buyers ................ 21

     4.    The Primary Fund Increases Its Holdings in Lehman Brothers............... 27

     5.    Lehman Brothers Totters, And Questions Are Raised Internally
But Willfully Ignored By Defendants........................................................ 31

     6.    Defendants Recklessly Ignored the Effect  Lehman Brothers'
Decline Would Have On the Primary Fund................................................ 34

     7.    Lehman Brothers Collapses, and Defendants Fail to Adjust the
NAV ......................................................................................................... 37

     8.    In Violation of the Primary Fund's Policy, Defendants  Prioritized
the Redemption Requests of Large Institutional Investors ...................... 42

     9.    Defendants Knowingly Mislead the Public About  the Primary
Fund's Fictional Credit Support Agreement............................................. 45

10.   Defendants Make False and Misleading Statements About the Status of Redemptions and the Primary Fund's Ability to Honor Redemption Requests.................................................................. 55

11.   The Truth is Finally Revealed When Defendants  Announce that the Primary Fund Had "Broken the Buck" ................................................. 57

12.   Defendants Record False Receivables To Fraudulently Maintain the NAV ............................................................................................... 59

13.   After the September 16 Announcement That the Primary Fund Had "Broken the Buck," Defendants Continued to Make  False Statements to the Public and Engaged in Other Misconduct.................... 61

VI.  LOSS CAUSATION ............................................................................................. 64

VII. INAPPLICABILITY OF THE STATUTORY SAFE  HARBOR AND BESPEAKS CAUTION DOCTRINE ........................................................................... 65

VIII.   PRESUMPTION OF RELIANCE ................................................................. 66

IX.  CLAIMS FOR RELIEF ......................................................................................... 67

X.   JURY TRIAL DEMAND ...................................................................................... 91

XI.  PRAYER FOR RELIEF ........................................................................................ 91

Lead Plaintiff Third Avenue Institutional International Value Fund, L.P. ("Third Avenue or "Lead Plaintiff"), through its attorneys, brings this class action against Defendants Reserve Management Company, Inc. ("RMCI" or "The Reserve"), Resrv Partners, Reserve Management Corporation, Bruce Bent Sr. ("Bent"), Bruce R. Bent ("Bent II") and Arthur T. Bent ("Bent III") on behalf of itself and all other persons and entities, other than Defendants and their affiliates, who purchased or held shares of the Reserve Primary Fund (the "Primary Fund") from September 28, 2006 to September 16, 2008, inclusive (the "Class Period") and were harmed and/or continue to be harmed by the wrongful acts of Defendants as alleged herein. Consistent with the Court's November 25, 2009 Order in *SEC v. Reserve Management Company, Inc., et al.*, 09 Civ. 4346 (PGG), this Action does not assert any claim against the Primary Fund, nor does this Action assert any claim against any of the Primary Fund's "Indemnitees" that seeks an award that would be payable or subject to indemnification by the Primary Fund.

## I.    NATURE OF THE ACTION

1.      On September 16, 2008, The Reserve – marketed as "The World's Most Experienced Money Fund Manager" and "The World's First Money Market Fund" –announced that its premier fund – the $62 billion Primary Fund – had "broken the buck." By "breaking the buck," The Reserve had suffered losses so severe that it had become the first, and to this date, only retail money market fund to dip below the required $1.00 net asset value ("NAV") and face liquidation. Subsequent event have revealed that The Reserve was not the innocent victim of a poor economy or disruptions in the financial markets. Throughout the recent economic trouble, no other money market fund "broke the buck" and left its investors unprotected. This class action arises from the wrongdoing of Defendants who, through their willful misfeasance and recklessness, changed the investment objectives of the Primary Fund so drastically that they

1

allowed the nation's oldest money market fund to fail, costing Lead Plaintiff and the members of the Class hundreds of millions of dollars in losses.

2.     Money market funds are designed to serve as an extremely safe, low-yield alternative to holding cash or investing money in short term instruments.  The Primary Fund was no exception to that rule.  In fact, as the nation's oldest money market fund, Defendants held the Primary Fund out to be the epitome of a "safe" and "conservative" money market fund, and repeatedly emphasized the Primary Fund's superiority over other funds that had "prostituted" the concept of money market funds "by putting garbage in the funds and reaching for yield."  Even in the midst of a declining market, Lead Plaintiff and the Class reasonably relied on Defendants' insistence that a "fundamental policy" of the Primary Fund was to "preserv[e] capital and liquidity" and that its investment strategy was so secure that it should "bore the investor into a sound night's sleep."

3.     Although the above representations may have been correct prior to 2006, in March 2006, Defendants decided to lift the Primary Fund's historical prohibition against exposure to commercial paper – investments that Defendant Bent had previously called "anathema to the concept of the money fund" – in order to increase investment capital, increase yields, and secure for their own pockets hundreds of millions of dollars in new management fees.

4.     By mid-2008, the Primary Fund was exposed to an unprecedented amount of risk. A sizable part of that risk exposure took the form of $785 million in commercial paper issued by Lehman Brothers Holdings, Inc. ("Lehman Brothers").  These increased risks paid substantial dividends to Defendants, and by September 2008, the Primary Fund had the highest 12-month yield among the 2,100 money funds tracked by Morningstar, Inc.  But these increases were not sustainable given the unsuitably high risk of the investments and the evident turmoil in the

market.  At a time when investors sought safety by investing their available cash in money

market funds, Defendants changed the very foundation of the fund's investments, recklessly

jeopardizing the billions of dollars entrusted to the Primary Fund by Lead Plaintiff and the Class.

5.      Although Defendants were required to inform investors of a fundamental shift in

investment policy, they chose instead to repeatedly make false and misleading statements

emphasizing the Primary Fund's "stable" policy of focusing on liquidity and capital and avoiding

risky investments.  To the extent that the Fund's investment composition had changed,

Defendants assured investors that their investments were safe, secure, and conservative.

6.      Ultimately, Defendants' assurances had no foundation.  Because of the shift

towards riskier investments, by September 15, 2008, the Lehman Brothers commercial paper

constituted 1.2% of the Primary Fund's total holdings.  In the late summer of 2008, as Lehman

Brothers began to fail, and the threat of its collapse teetered closer to reality, Defendants

recognized that the deterioration and possible liquidation of Lehman Brothers would likely have

a material impact on the Primary Fund and could threaten the Primary Fund's very existence

should investors react by pulling out – or "redeeming" – their investments.  Defendants knew

that a large and sudden number of redemptions could quickly deplete the Primary Fund's

operating capital, and thus threaten the $1.00 NAV.  Like other competitor funds, Defendants

could have arranged for a third party line of credit to maintain the NAV, or by entering into a

credit support agreement that would preserve capital and maintain the NAV.

7.      Rather than taking appropriate measures such as divesting the Primary Fund of its

Lehman Brothers commercial paper exposure or entering into a credit support agreement,

Defendants waited for the worst-case scenario to occur – Lehman Brothers' announcement of its

bankruptcy – and then engaged in a fraudulent campaign of disinformation in an attempt to

dissuade investors from redeeming their Primary Fund shares and stave off an otherwise inevitable collapse.

8.      Defendants' deceitful conduct on September 15 began within hours of Lehman Brothers' bankruptcy announcement.  Following the announcement, the Primary Fund's Board was convened to discuss the ramifications of the bankruptcy on the Primary Fund.  The Board's first order of business was to decide on a fair calculation of the value of the Lehman Brothers' commercial paper.  Despite early market evidence – known to RMCI and the Bent Defendants – that Lehman paper was trading at $0.30 - $0.40, the Board accepted Bent's proposal of a valuation of $0.80.  This unrealistic and un-fair valuation of Lehman Brothers falsely propped up the Primary Fund's NAV throughout September 15.

9.      By the start of the business day, it appears that Defendants' representatives were illegally providing select larger investors inside information about the gravity of the situation and the need to redeem their shares to ensure full and immediate recovery of their investments.  They then illegally prioritized the redemption requests of these select investors, fulfilling their redemptions before the more timely requests of others.  The volume of redemptions was so incredible that State Street Corporation ("State Street"), the Primary Fund's custodial bank responsible for fulfilling redemption requests, stopped fulfilling redemptions at 10:10 a.m. once it had paid out over $10 billion (nearly 1/6 of the total investments in the Fund) and suspended RMCI's overdraft privileges.  Defendants did not tell investors that redemptions were no longer being fulfilled; in fact, when questioned by investors as to the status of their redemptions, Defendants lied and blamed any delays on fabricated technical difficulties.

10.      By the early afternoon on September 15, when redemption requests had (unknown to the public) skyrocketed to $16 billion, and would top $20 billion by the end of the day,

investors were seeking guidance as to the safety of the Primary Fund's NAV, and, by extension, their money.  Despite the fact that Bent II had made clear internally on the eve of the Lehman Brothers bankruptcy that RMCI and the Bent Defendants were unable to, or not inclined to, provide credit support to protect the $1.00 NAV, Defendants made numerous false statements to make it appear as if that was exactly what they were planning.  On September 15, Defendants sent out to investors a press release stating that RMCI 'intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund," that they "have discussed with the SEC that our intent is to mitigate any decline in value of the Lehman debt so that it will not result in a decrease to the NAV of the Fund," and that "[w]e are submitting appropriate documentation to the SEC today, September 15, 2008."  All of those statements were false and misleading.  As a direct consequence of these false statements, many Class members delayed redeeming their shares until after the Fund had fallen below the $1.00 NAV and "broke the buck."

11.     By the afternoon of September 16, 2008, however, Defendants could no longer conceal the truth, and they were forced to disclose that the Primary Fund's exposure to the bankrupt Lehman Brothers had caused the Primary Fund to break the buck.  This marked the first time that a retail money market fund with direct individual investors had broken the buck, and this announcement immediately cost Primary Fund investors hundreds of millions of dollars.

12.     Defendants did not cease their wrongful conduct on September 16.  Once liquidation became inevitable, Defendants continued to put their own interests high above those of Lead Plaintiff and Class members, to whom they continue to owe fiduciary duties and loyalty. After several months and numerous unexplained delays in the announcement of the plan of liquidation of distribution, Defendants shocked investors by announcing the withholding of a

"Special Reserve" of $3.5 billion to be used to satisfy legal claims brought against them based on their own gross misconduct.  Defendants continue to this day to seek lucrative management fees in exchange for the work they have done to liquidate the Fund they recklessly destroyed.

13.     The Primary Fund is now a relic of the past, and investors' confidence in the sanctity of money market funds has been shaken.  The true victims here – Lead Plaintiff and the Class – were deceived by these Defendants, who had assured them that their investments were so sound that they should be "bore[d] . . . into a sound night's sleep."  Rather, they were lulled into a false sense of security and then actively deceived and manipulated while Defendants tried to dig themselves out of a sinkhole.  Despite the partial distribution of the Primary Fund's capital, Lead Plaintiff and the Class have suffered significant losses, totaling hundreds of millions of dollars, due to Defendants' misconduct.

## II.      JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); Sections 11 and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k and 77o); Sections 13(a) and 36(b) of the ICA of 1940 (the "ICA") (15 U.S.C. §§ 78m(a) and 80a-35(b)), and related state law claims.

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C. § 77v); Section 44 of the ICA (15 U.S.C. § 80a-43); and 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

16.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C. § 77v); Section 44 of the ICA (15 U.S.C. § 80a-43); and 28 U.S.C. § 1391(b).  A substantial portion of the acts and transactions

that constitute the violations of law complained of herein occurred in this District.  Defendants

conducted other substantial business in this Judicial District and many Class members reside in

this District.  Venue is also proper in this District pursuant to the multi-district litigation

provisions of 28 U.S.C. § 1407.

## III.    PARTIES

### A.  Lead Plaintiff

17.    Lead Plaintiff Third Avenue is a Delaware limited partnership with its principal

office located at 622 Third Avenue, 32nd Floor, New York, New York 10017.  During the Class

Period, Third Avenue purchased and held shares of the Primary Fund and was damaged by the

wrongful conduct alleged herein.  On August 26, 2009, the court appointed Third Avenue as

Lead Plaintiff for this litigation.

### B.  Non-Parties

18.    Non-Party the Primary Fund is a money market fund and one of several series of

funds operated by Defendants.  The Primary Fund's principal place of business is at 1250

Broadway, New York, New York 10001.

19.    Non-Party The Reserve Fund ("Reserve Fund") is a Massachusetts business trust

registered with the U.S. Securities and Exchange Commission ("SEC") under the ICA.  The

Reserve Fund's principal place of business is at 1250 Broadway, New York, New York 10001.

On September 28, 2006, Defendants caused the Reserve Fund to file with the SEC a Registration

Statement on Form N-1A, a Prospectus and a Statement of Additional Information (defined

herein, together with subsequent amendments and supplements, as the "2006 Prospectus").  On

September 28, 2007, Defendants caused the Reserve Fund to file with the SEC a Registration

Statement on Form N-1A, a Prospectus and a Statement of Additional Information (defined

herein, together with subsequent amendments and supplements, as the "2007 Prospectus").  The

7

2006 Prospectus and the 2007 Prospectus are referred to collectively as the "Prospectus" or the "Registration Statement."  The Reserve Fund's principal place of business is at 1250 Broadway, New York, New York 10001.

### C.  Defendants

20.      Defendant Reserve Management Company, Inc. ("RMCI"), which carries out its business under the name "The Reserve," is the investment adviser and fund manager for The Reserve's funds, including the Primary Fund.  RMCI is owned and controlled by the Bent Defendants (defined below) and is a privately held New Jersey corporation that transacts business in New York, with its principal office located at 1250 Broadway, 32nd Floor, New York, New York 10001.

21.      Defendant Resrv Partners, Inc. ("Resrv Partners") is an RMCI affiliate that acts as the distributor and principal underwriter for the Reserve Fund and the Primary Fund.  Resrv Partners is a New York corporation, with its principal place of business at 1250 Broadway, New York, New York 10001.

22.      Reserve Management Corporation ("RMC") is the parent company to RMCI, and is based in New York, New York.  RMC controls RMCI, Resrv Partners and the Reserve Fund. RMCI, Resrv Partners and RMC are defined as "the Reserve Defendants."

23.      Defendant Bruce Bent Sr. ("Bent") is the co-founder of The Reserve and was at all relevant times the Chairman, President, and Treasurer of the Reserve Fund; Chairman and President of RMCI; and Chairman of Resrv Partners.  Bent is a resident of New York State, and his business address is 1250 Broadway, New York, New York 10001.  Bent signed the 2006 Prospectus and the 2007 Prospectus in his capacity as the Chairman, President and Treasurer of the Reserve Fund.

8

24.     Defendant Bruce R. Bent ("Bent II") is a son of Bent and was at all relevant times Co-Chief Executive Officer, Senior Vice President, and Assistant Treasurer of the Reserve Fund; Senior Vice President, Secretary, and Assistant Treasurer of RMCI; and Secretary, Assistant Treasurer, and Director of Resrv Partners.  Bent II is a resident of New York State, and his business address is 1250 Broadway, New York, New York 10001.  Bent II signed the 2006 Prospectus and the 2007 Prospectus in his capacity as Co-Chief Executive Officer, Senior Vice President and Assistant Treasurer of the Reserve Fund.

25.     Defendant Arthur T. Bent III ("Bent III") is a son of Bent and was at all relevant times Co-Chief Executive Officer, Senior Vice President, and Secretary of the Reserve Fund; Chief Operating Officer, Treasurer, Senior Vice President, and Assistant Secretary of RMCI; and Treasurer, Assistant Secretary, and Director of Resrv Partners.  Arthur Bent is a resident of New York State, and his business address is 1250 Broadway, New York, New York 10001.  Bent III signed the 2006 Prospectus and the 2007 Prospectus in his capacity as Co-Chief Executive Officer, Senior Vice President and Assistant Treasurer of the Reserve Fund.

26.     Bent, along with his sons Bent II and Bent III (collectively, the "Bent Defendants") exercised control and decision-making authority over all aspects of the Reserve Defendants, including overseeing the investments made by the Primary Fund, interacting with the Boards of Trustees of the Reserve Fund's various funds, which met jointly (the "Board"), and reviewing and approving public communications of the Reserve and the Primary Fund prior to dissemination.

## IV.     CLASS ACTION ALLEGATIONS

27.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) all other persons and entities who purchased or held shares of the Primary Fund during the Class Period and were harmed and/or continue to be harmed by the

wrongful acts of Defendants as alleged herein.  Excluded from the Class are: (a) Defendants; (b) members of the immediate families of Bent, Bent II, and Bent III; (c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner, executive officer, director, trustee, or controlling person of The Reserve Defendants, the Reserve Fund or the Primary Fund (including any of their subsidiaries or affiliates); (e) any entity in which any Defendant has a controlling interest; (f) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representative, heirs, successors and assigns of any such excluded party.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  The Primary Fund had over 62 billion shares outstanding as of September 15, 2008.  While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that Class members number in the thousands.

29.     Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and other members of the Class acquired Primary Fund shares during the Class Period.  Lead Plaintiff and members of the Class sustained damages as a result of Defendants' conduct complained of herein.

30.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it

impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

32.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.   Whether the federal securities laws and other laws were violated by Defendants' conduct as alleged herein;

      b.   Whether defendants breached their fiduciary duties to Class members;

      c.   Whether statements made by defendants to the investing public in the Prospectus, press releases, statements to the media, or other statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

      d.   Whether and to what extent Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in their press releases, statements to rating agencies, statements to the media, or other statements to the public;

      e.   Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

## V.    STATEMENT OF FACTS

### 1.    Defendants' SEC Filings Portrayed the Primary Fund As a Conservative Money Market Fund Focused On The Preservation of Capital and Liquidity

33.    The Primary Fund was the Reserve's flagship fund and was marketed by Defendants as the oldest money market fund in the country.  Throughout the Class Period and for years beforehand, Defendants held the Primary Fund out to be a conservative investment vehicle that prioritized the preservation of capital over aggressive returns.  Defendants – and Bruce Bent

in particular – made repeated statements to investors and the market emphasizing the supposed

safety, conservative investment strategy and liquidity of the Primary Fund.

34.     In their filings with the SEC, Defendants emphasized that "the investment

objective of the Primary Fund . . . is to seek as high a level of current income as is consistent

with the preservation of capital and liquidity."  The Primary Fund was described in the 2006

Prospectus and the 2007 Prospectus as a "money market fund[], designed as a convenient

alternative to the direct investment of temporary cash balances in short-term instruments."

Money market funds are designed to serve as an especially safe, low-yield alternative to holding

cash or investing it in short term instruments.  Shares of money market funds sell for $1 each, so

that they appeal to ordinary, everyday investors.  These funds are so conservative, and their

performance is so predictable, that in the entire thirty-eight year history of money market funds,

only one other fund has ever "broken the buck" (had its NAV decline below $1.00 per share),

and the Primary Fund is the first and only retail money market fund to do so.

35.     In accordance with their supposed purpose of serving as a safe haven for

investors' cash, money market funds are defined by the SEC as follows:

> A money market fund is a type of mutual fund that is required by
> law to invest in low-risk securities.  These funds have relatively
> low risks compared to other mutual funds and pay dividends that
> generally reflect short-term interest rates . . .
>
> Money market funds typically invest in government securities,
> certificates of deposit, commercial paper of companies, or other
> highly liquid and low-risk securities.  They attempt to keep their
> net asset value (NAV) at a constant $1.00 per share – only the
> yield goes up and down.

36.     The SEC also recognizes that money market funds are used by a wide variety of

investors that seek a combination of stability and liquidity:

> This combination of stability of principal and payment of short-
> term yields has made money market funds one of the most popular

investment vehicles for many different types of investors.
Commonly offered features, such as check-writing privileges,
exchange privileges, and near-immediate liquidity, have
contributed to the popularity of money market funds. More than
750 money market funds are registered with the Commission, and
collectively they hold approximately $3.8 trillion of assets. Money
market funds account for approximately 39 percent of all
investment company assets.

Individual (or "retail") investors use money market funds for a
variety of reasons. For example, they may invest in money market
funds to hold cash temporarily or to take a temporary "defensive
position" in anticipation of declining equity markets. Money
market funds also play an important role in cash management
accounts for banks, broker-dealers, variable insurance products,
and retirement accounts. As of December 2008, about one-fifth of
U.S. households cash balances were held in money market funds.

SEC Release No. IC-28807, File No. S7-11-09; "Proposed Rule on Money Market Fund

Reform," *available at* www.sec.gov/rules/proposed/2009/ic-28807 (June 30, 2009).

37.    During the Class Period, Bent and other Defendants repeatedly emphasized the

Primary Fund's focus on "safety of principal, liquidity and <u>soundness of sleep</u>"[1] and that the

Primary Fund was "designed as an investment vehicle for short-term cash management and is

intended to provide liquidity to shareholders." Lead Plaintiff and other members of the Class

reviewed and relied on these and other statements made during the Class Period. In addition,

these statements were disseminated into the marketplace and were reflected in the total mix of

information about the Primary Fund known to investors. For instance, the 2006 Prospectus and

2007 Prospectus filed with the SEC, stated:

The investment objective of the Primary Fund . . . is to seek as
high a level of current income as is consistent with the preservation
of capital and liquidity . . . . The Funds are money market funds,
designed as a convenient alternative to the direct investment of
temporary cash balances in short-term instruments. The Funds
seek to employ idle cash at yields competitive with yields of other

---

[1] Herein, all emphases are added unless otherwise indicated.

comparable short-term investments, and to reduce or eliminate the mechanical problems of direct investment, such as scheduling maturities and reinvestment, evaluating the credit of issuers, investing in round lots, and safeguarding the receipt and delivery of securities. Each Fund invests only in *short-term securities* and seeks to maintain a stable $1.00 share price . . . . The average maturity of each Fund's securities portfolio will not be more than 90 days.

* * *

The investment adviser to the Funds monitors a range of economic and financial factors.  Based on this analysis, the assets of the Funds are invested in a mix of U.S. dollar denominated *money market securities* that are intended to provide as high a yield as possible without violating each Fund's credit quality and maturity policies or jeopardizing the stability of its share price.  The average maturity for each Fund's securities portfolio will not be more than 90 days.  (Emphasis in original.)

38.    Both Prospectuses also stated that "because money market funds may only invest in securities with a lower level of risk, over time they may produce lower returns than investments in stocks or bonds, which entail higher levels of risk," and that:

Different investors have different investment goals.  Investments in money market funds provide greater security and liquidity than other types of investments but do not usually offer as high a rate of return.  The Funds are not intended to be a balanced investment program. They are intended to provide professional management for your cash and a convenient way to gain interest income as part of a diversified portfolio.

39.    On September 28, 2006, Defendants caused to be filed with the SEC a Statement of Additional Information ("SAI"), which was incorporated into the 2006 Prospectus.  A similar SAI was filed by Defendants on September 28, 2007, which was incorporated into the 2007 Prospectus.  Each SAI states:  "The investment objective of each Fund [including the Primary Fund] is to seek as high a level of current income as is consistent with preservation of capital and liquidity.  This investment objective is a fundamental policy and may not be changed without the

vote of a majority of the outstanding shares of the Fund as defined in the Investment Company

Act." The SAIs continue:

> ***Fundamental Policies.***  Each Fund's investment objective and the
> following fundamental investment policies may not be changed
> without the affirmative vote of a majority of the outstanding shares
> of a Fund.  (Emphasis in original.)

40.     The SAIs also represented that "[i]nvestments in commercial paper will be of high

quality" and that if a security's high-quality rating changes after purchase by the Primary Fund,

Defendant RMCI will take whatever action is "determined to be in the best interest of the Fund."

41.     On January 29, 2008, Defendants filed with the SEC the Semi-Annual Report for

the Primary Fund for the period ended November 30, 2007.  The Semi-Annual Report, which

was specifically referenced in the 2007 Prospectus, represents that "the Funds [including the

Primary Fund] generally invest in a more conservative and risk adverse manner than their peers"

and that "the Funds typically have a shorter average maturity than many other money market

funds."

42.     The Semi-Annual Report also includes a letter from Defendant Bent, dated

January 25, 2008, which states as follows:

> The current liquidity and mortgage crises have provoked everyone
> – institutions, corporations and individuals – to question just how
> safe their cash really is.  And it's about time.
>
> The management of a money market fund is counter-cultural to the
> vast majority of organizations that sponsor or manage virtually all
> the money funds because these organizations are not specialists in
> cash management.  Rather they manage stock and bond funds, the
> focus of which is the highest rate of return, *not* safety of principal,
> liquidity and soundness of sleep.
>
> When we created the world's first money fund in 1970, we clearly
> stipulated the tenets that define a money fund: sanctity of principal,
> immediate liquidity, a reasonable rate of return – all while living
> under the overarching rubric of boring investors into a sound sleep.
> Unfortunately, a number of firms that sponsor money funds, and a

number of investors that selected them, have lost sight of the purpose of a money fund and the simple rules that guide them in their <u>foolhardy quest for a few extra basis points.</u> (A basis point is 1/100 of 1% or $10 on $100,000 invested for an entire year.) <u>The cash entrusted to a money fund is your reserve resource that you expect to be there no matter what</u>. This is why we call ourselves The Reserve.  Be you an individual, institution or a Fortune 500 company, this is your working capital to pay the rent, to finance inventory and receivables, to put food on the table.  <u>This is definitely not money to take risks with, and that is exactly how it should be managed.</u>

We have been "accused" by some of asserting these tenets as if they were dogma, to which The Reserve pleads: Guilty as charged. If one focused on the goal of effective cash management, the truths to accomplish it are self evident and unequivocal, and reaching for yield while risking principal, liquidity or peace of mind is not among them.  Let us hope that this dance on the precipice will re-instill the objectivity that is crucial to cash management in both the money managers and the investors who have exhorted them to take a flyer.  After all, how dangerous could it be?  It's *only* cash management.

Cash is the very lifeblood of every individual and organization, yet despite the critical nature of cash, it is the least researched asset class, the results of which have created the current problems in the market place.

43.    On August 8, 2008, Defendants filed with the SEC the Annual Report for the

Primary Fund for the fiscal year ended May 31, 2008.  The Annual Report includes a letter from

Defendant Bent, dated July 28, 2008, which states as follows:

After a recent speech a questioner asked what I would do if I was appointed Chairman of the Federal Reserve.  I responded that I would immediately resign and go back to being Chairman of The Reserve. Here is why.  We are at the flex point in our economy. Inflation pressures that were apparent last summer are still present. Because of the crisis of confidence that emerged last year, inflation fighting was put on hold, interest rates were dropped to protect the valuation of securities and therefore the integrity of investment banks, commercial banks and some money market mutual funds too as it worked out.  Unfortunately, the crisis of confidence is not over but the market has improved dramatically.

Many dangerously Structured Investment Vehicles (SIVs) were folded by their sponsors which had the effect of taking matches

from children that had proved themselves unworthy of the responsibility, underscoring my earlier points that not anyone can run a money fund.  One year has passed since the subprime and SIV crisis shook the foundation of our markets, which has investors questioning the safety of their money funds.  Good!

We are pleased to report that you, and the markets in general, have embraced the very concept and foundation on which The Reserve was founded, an unwavering discipline focused on protecting your principal, providing daily liquidity and transparency, and all the while boring you into a sound sleep. Experience has prevailed and as a result, The Reserve's assets grew by nearly 100%, or $60 billion, over the past year.

44.     Defendants' SEC statements also emphasized the liquidity of the Primary Fund by explaining the process by which shareholders could, at any time, remove their money from the Primary Fund.  Both Prospectuses stated that "You may redeem your shares on each day that the Primary Fund's NAV is calculated.  Shares will be redeemed at the next NAV determined after a proper redemption request, by telephone or in writing, is received by the Primary Fund, or by an authorized financial intermediary."  The November 30, 2007 Supplement to the Prospectus stated that "[t]he cut-off times are 8:30 a.m., 9:00 a.m., thereafter hourly up to and including 5:00 p.m. Eastern Time for the Primary Fund . . . ."  This same language was included again in the March 14, 2008 Supplement to the Prospectus, and remained in effect through the remainder of the Class Period.  Lead Plaintiff and other members of the Class reviewed and relied on these and other statements made during the Class Period.  In addition, these statements were disseminated into the marketplace and were reflected in the total mix of information about the Primary Fund known to investors.

## 2.        Defendants Marketed the Primary Fund to Investors as Safe and "Boring"

45.      The statements in the Primary Fund's offering documents were consistent with Defendants' refrain over the years that the Primary Fund was safe, conservative and "boring" enough to put investors to sleep.

46.      According to a December 8, 2008 *Wall Street Journal* article, "[f]or years, Mr. Bent railed against investment of money funds' cash in anything riskier than Treasury bills and bank certificates of deposit."  Defendant Bent Sr. took particular issue with investments in commercial paper, which is short-term corporate debt that is usually unsecured.  In 2001, Bent told Reuters that "[c]ommercial paper is anathema to the concept of the money fund," and that "[p]eople prostituted the concept [of money funds] by putting garbage in the funds and reaching for yield."  Bent later told Investor's Business Daily:  "we don't drink, smoke, or buy commercial paper."

47.      In a November 2007 interview with Bloomberg News, as quoted in the *New Zealand Herald*, Bent criticized funds that had suffered losses on debt linked to subprime mortgages:  "When you get involved in this contest to make 3 basis points more here or 2 basis points more there, that's insane," he said. "It's not what I designed the money fund to do."

48.      Defendant Bent was quoted in an April 7, 2008 *Financial Week* article discussing the trend of corporate treasury departments outsourcing cash management functions to the Reserve, and describing recent market disruptions that made it "easier, and less risky, to hand off management of cash assets to a specialist."  The article quoted Bent as saying "Executives need to concentrate on running their businesses . . . not preserving their working capital . . . .  That's where we come in . . . . Cash is the lifeblood of your company . . . .  Why would you jeopardize

it in this environment just to save a few basis points."  Instead, Bent said, it makes sense "<u>to pay for safety</u>."

49.     Prior to and during the Class Period, Defendants also engaged in an extensive marketing campaign targeted at current and potential investors in the Primary Fund.  These marketing efforts included the regular forwarding of a variety of news articles to Class members in "blast emails" as well as emails targeted to specific institutional investor clients with commentary touting the Primary Fund's focus on liquidity and preservation of capital.  Some examples are set forth below.

50.     On July 5, 2006, a representative of RMCI e-mailed certain investors to tout the high ratings and liquidity of the Primary Fund and state that – as quoted in the complaint in *Henry Ford Health System, et al. v. The Reserve Fund, et al.*, No. 09 Civ. 5108 (filed June 1, 2009) ("HFHS Complaint") – RMCI was the "media's leading advocate of money market fund safety & liquidity."

51.     On August 21, 2007, RMCI distributed a *Crain's New York* article on The Reserve and, in a cover e-mail captioned "The Reserve is safe haven for cash," stated that the article discussed "how The Reserve has responded and provided benefit to investors seeking quality and liquidity during the credit crisis."

52.     On October 25, 2007, a representative of RMCI forwarded to investors an *Associated Press* article quoting Bent and stated in a cover e-mail that "[s]afety and liquidity are first and foremost, followed by a reasonable rate of return.  We will not jeopardize our reputation, and the reputation of our partners, by overlooking the money fund principles we created nearly 40 years ago."

53.     According to the HFHS Complaint, on March 12, 2008, a representative of RMCI sent certain investors an e-mail that included a blurb touting the Primary Fund's institutional class as "the #1 performing rated money fund for 2007" and noting that this was "achieved by staying focused on safety, liquidity, a reasonable rate of return and no headline risk."

54.     On April 7, 2008, a representative of RMCI forwarded to certain investors the above-referenced Financial Week article quoting Bent and his assertion that an investment with the Reserve as essentially "pay[ing] for safety."

55.     In July 2008, RMCI issued a brochure for the Primary Fund, dated June 30, 2008. The brochure stated that the "Primary Fund's investment objective is to seek as high a level of current income as is consistent with the preservation of capital and liquidity."  The brochure also stated that the high ratings for the Primary Fund "signify excellent safety of invested principal and a superior capacity to maintain a $1.00 per share net asset value at all times.  This is accomplished through conservative investment practices and strict internal controls."

56.     A July 11, 2008 cover e-mail to investors from a representative of RMCI included an article from that same day's *New York Times* and stated:

> The article details the challenges in the market money [sic] fund industry over the past year.  Many other funds invested in exotic securities without fully understanding the fundamentals.  Mr. Bent was interviewed to provide perspective to the money market fund industry and insight on its behavior.  The Reserve's consistent investment strategy focuses on stability, liquidity and reasonable rate of return.
>
> Central to the investment strategy is our disciplined research and credit analysis.  Our clients value the expertise only The World's Most Experienced Money Fund Manager can provide.

57.     Just three days before Lehman Brothers declared bankruptcy, sending RMCI and the Primary Fund into a tailspin, an article in the Wall Street Journal quoted Bent stating firmly that "the purpose of the money fund is to bore the investor into a sound night's sleep."  Ben also

20

discussed how funds managed by RMCI did not delegate the responsibility of determining whether the investments in its funds (such as Lehman Brothers) represent a minimal credit risk, stating that "If a fund sponsor [like RMCI] does not have the expertise, . . . he shouldn't be in the business."

58.     In a September 18, 2008 article about the Primary Fund, the *Wall Street Journal* noted the many instances in which Bent had criticized other money market funds for investing in commercial paper and other risky holdings to increase yields:

> Seven years ago, Mr. Bent told The Wall Street Journal that he was appalled that money-market funds would buy commercial paper that paid slightly higher yields… Mr. Bent has often said that money funds should be so "boring" that they put investors to sleep. Last year, when several money funds were facing headaches because of their investments in structured investment vehicles and other risky asset-backed paper that went bad in the early stages of the credit crunch, Mr. Bent was vocal in his disapproval.  "People have taken the concept of money funds and corrupted it" by investing in exotic investments, Mr. Bent said in an interview then.

**3.      Defendants Caused the Primary Fund to Make Increasingly Risky Investments, Which Attracted Capital, Increased The Management Fees Collected By Defendants, and Enticed Potential Buyers**

59.     Until 2006, the Primary Fund had a stated policy against investing in commercial paper.  The 2005 Prospectus, filed with the SEC on September 28, 2005, stated that "[t]o further minimize investment risks, the Funds [including the Primary Fund] do not invest in commercial paper" and identified this as a "Principal Investment Strategy" of the Primary Fund.  The Reserve Fund repeated this statement in a registration statement for the Primary II Fund filed with the SEC that same day ("Primary II Fund Registration Statement").  The Primary II Fund Registration Statement also stated in its "Fundamental Policy" section that "[a]s a matter of Policy, the Fund [referring to both the Primary Fund and Primary II Fund] may not invest in

commercial paper."   In addition, this public filing included the more general statement that "the

Funds [the Primary Fund and Primary II Fund] do not invest in corporate securities."

60.     The Primary II Fund Registration Statement made it clear the Primary Fund and

Primary II Fund were willing to accept the decreased yields that accompanied a bar on

commercial paper in exchange for the minimal investment risks.  Under the "Comparative

Performance" heading, it specifically stated that "the Fund slightly underperformed relative to

other money market funds with similar objectives and policies" and that this was because "the

Fund generally invests in a more conservative and risk averse manner than its peers.  For

example, the Fund does not invest in commercial paper . . . ."   These statements from the

Primary II Fund Registration Statement all apply with equal force to the Primary Fund and the

Primary II Fund.  The Primary II Fund Registration Statement defines the term "Fund" to refer to

both "the direct investments of the Primary Fund and the indirect investments of the Primary II

Fund"; specifically notes that "[t]he Primary Fund's investment objective is identical to the

Primary II Fund's investment objective"; and explains that "the Primary II Fund invests all of its

assets in shares of the Primary Fund."  Moreover, these statements were repeated in a Proxy

Statement filed with the SEC on February 24, 2006 on behalf of the Reserve Fund, which stated:

> The Trustees noted that each of the Reserve Funds slightly
> underperformed relative to other money market funds with similar
> objectives and policies. In this regard, the Trustees noted that <u>the
> Funds generally invest in a more conservative and risk averse
> manner than their peers. For example, the Funds do not invest in
> commercial paper</u> and typically have a shorter average maturity
> than many other money market funds. <u>The Trustees concluded
> that, under the circumstances, the performance of the Funds was
> satisfactory</u>.

61.     The March 15, 2006 Semi-Annual Report, filed with the SEC, repeated the above

language about the Reserve Funds' "Comparative Performance" nearly verbatim, stating that

"each of the Funds slightly underperformed relative to other money market funds with similar

objectives and policies," that this was because "the Funds generally invest in a more conservative and risk averse manner than its peers, and that "the Funds do not invest in commercial paper."

62.     Just one week later, however, Defendants cause the Reserve to file its March 22, 2006 supplement to the Prospectus and SAI for the Primary Fund, which noted the deletion of the paragraph that said the Primary Fund would not buy commercial paper, and thus opened up the Primary Fund to investments Bent once characterized as "anathema to the concept of the money fund."   Thereafter, the commercial paper prohibition was not mentioned in the Primary Fund's prospectuses.

63.     Beginning soon thereafter, and continuing through 2008, the Primary Fund began to invest in riskier commercial paper offered by institutions such as Lehman Brothers, Merrill Lynch & Co., Inc., and Washington Mutual, Inc.  In 2007 and 2008, in particular, the Primary Fund went on a commercial paper buying spree.  Commercial paper comprised more than 18% of the Primary Fund's assets by the end of August 2007.  Two months later, that figure had nearly tripled and by August 2008, 57% of the Primary Fund's portfolio was in commercial paper.  Nonetheless, as described herein, Defendants continued to use virtually the same language to describe the Primary Fund as they had previously used when the Primary Fund did not invest in commercial paper – continuing to describe the Primary Fund in SEC filings and elsewhere as focused on the "preservation of capital and liquidity" and a "safe and boring" investment.  These statements were designed to mislead investors into believing that, even as the type of securities chosen by the Bents and other Defendants changed, the fundamental purpose of the Primary Fund – safety of capital and liquidity – remained unchanged.

64.    The Primary Fund's investments during this time represented a fundamental shift in the Primary Fund's investment strategy. As a result of this 6000% increase in commercial paper – which occurred during a period when the Primary Fund continued to boast of its "stable" "conservative" investment policy – the Primary Fund was able to attract huge numbers of new investments, and the Primary Fund's market share more than doubled between July 2007 and July 2008.

65.    In addition to standard commercial paper, the Primary Fund began to invest in even more exotic "special-purpose commercial paper vehicles," including credit arbitrage funds and "conduits." A September 22, 2008 article in *Forbes* entitled "Hell Bent Innovator" described the Primary Fund's investments:

> Turns out that the Primary Fund, like many other money market funds, made significant investments in asset-backed commercial paper (ABCP) . . . Besides holding ABCP of Lehman Brothers, Bent's Primary Fund also bought into a slew of special-purpose commercial paper vehicles, sometimes referred to as credit arbitrage funds or "conduits." These funds have names that are unfamiliar to most investors, but most are set up by major banks with the purpose of borrowing money in the commercial-paper market and investing it in longer maturity credit derivatives. One firm prominent in Primary Fund's asset mix in 2007 was Grampian Funding. Never heard of Grampian? Back in November 2007, Reserve Primary Fund held $1.1 billion in paper from Grampian with coupons ranging from 5.04% to 5.5%. A drill down into Grampian's holdings in 2007 reveals that it held $36.9 billion worth of asset-backed securities such as Alt-A residential mortgage loans. These Alt-A mortgages include loans to people with spotty credit histories and so-called "liar's loans," which do not require borrowers to fully document income or assets on their loan application. Grampian first made headlines in August 2007 when its parent company HBOS, the U.K.'s largest mortgage lender and holding company for Royal Bank of Scotland stepped in to fund the $35 billion it owed but was having trouble paying. More recently, HBOS shares plummeted in the wake of collapses at Lehman and near-death at AIG and on Sept. 17, HBOS (and its Grampian subsidiary) threw in the

towel and were acquired by Lloyds TSB for $22 billion. Only a month prior, HBOS had a market capitalization of $65 billion.

66.    The Primary Fund's risky investments fattened its yields.  In the September 22, 2008 article, *Forbes* pointed out these investments "offered juicy yields."  The result, according to a December 8, 2008 *Wall Street Journal* article, was that by September 2008, "the Primary Fund's 12-month yield was the highest among more than 2,100 money funds tracked, according to Morningstar – 4.04% versus an average of 2.75%."

67.    Higher yields, coupled with Defendants' continued statements in SEC filings and elsewhere regarding the supposedly "safe" and "conservative" investment objectives of the Primary Fund, were designed to attract more investors.  This, in turn, increased the Primary Fund's assets.  The December 8, 2008 *Wall Street Journal* reported that with the Primary Fund's "stellar yield," its assets "tripled in two years to $62.6 billion."

68.    Ballooning assets quickly led to dramatic increases in the management and advisory fees earned by RMCI.   One of the "services" for which shareholders paid an investment fee – in addition to the fact that Defendants were supposed to keep shareholders' investments safe – was Defendants' responsibility to respond to shareholder inquiries and provide information about the investments made by the Primary Fund.  In SEC filings made by Defendants on behalf of the Primary Fund, including in the 2007 Prospectus, Defendants stated that the Primary Fund:

> [P]ay[s] a "Comprehensive Management Fee" that includes the advisory fee, all administrative and customary operating expenses of the Fund, as well as shareholder Liaison services (such as responding to inquiries and providing information on investments), record keeping charges, accounting expenses, transfer agent costs, and the expenses of preparing, printing and mailing shareholder shareholder reports and prospectuses. The Comprehensive Management Fee does not include Other Expenses

(see below).   The advisory fee of 0.08% of the "Comprehensive Management Fee" is the same for all share classes.

69.     The 2007 Prospectus further described that "each Fund pays RMCI a comprehensive management fee at an annual rate, based on the average daily net assets of each outstanding class of the Fund's shares."  According to a February 2007 Proxy Statement, management fees had been raised one basis point (0.01%) for all share classes in April 2007 such that the management fee payable to RMCI for the Primary Fund ranged from 0.81% (from 0.80%) for certain classes of shares called "Class R" to 0.13% (from 0.12%) for classes of shares called "institutional."

70.     In addition, the 2007 Prospectus states that Resrv Partners received an additional "distribution fee" of "0.25% per year of each class's average net assets."  This distribution fee had also been raised from 0.20% to 0.25% in April 2007.

71.     From mid-2007 through September 2008, Defendants' efforts to boost the yield on the Primary Fund, coupled with their intense marketing efforts designed to assure investors that the Primary Fund was a safe investment, resulted in an influx of approximately $30 billion in additional investments.  This resulted in hundreds of millions of dollars in additional management fees being paid to Defendants.

72.     For example, the additional "advisory fee" – which, as noted above, constituted 0.08% of the Comprehensive Management Fee – paid on this additional capital was approximately $24 million on an annual basis.  Similarly, Resrv Partners would have earned approximately $75 million annually through the "distribution fee" on just this additional capital alone.  The total management fee to RMCI on just this additional capital would have ranged between $243 million (at 0.81%) to $39 million (at .13%).  Thus, Defendants profited handsomely by, on one hand, causing the Primary Fund to expand into increasingly risky

investments while, on the other, repeatedly assuring investors that the Primary Fund remained safe, conservative, stable and "boring."

73.     Apart from augmenting management fees, RMCI and the Bents had another motive for investing in riskier holdings to enhance the Primary Fund's yields:  they were seeking a buyer for their business, and the increased assets and management fees resulting from greater yields would make the business a more attractive investment.

74.     The *Wall Street Journal* reported in December 2008 that "[i]n 2006, Mr. Bent sought a buyer for the fund business, according to a person familiar with the situation, but no deal was done.  Reserve declined to comment."  The article points out that the same year, the Primary Fund altered its investment strategy."  Likewise, according to a September 18, 2008 *Wall Street Journal* article, "Reserve Management was trying to sell itself last year, but then took itself off the block as its assets skyrocketed, says a person close to the situation.  It was working with the firm Putnam Lovell, and one possibility was approaching European banks."

75.     Thus, the prospective sale of the business provided a motive for the Primary Fund's altered investment strategy, its sudden yield-chasing and the decision, in 2006, to change the Primary Fund's Prospectus to allow for investments in commercial paper.

### 4.     The Primary Fund Increases Its Holdings in Lehman Brothers

76.     This changing investment portfolio included continued aggregation of Lehman Brothers holdings, even as concerns about the financial stability of Lehman Brothers began to surface.  A September 9, 2009 *Bloomberg.com* article entitled *"Sleep-At-Night Money Lost in Lehman Lesson Missing $63 billion"* recounts Bent's own description of his commercial paper buying process:

> Then, in August 2007 the commercial-paper and other credit markets froze
> as a result of deteriorating mortgage values. Banks such as Citigroup had

funded the home loans in their structured investment vehicles, or SIVs, with commercial paper, and now the off-balance-sheet pools were collapsing because investors stopped purchasing their short-term notes. When SIV managers put their debt up for sale for as little as half the face value, Bent went on a buying spree . . . **"<u>When they dumped it out into the marketplace, there were cats and dogs, and there were snakes, but there were also pearls," the white-haired Bent said in an interview with Bloomberg in June 2008. "So I go through and I pick out the carrots and the peas, and the rest of the stuff I let it go."</u>**

77.    One of the "peas" Bent acquired in his move into commercial paper was debt that Lehman Brothers issued in August 2007.  By November, the Primary Fund held $375 million in Lehman Brothers commercial paper.  In February 2008, the Primary Fund acquired an additional $250 million in Lehman Brothers medium-term notes and $150 million in Lehman Brothers commercial paper, bringing the Primary Fund's investment in Lehman Brothers debt to $775 million.   By September 15, 2008, the Primary Fund's total exposure to Lehman Brothers securities was $785 million

78.    During this same period, concerns about Lehman Brothers were mounting.  For instance, on August 22, 2007 – around the same time that the Primary Fund first acquired the Lehman Brothers debt – an article published on Bloomberg stated that "The rising cost of credit took its toll on Lehman Brothers Holdings, Inc. . . . as the subprime mortgage fallout spreads through the economy.  Lehman, the biggest underwriter of U.S. bonds backed by mortgages, became the first firm on Wall Street to shut its subprime-lending unit and said 1,200 employees will lose their jobs."

79.     On March 16, 2008, JP Morgan announced that it was acquiring Bear Stearns & Co. for $2 per share, and fears that Lehman Brothers would be the next investment bank to fail caused Lehman Brothers' publicly traded shares to drop more than 50% in value.  But the Primary Fund did not diminish its position in Lehman Brothers on this news.  To the contrary, in

April and May, the Primary Fund rolled over $375 million of Lehman Brothers commercial

paper that was about to mature and replaced it with $385 million of new Lehman Brothers paper

set to mature in October 2008.  During the summer of 2008, the press was flush with articles

evidencing the problems facing Lehman Brothers:

a.       On July 28, 2008, Bloomberg noted that, as measured by credit default

swaps, "[t]he cost to protect Lehman's debt from default more than doubled this year."

b.       On August 19, 2008, the *New York Times* stated that Lehman Brothers was

considering the sale of its money management division to free up capital caused by losses

in the real estate sector:

> Lehman sent letters last week to a number of financial companies,
> including private equity firms like Kohlberg, Kravis & Roberts, C.
> Flowers, the Blackstone Group, the Carlyle Group, and Apollo
> Management, to test interest in its money management division, according
> to several people briefed on its contents.
>
> ***
>
> Lehman now faces the capital-raising problem that haunted Merrill Lynch
> for months.  As the third quarter draws to a close, it is looking more likely
> that Lehman will have to write down the value of its mortgage and other
> investments to a degree that could wipe out all of the investment bank's
> earnings.  In the last 12 months, the stock is down 74 percent, compared
> with a 33 percent decline in the Amex XBD broker dealer index.  Earlier
> this summer, analysts expected Lehman Brothers to earn a small third-
> quarter profit, but now some expect a loss of $1.8 billion.
>
> That forces Lehman to consider selling some of its more valuable assets.
> Aside from the potential sale of its investment management unit, Lehman
> is looking to offload assets, including a portfolio of up to $40 billion worth
> of troubled commercial real estate assets, according to investors involved
> in that sale.

c.       On August 29, 2008, another *New York Times* article stated:

29

On Wall Street, the ax keeps falling again and again.  As the financial industry limps from one bleak quarter to the next, bankers and traders who dodged painful layoffs in the past year wonder if their luck is running out.

The issue gained new urgency on Thursday, as Lehman Brothers, Wall Street's most troubled firm, prepared to lay off up to 1,500 people in its fourth round of cutbacks this year.  Those layoffs, which would amount to about 6 percent of Lehman's work force, are likely to come before the firm reports third-quarter results in mid-September, according to a person briefed on the plan.  The grim news at Lehman underscores not only the precarious state of that once-proud firm but also the pain afflicting the whole of Wall Street.

d.      On September 10, 2008, the *New York Times* stated:

Stocks tumbled Tuesday after fresh concerns about the stability of Lehman Brothers Holdings touched off renewed jitters about the overall financial sector.

*** 

But worries about Lehman regained investors' attention.  Its shares lost nearly half their value Tuesday as investors worried that the company was having trouble finding fresh sources of capital.

80.     As a result of these widespread market concerns about the ability of Lehman Brothers to service its debt and meet its short-term liquidity requirements, the cost of insuring Lehman Brothers debt for five years through credit default swaps increased more than six-fold between July 2007 and July 2008.

81.     Despite the fundamental changes in its investment objective which now allowed the Primary Fund to purchase risky commercial paper, the Primary Fund continued to boast about its stable investment strategy.  For example, as late as September 12, 2008, RMCI made statements to the *Wall Street Journal* that the Primary Fund was designed to "bore the [] investor into a sound night's sleep."  This statement – made on the eve of the Primary Fund's unprecedented collapse – was identical to numerous similar Class Period statements by

Defendants that not only failed to disclose the Primary Fund's changed investment strategy, but were calculated to mislead investors into thinking that the Primary Fund's changed investments had not altered the fundamentally "safe," "boring," and "conservative" focus and investment policies of the Primary Fund.

### 5.      Lehman Brothers Totters, And Questions Are Raised Internally But Willfully Ignored By Defendants

82.     As discussed above, as early as the summer of 2007 and continuing throughout 2008, Lehman Brothers exhibited signs of financial distress that called into serious question its ability to service its debt and meet short term liquidity requirements.  Federal Reserve Chairman Ben Bernanke later testified before Congress that "the high cost of insuring Lehman's debt in the market for credit default swaps" evidenced Lehman's bad financial health and the "significant possibility" of its failure.

83.     While Lehman Brothers' stock price dropped and the cost of insurance increased, Lehman Brothers debt securities were paying higher returns than other comparable securities, reflecting the increased risk of investing in Lehman Brothers at the time.

84.     In this environment, the increased exposure to Lehman Brothers commercial paper at the various RMCI funds, including the Primary Fund, drew concern even inside the Reserve, with one trustee expressing reservations about the fact that "there had been speculation in the press and in the financial markets about Lehman's financial situation almost from the day after Bear Stearns was acquired by J.P. Morgan Chase" in March 2008.

85.     In July 2008, Moody's began seeking information from its rated funds about whether they had credit support agreements in place, and on July 18, 2008, Moody's met with Bent and Bent II at RMCI's offices and asked whether they were personally willing and able to support the $1.00 NAV if necessary.  If the $1.00 NAV was not supported, the Primary Fund

would be at risk of "breaking the buck," a catastrophic and unprecedented event for a retail money market fund like the Primary Fund. Bent and Bent II falsely provided Moody's with general assurances that they were committed to the Primary Fund and could personally support the Primary Fund. In reality, however, RMCI had not developed or even discussed internally these types of contingency plans or investigated credit support agreements.

86.     By mid 2008, Lehman Brothers was forced to attempt to raise capital, raising concern in the marketplace. The *New York Times* reported in August that Lehman Brothers was considering the sale of all or part of its prized investment management division, or the sale of about $40 billion of troubled commercial real estate:  "Lehman now faces the capital-raising problem that haunted Merrill Lynch last month.  As the third quarter draws to a close, it is looking more likely that Lehman will have to write down the value of its mortgage and other investments to a degree that could wipe out all the investment bank's earnings."

87.     The end of August 2008 brought further bad news for Lehman Brothers. With the close of the third quarter near, the *New York Times* reported that Lehman Brothers could face "write-downs of as much as $4 billion and an estimated loss for the quarter of $3.30 a share."

88.     According to testimony cited in a complaint filed by the Commonwealth of Massachusetts Securities Division ("Massachusetts Complaint")[2] that was reviewed and relied upon by Lead Plaintiff for the allegations herein, by August 2008, RMCI's Director of Institutional Sales informed RMCI's Managing Director and Global Head of Sales, that some Primary Fund shareholders might leave the Primary Fund because of the Lehman Brothers

---

[2] The Massachusetts Complaint is based on testimony and documents provided by a number of individuals associated with Defendants, as well as by Defendants themselves and asserts fraud and other claims against RMCI, Reserve funds, Resrv Partners and Bent II.

holdings.  The Global Head of Sales immediately directed the Director of Institutional Sales to inform Bent II of the situation.

89.     According to the Massachusetts Complaint, that same day, RMCI's Chief Information Officer ("CIO") sent an e-mail captioned "Lehman Exposure" to Bent and Bent II with detailed information about the Primary Fund's Lehman Brothers holdings.

90.     In early September, Lehman Brothers' slide worsened so appreciably that rumors of its demise swept through the markets.  On September 8, Lehman Brothers stock was at under $18 a share.  By the time the market closed the following day, Lehman Brothers stock had again plunged and was trading at $7.79 per share.  The *New York Times* reported that Lehman Brothers stock prices "tumbled on Tuesday after fresh concerns about the stability of Lehman Brothers Holdings touched off renewed jitters about the overall financial sector… But worries about Lehman retained investors' attention.  Its shares lost nearly half their value Tuesday as investors worried that the company was having trouble finding fresh sources of capital."

91.     The next day, September 10, Lehman Brothers announced a massive $3.2 billion loss for the 2008 fiscal third quarter, and share prices again nose-dived.  On the same day, the cost of insuring Lehman Brothers debt jumped dramatically, to as high as 570 basis points over LIBOR.  Lehman's stock price plummeted another 42% on September 11 to $4.22 per share.

92.     On Friday, September 12, the market was awash with news that Lehman Brothers was experiencing a liquidity crisis and that bankruptcy was imminent unless the bank either found a willing buyer or received a federal bailout.  The heads of prominent Wall Street investment banks convened with high-ranking government officials, including the heads of Treasury and Federal Reserve Bank, to discuss Lehman's options.  In the midst of this

impending crisis, Bent was quoted in  a *Wall Street Journal* article published on September 12 –

just three days before Lehman Brothers announced that it would be filing for bankruptcy:

> Meanwhile, Mr. Bent said that when he first created the money-market fund in 1970, it was designed with the tenets of safety, liquidity and a reasonable rate of return. "Lest we forget, the purpose of the money fund is to bore the investor into a sound night's sleep," he said.

> But the past year has shown that those original tenets have fallen by the wayside, Mr. Bent said, as portfolio managers chased the highest yield and compromised the integrity of their money funds. In addition, it has shown that the ratings firms are unreliable, he said.   "<u>The money-market fund's board of trustees and its investment adviser have a fiduciary duty to the shareholders; this responsibility is not diluted by the presence of ratings for securities in the fund</u>," Mr. Bent wrote. Many who approached the money-fund business simplistically, thinking "any idiot can run a money fund," received a wake-up call this year, Mr. Bent said in an interview. "This last year made them realize this requires more than that and they're looking for a fig leaf to hide behind." That fig leaf has been the credit ratings, he said.  As for the argument made by the boards of some money funds that they don't have the expertise or time to determine whether investments represent a minimal credit risk, Mr. Bent said, "they're trying to play wordcraft."  The responsibility, he said, can be delegated to the fund sponsors. "<u>If a fund sponsor doesn't have the expertise," he said, "he shouldn't be in the business.</u>"

93.     As high-profile meetings between investment banks and government and agency

officials continued on Saturday, September 13, word spread that the federal government was

unwilling to bail Lehman Brothers out and that Lehman Brothers was having trouble finding a

private buyer.  By Sunday, September 14, it was reported that Lehman Brothers would file for

bankruptcy first thing Monday morning.  As predicted, on the morning of September 15, Lehman

Brothers filed for Chapter 11 bankruptcy in the largest and most high-profile bankruptcy filing in

U.S. history.

### 6.     Defendants Recklessly Ignored the Effect Lehman Brothers' Decline Would Have On the Primary Fund

94.     Defendants were on notice weeks before September 15, 2009 that Lehman

Brothers was facing serious financial troubles that might impact the value of the Primary Fund's

significant Lehman Brothers holdings and, by extension, the preservation of the Primary Fund's $1.00 NAV. Nonetheless, Defendants ignored the signs of Lehman's distress and focused most of their efforts in the weeks before the collapse towards dishonestly convincing shareholders and the market that the Primary Fund's Lehman Brothers exposure constituted no threat to the Primary Fund's NAV or liquidity. By the time Lehman Brothers filed for bankruptcy on September 15, 2008, the Primary Fund had increased its Lehman Brothers holdings to $785 million, or 1.24% of the Primary Fund's portfolio. Defendants maintained – even after Lehman Brothers had filed for bankruptcy – that Lehman's financial condition did not pose a risk to the Primary Fund.

95.    According to the January 2009 Wells Submission of Defendants Bent and Bent II, during the week of September 8, 2008, "RMCI investment professionals were knowledgeable about [Lehman] developments and conveyed Lehman's statements to the Board for the Primary Fund … reporting that the Lehman holdings likely would mature at par." This was more than just wishful thinking on the part of RMCI and the Bents; it was grossly negligent and willfully reckless. Defendants utterly failed to take into account the significant developments at Lehman Brothers and their conclusion was not based on any meaningful analysis.

96.    At the September 10, 2008 RMCI Board of Trustees meeting, Bent and other RMCI executives repeated their baseless assurances that the Lehman Brothers exposure did not constitute a threat to any of the RMCI funds holding Lehman Brothers paper. According to the Massachusetts Complaint, on September 11, 2008, RMCI's Director of Institutional Sales informed senior management at RMCI that Lehman Brothers shares were down another 45%, that markets were "imploding," that the "entire sector is getting crushed," and that he wanted to "make clients aware that we do have options besides Primary." In testimony cited in the

Case 1:08-cv-08060-PGG   Document 50   Filed 01/05/10   Page 39 of 95


Massachusetts complaint, RMCI's CIO stated that he was aware of the price drop and acknowledged that the Lehman Brothers "stock price had been dropping for the previous six to twelve months."

97.     Despite the warning signs, Defendants set about reassuring Primary Fund investors and the marketplace regarding the Primary Fund's Lehman Brothers holdings.  In the days immediately preceding the Lehman Brothers bankruptcy, RMCI personnel told clients that they saw little risk for the Primary Fund, even in light of its exposure to Lehman Brothers debt.  On September 10, 2008 RMCI's CIO e-mailed RMCI sales, marketing, and portfolio personnel, as well as Bent and Bent II, information about Lehman's financial status and stated that RMCI's Lehman Brothers exposure "is not a liquidity problem."  On September 12, 2008 a Moody's employee sent an e-mail to RMCI's CIO seeking "Reserve's view of the [Lehman] credit.  I know you have some exposure into 2009."  He responded that RMCI was "ok holding what we own" and that he believed Lehman Brothers would, if necessary, be assisted by the federal government.  Moody's responded that it wanted to discuss the increasingly risky nature of the Primary Fund's portfolio, which was "pushing up against the boundaries for Aaa rating."

98.     An affidavit filed in the *Ameriprise Financial Services, Inc., et al. v. The Reserve Fund, et al.* action arising from the Primary Fund's collapse states that an official for Lazard Freres & Co. had a call with representatives of RMCI on September 11 about the Lehman Brothers paper.  According to the *Wall Street Journal,* "During that call, representatives of RMCI indicated that they were comfortable with all their portfolio holdings, including Lehman Brothers, and strongly noted that they would not 'break the buck'."

99.     These and other statements regarding the Primary Fund's focus on safety and stability, made by and on behalf of the Defendants were designed to and did cause investors to

believe that the Primary Fund's investment strategy remained conservative and that the Primary

Fund's holdings in Lehman Brothers did not threaten the value or liquidity of the Primary Fund.

### 7.     Lehman Brothers Collapses, and Defendants Fail to Adjust the NAV

100.    Defendants' efforts to give a false sense of security regarding the Primary Fund

were complicated, if not demolished, by the collapse of Lehman Brothers in September 2008.  In

the early hours of September 15, 2008, Lehman Brothers announced that it was filing for

bankruptcy under Chapter 11 of the U.S. Bankruptcy Code.

101.    At 8:00 a.m. on September 15, 2008, RMCI called a meeting of the Board.  The

meeting was scheduled because the Bent Defendants knew that the holdings of the Primary Fund

were going to be profoundly impacted by Lehman's bankruptcy.  Indeed, immediately prior to

the meeting, at approximately 7:50 a.m., the Bents contacted the Banking Division of the Federal

Reserve Bank of New York and expressed their concerns that the Lehman Brothers bankruptcy

might have a negative impact on the Primary Fund.

102.    Bent joined the Board meeting by telephone, as he was out of the country during

the days of September 15 and 16.  At the meeting, the Board determined that it would no longer

value Lehman Brothers at its amortized cost, but that the Board required additional guidance to

determine a fair value for the Lehman Brothers paper.  Bent volunteered to supervise the

collection of Lehman Brothers market information to "see what happens in the marketplace."

However, Bent at this time had just arrived in Italy and had no ready electronic access to market

information, documents, or e-mails.

103.    At the 8:00 a.m. Board meeting, Bent and Bent II did not reveal their concerns

about the impact of the Lehman Brothers bankruptcy on the Primary Fund.  Although the Bents

and RMCI were not prepared to recommend a price for Lehman Brothers debt, they informed the

Board that the Lehman Brothers debt would continue to be valued at par under the amortized cost method of accounting unless the Board instructed them differently.

104.    At this point, the Primary Fund had been carrying the Lehman Brothers debt on its books at par value based on an amortized cost method of accounting.  As Defendants knew, they were required to use a fair value accounting method on the morning of September 15 because the amortized cost method did not result in a price that fairly approximated the market value of the Lehman Brothers debt.  Moreover, as Defendants knew, Rule 2a-7 of the ICA required Defendants to promptly notify the SEC that the securities of a bankrupt issuer (Lehman Brothers) now comprised more than one-half of one percent of the Primary Fund's total assets. In fact, Lehman Brothers comprised over 1% of the Primary Fund's total assets when it declared bankruptcy.

105.    Rule 2a-7 allows money market funds to value assets at par using the amortized cost method of accounting.  This rule is an exception to the requirements of Section 2(a)(41) of the ICA that an asset be assigned a fair value that is determined in good faith after considering all relevant pricing factors.  Thus, Rule 2a-7 can only be used if the amortized cost method does not cause a "material dilution" or other "unfair result to investors or existing shareholders."  If the amortized cost method cannot be used, a money market fund is required to value its assts at fair value.  Rule 38a-1 of the ICA mandates that money market funds have in place policies and procedures which specify how the fund determines the "current fair value of the portfolio security."

106.    The factors that must be considered in making a fair value determination include (i) what the asset would bring in a current sale at the time the fair value is set (not what it potentially could be sold for or what it might be worth at maturity); and (ii) the value of

comparable securities that are actually being traded.  Although Defendants were required to

arrive at a fair value for the Lehman Brothers debt no later than the morning of September 15,

they recklessly and/or with gross negligence, failed to do so.

107.     At approximately 8:23 a.m. on September 15, 2008, Moody's and S&P began

making urgent inquiries to Bent, Bent II, and RMCI about their plans for responding to the

Lehman Brothers bankruptcy, including whether RMCI would protect the $1.00 NAV if

necessary.

108.     At about 8:40 a.m., the Board meeting adjourned, purportedly so RMCI could

gather more information about the market pricing of Lehman Brothers debt securities.

109.     Despite Defendants admissions at the 8:00 a.m. meeting that they were not

prepared to recommend a value for the Lehman Brothers holdings, Defendants continued to

value the Lehman Brothers holdings at par for the first two NAV calculations of the day – at 8:30

a.m. and 9:00 a.m.  They also continued to permit redemption requests to be paid out, despite

knowing that the requests were being filled at an incorrectly calculated NAV, to the detriment of

investors who had not submitted redemption requests.

110.     At 9:30 a.m. on September 15, 2008, the Board reconvened.  At this point, Bent,

Bent II, and other RMCI executives acknowledged that there was "no valid market" for Lehman

Brothers paper and no trades had taken place since the 8:00 a.m. meeting.  RMCI, however,

stated that bids for Lehman Brothers were "being thrown out there" and that the indicative

pricing in the market for the Lehman Brothers debt was in the range of $0.45 to $0.80.  As the

Bents knew, even this was false.  According to a Complaint filed by the SEC on May 5, 2009 in

the Southern District of New York against RMCI, Resrv Partners, Bent and Bent II ("the SEC

Complaint"), that was reviewed and relied upon by Lead Plaintiff, market data available to

RMCI and shown to Bent and Bent II on September 15, 2008 actually suggested that Lehman Brothers debt would not trade any higher than between $0.30 and $0.40.

111.    In addition to disregarding this market data, Defendants failed to consider a pricing matrix or follow other industry standard practices in arriving at a Lehman Brothers fair value price or in valuing the NAV on September 15 and 16.  Nor did they consider any of the fair value policies and procedures required by Rule 38a-1 of the ICA.  The higher valuation estimates cited by Bent and Bent II at the Board meeting apparently came from preliminary valuations that Lehman Brothers shareholders might recover 60 to 80 cents on the dollar after the conclusion of bankruptcy proceedings months if not years later.  These valuations were not based on any analysis or meaningful information.  Moreover, under fair value accounting, Defendants were required to calculate the NAV using the current price for the Lehman Brothers securities.

112.    Again participating in the 9:30 a.m. meeting by telephone, Bent recommended that the Board value the Lehman Brothers holdings at par.  There was no basis whatsoever for this recommendation given the indicative trading data for the Lehman Brothers holdings, which Bent knew, and the fact that Lehman Brothers would be unlikely to make payments on its debt for many months.  As subsequently recognized by Trustee William J. Montgoris in his deposition testimony provided to the SEC and referenced in the SEC Complaint, it was immediately obvious that par was not fair value for Lehman Brothers Brothers debt at this time "[b]ecause I had never in my career seen any debt of a company that had filed bankruptcy being deemed at par.  It's an illogical assumption to think that an institution that is in bankruptcy is going to redeem its paper at par."

113.    When asked, Bent acknowledged that he would not purchase Lehman Brothers shares at par and that some lower value would need to be applied.  He ultimately recommended

what he termed to be an "ultra-conservative" valuation of 80 cents on the dollar, which the Board accepted.  The $0.80 valuation was not supported by information known to RMCI and the Bent Defendants that "soft bids" in the market were between $0.30 and $0.40 cents on the dollar for Lehman Brothers debt, not the $0.80 trumpeted by Bent and approved by the Board.

114.    The decision to lower the valuation on the Lehman Brothers debt to $0.80 prevented—just barely—the Primary Fund's NAV from declining below $1.00 per share.  By reducing the value to $0.80, the NAV declined to approximately $0.9975.  If a lower (and more realistic) valuation for the Lehman Brothers debt had been selected, the Primary Fund would have broken the buck on the morning of September 15.  This was documented in an email sent to the Bent Defendants at 10:48 on September 15.  In this email, a member of the Finance department outlined two scenarios:  a valuation of $0.80, that did not "break the buck," and a second, lower valuation of $0.625 that would "break the buck."

115.    Defendants knew that the Primary Fund would break the buck if a lower valuation was used, and this was the primary reason that the Bents and RMCI insisted on the $0.80 valuation – a value at the very top of the "indicative pricing range" (which, itself was falsely overstated).  Indeed, Lehman Brothers debt was already trading in the $0.70s and $0.80s by Friday, September 12, and the highest opening price on September 15 for these securities was 40.25 cents on the dollar (at 8:34 a.m.), with the next trade that actually occurred at 29.2 cents on the dollars.  For example, Lehman Brothers senior unsecured bonds maturing on October 22, 2008, CUSIP # 52517PC58, were trading at or below 33.5 cents on the dollar from 8:00 a.m. to 9:30 a.m. on the morning of September 15, 2008.  Thus, the valuation of $0.80 presented to the Board by Bent was without basis, and Bent knew that it was without basis or acted with reckless disregard for the truth in presenting that valuation to the Board.

116.    The Board instructed RMCI to reconvene the Board if any information became available that might assist in determining the fair value of the Primary Fund's Lehman Brothers holdings.   Although the Board reconvened telephonically at 1:00 p.m. on September 15 to discuss the possibility of seeking approval for a credit support agreement from the SEC, no additional discussion of the valuation of Lehman Brothers at $0.80 or adjustment to the NAV was discussed.  Defendants did not reconvene the Board until the following morning at 10 a.m.

117.    Having falsely preserved a $1.00 NAV, Defendants immediately began to communicate this information to investors and the market.  At 10:05 a.m. on September 15, at the Bent Defendants' direction, an officer of RMCI e-mailed talking points to RMCI's Sales and Marketing personnel.  These talking points, like many communications to Sales and Marketing personnel that day, were meant to be disseminated to the investing public and reflected Bent II's false statement to Board members that, "[b]ased on the current valuations of these [Lehman Brothers] holdings, we believe that the holdings will mature at par value."  These false and misleading statements were intended to provide assurance to Primary Fund investors that the NAV would hold at $1.00 in order to prevent them from placing redemptions and causing a run on the bank.

**8.    In Violation of the Primary Fund's Policy, Defendants Prioritized the Redemption Requests of Large Institutional Investors**

118.    Defendants were legally and contractually bound to pay out redemption requests in the order in which they were received.  As a money market fund under Rule 2a-7 of the ICA, the Primary Fund was subject to stringent regulations designed to ensure its safety and liquidity, and was required to maintain a conservative portfolio that was sufficiently safe and liquid.  The Primary Fund's redemption procedures were also guided by statute.  Rule 22c-1(b)(1) under the ICA requires money market funds to compute their NAV "no less frequently than once daily,

Monday through Friday."  The Primary Fund, under the terms of its prospectus, computed its

NAV on an approximately hourly basis.  In the ordinary course of business, after the submission

of a redemption request to RMCI, shareholders would receive payment in the next hour in the

form of a wire transfer from State Street Bank at that hour's NAV.  Up until September 15, 2008,

that NAV had always remained constant at $1.00.  Additionally, Defendants—as stated explicitly

in the policy posted on The Reserve's website and signed by Defendants RMCI and Bent—were

prohibited "by law [to] give some investors information before [they] give it to others."

119.    Defendants, however, brazenly and illegally violated these obligations on the

morning of September 15, 2008.  Not only did Defendants illegally tip off certain investors about

the risks of the Lehman Brothers bankruptcy and the need to redeem early to receive the then-

prevailing NAV of $1.00 per share, but Defendants also prioritized the redemption requests of

large institutional investors over other investors who filed their redemptions first.  As a result,

many investors who would have received the NAV of $1.00 per share received little or nothing

in the days following Lehman's bankruptcy.

120.    The flood of redemption requests that began on the morning of September 15 was

enormous.  By 8:30 a.m., the requests totaled $5.2 billion.  At 8:37 a.m., the CFO of The Reserve

and RMCI stated in an email:  "$5.2 billion already?  People will have to wait today."  By 10:00

a.m., the redemption requests totaled over $10 billion.  By 1:00 p.m., they climbed to $16.5

billion and by 5:00 p.m., they had risen to over $20 billion.  The surge continued unabated,

growing to approximately $24.6 billion by 9:00 a.m. on September 16 and then to approximately

$40 billion by 3:45 p.m. that day.

121.    From the outset, as early as 8:30 a.m. on the morning of September 15,

Defendants' improperly prioritized redemption requests, favoring a select group of large

institutional investors to the detriment of the remainder of the shareholders.  By example, in an e-mail sent at 8:33 a.m. on September 15, 2008, RMCI directed State Street, the Primary Fund's custodial bank, to ignore the order that requests came in, pushing several later redeemers to the front of the line: "Bear Stearns has first priority with a redemption of 1,000,000,000.00.  Farmer Mac [the Federal Agricultural Mortgage Corporation] has 2nd priority of 50,000,000 Pershing [Square Capital Management, L.P.] with a 3rd priority of 800,000,000.00 and 405 mm and 27 mm."  A table attached to this e-mail lists each redemption request from 7:51 a.m. to 8:30 a.m. and shows that 21 redemption requests were received ahead of Bear Stearns, including Farmer Mac's (which was 13th) and Pershing's (which was 19th).

122.    In addition, as discussed in the amended complaint in the related *Ameriprise Financial Services, Inc., et al. v. The Reserve Fund, et al.* litigation, that was reviewed and relied upon by Lead Plaintiff, RMCI'S Global Head of Sales its CIO both testified on October 3, 2008 (in sealed depositions) that, on September 15, 2008, Defendants wrongfully tipped certain significant institutional investors about the risk that Lehman Brothers holdings posed to the Primary Fund's NAV, causing those investors to redeem early at the then-prevailing NAV of $1.00 per share, while saying nothing to the Primary Fund's shareholders generally.

123.    By 10:10 a.m. on September 15, State Street had stopped funding redemption requests and suspended the RMCI's overdraft privileges.  Without the overdraft privileges, no redemption requests could be paid by State Street, and the Primary Fund did not have sufficient capital to fund the redemptions.  Yet, at 10:13 a.m., a representative of RMCI e-mailed State Street to confirm that the $1 billion Bear Stearns redemption "has gone out" and that Farmer Mac and Pershing were next in line to have their redemptions honored.  Defendants maintained their illegal selective loyalties to large investors throughout the day, such that, by the close of

44

business on September 15, 2008, after nearly $20 billion in unfunded redemption requests had

been received, an RMCI Sales executive stated to a client that "we are obviously going to

prioritize the large redemptions" and that "it's all about priority and size and everything, and we

understand that the big ones are the most important ones."  Just hours later, however, at

approximately 9:52 a.m. on September 16, that same Sales executive directly contradicted

himself, informing another shareholder that redemptions were being carried out on a first-come,

first-served basis.

### 9.    Defendants Knowingly Mislead the Public About the Primary Fund's Fictional Credit Support Agreement

124.    In order to persuade investors to refrain from redeeming shares, and to induce

new purchases of shares, Defendants violated the federal securities laws as well as their fiduciary

obligations as investment advisers by, among other things, falsely assuring shareholders, the

Board and the rating agencies that RMCI had agreed to provide the Primary Fund with sufficient

capital to maintain its NAV at $1.00.  In an attempt to falsely assure shareholders that the

Primary Fund remained a safe and liquid investment, Defendants published or authorized the

dissemination of materially false and misleading statements that they knew to be false at the time

they were made.

125.    Historically, the management or parent companies of money market funds that

have been threatened by depreciating assets have intervened to protect the funds from "breaking

the buck" by entering into credit support agreements or by securing third party letters of credit.

In fact, according to a September 30, 2008 article published on the website marketwatch.com,

the Primary Fund was unique among other money market funds for not securing such a credit

support agreement to save it from breaking the buck.  According to the article, more than a dozen

money market funds used supplemental financing to keep themselves in business.  *See* Sam

Mamudi, "Money funds struggled before Reserve fall," *available at* www.marketwatch.com/
story/behind-the-scenes-money-fund-rescues-more-common-than-you-know.  Moreover, some
of the Primary Fund's competitors entered into credit support agreements or other financial
mechanisms to support the $1.00 NAV of their respective funds in the wake of the Lehman
Brothers bankruptcy.  For example, on September 15, 2008, Primary Fund competitor the
Evergreen Money Market Fund announced that its parent company would shore up its three
funds through credit support agreements to support the value of Lehman Brothers credit held in
the funds.

126.    The Class here had no reason to think that the Primary Fund would not be able to
find the same financing to carry it through the Lehman Brothers bankruptcy if necessary.  To the
contrary, during the Class Period, Defendants took great pains to create the false impression
among investors that they too would do "whatever it takes" to support the Primary Fund's NAV.
In fact, as far back as 2007, Defendants themselves had agreed to protect the $1.00 NAV of The
Reserve Enhanced Cash Strategies Portfolio, a smaller series fund that, while not a money
market fund, nevertheless also needed to preserve a $1.00 NAV.

127.    Defendants had specifically indicated that they would support the Primary Fund's
NAV in the months leading up to the Lehman Brothers bankruptcy.  For example, on July 11,
2008, Defendants e-mailed certain shareholders a copy of an article from that same day's *New
York Times* discussing how other money market funds had been supported by affiliated financial
institutions that purchased deteriorating assets or provided credit support for the related money
market funds.  The clear implication of this e-mail was to soothe potentially worried investors by
suggesting that Defendants too would ultimately support the Primary Fund's $1.00 NAV if
necessary.

128.    Indeed, also in July 2008, as part of its ratings review process of money market funds, Moody's sought information from the Primary Fund about whether the Primary Fund had engaged in contingency planning for responding to adverse credit events.  In particular, Moody's asked whether RMCI had in place, or was prepared to enter into, a credit support agreement to protect the $1.00 NAV of the Reserve's money market funds in the event of a credit event.  On July 18, 2008, at a meeting with the Bents to specifically discuss RMCI's contingency planning, Moody's asked the Bents whether they had considered the impact on the Primary Fund of an unforeseen credit event and whether RMCI and/or the Bents were willing and financially able to support the $1.00 NAV of the Primary Fund in such a situation.  The Bents assured Moody's that they were committed to the Primary Fund and that they could, if necessary, execute a personal note to support the Primary Fund.

129.    In reality, however, even before Lehman Brothers declared bankruptcy, Defendants had no intention of, and, in fact, never seriously considered, stepping in to protect the Primary Fund and its shareholders, despite the fact that the Primary Fund was investing in increasingly risky investments, including its significant stake in Lehman Brothers commercial paper which, by mid-2008, was widely predicted to fail.  Indeed, as was revealed later, Defendants all along had lacked the means to provide the necessary credit support.

130.    Even before Lehman Brothers declared bankruptcy and the flood of redemptions began, Bent II, in response to a September 14, 2008 e-mail commenting on how other money market funds had calmed investors by stating they had lines of credit, clearly stated "this is not an option for us," indicating that RMCI and the Bents were not able or inclined to provide credit support to protect the $1.00 NAV of the Primary Fund.

47

131.    On September 15, however, Defendants set in motion a plan to make it appear to investors that the Primary Fund's NAV of $1.00 would be protected by a credit support agreement between RMCI and the Primary Fund, even though they had no intention of entering into such an agreement.  Throughout September 15, 2008, in the wake of shareholder inquiries about RMCI's stated willingness to protect the $1.00 NAV, Defendants repeatedly and falsely represented that they were seeking out a credit support agreement to bolster the NAV.

132.    At about 8:34 a.m., Bent II forwarded a press release describing the Evergreen Money Market Fund's procurement of a credit support agreement that protected its $1.00 NAV against declines in Lehman Brothers debt to RMCI's Managing Director of Marketing.  A few minutes later, the Managing Director of Marketing acknowledged that such an agreement was not on the table for the Primary Fund by noting that "the part it offers which we don't is the line of credit item from Wachovia.  For us we need to deliver a message of confidence of nav stability without any specific steps as outlined below."

133.    The pressure to enter into a credit support agreement began to mount.  At 10:30 Moody's relayed its concerns about the Primary Fund to RMCI's CIO, and questioned RMCI's intention to support the Primary Fund.  Soon after, just before 1 p.m., the CIO e-mailed Bent II to report on a just completed phone conversation with S&P and stated: "Similar to . . . Moody's . . . they are looking for some type of capital support facility to be put in place."

134.    At approximately noon on September 15, 2008, Bent II requested another Board meeting.  Unbeknownst to investors, by this time, Bent II had concluded that RMCI should pursue an immediate sale of RMCI and The Reserve to a third party and had even retained two investment banks to search for a buyer or partner.  Significantly, Bent II had instructed the banks to inform potential buyers that they would not be required to protect the $1.00 NAV.

135.    However, at the 1:00 p.m. meeting of the Board, Bent II made no mention of his search for a buyer and instead stated that RMCI intended to implement a credit support agreement to protect the $1.00 NAV.  He stated that RMCI would seek immediate relief from the SEC to implement the agreement, a required threshold step under the ICA.  RMCI, Bent, and Bent II indicated that entering into a credit support agreement was an urgent priority.  When questioned whether RMCI had sufficient financial resources to support the $1.00 NAV, Bent assured the Board that it had sufficient capital, and the Board ratified the plan to implement a credit support agreement.  In fact, RMCI did not have sufficient resources to support the $1.00 NAV.

136.    Defendants never intended to support the Primary Fund at all and never submitted an application to the SEC for the credit support approval.  Despite Defendants' strong statements in prior months, they had done nothing to further the securing of a credit support agreement.  At 1:15 p.m., Bent II and other RMCI personnel made an approximately 5-minute call to the SEC to inquire about a capital support agreement.  This call concluded with the SEC asking RMCI the very basic question of what type of credit support agreement it wanted to enter into.  Unprepared to answer this basic question, RMCI agreed to think about it and get back to the SEC.  Bent II himself later acknowledged in testimony to the Massachusetts Securities Division that RMCI had not decided which type of credit support agreement to enter into at this point, and that he does not believe RMCI ever followed up with the SEC.  Moreover, Defendants acknowledged in subsequent submissions to the SEC that, at best, they intended to support the Primary Fund up to $10 million, far less than what was needed to shore up the Primary Fund.

137.    Nevertheless, at 1:19 p.m., Bent II sent an e-mail to Defendants Bent and Bent III, other RMCI executives, and RMCI's General Counsel saying that "We (RMCI) intend to protect

the NAV on the Primary fund [sic] to whatever degree is required.  We have spoken with the SEC and are waiting [for] their final approval which we expect to have in a few hours.  You may communicate this to clients on an as needed basis.  [] if you want something on the website I need to see language for approval first, thanks."  This statement was knowingly false and misleading, and Defendant Bent II made this statement with the explicit instruction that it be disseminated to the Primary Fund's clients.

138.    RMCI's Global Sales Director immediately read this e-mail to his Sales force and instructed Sales personnel to inform shareholders that RMCI would unequivocally protect the Primary Fund's $1.00 NAV.  Bent II's message quickly made its way to the investing public, as Sales personnel informed investors that the Bents "definitively" "would step in and support our money-market funds," that RMCI would take "whatever steps that are needed" to support the NAV of the funds, and that "we have a backstop and are going to ensure that the fund does not break the buck."  This message was communicated so aggressively that Sales personnel went beyond current Primary Fund investors and actually contacted certain prospective investors to assure them (falsely) that RMCI was committed to protecting the $1.00 NAV in order to persuade them to invest in the Primary Fund.

139.    Similarly, RMCI's Director of Institutional Sales called a client less than ten minutes after Bent II's email, and stated "you can tell and share with your team and your – the people invested in you, that we are supporting the fund 100 percent.  The board literally just passed it.  That there's no issue and we are going to support the fund unequivocally."

140.    At around the same time, sometime prior to 1:30 p.m., Bent II called Moody's and S&P to represent that RMCI was entering into credit support agreements to protect the Primary Fund's NAV.  In his call with Moody's, Bent II also represented that RMCI would protect the

NAV of the Yield Plus Fund and the International Liquidity Funds.  When pressed by Moody's, Bent II declined to provide additional details, but promised to do so later in the day.

141.    At about 2:00 p.m., RMCI's Director of Global Sales informed RMCI's CIO and CFO that RMCI's strategy of communicating a definitive message of credit support to investors was successfully slowing the rate of redemptions.

142.    Furthermore, in response to Bent II's 1:19 p.m. e-mail saying Defendants would support the NAV "to whatever degree is required," RMCI Marketing personnel sprang into action, drafting and editing a press release titled "Reserve Insights" describing RMCI's purported intent to protect the $1.00 NAV through a credit support agreement.  This release stated that RMCI "intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund."  As noted below, the Reserve Insights document also falsely asserted that Defendants "believe[d] that the [Lehman Brothers] holdings will mature at par value," despite the Lehman Brothers bankruptcy and the fact that the Board had already overvalued the Lehman Brothers paper at $0.80 on the dollar.

143.    After obtaining sign-off from Bent and Bent II, the "Reserve Insights" publication was circulated to all Sales and Marketing personnel at 3:41 p.m. as the "approved version of The Reserve's communications regarding this weekend's events with Lehman/Merrill and the position The Reserve is taking."  Throughout the afternoon of September 15, 2008, sales team members from RMCI and Resrv Partners e-mailed the "Reserve Insights" document to shareholders and to the rating agencies.  This document also contained false statements that RMCI was "submitting appropriate documentation to the SEC today, September 15, 2008" and that "our support agreements ensure the integrity of a $1.00 NAV."  Lead Plaintiff and other members of the Class reviewed and relied on these and other statements made during the Class

Period.  In addition, these statements were disseminated into the marketplace and were reflected in the total mix of information about the Primary Fund known to investors.  The representations made in this Reserve Insights were blatantly false and misleading and designed to stop the flow of redemptions streaming in by concerned investors.

144.    By around 4:00 p.m. on September 15, RMCI's counsel had prepared draft documentation to implement a credit support agreement, but neither Bent nor Bent II ever asked to review or execute the drafts.

145.    At approximately 5:00 p.m., RMCI's CIO informed Bent that he believed the rating agencies would be "fat and happy" after receiving the "Reserve Insights" publication. Although both Moody's and S&P wanted additional information about the details of the credit support agreements, the distribution of "Reserve Insights" was critical in delaying a ratings downgrade.

146.    Bent and Bent II actively reviewed and approved communications with the investing public about the credit support agreement.  For example, at 5:38 p.m. on September 15, Bent II received an email with the following proposed "anonymous" language to be provided for a *Wall Street Journal* article:

> Lehman debt constitutes less than 1% of the Reserve's total money fund assets.
>
> If needed, the Reserve intends to protect the NAV on the funds to whatever degree is required, however this protection has not been needed.
>
> We are confident in the underlying credit strength and quality of the securities in our money market funds.

Bent II responded at 5:46 p.m. on September 15 with the instruction to "Drop the last line. and then go with it," adopting and approving language regarding RMCI's ability and intention to protect the NAV.

147.    At 6:22 p.m., RMCI e-mailed the Reserve Insights publication to a Primary Fund

investor, saying "Please also find attached confirmation of our support of the NAV."

148.    At 7:01 p.m., another e-mail to investors was sent by RMCI accompanying the

Reserve Insights document:

> Due to the unprecedented stress in the market (characterized by
> Alan Greenspan as a "once in a century event") and based on our
> client conversations and feedback during the day, I want to pass
> along the following document to you (if you have not received
> already).    We currently have a 1.2% exposure to Lehman in
> Primary Fund – as you will note: The Reserve is committed to a
> $1.00 NAV for its Primary Fund.  Reserve Management Company,
> Inc. (RMCI) intends to enter into support agreements with the
> Primary Fund to support the value of Lehman credit held in the
> Fund.    RMCI is the investment adviser to the Fund and has
> provided investment advice to investment companies within The
> Reserve family of funds since November 15, 1971.    We have
> discussed with the SEC that our intent is to mitigate any decline in
> the value of the Lehman debt so that it will not result in a decrease
> to the NAV of the Fund.    We are submitting appropriate
> documentation to the SEC today, September 15, 2008.

At 8:01 p.m., an RMCI Sales executive e-mailed the Reserve Insights document to scores of

additional investors.

149.    At 7:34, a RMCI Sales Director emphasized to Bent II that the credit support

message had been instrumental in slowing the rate of redemptions: "[a]t approximately midday,

the Reserve (via RMCI) established a posture that it would 'protect' the NAV of the Primary

Fund.  The client base reacted positively to this news and the redemption activity slowed

greatly."  Bent II responded at 9:47 p.m. by saying "that's a nice summary, thank you very

much."  Around the same time, RMCI posted the Reserve Insights publication to its website,

further disseminating the misstatements about a credit support agreement and the valuation of

Lehman Brothers paper.

150.    All along, and without doubt, by the end of September 15, 2008 (as Bent II later acknowledged in testimony before the Massachusetts Securities Division), RMCI senior management knew that the Primary Fund would not enter into a credit support agreement. Nevertheless, Defendants continued to mislead investors into believing that Defendants were taking active steps to execute a credit support agreements that would save the NAV and protect their investments.

151.    The following day, RMCI sales personnel continued to note the positive reaction that the false information about the credit support agreement had received from shareholders. Internal communications confirm that RMCI personnel believed the false message about credit support was having the desired effect on redemptions.  In an 11:23 p.m. September 16, 2008 e-mail from RMCI's Manager of Institutional Relationships to the Directors of Global and Institutional Sales, the individual noted that "First [D]ata stayed in the Primary Fund as I shared with them the Reserve Insight about RMC supporting the NAV of $1.00."  The e-mail chain with First Data memorialized First Data's conversation with RMCI's Manager of Institutional Relationships on the morning of September 15 during which First Data was assured that "the Reserve would 'step up' to ensure that the NAV remained at $1.00."

152.    Defendants continued to disseminate the false message about credit support for the Primary Fund on September 16, 2008.  For example, the Managing Director of Marketing e-mailed the "Reserve Insights" document to a contact at Crane Data, after which Crane Data published a news article discussing the impact of the Lehman Brothers bankruptcy on money market funds.  The article noted that the Primary Fund was "expected to protect their funds from any threat to the $1.00 a share NAV should it become necessary," further bolstering the public perception that the Primary Fund was prepared to protect the NAV and its investors.

     **10.**     **Defendants Make False and Misleading Statements About the Status of Redemptions and the Primary Fund's Ability to Honor Redemption Requests**

153.     In addition to their elaborate deception about the existence of a credit support agreement or their purported plans to create such a mechanism to protect the NAV, Defendants misled investors by denying that the Primary Fund faced any—let alone catastrophic—problems with liquidity that would prevent the Primary Fund from honoring redemption requests. Instead, when confronted by investors whose redemption requests had not been processed, Defendants falsely blamed the delays on technical "operational" issues at custodial bank State Street.

154.     Although redemptions had stopped being paid at 10:10 a.m. on September 15, Defendants lied to both the rating agencies and apparently attempted to mislead the Primary Fund's own board about the status of the redemption requests and their ability to pay them. As Board member William J. Montgoris testified before the SEC, the Board was never informed that the redemption requests received on September 15 reached $16 billion by the Board's 1:00 p.m. meeting and $20 billion by the end of that day. Rather, the highest figure that he heard that day was somewhere between $5 and $8 billion. Additionally, at approximately 2:30 p.m. on September 15, RMCI falsely informed Moody's that redemption requests had apparently "stopped" and that RMCI had been able to generate sufficient liquidity to honor redemptions by "selling product on the street." Later that afternoon, Bent II falsely represented to Moody's that RMCI had paid all outstanding redemptions through liquidity in the fund. In reality, redemptions had exceeded $20 billion at that point, and nearly $10 billion of them remained unpaid.

155.     Defendants made similar false and misleading representations to the Primary Fund's shareholders, assuring them that redemption requests were being honored and that any delays in fulfilling these requests were due to technical issues at custodial bank State Street. For example, at about 2:04 p.m. on September 15, RMCI's Manager of Institutional Relationships e-

mailed an investor and stated "there is no liquidity issue at The Reserve as we have met all of the redemptions.  The reason for us facing potential redemption failure is that State Street Bank [sic] settlement processing issue." These and similar statements were widely disseminated by Defendants to investors and the marketplace.

156.    In addition, in the "Reserve Insights" document sent to investors after 3 p.m. on September 15, 2008, Defendants emphasized that "[w]e are confident that there will be no shareholder impact as the portfolios are structured to ensure principal protection and provide daily liquidity" and emphasizing again that "The Reserve is the world's most experienced money fund manager and global cash and liquidity specialist . . . ."    Perhaps most egregiously, Defendants stated in the "Reserve Insights" publication that the Primary Fund's Lehman Brothers holdings would not lead to a "material impact" on the Primary Fund or a "negative impact[]" on the NAV because "[b]ased on the current valuations of [the Lehman Brothers] holdings, we believe that the holdings will mature at par value."

157.    The strategy of denying liquidity problems and blaming State Street for any delays was echoed in phone calls to large institutional investors.  For example, on September 16, 2008, certain investors spoke to an RMCI representative, who informed them that delay in processing redemptions was due to an "operational" issue at State Street bank, and that this purely technical issue would be resolved because State Street bank was bringing in additional personnel.

158.    This statement was made despite the fact that, long before this time, it was clear to Defendants that the problem at State Street was the suspension of overdraft privileges, not technical "operational" problems.  Although Defendants recognized the likelihood that State Street would be unable to fulfill all redemption requests on September 14, 2008, before the

Lehman Brothers bankruptcy was even announced, by Defendants' own admission, Bent II learned of overdrafts at State Street in an e-mail "[s]ometime after 2:48 p.m." on the afternoon or September 15, 2008.  Bent II likely knew of State Street's refusal to honor redemption requests long before 2:48 p.m. on September 15.

159.    By at least 1:50 p.m. on September 16, RMCI's CFO and other senior RMCI personnel were privately acknowledging that State Street's suspension of overdraft privileges that morning was "the kiss of death" for the Primary Fund, and that the Primary Fund was "screwed" unless "something magical happens."  However, RMCI failed to disclose this information to investors or to the Board.

160.    By around 5:00 p.m. on September 15, Primary Fund redemption requests had climbed to over $20 billion, nearly half of which were unredeemed.  Despite significant efforts throughout the course of the day, and despite their statements to the contrary, Defendants were unable to persuade State Street to provide additional liquidity to fund redemption requests.  However, the Board was not informed of these developments until the following morning, and RMCI's posture to the public continued to be that the Primary Fund was not experiencing any liquidity problems and that any redemption requests would be honored.

**11.    The Truth is Finally Revealed When Defendants Announce that the Primary Fund Had "Broken the Buck"**

161.    At approximately 10:00 a.m. on September 16, 2008, the Board reconvened for the first time since 1:00 p.m. the previous day.  At the meeting, Bent II revealed to the Board that RMCI had not entered into a credit support agreement to protect the Primary Fund's $1.00 NAV.  He also revealed for the first time that the level of redemption requests as of 9:00 a.m. on September 16, 2008 was about $24.6 billion, and that the Primary Fund had only been able to

pay the first $10.7 billion.  At this meeting, Bent II also revealed to the Trustees for the first time

that State Street bank had refused to extend overdraft privileges.

162.    The Board entered into an executive session, outside the presence of RMCI's

officers where, according to the Board's minutes:

> Initially, the Independent Trustees indicated how shocked they
> were by the information relayed to them by Reserve Management
> during the morning's earlier call.  The Trustees noted that at 1:30
> p.m. meeting yesterday Management had indicated that
> redemptions were approximately $5 billion and that Management
> intended to enter into a capital support agreement to support the
> $1.00 NAV.  Moreover, in response to a direct question from
> counsel to the Independent Trustees regarding whether
> Management had sufficient capital to support a $1.00 NAV,
> Management assured the Trustees they did.  The Trustees further
> indicated that no indication had been given prior to this morning's
> call that redemptions had mushroomed to $20 billion and that there
> was essentially a run on the funds.

163.    The Board met continuously in executive session throughout the day of

September 16, 2008.  In this session, the Trustees discussed whether the Primary Fund was "still

a going concern or . . . were [sic] really the beginning of a liquidation of the fund" and

determined that no credible assignment of any value of Lehman Brothers paper could be made at

the time.  The Board considered marking the Lehman Brothers holdings down to zero, but agreed

to postpone any markdown temporarily to find a third party buyer.  RMCI omitted to tell the

Board at the 10:00 a.m. session that marking the Lehman Brothers paper below 80% would bring

the NAVs of the Primary Fund's sister funds, the International Liquidity Fund and Yield Plus

Fund, below $1.00, causing both funds to break the buck.

164.    At the 12:00 p.m. meeting of the Board on September 16, 2008, there was

additional discussion of Lehman's fair market valuation, and it was noted that Lehman Brothers

was being valued at 40 to 60 cents on the dollar, and the lower end of this spectrum was

supported by a representative from the auditing firm KPMG LLP.

165.    At the Board's 3:45 p.m. meeting on September 16, 2008, the Board decided that the Primary Fund had "broken the buck" and was in liquidation mode.  At approximately 5:48 p.m. on September 16, 2008, RMCI disclosed to the public that the Primary Fund had "broken the buck" at 4:00 p.m. that day.  The disclosure came in a press release, which announced that the "value of the debt securities issued by Lehman Brothers Holdings, Inc. . . . and held by the Primary Fund had been valued at zero effective 4:00 PM New York time today.  As a result, the NAV of the Primary Fund, effective as of 4:00 PM, is $0.97 per share."

166.    RMCI's Sales team learned through the Press Release that there was not going to be a credit support agreement.  RMCI's Global Head of Sales described the receipt of the press release as "like a body blow . . . [because] we told people we were going to protect the N.A.V."

167.    As Defendants now acknowledge, the Primary Fund actually broke the buck much earlier than 4:00 p.m. on September 16.  Defendants conceded on November 26, 2008, that the Primary Fund's NAV declined below $0.995 before 11:00 a.m. on September 16, even with the assumption that Lehman Brothers paper was valued at $0.80 on the dollar.  They admitted at that time that, "contrary to previous statements to the public and to investors, the Primary Fund's net asset value per share was $0.99 from 11:00 a.m. Eastern time to 4:00 p.m. Eastern time on September 16, 2008 and not $1.00."  RMCI attributed the mistake to "administrative error."  In fact, had the Defendants properly valued the Lehman Brothers commercial paper at fair value on September 15, the Primary Fund would have "broken the buck" the morning of September 15.

12.    **Defendants Record False Receivables To Fraudulently Maintain the NAV**

168.    In addition to the gross misconduct detailed above, there is evidence that Defendants shifted funds between The Reserve's various series of funds in an attempt to preserve the Primary Fund's $1.00 NAV.

169.    One example of these fraudulent financial maneuvers involved a $2.2 billion false receivable recorded in the Primary Fund on September 15, 2008.  Not until February 11, 2009 did Defendants disclose that a $2.2 billion in purchase orders for other Reserve funds had been "individually invested in the Primary Fund" in September 2008.  This "error" was purportedly identified in October 2008 and corrected "by transferring amounts out of the Primary Fund into the [funds] where the purchase had actually been made."

170.    False receivables were also recorded in the other Reserve funds.  At approximately 4:00 p.m. on September 16, 2008, around the same time that the Primary Fund was announcing that it had broken the buck – and consequently, around the same time that the Bents no longer had much incentive to protect the reputation and viability of other Reserve funds – Bent II instructed RMCI's Director of Fund Accounting to reverse $17 million in false receivables that had been secretly recorded on September 15 to maintain the $1.00 NAV of the Reserve Yield Plus Fund and the Reserve International Liquidity Fund.  At the time they were reversed, the receivables totaled approximately $17 million that was owed by RMCI, and ultimately, the Bents.

171.    By Defendants' own admission, the events on September 15 were unusual in that Bent II, who according to Bents' and Bent II's own *Wells* submission to the SEC on January 23, 2009 ("Bent Defendants' Wells Submission"), previously had "little experience working directly with [members of RMCI's Finance Department]," asked a member of that department to prepare calculations to assess the capital support of the International Liquidity and Yield Plus Fund, and then to prepare false receivables to bolster the funds' NAV.  A significant paper trail quoted and cited in the Bent Defendants' Wells Submission reveals that that member of the Finance Department directed the International Liquidity and Yield Plus funds to improperly book

receivables.  This paper trail included a 1:54 p.m. e-mail that, as quoted in the Bent Defendants'

Wells Submission, directed State Street to "See calc to book receivable from RMC," and

instructions to State Street to finalize the value of any Yield Plus receivable after State Street

struck that fund's NAV at the end of the day.

172.    As a result, it was revealed in an email to the Bent Defendants and several other

RMCI executives at 10:39 a.m. on September 16th that:

> Due to the Lehman write-down and large redemptions in the
> Funds, receivables from RMCI were booked in Yield Plus and
> International Liquidity Fund in the amounts of $1.7 million and
> $14.8 million respectively.  We did not need to book a receivable
> in Primary due to its large asset size.  As of last night Primary
> would have to still incur additional losses of approximately $188
> million for the need to book a receivable from RMCI.  Let me
> know if you have any questions on the attached.

This e-mail indicates that the Bent Defendants specifically considered booking additional

receivables to the Primary Fund on September 15 and 16.

173.    As described in the Bent Defendants' Wells Submission, e-mail correspondence

from the Finance Department employee to State Street included a specific instruction to book a

receivable for the Primary Fund, as well as a formula for computing that receivable.  Although

Defendants claim no such receivable was ever created, $2.2 billion mysteriously appeared on the

books of the Primary Fund on September 15, 2008.

### 13.    After the September 16 Announcement That the Primary Fund Had "Broken the Buck," Defendants Continued to Make False Statements to the Public and Engaged in Other Misconduct

174.    The period after Defendants disclosed that the Primary Fund had broken the buck

was characterized by repeated delays and a string of broken promises to investors.  On

September 29, 2008, RMCI disclosed in a press release that the Board had voted to liquidate the

Primary Fund and distribute its assets to shareholders.  With over $50 billion left to distribute,

RMCI announced that an initial *pro rata* distribution of $20 billion would take place while a distribution plan was developed.  This press release—and subsequent press releases—falsely stated that Defendants would effectuate a partial distribution on or about October 13.  However, Defendants subsequently announced that the funds would not be distributed that day, and the partial distribution did not occur until two weeks later on October 30.

175.    The Yield Plus receivable, which had been previously authorized by the Board of Trustees on September 15, 2008 to provide credit support for that fund, was reversed on October 24, 2008 without the authorization of the Board.

176.    Then, on December 3, 2008, RMCI disclosed the terms of a "Plan of Liquidation and Distribution of Assets" for the Primary Fund (the "Plan of Liquidation").  The Plan of Liquidation announced the creation of a "Special Reserve" of an unspecified size that "would include amounts that would be required to satisfy disputed claims."   Although Defendants said that the Special Reserve amount would be announced within three weeks, this did not happen. On December 24, Defendants stated that the Special Reserve size would be announced within 45 days.  Again, this did not happen.

177.    On January 20, 2009, Defendants announced that a partial distribution would occur on February 9.  Eight days later, Defendants announced that the distribution would be delayed until the week of February 16.

178.    Defendants finally revealed the size of their so-called Special Reserve on February 26, 2009, when they announced they were holding back <u>$3.5 billion</u> of investors' money for the purported purpose of satisfying anticipated legal and accounting fees and pending or threatened claims against the Primary Fund and its officers and trustees.  Defendants noted that the amount of the Special Reserve "may be increased or decreased as further information

becomes available."  Defendants also made it apparent that they were withholding investor assets in an effort to persuade Primary Fund shareholders to waive meritorious claims, stating that "[o]bviously, the sooner the litigation is resolved, the sooner monies held in the special reserve can be released to shareholders and, potentially, the greater the payout."  In addition, Defendants made it clear that Primary Fund shareholders should not expect to see their funds for an extended time period, stating that "determination of [shareholder] entitlement to those amounts [that are left over after claims are satisfied] may take a long period of time and involve substantial expense."

179.    In its November 25, 2009 Order in *SEC v. Reserve Management Company, Inc., et al.*, No. 09-CV-4346 (PGG), while ordering that the remaining Primary Fund assets – including the balance of the $3.5 billion Special Reserve – be distributed to shareholders on a pro rata basis, the Court set aside an "Expense Fund" of $83.5 million.  In their December 7, 2009 letter to the Court in that same action, Defendants indicated that they were considering increasing the size of this Expense Fund.

180.    In addition to their efforts to hold investor funds hostage, and despite the catastrophic mismanagement and fraud that led to the Primary Fund's collapse, Defendants continue to seek fees for their purported management of the Primary Fund assets during the period since September 2008.  As Defendants acknowledged in their December 7, 2009 letter to the Court  in *SEC v. Reserve Management Co., Inc., et al.*, they have already collected some management fees for "services rendered" between September 2008 and September 2009, and they intend to seek "the bulk of management fees" that supposedly accrued to them during this period.  In addition, Defendants indicated that they intend to seek fees incurred since 2009, despite the fact that there is no fee agreement or any other justification for such payments.

63

Defendants have also communicated their intention to use management fees as yet another ground for delaying payments to Primary Fund investors, stating that "[t]he resolution of this [fee] issue also could affect the timing of the distribution."  Defendants stated in their December 7, 2009 letter to the Court that "we intend to file a motion on this [fee] issue within the next day," although no such motion has yet appeared on the docket in that action.

## VI.    LOSS CAUSATION

181.    Defendants' misconduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.  Defendants repeatedly misrepresented that the Primary Fund was a safe, conservative, "boring" money market fund focused on liquidity, the preservation of capital, and the maintenance of a $1.00 NAV.  Defendants specifically boasted that the Primary Fund minimized investments in commercial paper and made misrepresentations to conceal the fact that the Primary Fund changed its investment objectives during the Class Period.  In addition, at the end of the Class Period, Defendants repeatedly misled investors about the Primary Fund's liquidity, the causes for delays in redemptions, and the existence of credit support agreements to bolster the $1.00 NAV.

182.    In reality, during and continuing after the Class Period the Primary Fund was not managed with the primary goal of preserving capital but, by summer 2008, invested a majority of its holdings in commercial paper, including significant investments in high-risk commercial paper issued by Lehman Brothers and Merrill Lynch & Co. and backed by subprime loans and other derivative instruments.  These holdings subjected the Primary Fund to the substantial and unreasonable risk of debtor default on commercial paper, and these risks became reality when Lehman Brothers filed for bankruptcy.  As a direct result, the Primary Fund was forced to write down its Lehman Brothers holdings, causing it to fall below a $1.00 per share NAV and

64

liquidate.  In addition, at the end of the Class Period, Defendants' misstatements led Lead

Plaintiff and other members of the Class to delay redeeming shares.

184.    Because of, and upon disclosure of, Defendants' misrepresentations and

omissions, the Primary Fund investments of Lead Plaintiff and the Class suffered material losses,

and Lead Plaintiff and the Class were damaged thereby.  Defendants' unlawful conduct as

described herein directly caused the losses incurred by Lead Plaintiff and the Class.

## VII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

184.    The statutory safe harbor and/or bespeaks caution doctrine that is applicable to

forward-looking statements under certain circumstances does not apply to any of the false or

misleading statements pleaded in this Amended Complaint.

185.    None of the statements complained of herein was a forward-looking statement.

Rather, the statements complained of herein were historical statements or statements of

purportedly current facts and conditions at the time the statements were made, including

statements about, among other things, the Primary Fund's investment philosophy, the Primary

Fund's historical and current mix of investments, the liquidity available to the Primary Fund, and

Defendant's ability and intent to provide credit support to the Primary Fund, as well as the steps

they had taken to effectuate such support.  Given the then-existing facts contradicting these and

other statements by Defendants, the generalized risk disclosures made by the Primary Fund in its

SEC filings and press releases were not sufficient to insulate Defendants from liability for the

statements they made because those statements were materially misstated when made.

186.    To the extent any of the false or misleading statements alleged herein can be

construed as forward-looking statements, the statements were not accompanied by meaningful

cautionary language identifying important facts that could cause actual results to differ materially

from those in the statements. This is because, as set forth above in detail, the then-existing facts contradicted Defendants' statements regarding, among other things, Defendants' investment philosophy, investment mix, available liquidity, and purported credit support arrangements.

187.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of one of the Defendants who knew that the statement was materially false or misleading when made.

## VIII.   PRESUMPTION OF RELIANCE

188.    Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions that Defendants had a duty to disclose. Defendants had a duty, *inter alia*, under Section 13(a) of the Investment Company Act to disclose to shareholders the change in the Primary Fund's policies.

189.    In the alternative, Lead Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Primary Fund shares was efficient and well-developed and promptly digested current information from all publicly available sources and reflected such information in the market for these securities. The false and misleading statements detailed herein were disseminated into the marketplace and were reflected in the total mix of information about the Primary Fund known to investors. The Reserve's money market funds and its flagship Primary Fund were consistently followed by the media before and throughout the Class Period. For example, during the Class Period, at least 130 news stories

referenced the Bent Defendants and the various Reserve funds.  Accordingly, Lead Plaintiff and

other members of the Class did rely and are entitled to have relied upon the integrity of the

market for Primary Fund shares and to a presumption of reliance on Defendants' materially false

and misleading statements and omissions during the Class Period.

## IX.    CLAIMS FOR RELIEF

190.    In the Counts set forth below, Lead Plaintiff does not assert any claim against any

of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to

indemnification by the Primary Fund.  To the extent that the burden of proof or standard of

liability for any claim asserted below would otherwise make the claim one that is seeking an

award that would be payable or subject to indemnification by the Primary Fund, Lead Plaintiff

expressly disclaims that burden of proof and/or standard of liability and expressly assumes a

higher burden of proof or standard of liability as necessary to make the claim non-indemnifiable.

**COUNT I:  Violations of Section 11 of the Securities Act**
**<u>Against RMCI, Resrv Partners, and the Bent Defendants</u>**

191.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if

fully set forth herein.

192.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C.

§77k, against RMCI, Resrv Partners, and the Bent Defendants on behalf of Lead Plaintiff and all

other members of the Class who purchased or otherwise acquired shares in the Primary Fund

during the Class Period and were damaged by acts alleged herein.

193.    This Count does not sound in fraud, and all of the preceding allegations of fraud

or fraudulent conduct and/or motive are specifically excluded from this Count.  Lead Plaintiff

does not allege that the Defendants had scienter or fraudulent intent as to this Count, which are

not elements of a Section 11 claim.  However, because this Action does not assert any claim

67

against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their actions which constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

194.    Defendants caused the Primary Fund to issue shares pursuant to a Registration Statement on Form N-1A, a Prospectus and a Statement of Additional Information the Prospectuses filed on September 28, 2006 (the 2006 Prospectus) and a Registration Statement on Form N-1A, a Prospectus and a Statement of Additional Information the Prospectuses filed on September 28, 2007 (the 2007 Prospectus, together with the 2006 Prospectus, referred to as the Prospectus).  All Class Period purchases of the Primary Fund shares are traceable to the Prospectus.

195.    The Prospectus contains untrue statements of material facts, including, but not limited to, materially inaccurate, false and misleading statements, and omissions of fact necessary to make the statements made not misleading and/or required to be stated therein, about, *inter alia*, the Primary Fund's investment objectives and fundamental investment policies. The facts misstated and omitted would have been material to a reasonable person reviewing the Prospectus.

196.    The Reserve Fund is the registrant of the Prospectus.  The Defendants named herein were responsible for the contents and dissemination of the Prospectus.  RMCI is the *de facto* issuer of the shares of the Primary Fund, and is liable to the Lead Plaintiff and the Class for the misstatements and omissions.  Resrv Partners is the underwriter of the shares of the Primary Fund.  The Bent Defendants are the Officers of RMCI and Directors of Resrv Partners, and

68

signed the Prospectus.  Each of the Bent Defendants was responsible for the contents and dissemination of the Prospectus.

197.    Each of the Defendants named herein acted with gross negligence, willful misfeasance, bad faith and/or reckless disregard of their obligations and/or duties to the Primary Fund in failing to make a reasonable investigation of the statements contained in the Prospectus, and did not possess reasonable grounds for the belief that the Prospectus did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

198.    Lead Plaintiff and the Class did not know, nor in the exercise of reasonable diligence, could they have known, of the untrue statements of material facts or omissions of material facts in the Prospectus when they purchased the Primary Fund shares.

199.    By reason of the conduct alleged herein, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

200.    Lead Plaintiff and the Class acquired Primary Fund shares pursuant to or traceable to one of the Prospectuses.

201.    Lead Plaintiff and the Class have sustained damages.  The value of the Primary Fund's shares declined subsequent to and due to Defendants' violations.

202.    This claim was brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Prospectus.

203.    By reason of the foregoing, the Defendants are liable to the Class for violations of Section 11 of the Securities Act.

### COUNT II:  Violations of Section 12(a)(2) of the Securities Act
### Against RMCI, Resrv Partners and the Bent Defendants

204.     Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

205.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act against RMCI, Resrv Partners, and the Bent Defendants on behalf of Lead Plaintiff and all other members of the Class who purchased or otherwise acquired shares in the Primary Fund during the Class Period and were damaged by acts alleged herein.

206.     This Count does not sound in fraud, and all of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Lead Plaintiff does not allege that the Defendants had scienter or fraudulent intent as to this Count, which are not elements of a §12(a)(2) claim.  However, because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their actions which constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

207.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

208.     Defendants were sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to and/or traceable to the Prospectus.  Their actions of solicitation included preparation and distribution of the false and misleading Prospectus and participating in road shows to market the Primary Fund to investors.  Resrv Partners, as the distributor of the shares in the Primary Fund, acted as an underwriter.

209.     Defendants owed to the purchasers of the Primary Fund shares, including Lead Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements therein not misleading.  Defendants acted with gross negligence, willful misfeasance, bad faith and/or reckless disregard of their obligations and/or duties, in failing to exercise the reasonable care required for them to have known of the misstatements and omissions contained in the Prospectus as set forth above.

210.     Lead Plaintiff and other Class members purchased or otherwise acquired Primary Fund shares pursuant to and/or traceable to the Prospectus.  By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiff and Class members hereby tender their shares in the Primary Fund to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.  Class members who have sold their Primary Fund shares are entitled to rescissory damages.

211.     Lead Plaintiff and the Class did not know, nor in the exercise of reasonable diligence, could they have known, of the untrue statements of material facts or omissions of material facts in the Prospectus when they purchased the Primary Fund shares.

212.     Lead Plaintiff and the Class suffered injury as a result of Defendants' actions in violation of Section 12(a)(2).  The value of the Primary Fund's shares declined subsequent to and due to Defendants' violations.

213.     This claim was brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Prospectus.

71

214.    By reason of the foregoing, the Defendants are liable to the Class for violations of Section 12(a)(2) of the Securities Act.

### COUNT III:  Violations of Section 15 of the Securities Act Against RMCI, Resrv Partners, RMC, and the Bent Defendants

215.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

216.    This Count is brought pursuant to Section 15 of the Securities Act against RMCI, Resrv Partners, RMC, and the Bent Defendants on behalf of Lead Plaintiff and all other members of the Class who purchased or otherwise acquired shares in the Primary Fund during the Class Period and were damaged by acts alleged herein.

217.    This Count does not sound in fraud, and all of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Lead Plaintiff does not allege that the Defendants had scienter or fraudulent intent as to this Count, which are not elements of a §15 claim.  However, because this Action does not assert any claim against any of the Primary Fund's "Indemnitees" that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their actions which constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

218.    RMC controls RMCI, Resrv Partners and the Reserve Fund.  RMCI controls the Reserve Fund and the Bent Defendants.  Each of the Bent Defendants was a control person of the Reserve Fund, RMCI, RMC, and Resrv Partners by virtue of his position as a senior officer of all of the Reserve entities.  The Bent Defendants each had a series of direct and/or indirect business and/or personal relationships with trustees and/or officers and/or major shareholders of the

Reserve Fund and the Primary Fund.  In addition, the Bent Defendants are considered

"controlling persons" of RMCI and Resrv Partners based on their direct and indirect securities

ownership.

219.    RMCI, Resrv Partners, RMC and the Bent Defendants are "control persons"

within the meaning of Section 15 of the Securities Act.

220.    Each of Defendants in this Count was a culpable participant in the violations of

Sections 11 and 12 of the Securities Act alleged in the Counts above, based on their having

signed or authorized the signing of the Registration Statements, having sold or offered for sale

shares of the Primary Fund, having caused distribution of the Prospectus materials, and/or having

otherwise participated in the process which allowed the sales of the Primary Fund shares to be

successfully completed.

221.    RMCI, Resrv Partners, RMC, and the Bent Defendants knew or had reason to

know that the facts alleged herein giving rise to liability of the persons they controlled.

**COUNT IV:  Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b),
Promulgated Thereunder, Against RMCI, Resrv Partners and the Bent Defendants**

222.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if

fully set forth herein.

223.    This Count is asserted against RMCI, Resrv Partners and the Bent Defendants for

violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b), 17 C.F.R.

§240.10b-5(b), promulgated thereunder.

224.    Prior to and throughout the Class Period, RMCI, Resrv Partners and the Bent

Defendants, individually and in concert with others, directly and indirectly, by the use of means

or instrumentalities of interstate commerce and/or of the mails and a national securities

exchange, made various untrue and/or misleading statements of material facts and omitted to

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and made the above statements with reckless disregard for the truth.  These untrue and/or misleading statements and omissions were intended to, and during the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding, among other things, the Primary Fund's compliance with its stated investment objectives and policies; and (ii) cause Lead Plaintiff and the Class to purchase Primary Fund shares that were impaired by concealed and unreasonable risks of loss for this type of investment.

225.    As the Class Period proceeded, Defendants caused the Primary Fund to deviate from its stated fundamental policy by making significant investments in securities, such as the Lehman Brothers commercial paper, that produced higher yields but posed a greater risk to capital preservation and liquidity.  These investments in riskier securities, in the aggregate, increased the Primary Fund's yield and benefitted Defendants by attracting more capital to the Primary Fund and increasing Defendants' management and other fees.  Defendants misled investors by failing to disclose the riskier nature of the Primary Fund's aggregate investments. To the contrary, Defendants reiterated throughout the Class Period that the Primary Fund's fundamentally conservative and "boring" investment policy remained unchanged.

226.    The Bent Defendants are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Primary Fund and the Reserve Fund, as well as through their positions as officers of RMCI and Resrv Partners, the Bent Defendants named in this Count were able to control and did control the content of the public statements contained herein and, with knowledge or reckless disregard, they caused the

above complained-of public statements to contain misstatements and omissions of material facts as alleged herein.

227.    Defendants RMCI and Resrv Partners are also liable for each of the materially false and misleading representations set forth herein, and for each omission of material fact, including each of the representations or material omissions of the Bent Defendants, under the principles of respondeat superior.

228.    Lead Plaintiff's and the Class's investments in the Primary Fund lost value as a result of Defendants' representations being untrue and as a result of the true facts being omitted by Defendants.  Lead Plaintiff and other members of the Class reviewed and relied on these and other statements made during the Class Period.  In addition, these statements were disseminated into the marketplace and were reflected in the total mix of information about the Primary Fund known to investors.

229.    Lead Plaintiff and the Class have suffered damages in that they did not purchase a true money market fund, or even a cash fund managed to preserve capital, but a much more risky fund.  As a result of that added risk, the Primary Fund value declined below $1.00 NAV, causing Lead Plaintiff's and the Class's losses.

230.    The Defendants named in this Count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  As detailed above, the scienter of these Defendants includes (but is not limited to) allegations demonstrating that:

a.  Defendants knowingly and/or recklessly misled investors as to the nature of the Primary Fund's investment objective that caused the Primary Fund to invest in risky commercial paper, such as the Lehman Brothers debt;

b.  Defendants knowingly and/or recklessly misled investors by representing that investment in the Primary Fund was safe, conservative and "boring;"

c.  Defendants were knowingly and/or recklessly motivated to invest in risky commercial paper in order to attract capital, increase significantly Defendants' management and distribution fees, and to entice potential buyers;

d.  Defendants knowingly and/or recklessly misled investors by ignoring and/or downplaying the risks that the Primary Fund's stake in Lehman Brothers posed to the health of the Primary Fund and its maintenance of a $1.00 NAV;

e.  Defendants knowingly and/or recklessly misled investors by making knowingly false and misleading statements that RMCI and/or the Bents were going to maintain the $1.00 NAV by entering into a credit support agreement or arranging for a third party letter of credit in the months leading up to the Lehman Brothers bankruptcy and up to and including September 15 and September 16, following the announcement of the Lehman Brothers bankruptcy, in order to persuade investors not to file redemption requests and to invest in the Primary Fund;

f.  Defendants' knowingly and/or recklessly misled the public about their intention to, and the steps taken to, secure a credit support agreement that would protect the Primary Fund's NAV on September 15 and September 16;

g.  Defendants knowingly and/or recklessly misled investors by knowingly or recklessly failing to assign a fair market value to the Lehman Brothers debt on September 15 in order to discourage investors from seeking redemptions and to prevent the Primary Fund from "breaking the buck;"

h.  Defendants knowingly and/or recklessly misled investors by wrongfully prioritizing certain redemption requests and providing insider information to certain investors, in violation of the Primary Fund's Prospectus and policies;

i.  Defendants knowingly and/or recklessly misled investors by providing false information as to the amount of redemption requests, the status of those redemption requests and the reason for the Primary Fund's inability to honor most redemption requests; and

j.  Defendants knowingly and/or recklessly misled investors by falsely inflating the NAV on September 15 by recording false receivable that were later reversed.

**COUNT V:  Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c), Promulgated Thereunder, Against RMCI, Resrv Partners and the Bent Defendants**

231.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

232.    This Count is asserted against RMCI, Resrv Partners and the Bent Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(a) & (c), 17 C.F.R. §240.10b-5(a) & (c), promulgated thereunder.

233.    Prior to and throughout the Class Period, RMCI, Resrv Partners and the Bent defendants, individually and in concert with others, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails and a national securities

exchange, (i) employed devices, schemes and artifices to defraud and (ii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of shares of the Primary Fund and concealed material adverse information, all actions that were intended to, and during the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding, among other things, the Primary Fund's compliance with its stated investment objectives and policies; and (ii) cause Lead Plaintiff and the Class to purchase Primary Fund shares that were impaired by concealed and unreasonable risks of loss for this type of investment.

234.   Lead Plaintiff's and the Class's investments in the Primary Fund lost value as a result of Defendants' fraudulent course of conduct.  Lead Plaintiff and other members of the Class reviewed and relied on these and other statements made during the Class Period.  In addition, these statements were disseminated into the marketplace and were reflected in the total mix of information about the Primary Fund known to investors.

235.   Lead Plaintiff and the Class have suffered damages in that they did not purchase a true money market fund, or even a cash fund managed to preserve capital, but a much more risky fund.  As a result of that added risk, the Primary Fund value declined below $1.00 NAV, causing Lead Plaintiff's and the Class's losses.

236.   RMCI, Resrv Partners and the Bent Defendants acted with scienter in that they knew that their fraudulent scheme to defraud Primary Fund investors would be communicated to and relied upon by the investing public, or they acted with reckless disregard in that they failed to ascertain that their pervasive scheme would be communicated to and relied upon by the investing public, as primary violations of the securities laws.  As detailed above, the scienter of these Defendants includes (but is not limited to) allegations demonstrating that:

k.  Defendants knowingly and/or recklessly misled investors as to the nature of the Primary Fund's investment objective that caused the Primary Fund to invest in risky commercial paper, such as the Lehman Brothers debt;

l.  Defendants knowingly and/or recklessly misled investors by representing that investment in the Primary Fund was safe, conservative and "boring;"

m.  Defendants were knowingly and/or recklessly motivated to invest in risky commercial paper in order to attract capital, increase significantly Defendants' management and distribution fees and to entice potential buyers;

n.  Defendants knowingly and/or recklessly misled investors by ignoring and/or downplaying the risks that the Primary Fund's stake in Lehman Brothers posed to the health of the Primary Fund and its maintenance of a $1.00 NAV;

o.  Defendants knowingly and/or recklessly misled investors by making knowingly false and misleading statements that RMCI and/or the Bents were going to maintain the $1.00 NAV by entering into a credit support agreement or arranging for a third party letter of credit in the months leading up to the Lehman Brothers bankruptcy up to and including September 15 and September 16, following the announcement of the Lehman Brothers bankruptcy, in order to persuade investors not to file redemption requests and to invest in the Primary Fund;

p.  Defendants' knowingly and/or recklessly misled the public about their intention to, and the steps taken to, secure a credit support agreement that would protect the Primary Fund's NAV on September 15-16;

79

q. Defendants knowingly and/or recklessly misled investors by knowingly or recklessly failing to assign a fair market value to the Lehman Brothers debt on September 15 in order to discourage investors from seeking redemptions and to prevent the Primary Fund from "breaking the buck;"

r. Defendants knowingly and/or recklessly misled investors by wrongfully prioritizing certain redemption requests and providing insider information to certain investors, in violation of the Primary Fund's Prospectus and policies;

s. Defendants knowingly and/or recklessly misled investors by providing false information as to the amount of redemption requests, the status of those redemption requests and the reason for the Primary Fund's inability to honor most redemption requests; and

t. Defendants knowingly and/or recklessly misled investors by falsely inflating the NAV on September 15 by recording false receivable that were later reversed.

**COUNT VI:  Violations of Section 20(a) of the Exchange Act Against RMCI, Resrv Partners, RMC, and the Bent Defendants**

237.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

238.    This Count is asserted against RMCI, Resrv Partners, RMC and the Bent Defendants for violations of Section 20(a) of the Exchange Act.

239.    Because this Action does not assert any claim against any of the Primary Fund's "Indemnitees" that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their culpable participation in the violations of Section 10(b) alleged

80

above, which constitutes at least willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations, as well as their positions of control and authority over the primary violators.

240.    RMC controls RMCI, Resrv Partners and the Reserve Fund.  RMCI controls the Reserve Fund and the Bent Defendants.  Each of the Bent Defendants was a control person of the Reserve Fund, RMCI, Reserve Management Corporation and Resrv Partners by virtue of his position as a senior officer of those Defendants.  The Bent Defendants each had a series of direct and/or indirect business and/or personal relationships with trustees and/or officers and/or major shareholders of the Reserve Fund and the Primary Fund.  In addition, the Bent Defendants are considered "controlling persons" of RMCI, RMC and Resrv Partners based on their direct and indirect securities ownership.

241.    RMCI, Resrv Partners, RMC and the Bent Defendants are "control persons" within the meaning of Section 20(a) of the Exchange Act.  Because of their positions of control, these Defendants were able to, and did, directly or indirectly, control the conduct of the persons directly liable for primary violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, promulgated thereunder.

242.    At the time the Defendants in this Count had the power to control or influence the particular transactions, statements, omissions and/or conduct giving rise to the primary violations of Section 10(b) and Rule 10b-5, as alleged herein, they exercised that power.  Each Defendant in this Count either directly or indirectly induced the primary violations of law complained of herein.

243.    As a direct and proximate cause of the wrongful conduct set forth in this Count, Lead Plaintiff and other Class members suffered damages in connection with their purchases of Primary Fund shares during the Class Period.

## COUNT VII:  Violations of Section 13(a) of the
## Investment Company Act Against All Defendants

244.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

245.    Lead Plaintiff brings this cause of action pursuant to Section 13(a) of the ICA on behalf of itself and the Class against all Defendants.

246.    Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their actions which constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

247.    The Reserve Fund is a registered investment company under Section 3 of the ICA.

248.    Under Section 13(a) of the ICA, 15 U.S.C. § 80a-13(a), the Reserve Fund cannot deviate from any fundamental policy identified in its registration statement without first obtaining authorization through the vote of a majority of outstanding securities.

249.    The fundamental investment objective for the Primary Fund early in the Class Period was the preservation of liquidity and capital.  This was specifically described as a "fundamental policy" in the SAI, which was incorporated by reference into the 2006 Prospectus and 2007 Prospectus.

250.    As the Class Period proceeded, the Reserve Fund deviated from the Primary Fund's fundamental policy by making significant investments in securities, such as the Lehman

Brothers commercial paper, that produced higher yields but posed a greater risk to capital preservation and liquidity.  These investments in riskier securities, in the aggregate, increased the Primary Fund's yield and benefitted Defendants by attracting more capital to the Primary Fund and increasing Defendants' management and other fees.  Defendants never disclosed that the aggregate impact of these purchases of riskier securities was to deviate from the Primary Fund's fundamental policy of preserving liquidity and capital.  To the contrary, Defendants reiterated throughout the Class Period that the Primary Fund's fundamental policy remained unchanged.

251.    The Reserve Fund deviated from the Primary Fund's fundamental policy without obtaining authorization from a majority of the voting shareholders of the Primary Fund.  At no time during the Class Period was any change in Fund policies ever put to a shareholder vote.

252.    As alleged herein, Defendants were grossly negligent in causing and/or permitting the Reserve Fund to deviate from the Primary Fund's fundamental investment objective without shareholder approval.

253.    As a direct and proximate result of this unauthorized change in policy, the shares of the Primary Fund depreciated significantly at the end of the Class Period, causing significant damages to Lead Plaintiff and other members of the Class.

## COUNT VIII:  Violations of Section 36(b) of the Investment Company Act Against All Defendants

254.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

255.    Lead Plaintiff brings this cause of action as a derivative claim on behalf of the Reserve Fund and the Primary Fund pursuant to Section 36(b) of the ICA (15 U.S.C. § 80a-36b) against all Defendants.

256.     Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their actions which constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

257.     The Primary Fund and Defendant the Reserve Fund are registered investment companies under Section 3 of the ICA.

258.     Defendant RMCI is the investment adviser for the Primary Fund and the Reserve Fund under Section 2 of the ICA.

259.     Defendants Resrv Partners and the Bent Defendants are affiliated persons of RMCI under Section 2 of the ICA.

260.     Under Section 36(b) of the ICA, 15 U.S.C. § 80a-36(b), Defendants RMCI, Resrv Partners and the Bent Defendants owe the Primary Fund and Reserve Fund certain fiduciary duties with respect to the receipt of  compensation or payments from the Primary Fund and the Reserve Fund.  These fiduciary duties include the duties of loyalty, care, candor, and good faith and fair dealing.  These Defendants owe these fiduciary duties in connection to all compensation they receive from the Primary Fund and the Reserve Fund, including Comprehensive Management Fees and other fees.

261.     Defendants breached their fiduciary duties to the Primary Fund and the Reserve Fund through the acts alleged herein, including without limitation, changing the Primary Fund's fundamental policy of preservation of capital and liquidity by increasing the Primary Fund's commercial paper holdings sixty times over.  As noted herein, this shift to more lucrative but

riskier investments had the effect of significantly boosting the Primary Fund's yield and more than doubling the Primary Fund's market share.

262.    In addition, these Defendants breached their fiduciary duties by making false and misleading statements and omissions to the investing public about these increasingly risky investments, thereby extending the period during which the Primary Fund and Reserve Fund had significant exposure to lucrative but risky securities.

263.    These Defendants also breached their fiduciary duties by failing to satisfy their independent duty under Section 15(c) of the Investment Company Act, 15 U.S.C. § 80a-15(c), to "furnish[] such information [to the Board] as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company."  Specifically, these Defendants failed to provide full and complete information about their advisory services, namely by failing to disclose that they were making riskier investments in order to increase their own compensation.  For example, when these Defendants placed their Comprehensive Management Fee agreement before the Board at the July 17, 2006 Board meeting (as summarized in Exhibit K(A) to the February 23, 2007 Proxy Statement on Form 14-A), these Defendants did not inform the Board of the fundamental change in the Primary Fund's policy and strategy of not investing in commercial paper, nor did they inform the Board of the likely impact of the change on their overall compensation.

264.    As a result of these breaches, the compensation of these Defendants, including Comprehensive Management Fees, which were based on the Primary Fund's average NAV. Thus, the breaches of fiduciary duty by these Defendants "concern[ed]" the compensation or payments paid by the Primary Fund and the Reserve Fund.

265.     As a direct and proximate result of these Defendants' breaches of fiduciary duty in respect of their compensation, the shares of the Primary Fund depreciated significantly at the end of the Class Period, causing significant damages to Lead Plaintiff and other members of the Class.

### COUNT IX:  Claim for Breach of Fiduciary Duty And/Or
### Aiding and Abetting Breach of Fiduciary Duty Against All Defendants

266.     Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

267.     Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their actions which constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

268.     This Count is not based upon any untrue statement or omission of material fact in connection with the purchase or sale of the Primary Fund's securities, nor is it based on any manipulative or deceptive device or contrivance in connection with the purchase or sale of the Primary Fund's securities.

269.     Defendants have violated their fiduciary duties of care, loyalty, good faith and independence owed to members of the Primary Fund, and have acted to put their personal interests ahead of the interests of the Primary Fund's members, and/or have aided and abetted other Defendants therein.

270.     By the acts, transactions and course of conduct alleged herein, the Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, and independence owed to the members of the Primary Fund, and/or aided and abetted other

Defendants therein.  These Defendants breached their fiduciary duties by failing to properly preserve the assets of the Primary Fund and failing to invest the assets in a manner than met with the Primary Fund's investment objective and acting in their own self interest to the detriment of the Primary Fund shareholders.

271.    By reason of the foregoing acts, practices and common course of conduct, Defendants identified in this Count have failed to carry out the care and diligence in the exercise of their fiduciary obligations toward Lead Plaintiff and other members of the Class, and/or have aided and abetted other Defendants therein.

272.    As a result of the actions of Defendants, Lead Plaintiff and the Class have been and will be irreparably harmed in that they have not and will not receive their fair portion of the value of the Primary Fund's assets and have been and will be prevented from obtaining a fair price for their shares.

## COUNT X: Claim for Fraud Against All Defendants

273.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

274.    The allegations set forth above demonstrate that the Reserve Defendants and the Bent Defendants knowingly or recklessly made, or caused to be made, numerous false and/or misleading statements and omissions regarding Lead Plaintiff's and the Class's investments in the Primary Fund.

275.    Initially, Defendants repeatedly misrepresented in numerous SEC filings, marketing materials, and public statements that the Primary Fund was a safe, highly liquid investment that sought to "guarantee" a $1.00 NAV, when, in fact, Defendants had caused the Primary Fund (i) to abandon its fundamental investment objective as early as March 2006, (ii) to

dramatically increase exposure to riskier investment vehicles, such as Lehman Brothers debt, in order to increase yield and market share, and (iii) to become increasingly vulnerable to credit and liquidity risks that it was representing to Primary Fund investors.

276.    Lead Plaintiff and the Class reasonably and justifiably relied upon the foregoing materially false and misleading statements and omissions to their detriment by, among other things, initially investing in, and continuing to invest in, the Primary Fund in the mistaken, but reasonable, belief that the Primary Fund was still being managed in a safe and conservative manner.

277.    Defendants also orchestrated and executed a fraudulent campaign to deceive investors, including Lead Plaintiff and the Class, about the true state of affairs at the Primary Fund on September 15 and 16, 2008.  This fraudulent campaign was designed to discourage Primary Fund investors from submitting redemption requests, and was carried out through applying an artificially inflated valuation to the Lehman Brothers debt held by the Primary Fund, setting a false NAV, and making and/or causing to be made the materially false and misleading statements alleged above.  Defendants knew, or were reckless in not knowing, that the statements and omissions were false and misleading when made.

278.    As a result of the actions of Defendants, Lead Plaintiff and the Class have been and will be irreparably harmed in that they have not and will not receive their fair portion of the value of the Primary Fund's assets and have been and will be prevented from obtaining a fair price for their shares.

## COUNT XI:  Claim for Gross Negligence Against All Defendants

279.    Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

280.     Because this Action does not assert any claim against any of the Primary Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their actions which constitute gross negligence.

281.     This Count is not based upon any untrue statement or omission of material fact in connection with the purchase or sale of the Primary Fund's securities, nor is it based on any manipulative or deceptive device or contrivance in connection with the purchase or sale of the Primary Fund's securities.

282.     In exercising their professional obligations with respect to members of the Primary Fund, Defendants were grossly negligent in failing to exercise reasonable care, and breached their duties of loyalty, good faith, and independence, and/or aided and abetted other Defendants therein.  Moreover, Defendants failed to properly preserve the assets of the Primary Fund and failed to invest the assets in a manner that met with the Primary Fund's investment objective.

283.     As a result of the actions of Defendants, Lead Plaintiff and the Class have been and will be irreparably harmed in that they have not and will not receive their fair portion of the value of the Primary Fund's assets and have been and will be prevented from obtaining a fair price for their shares.

**COUNT XII:  Claim for Unjust Enrichment Against All Defendants**

284.     Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

285.     Because this Action does not assert any claim against any of the Primary Fund's "Indemnitees" that seeks an award that would be payable or subject to indemnification by the

Primary Fund, with respect to the challenged conduct, Lead Plaintiff asserts this Count against Defendants based solely on their actions which constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties to the Primary Fund and/or in the conduct of such person's office.

286.     This Count is not based upon any untrue statement or omission of material fact in connection with the purchase or sale of the Primary Fund's securities, nor is it based on any manipulative or deceptive device or contrivance in connection with the purchase or sale of the Primary Fund's securities.

287.     Defendants received money and financial benefits from Lead Plaintiff and the Class in the form of invested capital and payment of professional fees and expenses.  Defendants have retained (and continue to accrue) such money and financial benefits to the detriment of Lead Plaintiff and the Class.

288.     Defendants' retention of money and financial benefits from Lead Plaintiff and the Class was and is unjust by virtue of the acts, transactions and course of conduct alleged herein. In exercising their professional obligations with respect to members of the Primary Fund, Defendants failed to exercise the required level of care and diligence, and breached their duties of loyalty, good faith, and independence, and/or aided and abetted other Defendants therein. Moreover, Defendants failed to properly preserve the assets of the Primary Fund and failed to invest the assets in a manner that met with the Primary Fund's investment objective.

289.     As a result of the Defendants' actions, Lead Plaintiff and the Class have been and will be irreparably harmed absent the requested relief, since Lead Plaintiff and the Class have not and will not receive their fair portion of the value of the Primary Fund's assets and have been and will be prevented from obtaining a fair price for their shares.  Thus, Defendants' unjust

retention of money and financial benefits from Lead Plaintiff and the Class goes against the

fundamental principles of justice, equity, public policy and good conscience, all of which require

that Defendants rescind and disgorge back to the Primary Fund all such unjust enrichment.

## X.  JURY TRIAL DEMAND

290.    Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury.

## XI.  PRAYER FOR RELIEF

291.    WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for relief and

judgment as follows:

A.   Determining that this action is a proper class action and certifying Lead Plaintiff, Third Avenue, as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

C.   Awarding rescission and/or rescissory damages in favor of Lead Plaintiff and the members of the Class;

D.   Creating a constructive trust to withhold all "accrued" but not paid management fees or expenses, of whatever kind, Defendants claim they are entitled to from the Primary Fund;

E.   Awarding prejudgment interest and/or opportunity cost damages in favor of Lead Plaintiff and the other members of the Class;

F.   Awarding punitive damages to the extent permitted by law to Lead Plaintiff and the other members of the Class;

G. Awarding Lead Plaintiff and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

H. Granting such other and further relief as the Court may deem just and proper.

Dated: January 5, 2010                               Respectfully submitted,


John C. Browne
Lauren A. McMillen
Sean O'Dowd
**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Telephone: 212-554-1400
Facsimile: 212-554-1444

*Lead Counsel for Lead Plaintiff Third*
*Avenue Institutional International Value*
*Fund, L.P.*

92