**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re THE RESERVE PRIMARY FUND | ) | No. 08-cv-8060 (PGG) |
| SECURITIES & DERIVATIVE CLASS | ) | |
| ACTION LITIGATION | ) | ECF Case |
| | ) | |
| | ) | ORAL ARGUMENT |
| | ) | REQUESTED |

# MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Lyle Roberts (*Pro Hac Vice*)
DEWEY & LEBOEUF LLP
1101 New York Ave, NW
Washington, DC  20005
Tel: (202) 346-8000

Christopher J. Clark
Kevin C. Wallace
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York  10019
Tel:  (212) 259-8000

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

        A.     The Fund's Investments in Commercial Paper .......................................... 4

               1.     The Fund Timely Disclosed That Its Investment Strategy Included Investing in Commercial Paper ................................. 4

               2.     Money Market Funds Commonly Invested in Commercial Paper ............. 5

               3.     The Fund Invested in Lehman Commercial Paper and Fully Disclosed Those Investments ....................................... 6

                       (a)     The Fund's Lehman Investments Were Consistent with the Fund's Fully Disclosed Short-Term Investment Ratings Criteria ....................................... 7

        B.     The Fund Plainly Disclosed That Its NAV Could Fall Below $1.00 ...................... 9

        C.     The Lehman Bankruptcy and the Bankruptcy Examiner's Report ........................ 10

ARGUMENT .................................................................................................................. 12

I.     Applicable Pleading Standards ............................................................................. 13

II.     The Complaint Fails to Adequately Allege Any Misstatements or Omissions Related to the Investment Strategy Case ........................................... 15

        A.     The Fund's Disclosures Regarding Its Commercial Paper Investments Were Accurate and Fulsome ...................................................... 15

        B.     Defendants' Statements Concerning the Fund's "Goals" Are Immaterial as a Matter of Law .......................................................................... 20

III.     The Complaint Fails to Adequately Allege a Strong Inference of Scienter with Respect to the Investment Strategy Case ......................................... 22

IV.     The Complaint Fails to Adequately Allege Reliance as to the NAV Case (or *Any* of the Section 10(b) Claims) .......................................................... 23

V.       There Is No Private Right of Action Under Section 13(a) of the Investment
         Company Act and, in Any Event, the Complaint Does Not Establish That Any
         Violation Occurred.................................................................................................25

VI.      The Section 36(b) Claim Must Be Dismissed Because the Complaint Fails to
         Allege "Unreasonable Fees" and Seeks Improper Damages ..................................27

VII.     Plaintiffs' Various Derivative Claims Must Be Dismissed for Failure to Make a
         Demand ...................................................................................................................29

         A.      Breach of Fiduciary Duty..........................................................................30

         B.      Gross Negligence .......................................................................................31

         C.      Unjust Enrichment .....................................................................................32

VIII.    Plaintiffs' Common Law Fraud Claim is Preempted by SLUSA .......................32

IX.      The Court Should Decline To Exercise Supplemental Jurisdiction....................34

         CONCLUSION........................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009)........................................................................32

*Amron v. Morgan Stanley Investment Advisors Inc.*,
    464 F.3d 338 (2d Cir. 2006)....................................................................................27

*ATSI Communications v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).....................................................................................13

*Barron v. Igolnikov*,
    No. 09 Civ. 4471, 2010 U.S. Dist. LEXIS 22267 (S.D.N.Y. Mar. 10, 2010)...................32, 33

*Bartfied v. Murphy*,
    578 F. Supp. 2d 638 (S.D.N.Y. 2008)........................................................................32

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)..............................................................................................24

*Bell Atlantic Corp. v. Twombley*,
    550 U.S. 544 (2007)..............................................................................................13

*Bellikoff v. Eaton Vance Corp.*,
    481 F.3d 110 (2d Cir. 2007)....................................................................................28

*Brister v. Schlinger Foundation*,
    469 F. Supp. 2d 371 (E.D. La. 2007).........................................................................31

*Clark v. Nevis Capital Management, LLC*,
    No. 04 Civ. 2702(RWS), 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005)................................25

*Coronel v. Quanta Captial Holdings, Ltd.*,
    No. 7 Civ. 1405(RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)..................................13

*Cortec Industries, Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)......................................................................................4

*DeBlasio v. Merrill Lynch & Co.*,
    No. 07 Civ 318(RJS), 2009 WL 2242605 (S.D.N.Y. July 27, 2009).................................21

*Druck Corp. v. Macro Fund Ltd.*,
    290 Fed. Appx. 441 (2d Cir. 2008)............................................................................31

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..................................................................................21

*Fitzgerald v. Citigroup Inc.*,
   No. 03 Civ. 4305(DAB), 2007 U.S. Dist. LEXIS 15365 (S.D.N.Y. Feb. 22, 2007) ..............27

*Forsythe v. Sun Life Financial, Inc.*,
   417 F. Supp. 2d 100 (D. Mass. 2006) ........................................................................29

*Foster v. Jesup & Lamont Securities Co.*,
   759 F.2d 838 (11th Cir. 1985) ................................................................................22

*Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*,
   376 F. Supp. 2d 385 (S.D.N.Y. 2005).......................................................................34

*Friedman v. Mahasco Corp.*,
   929 F.2d 77 (2d Cir. 1991) ....................................................................................30

*Gartenberg v. Merrill Lynch Asset Management*,
   694 F.2d 923 (2d Cir. 1982)................................................................................27, 28

*Gidadex, S.r.L. v. Campaniello Imports, Ltd.*,
   49 F. Supp. 2d 298 (S.D.N.Y. 1999).......................................................................32

*Halebian v. Berv*,
   631 F. Supp. 2d 284 (S.D.N.Y. 2007).......................................................................30

*Halperin v. Ebanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)..................................................................................12

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008).......................................................................22

*Hunt v. Alliance North American Government Income Trust*,
   159 F.3d 723 (2d Cir. 1998)..................................................................................26

*In re American Bank Note Holographics, Inc. Securities Litigation*,
   93 F. Supp. 2d 424 (S.D.N.Y. 2000).......................................................................20

*In re Deutsche Telekom AG Securities Litigation*,
   No. 00 CIV 9475, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002).......................................21, 22

*In re Eaton Vance Mutual Funds Fee Litigation*,
   380 F. Supp. 2d 222 (S.D.N.Y. 2005).......................................................................28

*In re Global Crossing, Ltd. Securities Litigation*,
   No. 02 Civ. 910, 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005) ........................................25

*In re JPMorgan Chase Securities Litigation*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ....................................................................14

*In re Lehman Brothers Holdings, Inc.*,
  Case No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009) ........................................11, 12

*In re Livent, Inc. Noteholders Securities Litigation*,
  211 F.R.D. 219 (S.D.N.Y. 2002) ...........................................................................24

*In re Merrill Lynch Auction Rate Securities Litigation*,
  No. 1:08-cv-03037-LAP, 2010 U.S. Dist. LEXIS 33532 (S.D.N.Y. Mar. 31, 2010) .............12

*In re Merrill Lynch Research Securities Litigation*,
  No. 03 CV 4090(MP), 2004 WL 305809 (S.D.N.Y. Feb. 18, 2004) ...........................13

*In re Salomon Smith Barney Mutual Fund Fees Litigation*,
  441 F. Supp. 2d 579 (S.D.N.Y. 2006) ....................................................................28

*In re Salomon Smith Barney Mutual Fund Fees Litigation*,
  528 F. Supp. 2d 332 (S.D.N.Y. 2007) ....................................................................28

*In re Security Capital Assurance Ltd. Securities Litigation*,
  07 Civ. 11086(DAB), 2010 WL 1372688 (Mar. 31, 2010) .............................20, 23

*In re Tremont Securities Law, State Law & Insurance Litigation*,
  No. 08 Civ. 11117, 2010 U.S. Dist. LEXIS 32216 (S.D.N.Y. Mar. 30, 2010) .....................34

*In re Van Wagoner Funds, Inc.*,
  382 F. Supp. 2d 1173 (N.D. Cal. 2004) ..................................................................25

*Jones v. Harris Associates L.P.*,
  130 S. Ct. 1418 (2010) .........................................................................................27

*Kaggen v. IRS*,
  71 F.3d 1018 (2d Cir. 1995) ..................................................................................4

*Kaplan v. Shapiro*,
  655 F. Supp. 336 (S.D.N.Y. 1987) ........................................................................34

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
  659 F. Supp. 2d 532 (S.D.N.Y. 2009) ...................................................................20

*Lin v. Interactive Brokers Group, Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008) ...................................................................19

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006) ...............................................................................................34

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993)...............................................................................13

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................................22

*Olmsted v. Pruco Life Insurance Co. of New Jersey*,
   283 F.3d 429 (2d Cir. 2002)................................................................................26

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*,
   595 F.3d 86 (2d Cir. 2010)..................................................................................28

*Osan Ltd. v. Accenture LLP*,
   454 F. Supp. 2d 46 (E.D.N.Y. 2006) ..................................................................30

*Pinter v. Dahl*,
   486 U.S. 622 (1988)............................................................................................21

*Press v. Marvalan Industries, Inc.*,
   468 F. Supp. 1072 (S.D.N.Y. 1979)...................................................................31

*Ressler v. Liz Claiborne, Inc.*,
   75 F. Supp. 2d 43 (E.D.N.Y. 1998) ....................................................................14

*Retirement Ass'n v. Maounis*,
   No. 07 Civ. 2618(DAB), 2010 U.S. Dist. LEXIS 25501 (S.D.N.Y. Mar. 15, 2010) .............31

*Retirement System v. Wells Real Estate Investment Trust, Inc.*,
   No. 1:07-CV-862-CAP, 2008 U.S. Dist. LEXIS 53652 (S.D.N.Y. Mar. 31, 2008)...............32

*RMED International, Inc. v. Sloan's Supermarkets, Inc.*,
   185 F. Supp. 2d 389 (S.D.N.Y. 2002).................................................................30

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004).....................................................................13, 14, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................22

*Trostel on Behalf of Murray v. Bowen*,
   695 F. Supp. 1418 (E.D.N.Y. 1988) .....................................................................4

*Wagner v. First Horizon Pharmaceutical Corp.*,
   No. 05-14365, 2006 WL 2661652 (11th Cir. Sept. 18, 2006) ................................14

*Western Investment LLC v. DWS Global Commodities Stock Fund, Inc.*,
   No. 10 Civ. 1399, 2010 U.S. Dist. LEXIS 33788 (S.D.N.Y. Apr. 6, 2010) .........................26

*Young v. Nationwide Life Insurance Co.*,
    183 F.R.D. 502 (S.D. Tex. 1998) .........................................................25

*Yu v. State Street Corp.*,
    686 F. Supp. 2d 369 (S.D.N.Y. 2010) ...................................15, 19, 20

*Zerman v. Ball*,
    735 F.2d 15 (2d Cir. 1984) ...................................................................21

**STATE CASES**

*Billings v. GTFM, LLC*,
    449 Mass. 281 (2007) ............................................................................29

*Chambers v. Gold Medal Bakery, Inc.*,
    BRCV2009-00716, 2009 Mass. Super. LEXIS 344 (Sept. 17, 2009) ....30

**FEDERAL STATUTES**

15 U.S.C. § 77(p)(b) .....................................................................................33

15 U.S.C. § 77k(a) ........................................................................................20

15 U.S.C. § 77*l*(a)(2) ....................................................................................21

15 U.S.C § 77p(b) .........................................................................................33

15 U.S.C. § 77r(b)(2) ....................................................................................33

15 U.S.C. § 78bb(1)(1) ..................................................................................33

15 U.S.C. §§ 78bb(f) .....................................................................................33

15 U.S.C. § 78bb(f)(5)(B)(i)(I) ....................................................................33

15 U.S.C. § 78u-4(b)(1) ................................................................................13

15 U.S.C. § 80a-36(b) ...................................................................................27

28 U.S.C. § 1367 ...........................................................................................34

**STATE STATUTES**

Mass. Gen. Laws chap. 156D, § 7.41(1) ......................................................29

N.Y. Gen. Bus. Law §§ 352, *et seq.* ............................................................32

RULES

Fed. R. Civ. P. 23.1 .......................................................................................................29

REGULATIONS

17 C.F.R. §§ 270.2a-7(a)(10)........................................................................................18

17 C.F.R. § 270.2a-7(a)(12)(i) .........................................................................................5

17 C.F.R. § 270.2a-7(a)(21)(i) ..........................................................................................6

17 C.F.R. § 270.2a-7(c)(2)-(4) ..........................................................................................5

17 C.F.R. § 270.2a-7(c)(3)(i) ............................................................................................5

OTHER AUTHORITIES

Marcin Kacperszyk and Philipp Schanbl, *When Safe Proved Risky:  Commercial Paper during the Financial Crisis of 2007-2009* .............................................................17

Money Market Reform, Proposed Rule, SEC Release No. IC-28807, File No. S7-11-09 (June 30, 2009), *available at* http://www.sec.gov/rules/proposed/2009/ic-28807.pdf..............5

Standard & Poor's, *Commercial Paper – A Primer* at 3, *available at* http://www2.standardandpoors.com/spf/pdf/index/Commercial_Paper_Primer.pdf...........6, 17

12B William Meade Fletcher, *et al.*, *Fletcher Cyclopedia of the Law of Private Corporations* § 5924 ...........................................................................................................31

**INTRODUCTION**

On September 15, 2008, Lehman Brothers Holdings, Inc.'s ("Lehman" or "Lehman Brothers") bankruptcy filing set off a chain of events that led, among other things, to the collapse of the Reserve Primary Fund (the "Fund").  The Securities and Exchange Commission ("SEC") engaged in an extensive investigation of the Fund's collapse and has brought a suit alleging that the Fund's investment advisor, Reserve Management Company, Inc. ("RMCI"), and others named as defendants in this case, defrauded investors by failing to accurately inform them on September 15 and 16, 2008 of the effect of the Lehman Brothers bankruptcy on their Fund investments.  Plaintiffs have brought the identical claims on behalf of the Fund's investors, but tack on a new, longer, and completely different set of allegations.  Instead of confining themselves to the events of September 15 and 16, Plaintiffs allege a two-year class period and assert that Defendants (including the Fund's officers, but somehow not the Fund itself) systematically misled investors about the nature of the Fund's investment strategy.  According to Plaintiffs, once the investment strategy fraud was "revealed" by the Lehman bankruptcy, the Defendants then engaged in a new fraud on September 15 and 16 designed to create the false impression that they would support the Fund's $1.00 net asset value ("NAV").  Plaintiffs' theory of successive frauds is an obvious attempt to manufacture a case that will rope in more class members and potentially greater damages.

The Complaint is far from a model of clarity, often making it difficult to tell which misstatements are supposed to be associated with which claims.  It is possible, however, to delineate between the two distinct fraud cases, both of which must be rejected.

First, Plaintiffs allege that for over two years (2006 to 2008) Defendants made false statements regarding the conservative nature of the Fund's investment strategy (the "Investment Strategy Case").  These alleged misstatements were contained in the Fund's public filings (i.e., its prospectuses, semi-annual reports, proxy statements, and statements of additional information) and in public statements made by Fund officials.  When Lehman Brothers filed for bankruptcy, the "truth" about the Fund's investments strategy was revealed and investors began

to "flood" the Fund with redemption requests.  The Investment Strategy Case covers the Section 11 and 12(a)(2) claims, which are predicated entirely on alleged false statements about the Fund's investment strategy contained in the Fund's prospectuses, and most of the Section 10(b) claims.

The Investment Strategy Case is unique to the securities and derivative class action litigation.  The SEC has never alleged that Defendants engaged in securities law violations prior to the filing of the Lehman Brothers bankruptcy.  As a result, the Court did not consider these claims in its January 24, 2010 motion to dismiss ruling.  These claims are completely meritless because throughout the class period, the Fund clearly, expressly, and repeatedly informed investors that (a) the Fund was investing in commercial paper, including Lehman commercial paper; and that (b) the Fund's investments in commercial paper were subject to an increased credit risk based on the issuer's financial condition.  In other words, the Fund (and Defendants) informed investors of the exact investments and risks that Plaintiffs claim it misstated when it discussed the Fund's investment strategy.  Having failed to adequately allege that Defendants made any false statements, it is not surprising that Plaintiffs also fail to establish a strong inference that any of the Defendants acted with scienter.

Second, Plaintiffs allege (basically copying the allegations in the SEC's related case) that following the filing of the Lehman Brothers bankruptcy the Defendants made false statements regarding RMCI's commitment to maintain the $1.00 NAV (the "NAV Case").  These alleged public misstatements were contained in a Reserve Insights publication.  When the Fund announced – just 36 hours later – that the Fund had "broken the buck," the "truth" about the Defendants' failure to support the $1.00 NAV was revealed.  The NAV Case covers the rest of the Section 10(b) claims.

As to the NAV Case, Plaintiffs have affirmative pleading burdens that were not imposed upon the SEC and were not considered by this Court in its January 24, 2010 motion to dismiss decision.  Most notably, Plaintiffs must establish that they relied upon the alleged misstatements made by Defendants.  Plaintiffs attempt to do so by invoking the "fraud-on-the-market" theory,

pursuant to which a court may presume the existence of reliance where an issuer's stock trades on an efficient market, because the price of a company's stock is determined by the available material information regarding the company and its business.  As a number of courts (including a court in this District) have held, however, the fraud-on-the-market theory is inapplicable to funds that base their share price on NAV because information about the fund does not affect the share price.  On this basis alone, any Section 10(b) claim associated with the NAV Case (and the Investment Strategy Case, for that matter) must be dismissed.

      Plaintiffs tack on a number of related claims that are patently deficient on their face. There is no private right of action under Section 13(a) of the Investment Company Act and, in any event, the Fund did not deviate from its fundamental investment policy.  The Section 36(b) of the Investment Company Act claim must be dismissed because the Complaint fails to allege "unreasonable fees" and seeks improper damages.  The state law claims for breach of fiduciary duty, gross negligence, and unjust enrichment are derivative in nature and should be dismissed based on Plaintiffs' failure to make a demand on the Fund.  All of the state law claims also are inadequately plead (for all of the same reasons that the securities claims are inadequately plead) and must be dismissed.  In addition, the common law fraud claim is precluded by the Securities Litigation Uniform Standards Act ("SLUSA"), which prevents the filing of class action state law fraud claims related to the purchase and sale of securities.  Finally, the Court should decline to exercise supplemental jurisdiction over any of the state law claims to the extent it dismisses Plaintiffs' federal securities law claims.

      In sum, Plaintiffs are attempting to take advantage of the SEC suit by bringing (a) new securities claims that the SEC has implicitly rejected, (b) copycat securities claims that improperly rely on the fraud-on-the-market theory and cannot satisfy the Plaintiffs' pleading burden as to reliance, and (c) various tag-along claims that cannot stand on their own.  Plaintiffs' Complaint should be dismissed with prejudice.

**STATEMENT OF FACTS**

As the Court is already generally familiar with the Fund and its investment advisor and manager from the parties' submissions in *SEC v. Reserve Management Company, Inc., et al.*, 09 Civ. 4346 (PGG), Defendants address here only those specific facts that relate directly to the liability theories plead by Plaintiffs and that are relevant for purposes this Motion.

A.    **The Fund's Investments in Commercial Paper**

1.    **The Fund Timely Disclosed That Its Investment Strategy Included Investing in Commercial Paper**

Prior to 2006, the Fund did not invest in commercial paper.[1]  In its 2006 Prospectus,[2] the Fund made an express disclosure that *it had changed this policy and would invest in commercial paper*: the "Primary Fund will principally invest in debt and deposit-type obligations, such as

---

[1] The Reserve Fund, Registration Statement under the Securities Act of 1933, Post-effective Amendment No. 79 (Form N-1A), at 5/89 (Sept. 28, 2005), *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465905046155/a05-16215_1485bpos.htm. ("2005 Prospectus") (Ex. 1, attached hereto) (In deciding the instant Rule 12(b)(6) motion, the Court may consider all documents that Plaintiffs mention in the Complaint and that form the basis for their claims, *see, e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), all documents "required by law to be and which actually have been filed with the SEC," *id.*, and all other documents of which the Court may take judicial notice, including publicly-disclosed materials, court papers, and treatises. *See, e.g.*, *Kaggen v. IRS*, 71 F.3d 1018, 1021 (2d Cir. 1995); *Trostel on Behalf of Murray v. Bowen*, 695 F. Supp. 1418, 1420 (E.D.N.Y. 1988)).
[2] For purposes of all public filings with the SEC referred to in the Complaint, The Reserve Fund (the "Trust"), is the registrant. *See, e.g.*, 2005 Prospectus at 1/89; The Reserve Fund, Registration Statement under the Securities Act of 1933, Post-effective Amendment No. 83 (Form N-1A), at 1/165 (Sept. 28, 2006), *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465906063804/a06-20088_1485bpos.htm ("2006 Prospectus") (Ex. 2, attached hereto); The Reserve Fund, Registration Statement under the Securities Act of 1933, Amendment No. 87 (Form N-1A), at 1/108 (Sept. 28, 2007), *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465907072142/a07-24381_1485bpos.htm ("2007 Prospectus") (Ex. 3, attached hereto); The Reserve Fund, Registration Statement under the Securities Act of 1933, Amendment No. 101 (Form N-1A), at 1/93 (Sept. 29, 2008), *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465908061014/a08-24356_1485apos.htm ("2008 Prospectus") (Ex. 4, attached hereto).  All prospectuses filed by the Trust are signed by all the Trust's Trustees, as well as the relevant Trust officers.  *See, e.g.*, 2007 Prospectus at 106/108; 2008 Prospectus at 91/93.  All periodic reports filed with the SEC are signed by the relevant Trust officers, and all of the Trust's officers are also officers of some or all of RMCI, Reserve Management Corporation ("RMC") and Reserv Partners, Inc. ("Resrv").  *See, e.g.*, The Reserve Fund, Quarterly Schedule of Portfolio Holdings for the quarter ended August 31, 2006 (Form N-Q), at 13/13 (Oct. 31, 2006), *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465906069986/a06-21367_4nq.htm ("August 2006 Quarterly Report") (Ex. 5, attached hereto).

negotiable certificates of deposit and time deposits . . . *commercial paper*; and asset-backed securities."[3]

In its 2007 Prospectus, the Primary Fund disclosed again, echoing its 2006 Prospectus, that the Fund would "principally invest in debt and deposit-type obligations," including among other things, "*commercial paper* and asset-backed securities."[4]

Consistent with its disclosures in its 2006 and 2007 Prospectuses, from August 31, 2006 through May 31, 2008, the Primary Fund made and reported periodic investments in commercial paper.

## 2.    Money Market Funds Commonly Invested in Commercial Paper

There was nothing unusual about the Fund making investments in commercial paper. The SEC itself recognized such investments were typical of money market funds:

> Money market funds are open-end management investment companies that are registered under the Investment Company Act and *regulated under rule 2a-7* ["Rule 2a-7"] under the Act.  They invest in *high-quality, short-term instruments such as commercial paper*, Treasury bills and repurchase agreements.[5]

Significantly, Rule 2a-7 requires that every security acquired by a money market fund must satisfy five general requirements, one of which is that *the security must present minimal credit risks*.[6]  Thus, by observing that money market funds "regulated under rule 2a-7 . . . invest

---

[3] 2006 Prospectus at 6-7/165 (emphasis added).
[4] 2007 Prospectus at 7-8/108 (emphasis added).
[5] Money Market Reform, Proposed Rule, SEC Release No. IC-28807, File No. S7-11-09 (June 30, 2009), at 4, *available at* http://www.sec.gov/rules/proposed/2009/ic-28807.pdf ("SEC Proposal") (emphasis added) (Ex. 6, attached hereto).
[6] 17 C.F.R. § 270.2a-7(c)(3)(i) (2010).  The other four requirements are that the security must be United States Dollar denominated; the security must have a maturity of 397 days or less, and cannot cause the dollar weighted average maturity of the fund's portfolio to exceed 90 days; the acquisition of the security cannot violate applicable diversification requirements; and the security must be an Eligible Security.  17 C.F.R. § 270.2a-7(c)(2)-(4).  "Eligible Security" is defined as, among other things, a "Rated Security with a remaining maturity of 397 days or less that has received a rating from the Requisite [Nationally Recognized Statistical Rating Organizations ("NRSROs")] in one of the two highest short-term rating categories (within which there may be sub-categories or gradations indicating relative standing)."  17 C.F.R. § 270.2a-7(a)(12)(i).  In relevant part, Rule 2a-7 defines a "Rated Security" as one that "has received a short-term rating from a Designated NRSRO, or has been issued by an issuer that has received a short-term rating from a Designated NRSRO with respect to a class of debt obligations (or any debt obligation

5

in high-quality . . . instruments such as commercial paper," the SEC made clear that it considered

commercial paper (that otherwise met the basic requirements of Rule 2a-7) to "present minimal

credit risks."

Standard & Poor's ("S&P"), in a primer on commercial paper issued on September 10,

2008 – just three business days before Lehman filed for Chapter 11 bankruptcy, *see infra* –

likewise noted that commercial paper generally offers "very low risk" compared to other short-

term assets, and observed that:

> There have been very few cases of companies defaulting on
> commercial paper over the last thirty years.  Most issues are of a
> very short-term nature making it easier to assess the ability of the
> issuer to meet the obligation than for longer-term debt.  Also, most
> issuers are large companies with strong credit.  Moody's has
> reported default data on commercial paper from the period 1972-
> 2004 showing that issues rated P-1 or P-2 . . . have both had a 0%
> default rate over a 30 day horizon and default rates over a 365 day
> horizon of only .02% and .11%, respectively.[7]

As of the end of 2008, *money market funds were by far the largest holders of commercial

paper*, owning roughly one-third of all outstanding commercial paper.[8]

### 3.    The Fund Invested in Lehman Commercial Paper and Fully Disclosed Those Investments[9]

As noted, the Fund made investments in commercial paper beginning in 2006.  (*See

supra* at Section A.1.)  These investments included commercial paper issued by Lehman.  These

investments were fully and timely disclosed.  In the Fund's 2007 Semi-Annual Report as of

November 30, 2007, it was reported that the Fund had invested in Lehman's commercial paper in

---

within that class) that is comparable in priority and security with the security."  17 C.F.R.
§ 270.2a-7(a)(21)(i).
[7] Standard & Poor's, *Commercial Paper – A Primer*, at 1, 3 (Sept. 10, 2008), *available at*
http://www2.standardandpoors.com/spf/pdf/index/Commercial_Paper_Primer.pdf (Ex. 7, attached hereto).
[8] Federal Reserve Board, Statistical Release Z.1: Flow of Funds Accounts of the United States;
Flows and Outstanding, Fourth Quarter 2009, at 88, Table L.208 (Mar. 11, 2010), *available at*
http://www.federalreserve.gov/releases/z1/current/z1.pdf (Ex. 8, attached hereto).
[9] Of the Fund's various commercial paper investments, it is only the Fund's Lehman investments
that Plaintiffs specifically allege caused them to suffer their alleged harm and for which they
seek damages.  *See, e.g.*, Compl. ¶¶ 4, 6, & 77.

the face amount of $375 million.[10]  This investment in Lehman commercial paper represented 1.8% of all commercial paper held by the Fund and 1.0% of the Fund's total portfolio.[11]

In its 2008 Annual Report as of May 31, 2008, the Fund listed investments of approximately $34.7 billion in commercial paper (53.9% of the total portfolio).[12]  The Fund disclosed that $535 million in face value of that paper was issued by Lehman[13] (1.5% of all commercial paper and 0.8% of the total portfolio).

The Fund's Lehman investments also were disclosed in the Fund's Quarterly Schedule of Portfolio Holdings, which was filed with the SEC in April 2008.[14]  Furthermore, in accordance with the policies detailed in the Fund's Statements of Additional Information ("SAIs") that were filed in connection with (and incorporated by reference in) the 2006, 2007 and 2008 Prospectuses, the Fund made information concerning its portfolio holdings – including its investments in Lehman commercial paper –  available on demand to fund investors.[15]

> (a)  **The Fund's Lehman Investments Were Consistent with the Fund's Fully Disclosed Short-Term Investment Ratings Criteria**

The 2006 Prospectus provided that the Fund "may invest in securities rated in one of *the two highest short-term ratings*, generally by two of the nationally recognized statistical rating

---

[10] The Reserve Fund, Certified Shareholder Report of Registered Management Investment Companies as of November 30, 2007 (Form N-CSR), at 8-16/78 (Feb. 8, 2008), *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465908008455/a08-1786_1ncsrs.htm ("2007 Semi-Annual Report") (Ex. 9, attached hereto).
[11] *Id.*
[12] The Reserve Fund, Certified Shareholder Report of Registered Management Investment Companies as of May 31, 2008 (Form N-CSR), at 8-17/143 (Aug. 8, 2008), *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465908051129/a08-18071_1ncsr.htm ("2008 Annual Report") (Ex. 10, attached hereto).
[13] *Id.* at 8-22/143.
[14] The Reserve Fund, Quarterly Schedule of Portfolio Holdings for the quarter ended February 29, 2008 (Form N-Q), at 6/16 (Apr. 29, 2008), *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465908027852/a08-12099_5nq.htm (Ex. 11, attached hereto).
[15] The SAIs state that "[a] complete list of the portfolio holdings of each series of the Trust (the 'Funds'), as of the previous day if available, will be provided via facsimile by calling 800-637-1700.  This information is available to any person or entity on request."  *See* 2006 Prospectus at 70/165; 2007 Prospectus at 74/108; 2008 Prospectus at 59/93.

organizations."[16]   Appendix A to the 2006 Prospectus provides a description of the relevant

short-term rating categories, as follows:

> **Standard & Poor's** ("S&P") Instruments with the greatest capacity for timely payment are rated A by S&P. Issues (*including commercial paper*) within this category are further redefined with designations 1, 2 and 3 to indicate the relative degree of safety; A-1, the highest of the three, indicates the degree of safety regarding timely payment is strong; A-2 indicates that the capacity for timely repayment is satisfactory . . . .

> **Moody's Investors Service, Inc.** ("Moody's") employs the designations of Prime-1, Prime-2 and Prime-3 to indicate the relative capacity of the rated issuers (*which includes issuers of commercial paper*) to repay punctually. Prime-1 issues have a superior capacity for repayment. Prime-2 issues have a strong capacity for timely repayment, but to a lesser degree than Prime-1 . . . .[17]

In short, the 2006 Prospectus made clear that the Fund could invest in any security rated A-1 or

A-2 by Standard & Poor's and Prime-1 or Prime-2 by Moody's.

The 2007 Prospectus repeated the statement made in the 2006 Prospectus that the

Primary Fund "may invest in securities rated in one of the two highest *short-term* ratings,

generally by two of the nationally recognized statistical rating organizations."[18]   The 2007

Prospectus also contained the same descriptions of the relevant short-term rating categories as

the 2006 Prospectus.[19]

At all times during the putative class period in this case, including at all times the Fund

made its investments in Lehman commercial paper, *S&P gave Lehman's commercial paper*

*either an A-1 or A-1+ rating, and Moody's gave Lehman's commercial paper a Prime-1*

*rating.*[20]   It was not until September 15, 2008, the day that Lehman filed for bankruptcy

---

[16] 2006 Prospectus at 8/165 (emphasis added).
[17] *Id.* at 154/165 (emphasis added).
[18] 2007 Prospectus at 9/108 (emphasis added).
[19] *Id*. at 96/108.
[20] Forbes.com, *TEXT-Moody's release on Lehman Brothers Holdings Inc*, Thomson Financial News (Sept. 15, 2008), a*vailable at* http://www.forbes.com/feeds/afx/2008/09/15/afx5423059.html; Standard & Poor's, *Research Update:  Lehman Bros. Holdings Downgraded to "Selective Default"; Other Lehman Entities to "BB-" Or "R" (*Sept. 15, 2008) (Ex. 12, attached hereto); *See also* Lehman Brothers Holdings, Inc., Quarterly Report (Form 10-Q), at 95-97/123 (Oct. 10,

protection, that S&P and Moody's lowered their respective credit ratings of Lehman's commercial paper below their highest two ratings categories – S&P lowered its rating to B and Moody's lowered its rating to NP (Not Prime).[21]  In other words, from the time the Fund first invested in Lehman commercial paper until the very day before Lehman filed for bankruptcy protection (*see infra* at Section 2B), S&P and Moody's maintained Rule 2a-7 eligible ratings for Lehman commercial paper.  (*See supra* at Sections 2 and 3(a).)

      **B.**      **The Fund Plainly Disclosed That Its NAV Could Fall Below $1.00**

In its 2006 Prospectus, the Fund stated, in the section entitled "Principal Risks," that "[a]lthough [the Fund] seeks to preserve the value of your investment at $1.00 per share, *it is possible to lose money by investing in [the Fund].*"[22]  The 2006 Prospectus further provided that the Fund is subject to credit quality risk in that "*a decline in the credit quality of an issuer*, or of the provider of a credit support or maturity-shortening structure for a security, *can cause the value of a money-market security to decrease.*"[23]

The 2006 SAI issued by the Fund in connection with (and incorporated by reference in) the 2006 Prospectus, expressly stated in its Table of Contents, in italics, "*Shares of the funds are neither guaranteed nor insured by the U.S. government and there can be no assurance that a fund will be able to maintain a stable net asset value of $1.00 per share.*"[24]  In addition, the 2006 SAI stated that "[t]he investment objective of each Fund is to seek as high a level of current income as is consistent with preservation of capital and liquidity," but that "*[t]here can be no assurance that a Fund will achieve its investment objective*."[25]  The SAI filed as part of the 2007 Prospectus (the "2007 SAI") repeats the statement from the 2006 SAI that "[a]lthough each Fund

---

2007), *available at* http://www.sec.gov/Archives/edgar/data/806085/000110465907074207/a07-26158_110q.htm (Ex. 13, attached hereto); Lehman Brothers Holdings, Inc., Quarterly Report (Form 10-Q), at 106/151 (July 10, 2008), *available at* http://www.sec.gov/Archives/edgar/data/806085/000110465908045115/a08-18147_110q.htm. (Ex. 14, attached hereto).
[21] *See id.*
[22] 2006 Prospectus at 9/165 (emphasis added).
[23] *Id.* at 9/165 (emphasis added).
[24] *Id.* at 59/165 (emphasis in original).
[25] *Id.* 60/165 (emphasis added).

seeks to preserve the value of your investment at $1.00 per share, *it is possible to lose money by investing in a Fund.*"[26]

In a section of the 2006 SAI that describes the risks of investing in the funds, the SAI states that "[t]he principal risk factors associated with an investment in each Fund are the risk of fluctuations in short-term interest rates and the *risk of default among one or more issuers of securities* which comprise a Fund's assets."[27]

The 2007 Prospectus and SAI and the 2008 Prospectus and SAI repeat virtually word-for-word the principal risks of investing in the funds that were stated in the 2006 Prospectus and 2006 SAI.[28]  For instance, both the 2007 SAI and the 2008 SAI state, in ALLCAPS: "SHARES OF THE FUNDS ARE NEITHER GUARANTEED NOR INSURED BY THE U.S. GOVERNMENT, AND THERE CAN BE NO ASSURANCE THAT A FUND WILL BE ABLE TO MAINTAIN A STABLE NET ASSET VALUE OF $1.00 PER SHARE."[29]

### C.    The Lehman Bankruptcy and the Bankruptcy Examiner's Report

At approximately 12:30 a.m. on September 15, 2008, Lehman announced that it intended to file for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code.[30]  Later that day, Lehman made a Chapter 11 bankruptcy filing in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court").[31]  The filing led to heavy redemptions from many money market funds (including the Fund) that held Lehman debt securities.[32]

The Bankruptcy Court entered an order on January 16, 2009 directing the U.S. Trustee to nominate an examiner to "perform the duties specified in sections 1106(a)(3) and (4) of the

---

[26] 2007 Prospectus at 67/108 (emphasis added).
[27] 2006 Prospectus at 70/165 (emphasis added).
[28] 2007 Prospectus at 10/108 and 73/108; 2008 Prospectus at 8/93 and 58/93.
[29] 2007 Prospectus at 66/108; 2008 Prospectus at 51/93 (emphasis in original).
[30] Press Release, Lehman Brothers Holdings Inc., *Lehman Brothers Holdings Inc. Announces It Intends to File Chapter 11 Bankruptcy Petition* (Sept. 15, 2008), *available at* http://www.lehman.com/press/pdf_2008/091508_lbhi_chapter11_announce.pdf (Ex. 15, attached hereto); Grant Clelland, *Four Minutes That Changed The World*, Financial News, Sept. 15, 2008, *at* http://www.efinancialnews.com/story/2008-09-15/four-minutes-that-changed-the-world-1 (Ex. 16, attached hereto).
[31] *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008).
[32] SEC Proposal at 14.

Bankruptcy Code,"[33] which included filing a statement of investigation regarding, among other things, "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor."[34]  On January 20, 2009, the Bankruptcy Court approved the U.S. Trustee's appointment of Anton R. Valukas as Examiner (the "Examiner").[35]

The Examiner filed his Report under seal with the Bankruptcy Court in February 2010, and the Report was made public on March 11, 2010.  The Report found, *inter alia*, that Lehman had engaged in acts of financial manipulation;[36] that Lehman's public disclosures and failures to make certain disclosures created a misleading picture of its true financial condition that deceived even sophisticated parties;[37] and that government regulatory agencies, including the SEC, had failed in their oversight of Lehman.[38]

The Examiner's Report concluded that "There are many reasons Lehman failed, and the responsibility is shared . . . . Lehman's financial plight, and the consequences to Lehman's creditors and shareholders, was exacerbated by Lehman executives, whose conduct ranged from serious but non-culpable errors of business judgment to actionable balance sheet manipulation; by the investment bank business model, which rewarded excessive risk taking and leverage; and by Government agencies, who by their own admission might better have anticipated or mitigated the outcome."[39]  The Examiner also found that there were "colorable claims" against JP Morgan Chase and Citibank in connection with modifications of certain guaranty agreements they had with Lehman.  The Examiner determined that their increasing collateral demands *in Lehman's*

---

[33] Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code at 5, *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009), ECF No. 2569 (Ex. 17, attached hereto).

[34] Report of Anton R. Valukas, Examiner, Vol. 1 at 28, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Mar. 11, 2010), ECF No. 7531 (the "Examiner's Report" or "Report") (Ex. 18, attached hereto).

[35] Order Approving Appointment of Examiner, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Jan. 20, 2009), ECF No. 2583 (Ex. 19, attached hereto).

[36] *See, e.g.*, Examiner's Report, Vol. 1 at 5-6.

[37] *See, e.g.*, *id.*, Vol. 1 at 9, 17, 21; Vol. 3 at 747, 967, 977, 984.

[38] *See, e.g.*, *id.*, Vol. 1 at 14; Vol. 4 at 1482-83, 1488, 1510.

[39] *Id.*, Vol. 1 at 2-3.

*final days* had a "direct impact" on Lehman's diminishing liquidity, which was a prime cause of Lehman's demise.[40]

## ARGUMENT

Plaintiffs have essentially brought two separate securities fraud cases: the Investment Strategy Case and the NAV Case.  Both should be dismissed.

The Investment Strategy Case is based on Defendants' supposed misstatement of the risks associated with the Fund's commercial paper investments.  The alleged false statements are contained both in offering materials (Section 11, Section 12, and Section 10(b) claims) and in other public disclosures and statements (Section 10(b) claims only).  The Investment Strategy Case ends on September 15, prior to the opening of the market, when Lehman announced that it would file for bankruptcy.  Compl. ¶ 182 ("These holdings subjected the Primary Fund to the substantial and unreasonable risk of debtor default on commercial paper, and these risks became reality when Lehman Brothers filed for bankruptcy.").[41]  Plaintiffs fail to adequately plead that Defendants made any actionable misstatements concerning the Fund's investment strategy or that there is a strong inference that any of the Defendants acted with scienter.

The NAV Case covers the two days after the Lehman bankruptcy was announced (September 15 and 16) and is based on Defendants' supposed misstatement of RMCI's intention to enter into a credit support agreement for the Fund.  The alleged false statements are contained in public disclosures and statements (Section 10(b) claims only).  Plaintiffs fail to adequately plead reliance on these alleged false statements.

---

[40] *Id.*, Vol. 1 at 24.

[41] Once the "truth" about the Fund's commercial paper investments was revealed, any claims based on statements about the Fund's investment strategy were no longer sustainable.  *See In re Merrill Lynch Auction Rate Secs. Litig.*, No. 1:08-cv-03037-LAP, 2010 U.S. Dist. LEXIS 33532, at *41-52 (S.D.N.Y. Mar. 31, 2010) (plaintiffs failed sufficiently to plead reliance where information allegedly concealed was publicly available); *Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) ("[A] complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested.") (emphasis in original).

In sum, Plaintiffs' securities fraud claims fail to meet the strict pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "Reform Act").  Also, Plaintiffs' tag-along federal and state law claims are deficient on their face.  The Complaint should be dismissed in its entirety.

## I.     Applicable Pleading Standards

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must grant a motion to dismiss where the allegations of the complaint fail to provide "'plausible grounds' for the allegations with 'enough facts to raise a reasonable expectation that discovery will reveal evidence' to support them."  *Coronel v. Quanta Captial Holdings, Ltd.*, No. 7 Civ. 1405(RPP), 2009 WL 174656, at *10 (S.D.N.Y. Jan. 26, 2009) (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544 (2007)).  While the Court must accept all well-pleaded facts as true, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

These general pleading standards are heightened in cases alleging federal securities fraud claims.  First, Rule 9(b) of the Federal Rules of Civil Procedure requires that "circumstances constituting fraud . . . shall be stated with particularity."  Pursuant to this pleading standard, the Second Circuit "has repeatedly required . . . that the pleading 'explain why the statements were fraudulent.'"  *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Second, the Reform Act "imposes similar requirements to claims brought under the Exchange Act: 'the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'"  *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).

To satisfy the heightened pleadings standards of Rule 9(b) and the Reform Act, a plaintiff cannot rely on fraud-by-hindsight, but must plead detailed contrary facts existing contemporaneously with the statement.  *See, e.g.*, *In re Merrill Lynch Research Secs. Litig.*, No. 03 CV 4090(MP), 2004 WL 305809, at *4 (S.D.N.Y. Feb. 18, 2004).  To the extent that a

plaintiff relies on documents, the plaintiff must describe their contents, who prepared them, and which officers reviewed them. *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 53 (E.D.N.Y. 1998).

The Second Circuit has held that the heightened pleading standards for falsity apply to Section 11 and Section 12 claims "insofar as the claims are premised on allegations of fraud." *Rombach*, 355 F.3d at 171.  Plaintiffs attempt to avoid this outcome by stating that they "specifically exclude" any allegations of fraud in connection with their Section 11 and Section 12 claims.  Compl. ¶¶ 193, 206.

Plaintiffs' description or classification of their Section 11 and Section 12 claims is irrelevant.  Plaintiffs "cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness." *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005).  The real nature of Plaintiffs Section 11 and Section 12 claims is revealed by the fact that these claims and Plaintiffs' securities fraud claims are based on *the exact same statements*, which are alleged to be false for *the exact same reasons*.  Compl. ¶¶ 191, 204.  Moreover, in an attempt to avoid the effects of this Court's bar order against indemnifiable claims, Plaintiffs assert that their Section 11 and 12 claims do not allege negligence (the normal standard for non-issuers) but are "based solely on [Defendants'] actions which constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties."  Compl. ¶¶ 193, 206.

The Plaintiffs cannot have it both ways: either their Section 11 and Section 12 claims "sound in fraud" (e.g., willful misfeasance) or they do not.  Under these circumstances – where Plaintiffs themselves assert that their Section 11 and Section 12 claims are based on something more than negligence – there can be no doubt that they sound in fraud and Plaintiffs must plead particularized facts demonstrating the falsity of the alleged misstatements upon which these claims are based.  *See Rombach*, 355 F.3d at 172; *Wagner v. First Horizon Pharm. Corp.*, No. 05-14365, 2006 WL 2661652, at *3 (11th Cir. Sept. 18, 2006) ("It would strain credulity to claim that Rule 9(b) should not apply in this allegation: The defendant is a no good defrauder,

but, even if he is not, the plaintiff can still recover based on the simple untruth of the otherwise fraudulent statement.").

## II.   The Complaint Fails to Adequately Allege Any Misstatements or Omissions Related to the Investment Strategy Case

The Investment Strategy Case is based on Defendants' assurances to Fund investors "that their investments were safe, secure, and conservative." Compl. ¶ 5. According to Plaintiffs, these assurances were rendered false by the Fund's decision to invest in commercial paper. Compl. ¶ 6. The Investment Strategy case is entirely distinct from the SEC's action, which does not allege that Defendants engaged in *any* securities law violations prior to the filing of the Lehman bankruptcy.[42]   The SEC did not even attempt to bring these claims, nor could they have: the Defendants clearly did not make any actionable misstatements concerning the Fund's investments. The Fund publicly disclosed its decision to invest in commercial paper and, at all times, accurately informed investors of the extent of its commercial paper holdings (including its investments in Lehman commercial paper). Moreover, even if the Defendants' statements concerning the goals of the Fund, despite all of this public information, could somehow be described as misleading, they were clearly puffery and, as a result, immaterial as a matter of law.

### A.   The Fund's Disclosures Regarding Its Commercial Paper Investments Were Accurate and Fulsome

Plaintiffs allege that the Fund inaccurately described its investment strategy. According to the Complaint, the Defendants repeatedly emphasized the Fund's focus on "safety of principal, liquidity and soundness of sleep" and that the Fund was "designed as an investment vehicle for short-term cash management and is intended to provide liquidity to shareholders." Compl. ¶ 37; *see generally* Compl. ¶¶ 38-81. Plaintiffs contend that these statements, and many similar statements made by the Defendants prior to Lehman's bankruptcy, were false because the

---

[42] As a court in this district recently noted in a similar situation, the fact that the SEC's charges bore "little relationship to plaintiffs' claims" means that they should be given no weight in evaluating whether those claims have been adequately plead. *Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 381 n.6 (S.D.N.Y. 2010).

Fund chose to invest in commercial paper and lost money on its Lehman commercial paper investments.  What Plaintiffs conveniently ignore, however, is that investing in commercial paper (as determined by the SEC itself) was entirely consistent with a conservative investment strategy.

The SEC defines a money market fund as a type of mutual fund that invests in "government securities, certificates of deposit, *commercial paper of companies*, or *other highly liquid and low-risk securities*."  Compl. ¶ 35 (emphasis added).  In 2006, the Fund changed its investment strategy related to commercial paper.  While the Fund previously had disclosed to investors that it did "not invest in commercial paper" (Compl. ¶ 59), it decided to change its investment mix.  To ensure that this change received careful consideration from its investors, the Fund published a special March 22, 2006 SAI.  Compl. ¶ 62.  In the supplement, the Fund announced that it "may invest in obligations of corporations and other entities" and removed the earlier prohibition on commercial paper investing.[43]

In its next SAI, published on September 26, 2006 (the start of the putative class period in this case), the Fund expanded on its commercial paper disclosures.  First, the Fund specifically stated that, as a subcategory of corporate debt obligations, it may invest in commercial paper.[44]  Second, any "investments in commercial paper will be of high quality (i.e., rated A-1 or A-2 by S&P, Prime 1 or Prime 2 by Moody's, and, if unrated, of comparable quality)."[45]  Third, the Fund made it clear that credit ratings, while helpful in evaluating the safety of principal and interest payments, "do not evaluate the volatility of a debt security's value or its liquidity and do not guarantee the performance of the issuer."[46]  Finally, and more generally, the Fund disclosed that "it is possible to lose money by investing" in the Fund, it is possible the Fund's NAV may fall below $1.00, and the principal risk factors associated with investing in the Fund, included "the risk that the issuer will not make timely payments of principal and interest" and the extent

---

[43] 2006 Prospectus at 64/165.
[44] *Id.*
[45] *Id.*
[46] *Id.*

of that risk depended "on the issuer's financial condition."[47]  These disclosures were repeated in the Fund's 2007 SAI.[48]

Prior to the financial crisis, most market participants (consistent with the SEC's view) considered commercial paper to be a "safe asset" because of its short maturity and the high credit rating of its issues.[49]  A Standard & Poor's primer on commercial paper, issued on September 10, 2008 (just days prior to Lehman's bankruptcy), noted that "[t]here have been very few cases of companies defaulting on commercial paper of the last thirty years."[50]  In particular, the primer noted that Moody's, another credit rating agency, had "reported default data on commercial paper from the period 1972-2004 showing that issues rated P-1 or P-2 . . . have both had a 0% default rate over a 30 day horizon and default rates over a 365 day horizon of only .02% and .11%, respectively."[51]

Given the relative safety of commercial paper investments, combined with a higher yield than other short-term assets, it is no surprise that money market funds (including the Fund) were the largest holders of commercial paper.[52]  Standard & Poor's estimated that money market funds accounted for roughly 1/3 of *all* outstanding commercial paper.[53]  While Plaintiffs suggest that there was something unusual about the fact that as of "August 2008, 57% of the Primary Fund's portfolio was in commercial paper" (Compl. ¶ 63), the Fund's commercial paper holdings were completely in line with other large money market funds.  For example, in that same time period, the two largest Morgan Stanley money market funds held 53% and 49% of their net asset values in commercial paper.[54]

---

[47] *Id.*
[48] 2007 Prospectus at 67, 70, 73/108.
[49] Marcin Kacperszyk and Philipp Schanbl, *When Safe Proved Risky:  Commercial Paper during the Financial Crisis of 2007-2009*, J. Econ. Perspectives 29, Winter 2010.
[50] Standard & Poor's, *Commercial Paper – A Primer* at 3.
[51] *Id.*
[52] *Id.* at 2.
[53] *Id.*
[54] *See* Morgan Stanley Institutional Liquidity Funds, Quarterly Schedule of Portfolio Holdings of Registered Management Investment Company (Form N-Q), at 14-27/54 (July 31, 2008), *available at* http://www.sec.gov/Archives/edgar/data/1227155/000110465908060844/a08-24062_1nq.htm (Ex. 20, attached hereto).

Nor was there anything unusual or hidden about the Fund's investment in Lehman commercial paper.  When the Fund began investing in Lehman commercial paper in 2007, it promptly reported its investment in its 2007 Semi-Annual Report.  At that time, the Fund's investments in Lehman commercial paper totaled $375 million and represented 1.0% of the total portfolio.[55]  Similarly, in its 2008 Annual Report, the Fund disclosed that its investments in Lehman commercial paper and other debt totaled $785 million and represented 1.2% of the total portfolio.[56]  As Plaintiffs' concede in their Complaint, these disclosures were effective – the Fund's investors were fully aware of their exposure to Lehman commercial paper.  Compl. ¶¶ 84, 88.

Moreover, the Primary Fund's investment in Lehman Brothers commercial paper was inherently conservative because it *exceeded* the SEC's requirements for money market fund investing.  While the SEC only required that "eligible securities" be rated in one of the top two NRSRO short-term rating categories (17 C.F.R. Sec. § 270.2a-7(a)(10)), the Lehman commercial paper was rated by both Moody's and Standard & Poor's in their top short-term ratings categories (A-1 and P-1, respectively).[57]  In other words, the Lehman Brothers commercial paper was more highly rated, and therefore presumably less likely to default, than was required.  The Lehman commercial paper maintained its top rating throughout the pre-bankruptcy period.[58]

Investing in commercial paper was entirely consistent with the Fund's objective, common to all money market funds, "to seek as high a level of current income as is consistent with preservation of capital and liquidity."  Compl. ¶ 39.[59]  To sum up, the SEC permitted money

---

[55] 2007 Semi-Annual Report at 8-16/78.
[56] 2008 Annual Report at 8, 13 & 22/143.
[57] *See* Forbes.com, *TEXT-Moody's release on Lehman Brothers Holdings Inc*, Thomson Financial News; Standard & Poor's, *Research Update:  Lehman Bros. Holdings Downgraded to "Selective Default"; Other Lehman Entities to "BB-" Or "R"*; *see also* Lehman Brothers Holdings, Inc., Quarterly Report (Form 10-Q), at 95-97/123; Lehman Brothers Holdings, Inc., Quarterly Report (Form 10-Q).
[58] *Id.*
[59] The Fund's investment objective was the same as any other money market fund, including funds like JP Morgan Prime Money Market Fund and Evergreen Institutional Money Market Fund that held significant amounts of commercial paper.  *See, e.g.*, JP Morgan Trust I, Registration Statement Under the Securities Act of 1933 (Form N-1A), at 220/1108 (July 1,

market funds to invest in commercial paper, money market funds were the largest holders of commercial paper, the Lehman commercial paper held by the Fund had the highest possible credit ratings, and the Fund's investments in commercial paper were fully and accurately disclosed to the public.  Most importantly, Plaintiffs provide no facts suggesting, contrary to the ratings information, that the Fund's investments in commercial paper were anything other than "low risk."  *Yu v. State St. Corp.*, 686 F. Supp. 2d at 376 (rejecting allegations that fund's investments were not "high-quality" in absence of facts calling ratings into question).  Under these circumstances, the claim that the Fund's description of its investment strategy was false "must be dismissed for lack of facial plausibility."  *Id.*

While Lehman's bankruptcy revealed that its commercial paper (but not the commercial paper of other issuers) was more risky than expected, the Court should reject any attempt by Plaintiffs to use hindsight to impugn the Fund's disclosures.  As for the Section 11 and Section 12 claims, "the accuracy of offering documents must be assessed in light of information available at the time they were published."  *Id.* at 377; *see also Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (claim under Section 11 or 12 "requires plaintiffs to, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering") (internal citation omitted).  Plaintiffs' claims are limited to statements contained in the registration statements, prospectuses, and SAIs issued by the Fund in September 2006 and September 2007.  Compl. ¶ 194, 207.  The Complaint contains no facts, however, that would support a conclusion that as of those dates, at least a year before the Lehman bankruptcy, Defendants knew or could have known of the supposed riskiness of investing in commercial paper.  *Yu*, 686 F. Supp. 2d at 377 ("backward-looking assessment of

---

2008), *available at* http://www.sec.gov/Archives/edgar/data/1217286/000114544308001998/d23382.htm (Ex. 21, attached hereto) ("The Fund aims to provide the highest possible level of current income while still maintaining liquidity and preserving capital."); Evergreen Select Money Market Trust, Registration Statement Under the Securities Act of 1933 (Form N-1A), at 5/281 (July 1, 2008), *available at* http://www.sec.gov/Archives/edgar/data/1046233/000090724408000376/wrapper.htm (Ex. 22, attached hereto) ("The Fund seeks to achieve as high a level of current income as is consistent with preserving capital and providing liquidity.").

the infirmities" of investments "cannot help plaintiffs' case").  Nor does Plantiffs' reliance on news reports in 2008 concerning Lehman's financial troubles provide any assistance.  Compl. ¶¶ 79-93.  The news reports came out after the September 2007 offering materials were issued and, as for the Section 10(b) claims, investors are presumed to be aware of public information concerning their investments.  *See In re Sec. Capital Assurance Ltd. Secs. Lit.*, 07 Civ. 11086(DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010) (where plaintiffs have access to same information concerning investment's risks, defendants cannot be liable for securities fraud); *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 545 (S.D.N.Y. 2009) (omission of information that "reasonable investor" would already know is not material).  The Fund clearly communicated that Lehman commercial paper was "significant to the Fund's portfolio and allowed investors to evaluate that investment strategy against existing economic trends."  *Yu*, 686 F. Supp. 2d at 377.  Accordingly, even assuming that the news about Lehman's financial troubles rendered the Fund's ongoing descriptions of its investment strategy misleading, these statements were not material given the total mix of information available to the marketplace.  *Id.*[60]

**B.    Defendants' Statements Concerning the Fund's "Goals" Are Immaterial as a Matter of Law**

The Fund and its officers frequently stated during the class period, in various different ways, that the Fund was "focused on protecting your principal, providing daily liquidity and transparency, and all the while boring you into a sound sleep."  Compl. ¶ 43; *see also* Compl. ¶¶ 42, 45-57.  Plaintiffs allege that these statements were false and misleading because the Fund's investments in commercial paper were "risky."  Compl. ¶¶ 59-75.  As discussed above, Plaintiffs

---

[60] Only certain categories of individuals/entities can be defendants in a Section 11 claim.  15 U.S.C. § 77k(a).  Plaintiffs improperly include RMCI as a Section 11 defendant, even though as the Fund's investment advisor RMCI does not fit within any of the enumerated categories. Plaintiffs attempt to solve this problem by describing RMCI as a "de facto issuer of the shares of the Primary Fund."  Compl. ¶ 196.  Courts have rejected this pleading maneuver in other cases and this Court should as well.  *See, e.g., In re Am. Bank Note Holographics, Inc. Secs. Litig.*, 93 F. Supp. 2d 424, 436 (S.D.N.Y. 2000) (entity that did not sign the registration statement is not an issuer, no matter what label plaintiffs sought to use).

allege no facts that would support a finding that Defendants engaged in "risky" investments that belied their statements.  Even if Plaintiffs could make this showing, however, the Defendants' statements concerning the Fund's "goals" are immaterial as a matter of law.

The Second Circuit has made it clear that "generalizations regarding [a company's] business practices" are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."  *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (internal quotations omitted).  In *ECA*, the court considered whether a bank's statements concerning its "highly disciplined" risk management, reputation for "integrity," and "focus on financial discipline" could have been material to a reasonable investor.  *Id.* at 205-26.  The court concluded that "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements."  *Id.* at 206.  Similarly, Defendants' statements concerning the Fund's protection of investors' principal and boring investment strategy are similar to the statements made by every other money market fund.  There is no reason to believe that any investor would consider these statements, which effectively amounted to the Fund's advertising slogan, in making his or her investment decision.  *See Zerman v. Ball*, 735 F.2d 15, 20-21 (2d Cir. 1984) (E.F. Hutton advertising slogan and characterization of bonds as "marvelous" "do not constitute representations of fact that could be actionable under the securities laws"); *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ 318(RJS), 2009 WL 2242605, at *23 (S.D.N.Y. July 27, 2009) ("Defendants' advertisements regarding their aspirations for customer relationships were immaterial puffery.");  Plaintiffs' claims based on the Defendants' statements concerning the Fund's "goals" must be dismissed on this basis alone.[61]

---

[61] The Section 12(a)(2) claim also fails for an entirely independent reason.  A Section 12(a)(2) claim only may be brought against a "seller" of securities, meaning a seller "must have either (1) passed title of the security to the plaintiff or (2) successfully solicited the purchase motivated at least in part by his own financial interest."  *In re Deutsche Telekom AG Secs. Litig.*, No. 00 CIV 9475, 2002 WL 244597, at *3 (S.D.N.Y. Feb. 20, 2002) (approving the application of the definition of "seller" under Section 12(1) of the Securities Act, as defined in *Pinter v. Dahl*, 486 U.S. 622, 647 (1988), to Section 12(a)(2) claims); *see* 15 U.S.C. § 77*l*(a)(2).  Plaintiffs allege that all of the Defendants were sellers (Compl. ¶ 208), but this type of boilerplate pleading is

**III.    The Complaint Fails to Adequately Allege a Strong Inference of Scienter with Respect to the Investment Strategy Case**

A separate element of a Section 10(b) claim is scienter (i.e., fraudulent intent).  Plaintiffs cannot adequately plead scienter for their Investment Strategy case when they have failed to show that Defendants made any material false statements (*see* Section II, *supra*).  Even assuming, *arguendo*, that Plaintiffs have met the heightened pleading standards for falsity, they have not alleged sufficient facts suggesting that Defendants were engaged in a fraud.  Under the *Tellabs* standard, a court must consider "whether *all* of the facts alleged, taken collectively" give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the alleged facts."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 324 (2007).  The requisite "strong" inference of scienter may arise from well-plead allegations that defendants: "(1) benefitted in a concrete and personal way from the purported fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . ; or (4) failed to check information that they had a duty to monitor . . . ."  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

As to the Investment Strategy case, the Complaint is devoid of any scienter allegations other than the Defendants' alleged desire to increase the management and advisory fees earned by RMCI.  Compl. ¶¶ 66-72.  Courts in this District are "divided on whether the receipt of fees alone is enough to satisfy the 'motive' requirement."  *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008).  Even if the receipt of fees is sufficient, however, it must be set against an examination of the other *Novak* factors.  Plaintiffs do not allege that Defendants engaged in any deliberately illegal behavior or failed to check any information that they had a duty to monitor.  Instead, Plaintiffs rely entirely on Defendants' supposed knowledge

---

clearly insufficient.  *See, e.g.*, *In re Deutsche Telekom*, 2002 WL 244597, at *5 ("bald allegations of solicitation are insufficient" to confer "seller" status under Section 12).  Nor is Plaintiffs' allegation that Reserv Partners acted as an "underwriter" sufficient as to that entity.  *Foster v. Jesup & Lamont Secs. Co.*, 759 F.2d 838, 845 (11th Cir. 1985) ("[t]he fact that Congress made every underwriter liable in § 11, but not in § 12, suggests that underwriters are not to be liable under § 12 solely by virtue of their status as underwriters.").

22

of the "risky" nature of commercial paper (and Lehman commercial paper in particular).  Compl. ¶¶ 66-72.

Plaintiffs fail to provide any allegations, however, suggesting that Defendants knew the Fund's commercial paper investments were "risky" prior to the Lehman bankruptcy.  As discussed in greater detail above, the SEC permitted money market funds to hold commercial paper and viewed commercial paper as a "low risk" investment, commercial paper had low default rates, and the Lehman commercial paper held by the Fund had the highest possible credit ratings.  Moreover, the Fund's investments in commercial paper were fully and accurately disclosed to the public, including the exact extent of the Fund's exposure to Lehman commercial paper.  The Fund's investors also had access to the same news reports about Lehman's financial status as were available to Defendants.  *Sec. Capital*, 2010 WL 1372688 at *26 (scienter inadequately plead where "[p]laintiffs were just as aware of the housing market crisis as they allege Defendants were, but they did not act on that information").  Perhaps even more importantly, both Defendants and the Fund's investors were victims of Lehman's apparent misstatements concerning its financial strength.  (*See* Section A.I(a)(3)(C), *supra*.)  There can be no strong inference of scienter under these circumstances, which create a cogent and compelling alternative explanation that the entire market, including the ratings agencies, underestimated (with fraudulent assistance from Lehman) the true risk that Lehman would file for bankruptcy. *Id.*

## IV.   The Complaint Fails to Adequately Allege Reliance as to the NAV Case (or *Any* of the Section 10(b) Claims)

The Section 10(b) claims brought by Plaintiffs are based on alleged affirmative misstatements concerning the risks associated with the Fund's investments (Investment Strategy Case) and RMCI's intention to enter into a credit support agreement (NAV Case).  Plaintiffs invoke the fraud-on-the-market doctrine to substitute for a showing of individual reliance for these Section 10(b) claims (Compl. ¶ 189), but clearly do so improperly.

The fraud-on-the-market doctrine "is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 242-45 (1988) (internal quotations and citation omitted).  The price of a company's stock therefore reflects all publicly available information and, hence, any material misstatement.  *Id.* As a result, in a fraud-on-the-market case, the allegedly injured investors do not have to show that they relied on any particular misstatement.  Instead, there is a presumption of reliance.  *Id.*

The fraud-on-the-market doctrine, however, cannot be invoked if the securities in question do not trade on an "efficient" market.  *In re Livent, Inc. Noteholders Secs. Litig.*, 211 F.R.D. 219, 221 (S.D.N.Y. 2002) (fraud-on-the-market theory applies only where the applicable market is efficient).  An efficient market is one that "rapidly incorporates all publicly available information about a company's business and financial situation into the company's stock price." *Id.*  Accordingly, the price of the security fluctuates as this information is incorporated.

Plaintiffs state that "the market for Primary Fund shares was efficient and well-developed and promptly digested current information from all publicly available sources and reflected such information in the market for these securities."  Compl. ¶ 189.  Plaintiffs carefully do not, because they cannot, assert that information about the Fund was reflected in the Fund's *share price*.  In fact, the Fund's share price was determined in an entirely different way.  The price was based on the NAV per share – i.e., the total value of assets for each share class, subtracting its liabilities, and then dividing by the number of shares of that class that are issued and outstanding.[62]  The total value of assets was the value of the underlying securities in the Fund's portfolio.[63]

Based on this valuation and pricing process, information about the Fund did not affect its share price, which was generally maintained at a steady $1.00 per share.[64]  In other words, there

---

[62] 2007 Prospectus at 25/108.
[63] *Id.*
[64] *Id.* at 26/108.

was no "efficient" market for Fund shares that incorporated information about the Fund into its share price and, as a result, the fraud-on-the-market theory cannot be invoked.  Plaintiffs need to plead, with particularity, each individual class member's reliance upon the alleged misstatements.  The Complaint is devoid of any such allegations (even as to Third Avenue, the lead plaintiff).

There is nothing novel about this conclusion.  At least three district courts, including a court in this District, have held that prices of mutual funds (which also are calculated on a NAV basis) are not determined by an "efficient market," and rejected a fraud-on-the-market theory of reliance.  As held by Judge Sweet in the *Clark* case, "a plaintiff who has allegedly acquired shares in a mutual fund . . . may not establish reliance by invoking the integrity of the market or the so-called fraud-on-the-market theory."  *Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702(RWS), 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005).  This outcome is dictated by the fact that the share price of a mutual fund "is unaffected by alleged misrepresentations and omissions concerning the fund itself."  *Id.*; *see also In re Van Wagoner Funds, Inc.*, 382 F. Supp. 2d 1173, 1188 (N.D. Cal. 2004) (because "a mutual fund share price is not determined by the market, but the underlying asset value," fraud-on-the-market doctrine is inapplicable); *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998) (same).  Accordingly, Plaintiffs fail to adequately plead reliance and their Section 10(b) claims must be dismissed.[65]

## V.   There Is No Private Right of Action Under Section 13(a) of the Investment Company Act and, in Any Event, the Complaint Does Not Establish That Any Violation Occurred.

Plaintiffs allege that Defendants violated Section 13(a)(3) of the Investment Company Act of 1940 ("ICA") when they invested in commercial paper and caused the Fund to deviate

---

[65] To state claims for control-person liability under Section 15 of the Securities Act and Section 20(a) of the Exchange Act, Plaintiffs must allege both "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator."  *In re Global Crossing, Ltd. Secs. Litig.*, No. 02 Civ. 910, 2005 WL 2990646, at *7 (S.D.N.Y. Nov. 7, 2005) (quotations omitted).  Plaintiffs fail to adequately allege a primary violation of the Securities Act or Exchange Act by any of the defendants, as discussed *infra*.  Accordingly, Plaintiffs' control-person liability claims also must be dismissed.  *See, e.g.*, *Rombach*, 355 F.3d at 177-78.

from its "fundamental policy" without first obtaining shareholder authorization.  Compl. ¶¶ 250-51.  Relying on the Second Circuit's decision in *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429 (2d Cir. 2002), a court in this District recently dismissed a similar Section 13(a)(3) claim on the ground that Section 13(a)(3) does not create a private right of action.  *Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*, No. 10 Civ. 1399, 2010 U.S. Dist. LEXIS 33788 (S.D.N.Y. Apr. 6, 2010) (Cedarbaum, J.).  This Court should dismiss Plaintiffs' claim for the same reason.

Even if there were a private right of action under Section 13(a), Plaintiffs have inadequately plead such a claim.  "There can be no violation of Section 13(a)(3) [where] plaintiffs do not properly allege that the Fund's investment objective was changed."  *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 731 (2d Cir. 1998).  In *Hunt*, the Second Circuit refused to permit a plaintiff to pursue a claim under Section 13(a) to allege that investments in "speculative" sovereign debt and mortgage derivative products were inconsistent with the defendant fund's investment objective "to seek the highest level of current income, consistent with what the Fund's Adviser considers to be prudent investment risk."  *Id.*  The Complaint similarly alleges the Fund deviated from its fundamental investment objective by investing in new securities.  Compl. ¶¶ 249-50.  Yet, as discussed at length above, Plaintiffs fail to establish how commercial paper investments are inconsistent with seeking "as high a level of current income as is consistent with the preservation of capital and liquidity."  Compl. ¶ 37 (quoting 2006 and 2007 Prospectuses filed with the SEC).

Moreover, the Fund's SAIs specifically set forth which "fundamental policies" cannot be changed except by a vote.[66]  Noticeably absent from the list is the requirement for a shareholder vote when deciding whether or not to invest in commercial paper and the Complaint does not otherwise allege a violation of any of the policies listed in the SAIS.  Thus, the Complaint fails to

---

[66] 2006 Prospectus at 60/165; 2007 Prospectus at 67/108.

identify a particular policy or policies requiring a shareholder vote from which Defendants purportedly deviated.

      For all of these reasons, Plaintiffs' Section 13(a) claim should be dismissed.

## VI.   The Section 36(b) Claim Must Be Dismissed Because the Complaint Fails to Allege "Unreasonable Fees" and Seeks Improper Damages

      By bringing a claim under Section 36(b) of the ICA, Plaintiffs are effectively alleging that the management fees and other fees received by Defendants were "excessive" and violated the Defendants' "fiduciary duty with respect to the receipt of compensation" from the Fund. 15 U.S.C. § 80a-36(b); Compl. ¶¶ 254-65. To state a claim under Section 36(b), however, Plaintiffs must show that the challenged fee was "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418, 1425 (2010) (quoting *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982)). To do so, a "complaint may not simply allege in a conclusory manner that advisory fees are 'excessive,'" which Plaintiffs do not, in fact, even bother to do. "Instead, a plaintiff must allege facts that, if true, would support a claim that the fees at issue are excessive." *Fitzgerald v. Citigroup Inc*., No. 03 Civ. 4305(DAB), 2007 U.S. Dist. LEXIS 15365, at *29 (S.D.N.Y. Feb. 22, 2007) (quotation and citation omitted).

      To properly allege "excessive" fees, Plaintiffs must plead facts addressing the following six factors: (1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comprehensive fee structures; and (6) the independence and conscientiousness of the trustees. *Amron v. Morgan Stanley Inv. Advisors Inc*., 464 F.3d 338, 340 (2d Cir. 2006); *see also Gartenberg*, 694 F.2d at 929-30. Plaintiffs fail to plead facts relating to *any* of the six relevant factors and, as noted, never allege that the fees were so large that they bore no reasonable relationship to the services rendered. Instead, the Complaint avers that Defendants fraudulently brought in investors, which in turn increased the amount of their advisory fees.

Plaintiffs' allegation is akin to a claim for "improper" fees, which cannot be brought pursuant to Section 36(b).  *See, e.g.*, *In re Salomon Smith Barney Mut. Fund Fees Litig*., 528 F. Supp. 2d 332, 338 (S.D.N.Y. 2007).  In *Salomon*, the plaintiffs alleged that the defendants failed to reduce their fees to reflect benefits received from directed brokerage, soft dollar payments, and transfer agency fees.  However, the plaintiffs, as in the instant case, failed to make any allegations concerning the *amount* of the fees charged and rather focused on the *propriety* of the fees.  The court explained that "[t]he § 36(b) test is basically an economic one where the improper use of fees is not 'excessive per se.'"  *Id*.  The court found that the plaintiffs had failed to meet the relecvant pleading requirements for "excessive" fees and granted the defendants' motion to dismiss.  *See also In re Eaton Vance Mut. Funds Fee Litig*., 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005) ("The allegations that the defendants authorized improper 12b-1 fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under 36(b), which addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether the investment advisers acted improperly in the use of the funds."); *Bellikoff v. Eaton Vance Corp*., 481 F.3d 110, 114 (2d Cir. 2007) (fees generated from "shelf-space" payments schemes were improper rather than excessive).  As in *Salomon*, Plaintiffs' Section 36(b) claim should be dismissed.

Plaintiffs also improperly seek individual damages for the alleged Section 36(b) violation.  A Section 36(b) claim "must be brought in a representative capacity on behalf of the fund and with recovery going to the fund."  *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 98 (2d Cir. 2010).  It is well-settled law that under Section 36(b), "a claimant brings a 'direct' suit in name only and a 'derivative' one with respect to the recovery of any damages."  *In re Salomon Smith Barney Mut. Fund Fees Litig*., 441 F. Supp. 2d 579, 596 (S.D.N.Y. 2006).  "To the extent [plaintiff] seeks damages that inure to its own benefit and not to the Funds', that result is not permitted by § 36(b)."  *Operating Local 649 Annuity Trust Fund*, 595 F.3d at 98.

Individual damages are precisely what Plaintiffs seek.  The Complaint avers that "[a]s a direct and proximate result of these Defendants' breaches of fiduciary duty in respect to their compensation, the shares of the Primary Fund depreciated significantly at the end of the Class Period, causing significant damages to Lead Plaintiff and other members of the Class."  Compl. ¶ 265.  Because Plaintiffs are limited to seeking Section 36(b) damages on behalf of the Company on a derivative basis, to the extent they seek direct damages for the benefit of themselves, the claim also must be dismissed.[67]

## VII.   Plaintiffs' Various Derivative Claims Must Be Dismissed for Failure to Make a Demand

Plaintiffs' state law claims for breach of fiduciary duty and/or aiding and abetting a breach of fiduciary duty, gross negligence, and unjust enrichment are derivative, not direct, claims and should each be dismissed for failure to make a demand on the Fund as required under Federal Rule of Civil Procedure 23.1 and state law.[68]  A direct shareholder action is a claim by a shareholder to redress a personal injury for which the shareholder is entitled to relief.  The purpose of a direct shareholder suit is to compensate a shareholder from suffering a harm that the corporation itself has not suffered.  In contrast, a derivative shareholder suit allows shareholders to sue on behalf of the corporation to enforce a right of the corporation that the entity itself has failed to assert.

---

[67] Moreover, Lead Plaintiff appears to *lack standing* to bring the Section 36(b) derivative claim, as well as all the other derivative claims (incorrectly brought by Lead Plaintiff as direct claims) in this Complaint, because Lead Plaintiff fails to plead that it maintained shares of the Fund following the commencement of this action and throughout the litigation.  *See* Fed. R. Civ. P. 23.1 (requiring a derivative plaintiff to be a shareholder at the time of the act or omission complained of); Mass. Gen. Laws ch. 156D, § 7.41(1) (same); *Billings v. GTFM, LLC*, 449 Mass. 281, 291 n.21 (2007) (establishing "continuing ownership requirement" when bringing derivative claim, i.e., requiring the plaintiff remain an owner during the pendency of his suit).

[68] In determining whether a claim is derivative or direct, the court looks to the law of the state of the corporation at issue.  Here, the derivative claims belong to the Fund.  Because the Primary Fund is a series of the Reserve Fund, a Massachusetts business trust, the Court should look to Massachusetts law in determining whether a claim is derivative or direct.  "Under Massachusetts law, if the wrong underlying claim results in harm to a plaintiff shareholder only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative."  *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 112 (D. Mass. 2006) (citations omitted).

Under Massachusetts law, an investor who wishes to bring a derivative suit must make a demand on the company's board of directors to bring the case in the first instance.  Indeed, Massachusetts no longer recognizes "a futility exception to the demand requirement even if the directors are deemed to be 'interested' with respect to the subject matter of the demand." *Chambers v. Gold Medal Bakery, Inc.*, BRCV2009-00716, 2009 Mass. Super. LEXIS 344, at *26 (Sept. 17, 2009).  "Demand is an absolute prerequisite to the maintenance of a derivative action, and a complaint which fails to allege with particularity compliance with the demand requirement is fatally defective and subject to dismissal."  *Id.*; *see also Halebian v. Berv*, 631 F. Supp. 2d 284, 292-953 (S.D.N.Y. 2007) (discussing Massachusetts law).  Plaintiffs' claims are clearly derivative in nature, subject to the demand requirement, and therefore must be dismissed based on the Plaintiffs' failure to make the required demand.[69]

**A.      Breach of Fiduciary Duty**

A claim for breach of fiduciary duty may only be asserted derivatively.  *Friedman v. Mahasco Corp.*, 929 F.2d 77, 79 (2d Cir. 1991) (holding that breach of fiduciary obligation claims "could only be asserted derivatively on behalf of the corporation); *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 57 (E.D.N.Y. 2006) ("As a matter of law, a shareholder, such as Plaintiff, must bring a derivative action to sue a party for a breach of fiduciary duties to a corporation, . . . not against the individual shareholder."); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 406 (S.D.N.Y. 2002) (granting defendant's motion for summary judgment as to the plaintiff's breach of fiduciary duty claim on the ground that plaintiff must bring a shareholder derivative claim).  In *Friedman*, for example, shareholders appealed a district court's dismissal of what had been styled direct claims for breach of fiduciary duties in connection with a merger.  The Second Circuit affirmed the district court's holding that breach of

---

[69] Plaintiffs' breach of fiduciary duty, gross negligence, and unjust enrichment claims are all predicated upon the same alleged failure to make investments in accordance with the Fund's investment objective that forms the basis of Plaintiffs' federal securities claims in the Investment Strategy case.  Accordingly, the breach of fiduciary duty, gross negligence, and unjust enrichment claims are inadequately plead for the very same reasons as those federal securities claims.  *See supra.*

fiduciary duty claims can only be asserted derivatively on behalf of the corporation. *Friedman*, 929 F.2d at 79. When the primary injury is to the corporation, "the remedy lies with a shareholder's derivative action and a stockholder cannot proceed individually even though he may be injured by diminution of the value of his shares." *Press v. Marvalan Indus., Inc.*, 468 F. Supp. 1072, 1078 (S.D.N.Y. 1979). *See also Druck Corp. v. Macro Fund Ltd.*, 290 Fed. Appx. 441, 444 (2d Cir. 2008) ("[W]hen a plaintiff claims that a corporate officer 'breached her fiduciary duty to the corporation's shareholders,' thus causing 'damage to the [shareholders] in the form of diminution in the value of their shares,' 'such allegations plead a wrong to the corporation only, for which a shareholder can only sue derivatively, though he loses the value of his investment.'").

### B.   Gross Negligence

A claim for gross negligence may only be asserted derivatively. *San Diego Cnty. Emps.' Ret. Ass'n v. Maounis*, No. 07 Civ. 2618(DAB), 2010 U.S. Dist. LEXIS 25501, at *57-58 (S.D.N.Y. Mar. 15, 2010) (applying Delaware law) (holding that plaintiff's gross negligence claims are "paradigmatic derivative claims") (citation omitted); *see also Brister v. Schlinger Found.*, 469 F. Supp. 2d 371, 375 (E.D. La. 2007) (holding that plaintiff's negligence claim for injury suffered by the corporation as a result of the decrease in value of his shares was a derivative claim); 12B William Meade Fletcher, *et al.*, *Fletcher Cyclopedia of the Law of Private Corporations* § 5924 ("[a] shareholder ordinarily cannot, as an individual as distinguished from a representative of a corporation, sue directors or other corporate officers for mismanagement, negligence or the like," because such claims "belong to the corporation"). The Complaint alleges that Defendants were "grossly negligent in failing to exercise reasonable care" and "[a]s a result . . . Lead Plaintiff and the Class have been and will be irreparably harmed in that they have not and will not receive their fair portion of the value of the Primary Fund's assets and have been and will be prevented from obtaining a fair price for their shares." Compl. ¶¶ 282-83. Again, the Complaint's gross negligence claim based on the alleged decreased value of the

Case 1:08-cv-08060-PGG   Document 67   Filed 09/03/10   Page 41 of 44

shareholder's portion of the Primary Fund's assets does not allege an injury distinct from an injury to the corporation, making this a derivative claim.

### C.    Unjust Enrichment

A claim for unjust enrichment may only be asserted derivatively.  Unjust enrichment has the following elements: "(1) the defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit would be unjust."  *Bartfied v. Murphy*, 578 F. Supp. 2d 638, 648-49 (S.D.N.Y. 2008) (quoting *Gidadex, S.r.L. v. Campaniello Imps., Ltd.*, 49 F. Supp. 2d 298, 301 (S.D.N.Y. 1999)).  Here, the Complaint alleges that Defendants were unjustly enriched by virtue of their receipt of fees and financial benefits from the Fund. Because the Complaint fails to allege any injuries to the shareholders that are distinct from the Fund's injuries, the unjust enrichment claim also is derivative in nature and subject to the demand requirement.  *See Washtenaw Cnty. Emps.' Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*, No. 1:07-CV-862-CAP, 2008 U.S. Dist. LEXIS 53652, at *33 (S.D.N.Y. Mar. 31, 2008) (unjust enrichment claim derivative in nature and subject to demand requirement when plaintiff failed to allege injury to shareholders distinct from injury to the company itself).[70]

## VIII.  Plaintiffs' Common Law Fraud Claim is Preempted by SLUSA

Plaintiffs' common law fraud claim is preempted by the SLUSA, 15 U.S.C. §§ 78bb(f), 77p(b).  "SLUSA mandates dismissal when the following four-part test is met: (1) the . . . suit must be a 'covered class action'; (2) the action must be based on state or local law; (3) the action

---

[70] Plaintiffs' state law claims for breach of fiduciary duty and or aiding and abetting breach of fiduciary duty, gross negligence and unjust enrichment also should be dismissed because they are preempted by New York's blue-sky law, N.Y. Gen. Bus. Law §§ 352, *et seq.* (the "Martin Act"), which grants the Attorney General exclusive power to prosecute certain securities-related claims. *Barron v. Igolnikov*, No. 09 Civ. 4471, 2010 U.S. Dist. LEXIS 22267, at *14 (S.D.N.Y. Mar. 10, 2010).  In particular, "[t]he Martin Act preempts, at least, the following common law claims when they are predicated on the purchase or sale of securities within or from New York: negligence; breach of fiduciary duty; negligent misrepresentation; unjust enrichment; and aiding and abetting any of these claims."  *Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 172 (S.D.N.Y. 2009).

must concern a 'covered security'; and (4) the defendant must have misrepresented or omitted a material fact or employed a manipulative device or contrivance 'in connection with the purchase or sale' of that security." *Barron*, 2010 U.S. Dist. LEXIS 22267, at *9-10 (citation omitted).

The first three requirements for SLUSA preemption are easily met here. First, the Complaint alleges that the class members number in the thousands (Compl. ¶ 28), making this case a "covered class action" under SLUSA. 15 U.S.C. § 78bb(f)(5)(B)(i)(I) (involving a law suit in which "damages are sought on behalf of more than 50 persons or prospective class members . . ."). Second, the common law fraud claim is brought pursuant to state law. Finally, the Primary Fund shares are "covered securit[ies]" under SLUSA. 15 U.S.C. § 77r(b)(2) ("A security is a covered security if such security is a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940.").

The final requirement for SLUSA preemption – that the claims allege that the defendant either (1) "misrepresented or failed to disclose a material fact" in connection with the purchase or sale of a covered security; or (2) "used or employed any manipulative or deceptive device or other contrivance" in connection with the sale of a covered security – is also met. 15 U.S.C. § 77(p)(b); 15 U.S.C. § 78bb(1)(1). Here, the Complaint alleges "that the Reserve Defendants and the Bent Defendants knowingly or recklessly made, or caused to be made, numerous false and/or misleading statements and omissions regarding . . . the Class's investments in the Primary Fund." Compl. ¶ 274. Furthermore, the Class allegedly relied on these "materially false and misleading statements and omissions" when investing in the Primary Fund. Compl. ¶ 276. Finally, Defendants' alleged "fraudulent campaign" was designed to prevent the Class from receiving "their fair portion of the value of the Primary Fund's assets and . . . from obtaining a fair price for their shares." Compl. ¶¶ 277-78. The common law fraud claim clearly alleges

misrepresentations, omissions and in the connection with the purchase and sale of a security and should therefore be preempted under SLUSA.[71]

## IX.   The Court Should Decline To Exercise Supplemental Jurisdiction

If this Court dismisses the federal securities law claims, the Court also should decline to exercise supplemental jurisdiction over any of the state law claims in Counts IX through XII. *See* 28 U.S.C. § 1367; *Kaplan v. Shapiro*, 655 F. Supp. 336, 342 (S.D.N.Y. 1987) (declining to exercise supplemental jurisdiction over state claims after concluding that plaintiffs' federal securities claims failed).  In the alternative, if the Court dismisses the securities fraud claim, the common law fraud claim should also be dismissed because under New York law, the elements of a Section 10(b) claim are essentially the same as those for common law fraud.  *See In re Tremont Secs. Law, State Law & Ins. Litig.*, No. 08 Civ. 11117, 2010 U.S. Dist. LEXIS 32216, at *23-24 (S.D.N.Y. Mar. 30, 2010) (since plaintiff's Section 10(b) claim did not survive, plaintiff's common law fraud claim, based on the same allegations of fact, was dismissed).

## CONCLUSION

The Court should reject Plaintiffs' misguided attempt to turn the SEC's case about September 15-16 into a multi-year class action.  The Complaint is devoid of any factual allegations that support the Investment Strategy case.  To the contrary, it is clear that Defendants fully and accurately disclosed the Fund's investment objective and its commercial paper

---

[71] To the extent that the common law fraud claim also is supposed to cover "holders" of securities, SLUSA preemption still applies.  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 89 (2006) (holding that "holder" class actions are "in connection with the purchase or sale" of a security and therefore preempted by SLUSA) (citations omitted).  Moreover, should this Court decline to preempt the Complaint's common law fraud claim pursuant to SLUSA, the Complaint's common law fraud claim still fails, as to holders of Fund shares on September 15 and 16, for lack of loss causation.  Even though a claim for common law fraud is available to investors who retain their securities in reliance on a defendant's misrepresentation (*i.e.*, holders) (*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 407 (S.D.N.Y. 2005) (internal citation omitted)), the facts as stated in the Complaint fail to illustrate loss causation.[71]  It was not Defendants' statements, but rather State Street Corporation's refusal to redeem shares beginning at 10:10 a.m. on September 15 (Compl. ¶ 9) that prevented holders from selling their shares.  Because the Complaint fails to plead loss causation, an essential element of a common law fraud claim, Plaintiffs' claim for common law fraud should be dismissed with respect to the "holders" of Fund shares on September 15 and 16.

34

investments.  As for the NAV case, Plaintiffs (unlike the SEC) must meet the reliance

requirement for securities fraud.  Because Plaintiffs cannot utilize the fraud-on-the-market theory

to create a presumption of reliance for the class, their Section 10(b) claims must be dismissed.

Finally, the Complaint's hodge-podge of related federal and state law claims fail on their face.

In sum, and for all of the reasons discussed above, Plaintiffs' Complaint should be dismissed

with prejudice.

Respectfully Submitted,

Lyle Roberts (*Pro Hac Vice*)
DEWEY & LEBOEUF LLP
1101 New York Ave, NW
Washington, DC  20005
Tel: (202) 346-8000
lroberts@dl.com

Christopher J. Clark
Kevin C. Wallace
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York  10019
Tel:  (212) 259-8000
cjclark@dl.com
kwallace@dl.com

*Attorneys for Defendants Reserve Management
Company, Inc., Reserv Partners, Inc., Reserve
Management Corporation, Bruce R. Bent, Bruce R.
Bent II, and Arthur T. Bent, III*

Dated: June 25, 2010
       Washington, DC