**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE THE RESERVE PRIMARY FUND SECURITIES & DERIVATIVE CLASS ACTION LITIGATION | No. 08-cv-8060-PGG<br><br>(Class Action)<br><br>Hon. Paul G. Gardephe<br><br>ELECTRONICALLY FILED |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

John C. Browne
Lauren A. McMillen
Sean O'Dowd
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Lead Counsel and Attorneys for Lead*
*Plaintiff*

Dated:  August 13, 2010

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND ...................................................................................................5

    A.    Defendants Portray The Primary Fund As A "Conservative," "Safe" And "Boring" Investment That Was Focused On Capital Preservation And Liquidity .....................6

    B.    Defendants Caused The Primary Fund To Fundamentally Alter Its Investment Strategy, Which Attracted Capital, Increased The Management Fees Collected By Defendants, And Enticed Potential Buyers ...........................................................8

    C.    The Primary Fund Increased Its Holdings In Lehman Brothers As The Investment Bank Tottered ...............................................................................................................12

    D.    After Lehman's Collapse, Defendants Failed To Adjust The NAV (And Recorded False Receivables That Boosted The NAV Calculation), Improperly Prioritized The Redemption Requests Of Certain Investors And Continued To Mislead The Public About The Fund's Credit Support Agreement ........................................................13

ARGUMENT .......................................................................................................................14

I.    THE COMPLAINT STATES CLAIMS FOR VIOLATIONS OF SECTION 10(B) AND SECTION 20(A) OF THE EXCHANGE ACT....................................................................14

    A.    Defendants' Pre-September 15th Statements Were Materially False And Misleading ........................................................................................................15

    B.    The Complaint Adequately Pleads That Defendants Acted With Scienter In Making Their Pre-September 15 Statements ........................................................................20

    C.    The Complaint Adequately Alleges Reliance ........................................................23

II.    THE COMPLAINT STATES CLAIMS UNDER THE SECURITIES ACT ......................25

III.    THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF THE INVESTMENT COMPANY ACT................................................................................................................28

    A.    The Complaint States A Claim Under Section 36(b) Of The ICA............................28

    B.    The Complaint States A Claim Under Section 13(a)(3) Of The ICA ........................29

IV.    THE COMPLAINT ADEQUATELY PLEADS THE STATE LAW CLAIMS ..................31

    A.    Plaintiff Adequately Alleges Direct Claims For Breach Of Fiduciary Duty, Gross Negligence, And Unjust Enrichment Under Massachusetts Law ..............................31

B.    Plaintiff Adequately Alleges Direct Claims For Breach Of Fiduciary Duty, Gross Negligence, And Unjust Enrichment Under New York Law.....................................32

C.    If The Court Dismisses The Federal Claims, It Should Elect To Exercise Supplemental Jurisdiction ..........................................................................................34

CONCLUSION .....................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abramowitz v. Posner*,
   672 F.2d 1025 (2d Cir. 1982) ................................................................................... 33

*Affiliated Ute Citizens of Utah v. U.S.*,
   406 U.S. 128, 92 S. Ct. 1456 (1972) ............................................................... 23, 24, 25

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ....................................................... 18, 22, 26

*Anwar v. Fairfield Greenwich Ltd.*,
   No. 09 Civ. 0118 (VM), 2010 WL 3022848 (S.D.N.Y. July 29, 2010) ................................. 34

*Basic, Inc. v. Levinson*,
   485 U.S. 224, 108 S. Ct. 978 (1988) ......................................................................... 25

*Blasberg v. Oxbow Power Corp.*,
   934 F. Supp. 21 (D. Mass. 1996) .................................................................... 31, 32

*In re Cencom Cable Income Partners, L.P. Litig.*,
   No. CA. 14634 (MTS), 2000 WL 130629 (Del. Ch. Jan. 27, 2000) ..................................... 32

*In re CIT Group Inc. Sec. Litig.*,
   No. 08 Civ. 6613 (BSJ), 2010 WL 2365846 (S.D.N.Y. June 10, 2010) ................................ 18

*In re Citigroup Bond Litig.*,
   No. 08 Civ. 9522 (SHS), 2010 WL 2772403 (S.D.N.Y. July 12, 2010) ................................ 17

*In re Credit Suisse-AOL Sec. Litig.*,
   465 F. Supp. 2d 34 (D. Mass. 2006) ........................................................................ 17

*Cromer Finance Ltd. v. Berger*,
   205 F.R.D. 113 (S.D.N.Y. 2001)............................................................................. 24

*In re Deutsche Telekom AG Sec. Litig.*,
   No. 00 Civ. 9475 (SHS), 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ................................. 27

*Drenis v. Haligiannis*,
   452 F. Supp. 2d 418 (S.D.N.Y. 2006)..................................................................... 32

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)................................................................................. 19

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
   No. 08-cv-11064 (NMG), 2010 WL 1253114 (D. Mass. March 31, 2010) ..................... 17, 19

*Fenn v. Verizon Commc'ns, Inc.*,
   No. 08 Civ. 2348 (PGG), 2010 WL 908918 (S.D.N.Y. Mar. 15, 2010) ................................ 34

*Freudenberg v. E\*Trade Fin. Corp.*,
   No. 07 Civ. 8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010) ..................................... 17, 18

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
   694 F.2d 923 (2d Cir. 1982) ......................................................................................... 28

*Greenspun v. Lindley*,
   36 N.Y.2d 473, 330 N.E. 2d 79 (1975) ....................................................................... 32

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008) ......................................................................... 21

*Herman & MacLean v. Huddleston*,
   459 U.S. 375, 103 S. Ct. 683 (1983) ........................................................................... 25

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998) ......................................................................................... 30

*Hurley v. Fed. Deposit. Ins. Corp.*,
   719 F. Supp. 27 (D. Mass. 1989) ................................................................................ 31

*Jones v. Ford Motor Credit Co.*,
   358 F.3d 205 (2d Cir. 2004) ......................................................................................... 34

*Jones v. Harris Assoc. L.P.*,
   130 S. Ct. 1418, 176 L.E.D. 2d 265 (2010) ............................................................... 28

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ................................................................................... 20, 21

*Langner v. Brown*,
   913 F. Supp. 260 (S.D.N.Y. 1996) .............................................................................. 29

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) ......................................................................................... 20

*Marx v. Akers*,
   88 N.Y.2d 189, 666 N.E. 2d 1034 (1996) ................................................................... 33

*In re Mutual Funds Inv. Litig.*,
   384 F. Supp. 2d 845 (D. Md. 2005) ............................................................................ 24

*Norlin Corp. v. Rooney, Pace Inc.*,
   744 F.2d 255 (2d Cir. 1984) ......................................................................................... 32

*Northstar Fin. Advisors, Inc. v. Schwab Inv., Inc.*,
609 F. Supp. 2d 938 (N.D. Cal. 2009) ........................................................................ 30, 31

*Olmsted v. Pruco Life Ins. Co. of N.J.*,
283 F.3d 429 (2d Cir. 2002) ............................................................................................ 30

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) ............................................................................................... 17

*Pension Committee of the University of Montreal Pension Plan v. Banc of Am. Sec.*,
446 F. Supp. 2d 163 (S.D.N.Y.2006) .................................................................... 21, 32, 33

*Pfeiffer v. Bjurman, Barry & Assocs.*,
No. Civ. 974 (DLC), 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) .................................... 29

*Pinter v. Dahl*,
486 U.S. 622, 108 S. Ct. 2063 (1988) ............................................................................. 27

*Primavera Familienstifung v. Askin*,
130 F. Supp. 2d 450 (S.D.N.Y. 2001) ............................................................................. 33

*In re Reserve Fund Sec. & Deriv. Litig.*,
598 F. Supp. 2d 1370 (S.D.N.Y. 2009) ........................................................................... 33

*SEC v. Reserve Mgmt. Co., Inc.*,
No. 09 MD 2011 (PGG), 2010 WL 685013 (Feb. 24, 2010) .................................. 4, 13, 21, 22

*SEC v. Reserve Mgmt. Co., Inc.*,
673 F. Supp. 2d 182 (S.D.N.Y. 2009) ...................................................................... *passim*

*Shamrock Holdings Inc. v. Arenson*,
456 F. Supp. 2d 599 (D. Del. 2006) ................................................................................. 32

*Siemers v. Wells Fargo & Co.*,
243 F.R.D. 369 (N.D. Cal. 2007) ..................................................................................... 24

*Sloman v. Presstek, Inc.*,
No. 06 Civ. 377 (JD), 2007 WL 2740047 (D.N.H. Sept. 18, 2007) .................................... 20

*Stephens v. Nat'l Distillers and Chem. Corp.*,
Case Nos. 91 Civ. 2901, 2902 (JSM), 1996 WL 271789 (S.D.N.Y. May 21, 1996) ............. 32

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148, 128 S. Ct. 761 (2008) ............................................................................... 23

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*,
941 F. Supp. 326 (S.D.N.Y. 1996) ................................................................................... 29

*Tellabs v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308, 127 S. Ct. 2499 (2007) ................................................................. 20

*In re Twinlab Corp. Sec. Litig.*,
　　103 F. Supp. 2d 193 (E.D.N.Y. 2000) ................................................................. 25

*In re UBS Auction Rate Sec. Litig.*,
　　No. 08 Civ. 2967 (LMM), 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ............ 24

*Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*,
　　No. 10-CV-1399, 2010 WL 1404208 (S.D.N.Y. Apr. 5, 2010) ............................ 31

*Young v. Nationwide Life Ins. Co.*,
　　183 F.R.D. 502 (S.D. Tex. 1998) ....................................................................... 24

**STATUTES**

15 U.S.C. § 80a-13(a) (2010) ..................................................................................... 29

Martin Act, N.Y. Gen. Bus. L. § 352 (2010). ............................................................ 34

Securities Act of 1933

　　Section 11 .......................................................................................................... 25, 26

　　Section 12(a) (2) ............................................................................................ 23, 25, 27

　　Section 15 .......................................................................................................... 25, 28

Securities Exchange Act of 1934

　　Section 10(b) ............................................................................................ 15, 21, 23, 25, 27

　　Section 20(a) ...................................................................................................... 25

Investment Company Act of 1940

　　Section 36(b) ...................................................................................................... 28, 29

　　Section 13(a) ................................................................................................ 29, 30, 31

Court-appointed Lead Plaintiff, Third Avenue Institutional International Value Fund, L.P. ("Lead Plaintiff") submits this Opposition to Defendants Reserve Management Company, Inc. ("RMCI"), Reserve Partners, Inc. ("Resrv Partners"), Bruce Bent Sr., Bruce Bent II, and Arthur T. Bent's (collectively, "Defendants") Motion to Dismiss the Consolidated Class Action Complaint (the "Complaint").[1]

## PRELIMINARY STATEMENT

This litigation arises from the wrongdoing of Defendants, who owned and controlled the Reserve Primary Fund ("Primary Fund" or "Fund") during the Class Period. On September 16, 2008, the Primary Fund disclosed that its Net Asset Value ("NAV") had declined below $1.00 per share – called "breaking the buck" – due to losses on investments in commercial paper issued by Lehman Brothers, Inc. ("Lehman Brothers"). This disclosure came just one day after Defendants had issued a press release stating that the Fund's holdings in Lehman Brothers "would not have a negative impact on the NAV," and just <u>hours</u> after representatives of the Fund informed several Fund investors on direct telephone calls that the Fund's NAV was secure. ¶¶156-57. The Primary Fund subsequently entered liquidation proceedings, which are still continuing nearly two years later, and investors have suffered hundreds of millions of dollars in damages.

The collapse of the Primary Fund is unprecedented – despite downturns in the financial markets and the Lehman Brothers bankruptcy filing, the Primary Fund remains the <u>only</u> retail money market fund to have ever "broken the buck." As alleged in the Complaint, the failure of the Primary Fund was not the result of a poor economy or disruptions in the financial markets. It was the direct result of Defendants' policy of purchasing higher concentrations of ever-riskier investments, while falsely assuring investors that the Fund was still a "conservative" and "safe"

_____

[1] The Complaint is cited as "¶ _." All capitalized terms not otherwise defined herein have the meaning set forth in the Complaint. All emphasis is added unless otherwise indicated.

alternative to holding cash (which attracted more investors and resulted in greater management fees for themselves).

At no point during the Class Period did Defendants give any indication to investors that the largest and most renowned money market fund in the nation had made investments that could cause it to "break the buck" upon the bankruptcy filing of <u>a single company</u> – an inconceivable notion in the context of a $62 billion money market fund. To the contrary, throughout the Class Period, Defendants told investors that the Primary Fund "was more conservative and risk adverse than [its] peers," was governed by "conservative investment practices and strict internal controls," and had an "unwavering discipline focused on protecting your [*i.e.,* investors'] principal, providing daily liquidity and transparency, and <u>all the while boring you into a sound sleep</u>." ¶¶41, 43, 58. Indeed, Defendant Bruce Bent ("Bent") repeatedly emphasized the superiority of the Primary Fund over competitors that had supposedly "prostituted" the concept of money market funds by "putting garbage in the funds and reaching for yield." ¶47. Even as financial markets declined, Defendants assured investors that the Primary Fund was safe, its "fundamental policy" was to "preserve capital and liquidity," and it was more conservative than its peers. ¶2.

These and other statements detailed in the Complaint were false. By mid-2006, Defendants had deliberately abandoned any conservative investment practices that the Primary Fund may have once followed. Instead, Defendants had begun to invest in higher yielding and riskier investments such as commercial paper (which Defendant Bent had previously called "anathema to the concept of the money fund"), including commercial paper issued by institutions such as Lehman Brothers, Merrill Lynch & Co., Inc. and Washington Mutual, Inc. ¶63. In fact, during the Class Period, the Primary Fund went on a commercial paper buying spree. The Fund held almost no commercial paper in mid 2006, but by August 2007, commercial paper comprised more than 18% of the

Primary Fund's assets.  Two months later, that figure had nearly tripled.  By August 2008, a

staggering 57% of the Primary Fund's portfolio was in commercial paper.  These investments

increased the Fund's yields and, by early September 2008, the supposedly "conservative" and

"safe" Primary Fund was the highest yielding money market fund out of 2,100 such funds tracked

by Morningstar, Inc.  ¶66.

Defendants' efforts to boost the yield on the Primary Fund, coupled with their intense

marketing campaign designed to assure investors that the Primary Fund was a safe investment,

resulted in an influx of approximately $30 billion in additional capital from mid-2007 to September

2008.  ¶71.  This, in turn, resulted in hundreds of millions of dollars in additional management fees

paid to Defendants.  *See* ¶¶71-73.  Despite this fundamental shift in the Fund's investment

objective, Defendants continued to portray the Primary Fund as a conservative and safe investment.

As set forth in the Complaint, these statements were made in filings with the Securities and

Exchange Commission ("SEC"), in communications sent directly to investors and potential

investors by Defendants, and in the popular press.  *See* ¶¶33-58; 81; 85; 97-99.  As late as

September 12, 2008 – three days before the Fund imploded – Defendant Bent was quoted in the

*Wall Street Journal* as stating that "the purpose of the money fund is to bore the investor into a

sound night's sleep."  ¶43.

Defendants' assurances lacked any foundation.  By September 15, 2008, the Primary Fund

held $785 million in Lehman Brothers commercial paper, or approximately 1.2% of the Fund's total

holdings.  When Lehman Brothers declared bankruptcy, Defendants engaged in a campaign of

deceit and outright lies in an attempt to dissuade investors from redeeming their Primary Fund

shares and stave off an otherwise inevitable collapse.  *See* ¶¶100-60.  Defendants'

misrepresentations have been extensively documented in, among other places, complaints filed by

the SEC, the Commonwealth of Massachusetts Securities Division, and numerous private litigants.

As this Court itself recognized in its November 25, 2009 Opinion and Order in *SEC v. Reserve Management Company, Inc., et al.* (the "*SEC Action*"), 673 F. Supp. 2d 182 (S.D.N.Y. 2009) (the "November 25 Order") and its February 24, 2010 Opinion and Order in the *SEC Action*, 2010 WL 685013 (the "February 24 Order"), on September 15-16, 2008, Defendants made numerous misrepresentations to the Board of Trustees of the Primary Fund and the public, including:

- Misrepresenting the amount of redemption requests to the Primary Fund Board of Trustees (November 25 Order, 673 F. Supp. 2d at 187; February 24 Order, 2010 WL 685013, at *2);

- Deliberately concealing from the Board that the Primary Fund's custodian, State Street Bank, had stopped funding redemption requests (November 25 Order, 673 F. Supp. 2d at 187; February 24 Order, 2010 WL 685013, at *3);

- Misleading the Board into believing that Defendants would enter into credit support agreements in order to support the $1.00 NAV (November 25 Order, 673 F. Supp. 2d at 187-88; February 24 Order, 2010 WL 685013, at *2-*4); and

- Issuing a false press release to investors stating that Defendants intended to cause RMCI to "enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund," and that these "support agreements ensure the integrity of a $1.00 NAV." *See* November 25 Order, 673 F. Supp. 2d at 187-88; February 24 Order, 2010 WL 685013, at *3-*4.

In addition, on September 15, 2008, Defendants unlawfully tipped off certain select Fund investors regarding the risks that the Lehman Brothers bankruptcy posed to the Fund, prompting these investors to submit redemption requests early on the morning of September 15, 2008. ¶¶119-22. Defendants also wrongly – and in direct violation of their own policies – prioritized the redemption requests of a select group of favored investors to the detriment of the remaining shareholders. ¶¶119-23. Thus, Defendants allowed over $10 billion in investor funds to be distributed on the morning of September 15, 2008 at a NAV that was falsely calculated at $1.00, which left Lead Plaintiff and other Class members with shares worth less than their true value. ¶¶119, 123.

4

Despite an established record of egregious wrongdoing, Defendants have moved to dismiss the entire case at the pleading stage.  Defendants' motion to dismiss rests largely on their artificial division of the Complaint into "two successive frauds," one that occurred pre-September 15, 2008, and one that occurred on September 15 and 16, 2008.  Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def. Mem.") at 1.  This is a blatant distortion of the Complaint. In reality, the Complaint alleges a pattern of wrongdoing based on a related series of false and misleading statements regarding the same subject – falsely assuring investors that the Primary Fund was a safe, conservative and liquid investment and that investments in the Fund were secure.  The fact that on September 15-16, 2008, Defendants engaged in a brazen and ultimately doomed attempt to cover up their wrongdoing does not mean that Lead Plaintiff has alleged "two distinct fraud cases."  The events following the Lehman bankruptcy were the inevitable result and continuation of the fraud that commenced as soon as Defendants reversed decades of conservative investments, without shareholder approval, in order to seek higher yields and greater management fees for themselves.

In any event, however the Complaint is characterized, Defendants' legal attacks lack merit. Notably, Defendants do not contest that the Complaint adequately pleads that they made materially false statements on September 15-16, 2008, or that those statements were made with scienter.   To the extent that Defendants challenge the materiality of their earlier statements, or the legal theories on which Lead Plaintiff's claims are based, their arguments fail.

## FACTUAL BACKGROUND

Given the Court's familiarity with the facts surrounding the collapse of the Primary Fund, the facts are summarized below and additional facts are referenced in the argument section where relevant.

A.      **Defendants Portray The Primary Fund As A "Conservative," "Safe" And "Boring" Investment That Was Focused On Capital Preservation And Liquidity**

The Primary Fund was the Reserve's flagship fund and was marketed by Defendants as the oldest money market fund in the country.  Throughout the Class Period and for years beforehand, Defendants held the Primary Fund out to be a conservative investment vehicle that prioritized the preservation of capital over aggressive returns.  Defendants – and Bruce Bent in particular – made repeated statements to investors and the market emphasizing the supposed safety, conservative investment strategy and liquidity of the Primary Fund.  ¶33-58.

Defendants' SEC filings and statements to investors emphasized the Fund's conservative investment philosophy.  The Fund's 2006 and 2007 Prospectuses stated:

> The investment objective of each Fund is <u>to seek as high a level of current income as is consistent with the preservation of capital and liquidity.</u>  This investment objective <u>is a fundamental policy and may not be changed without the vote of a majority of the outstanding shares of the Fund</u> as defined in the Investment Company Act.

¶¶37-38.

The Fund Prospectuses also referred to the Fund as being "designed as a convenient alternative to the direct investment of temporary cash balances in short-term instruments."  ¶34.  Defendants' SEC filings noted that "because money market funds only invest in securities with a <u>lower level of risk</u>, over time they may produce lower returns than investments in stock or bonds, which entail higher levels of risk," and that "<u>investments in money market funds provide greater security and liquidity</u> than other types of investments."  ¶38.

Defendants also repeatedly distinguished the Primary Fund from its peers on the basis that the Primary Fund was safer and more conservative than other money market funds.  For instance, on January 29, 2008, Defendants filed with the SEC the Fund's Semi-Annual Report for the period ended November 30, 2007, which stated that the Primary Fund "generally invest[s] in a more

6

conservative and risk averse manner than [its] peers." ¶41.  The January 29, 2008 Semi-Annual

Report also included a letter to investors from Bent in which he contrasted the Fund's management

with "the vast majority of organizations that sponsor or manage virtually all the money funds

because these organizations are not specialists in cash management" and because "those other funds

are focused on the highest rate of return, *not* the safety of principal, liquidity and soundness of

sleep." ¶42. Bent stated that, unlike those other funds, the focus of the Primary Fund was the

"sanctity of principal, immediate liquidity, a reasonable rate of return – all while living under the

overarching rubric of boring investors into a sound sleep." *Id.* He continued:

> . . .  Be you an individual, institution or a Fortune 500 company, this is
> your working capital to pay the rent, to finance inventory and receivables,
> to put food on the table. This is definitely not money to take risks with,
> and that is exactly how it should be managed.
>
> We have been "accused" by some of asserting these tenets as if they were
> dogma, to which The Reserve pleads: Guilty as charged. If one focused on
> the goal of effective cash management, the truths to accomplish it are self
> evident and unequivocal, and reaching for yield while risking principal,
> liquidity or peace of mind is not among them.

*Id.*

In a November 2007 interview with *Bloomberg News*, Bent criticized funds that suffered

losses based on investments linked to subprime mortgages, opining that an attempt "to make 3 basis

points more here or 2 basis points more there" was "insane" and "not what I designed the money

fund to do."  ¶47.  A Fund brochure sent to investors and potential investors on or around June 30,

2008 stated that the Fund had "a superior capacity to maintain a $1.00 per share net asset value at

all times . . . through conservative investment practices and strict internal controls."  ¶55.  On July

11, 2008, Defendants forwarded to Fund investors a *New York Times* article that discussed the

troubles facing some money market funds and the threat that they could "break the buck" because

they "chas[ed] high returns" through investments in risky securities.  A cover email from RMCI

forwarding the article to investors proclaimed that "Mr. Bent was interviewed" for the article, which stated that while "[m]any other funds invested in exotic securities without fully understanding the fundamentals . . . <u>the Reserve's consistent investment strategy focuses on stability, liquidity and reasonable rate of return</u>." ¶56.

> **B.  Defendants Caused The Primary Fund To Fundamentally Alter Its Investment Strategy, Which Attracted Capital, Increased The Management Fees Collected By Defendants, And Enticed Potential Buyers**

For years prior to the Class Period, Defendant Bent had proclaimed that the Primary Fund would never invest in commercial paper, and was sharply critical of other money market funds that did so. For instance, a 2001 article published by *Reuters* stated that Bent was "icy on the more than 1,100 money funds that can buy higher-yielding corporate debt known as 'commercial paper,'" and quoted Bent as stating that "<u>commercial paper is anathema to the concept of the money fund.</u>" ¶46.[2] According to Bent, [p]eople prostituted the concept [of the money fund] by putting garbage in the funds and reaching for yield." *Id.* In 2002, Bent told *Investor's Business Daily* that "<u>we don't drink, smoke or buy commercial paper.</u>" ¶43. The market took note of the supposedly conservative investment characteristics of the Primary Fund, as demonstrated in a 2004 article in *Crain's New York Business,* which reported that the Reserve funds were notable because the Reserve "refuses to put its funds in short-term corporate IOUs called commercial paper. Those instruments, while generally safe, occasionally slip into default."[3]

This policy remained in place at the Primary Fund until mid-2006. Indeed, the Fund's 2005 Prospectus stated that "[t]o further minimize investment risks, the Funds [including the Primary

---

[2] *See also* Jonathan Stempel, "Money Market Funds Turn 30 – Creator Casts Wary Eye," *Reuters News* (Oct. 4, 2001) (Declaration of John C. Browne ("Browne Decl."), Ex. A). *See* Def. Mem. at 5 n.3 (arguing that court may take judicial notice of news articles).

[3] Tom Fredrickson, "Rising rates rescue money fund firm; Reserve profits by picking niches," *Crain's New York Business* (Dec. 20, 2004), at 3 (Browne Decl., Ex. B).

Fund] do not invest in commercial paper" and identified this as a "Principal Investment Strategy" of the Primary Fund.  ¶60.  In SEC filings on September 28, 2005, Defendants stated it was a "Fundamental Policy" that the Fund "may not invest in commercial paper," and fundamental investment objectives could "not be changed without the vote of a majority of the outstanding shares of the Fund."  ¶¶39, 60.  On March 15, 2006 in the Fund's Semi-Annual Report, filed with the SEC, Defendants again stated "the Funds generally invest in a more conservative and risk averse manner than their peers.  For example, the Funds do not invest in commercial paper."  ¶61.

Just one week later, however, Defendants filed the Fund's March 22, 2006 supplement to the Prospectus that deleted the paragraph prohibiting the Fund from purchasing commercial paper.  The March 22, 2006 supplement noted that Fund was "delet[ing] the last sentence [on] Page 2" of the Prospectus, without repeating the deleted sentence (which stated "to further minimize risks, the Funds do not invest in commercial paper.")[4]  ¶62  As Defendants acknowledge, during the quarter ended August 31, 2006, the Primary Fund began investing in commercial paper.  Def. Mem. at 6. Defendants never sought or obtained a majority shareholder vote to change the investment objectives of the Fund.  ¶251.

After removing the prohibition on purchasing commercial paper, Defendants began to purchase the previously-forbidden investment in massive quantities.  By August 2007, the Fund held more than 18% of its assets in commercial paper and by August of 2008, that amount had increased to a staggering 57% of the Fund's holdings.  ¶¶63-64; *see also* ¶65 (the Fund also started investing in exotic "special-purpose commercial paper vehicles").  Despite this drastic change in

---

[4] Neither the 2006 and 2007 Prospectuses nor any subsequent SEC filing by Defendants makes any mention of the Fund's reversal of its widely-touted ban on purchasing commercial paper, and certainly did not suggest that this change altered the risk profile of the Fund.  Rather, the words "commercial paper" were included in a long, dense passage regarding the Fund's varied investment mix.  Def. Mem., Exs. 2-3.

investment strategy, Defendants continued to describe the Fund in SEC filings and elsewhere as focused on the "preservation of capital and liquidity" and a "safe and boring" investment that was more secure than its peers.  ¶¶ 33-58.  While repeatedly emphasizing the "safety" of the Primary Fund in SEC filings and public statements, Defendant Bent never discussed the additional risks to investors posed by the Fund's skyrocketing commercial paper investments.  To the contrary, Defendants continued to market the Fund so as to give the exact opposite impression, repeating their assurances to investors that the Fund's strategy was ultra-conservative and safe.

For instance, in an October 25, 2007 *Associated Press* article – an article that was forwarded to Fund investors – Bent stated that "[s]afety and liquidity are first and foremost, followed by a reasonable rate of return. We will not jeopardize our reputation, and the reputation of our partners, by overlooking the money fund principles we created nearly forty years ago." ¶52; *see also* ¶¶50-51, 53.  An April 7, 2008 *Financial Week* article quoted Bent as stating that in the market downturn the Fund "stay[ed] focused on safety, liquidity, a reasonable rate of return and no headline risk." ¶48.  In a July 28, 2008 letter from Bent to investors, Bent stated that, as a result of the subprime crisis, investors "have embraced the very concept and foundation on which The Reserve was founded, an unwavering discipline focused on protecting your principal, providing daily liquidity and transparency, and all the while boring you into a sound sleep." ¶43.

On September 12, 2008, just three days before the Fund disintegrated, the *Wall Street Journal* published an article featuring Bent titled "Father of Money Funds Raps His Creation – Against Industry, Bruce Bent Backs SEC Rule Change."[5]  The article described how Bent was alone among his peers in his support for an SEC proposal to make money market funds less reliant on credit-rating firms.  Bent described how the past year had shown that "the ratings firms are

_____

[5] ¶57; Daisy Maxey, "Father of Money Funs Raps His Creation – Against Industry, Bruce Bent Backs SEC Rule Change," *Wall Street Journal*, at C11 (Sep. 12, 2008) (Browne Decl., Ex. C).

<u>unreliable</u> . . . [t]he money market fund's board of trustees and its investment adviser have a fiduciary duty to the shareholders, [and that] this responsibility is not diluted by the presence of ratings for securities in the fund." *Id.* Bent once again took "direct aim" at other money funds who "chased the highest yield and compromised the integrity of their money funds" and repeated his mantra: "<u>Lest we forget, the purpose of the money fund is to bore the investor into a sound night's sleep</u>." *Id.*

In sum, in less than two years, Defendants had quietly caused the Fund to become overwhelmingly dependent on commercial paper investments that were once affirmatively and prominently banned from the Fund because of their inherent riskiness, and did so without giving any explanation for the change, without seeking or obtaining the majority vote of shareholders, and all while claiming that the Fund was as safe as ever and safer than other money market funds. ¶52.

Defendants benefited tremendously from this change to a riskier investment philosophy. The increased yields, coupled with assurances that the Fund was as safe and secure as ever (and safer and more secure than competitor funds) resulted in an influx of capital that tripled the Fund's assets to $62.6 billion, with nearly $37 billion of that total invested in commercial paper. ¶67. By September 2008, the Primary Fund's 12-month yield was the highest among more than 2,100 money funds tracked . . . 4.04% versus an average of 2.75%. ¶66.

These ballooning assets led to dramatic increases in the management and advisory fees (which are based on net assets) earned by Defendants. ¶68. In addition, in April 2007, RMCI raised its management fees by one basis point and raised the Resrv Partners' distribution fees by .05 percent, further increasing the fees collected by Defendants. ¶¶68-70. Altogether, the addition of over $30 billion in assets and the increased fee percentages resulted in hundreds of millions of dollars in additional management fees being paid to Defendants. ¶¶71-72. RMCI and the Bents

were also motivated to quickly seek higher yields through riskier holdings because, since 2006, they had sought a buyer for the Reserve, and the increased assets and management fees made the business a more attractive investment.  ¶¶73-74.[6]

C.     **The Primary Fund Increased Its Holdings In Lehman Brothers As The Investment Bank Tottered**

In mid-2007, the commercial paper and other credit markets froze as a result of a severely deteriorating residential mortgage market, and banks such as Lehman Brothers began to sell their commercial paper and other debt for less than face value. ¶76.  It was at this time that Defendants began to purchase large amounts of commercial paper, and by November 2007, the Primary Fund held $375 million in Lehman Brothers commercial paper.  In February 2008, the Fund acquired an additional $250 million in Lehman Brothers medium-term notes and $150 million in commercial paper.  In April and May 2008, Defendants caused the Fund to roll over $375 million of Lehman commercial paper that was about to mature and replaced it with $385 million of new Lehman commercial paper set to mature in October 2008, bringing the Fund's total investment in Lehman Brothers' debt to $785 million by September 15, 2008, 1.24% of the Fund's total holdings.  ¶¶77, 79.

During this same period, concerns about Lehman Brothers were increasing.  In March 2008, just before Defendants caused the Fund to increase its investment in Lehman commercial paper, investment bank Bear Stearns collapsed and was sold in a fire sale to JP Morgan, and there were considerable fears that Lehman Brothers would be the next large investment bank to fail.  These concerns caused Lehman Brother's stock price to drop more than 50%.  ¶79.  The news about Lehman Brothers continued to worsen through the summer of 2008, causing the bank's stock to

---

[6] After the Fund's collapse, the *Wall Street Journal* reported that "[i]n 2006, Mr. Bent sought a buyer for the fund business, according to a person familiar with the situation, but no deal was done."  The article points out that the same year, the Fund altered its investment strategy. ¶74.

continue its steep decline amid fears about the bank's ability to survive.  Yet the Fund maintained its large stake in the bank's asset-backed commercial paper.  ¶¶79-80; 86-87.[7]

The risk Lehman Brothers posed to the Primary Fund was discussed internally at the Reserve, but concerns were ignored.  ¶¶88-89.  Defendants disregarded the signs of Lehman's distress in the weeks leading up to the bank's bankruptcy filing, telling clients, ratings agencies and investment managers that the Lehman exposure presented no risk of breaking the buck for the Fund. ¶¶95-99.

> **D.    After Lehman's Collapse, Defendants Failed To Adjust The NAV (And Recorded False Receivables That Boosted The NAV Calculation), Improperly Prioritized The Redemption Requests Of Certain Investors And Continued To Mislead The Public About The Fund's Credit Support Agreement**

The Court is already familiar with the sequence of events that transpired at the Fund between September 15 and September 16, 2008, having addressed similar allegations in its November 25 and February 24 Orders in the *SEC Action*.  *See also* ¶¶100-167.  Contrary to Defendants' assertions, however, Lead Plaintiff's Complaint also contains a variety of new allegations pertaining to Defendants' continuation of their fraud on September 15 and 16, 2008. Notably, Defendants do not contest the accuracy or substance of any of the factual allegations concerning these events, which include:

- Detailed allegations that, on September 15 and 16, 2008 Defendants released a false NAV after concealing the known value of Lehman debt securities from the Board (¶¶100-117);

_____

[7] In fact, the very profitability and high yields of the Lehman Brothers commercial paper communicated to Defendants the risks posed by this investment.  As Federal Reserve Chairman Ben Bernanke later testified before Congress, "the high cost of insuring Lehman's debt in the market for credit default swaps" evidenced Lehman's bad financial health and the "significant possibility" of its failure.  ¶82.  While Lehman Brothers' stock price dropped, the bank's debt securities paid higher returns, reflecting the increased risk of investing in Lehman Brothers at the time.  ¶83.

- In direct violation of the Primary Fund's policy and SEC Rules, Defendants prioritized the redemption requests of certain favored investors over others (¶¶118-23), which harmed all remaining shareholders;

- Misled investors that Defendants would support the NAV through credit support agreements, and in fact made affirmative false statements suggesting that they would do "whatever it takes" to support the Primary Fund's NAV (¶¶124-152);

- Failed to disclose that Fund investors would encounter liquidity difficulties (¶¶153-160); and

- Fraudulently recorded false receivables in a desperate effort to keep the truth about the Fund's imminent liquidation from reaching the public (¶¶168-173).

While Defendants attempt to suggest that these fraudulent activities constituted a "new fraud" (and one that they do not dispute is adequately alleged), the reality is that this egregious misconduct was an effort to "cover up" the impact that Defendants' increasingly risky investments ultimately had on the Fund.

On September 16, 2008, Defendants disclosed to the public that the Primary Fund had broken the buck at 4:00 p.m. that day.[8] ¶165. This shocking disclosure – the end result of Defendants' scheme to covertly prioritize high yields and short term profits over capital preservation and liquidity – made the Fund the first and only retail money market fund in history to break the buck.

## ARGUMENT

### I.   THE COMPLAINT STATES CLAIMS FOR VIOLATIONS OF SECTION 10(B) AND SECTION 20(A) OF THE EXCHANGE ACT

Defendants do not dispute that their post-September 15th statements were materially false and misleading and made with scienter (nor could they do so given the well-documented record of

---

[8] Defendants later admitted that the Primary Fund broke the buck earlier in the day on September 16, 2008. ¶167. The Complaint alleges, based on information regarding the value of Lehman Brothers' debt, that the Primary Fund actually broke the buck early in the morning on September 15, 2008. *Id.*

their wrongdoing).  But Defendants nonetheless contend that Lead Plaintiff has failed to adequately plead any Section 10(b) claim because (a) statements made pre-September 15th were not misleading (Def. Mem. at 15-21) and (b) and were not made with scienter (*id.* at 22-23); and (c) Lead Plaintiff has not adequately pled reliance with respect to Defendants' misrepresentations, including the admittedly fraudulent post-September 15th statements (*id.* at 23-25).  None of these arguments has merit.

A.    **Defendants' Pre-September 15th Statements Were Materially False And Misleading**

The Complaint alleges that, during the Class Period, Defendants made numerous material omissions and other misrepresentations relating to: (a) Defendants' improper change to the Fund's fundamental investment strategy, (b) the Fund's increased risk exposure due to investments in commercial paper and other risky instruments, (c) Defendants' ability and willingness to extend credit support agreements to the Fund, and (d) Defendants' failure to follow their own policies by miscalculating the NAV, making selective disclosures to "tip off" certain investors about non-publicly disclosed risks to the Fund, and prioritizing the redemption requests of certain selected and favored shareholders.  *See* ¶¶ 1, 4, 5, 33-34, 37-63, 68-72, 76-77, 81, 92, 100-52.[9]

Notably, Defendants do not challenge the falsity or materiality of the bulk of the omissions and misrepresentations alleged in the Complaint, and focus only on allegations surrounding Defendants' decision to invest in commercial paper and their repeated statements describing the Primary Fund as "conservative," "safe," "secure," and less risky than its peers.  Def. Mem. at 15-21.  With respect to these statements, Defendants first contend that the "truth was on the market"

_____

[9] The misstatements and omissions alleged in the Complaint are all actionable under Sections 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder.  To the extent such statements or omissions are contained in the Fund's 2006 or 2007 Prospectuses or the materials incorporated by reference therein, they are also actionable under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as discussed below in Section II below.

because the Primary Fund's SEC filings indicated that the Primary Fund could invest in commercial paper and the commercial paper investments themselves were disclosed in the Fund's periodic holding reports.  According to Defendants, the Fund's commercial paper investments were "in line with other large money market funds" and were "entirely consistent with a conservative investment strategy . . . to seek as high a level of current income as is consistent with preservation of capital and liquidity.'"  Def. Mem. at 15-20.  Defendants are wrong.

To begin with, the notion that the Primary Fund was "conservatively invested" cannot be credited.  As discussed above, the Complaint alleges in detail that Defendants caused the Primary Fund to purchase riskier investments in order to achieve a higher return – indeed, the Fund had the highest return of any money market Fund by September 2008.  ¶¶4, 66.  The fact that the bankruptcy of a <u>single company</u> caused the $62 billion Primary Fund to implode (when no other money market fund failed) is incontrovertible evidence at the motion to dismiss stage that the Fund was not conservatively invested, but was concentrated in highly risky investments that were not consistent with "preservation of capital and liquidity."

Moreover, Defendants' arguments that they adequately disclosed the risks to the fund because they told investors that the Fund was "not guaranteed" and "there can be no assurance that a Fund will achieve its investment objective" (Def. Mem. at 9), should be rejected.  Nowhere did Defendants disclose or give any suggestion that the investment strategy of the Primary Fund had changed so substantially during the Class Period that the largest and oldest money-market fund in the nation could implode as the result of the bankruptcy of a single company.  Defendants' boilerplate disclaimers cannot inoculate them from liability when examined in the overall context in which they were made, namely that Defendants repeatedly represented that the Fund was different and "more conservative" than its competitors, was governed by "conservative investment practices

and strict internal controls," and had an "unwavering discipline focused on protecting [investors']

principal . . . <u>all the while boring you into a sound sleep.</u>"  ¶¶41,43, 58.

As the Second Circuit recently confirmed, courts must examine the context in which

statements or omissions are made to determine whether they are materially misleading.  *See*

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86, 92

(2d Cir. 2010) ("literally accurate statements can, 'through their context and manner of presentation,

[become] devices which mislead investors.'").  *See also In re Citigroup Bond Litig.*, No. 08 Civ.

9522 (SHS), 2010 WL 2772439, *18 (S.D.N.Y. July 12, 2010) (test is whether statements and

omissions, when "taken together and in context" would have misled reasonable investors); *In re*

*Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. 08-cv-11064 (NMG), 2010 WL

1253114, *4 (D. Mass. March 31, 2010) ("the meaning of [misleading] statements was clarified by

the context in which they appeared").  In this case, where Defendants' vague "risk" disclosures

were overwhelmed by constant reassurances, made over the course of many years, that the

"overarching rubric" of the Fund was "<u>boring investors into a sound sleep</u>" (¶¶42, 43, 57-58, 63, 81)

and statements emphasizing how the Fund differed from other, purportedly riskier money funds,

falsity is adequately alleged.  *See In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 50 (D.

Mass. 2006) (continued optimistic representations were "<u>akin to a statement that the reader need not</u>

<u>worry much</u>" about generic risk disclosures) (quoted in *Freudenberg v. E*Trade Financial Corp.*,

No. Civ. 8538 (CCH), 2010 WL 1904314, at *20 (S.D.N.Y. May 10, 2010)).

This is especially true here, where Defendants repeatedly emphasized the consistently

conservative nature of the Fund's investment strategy dating back to its creation 40 years earlier by

Defendant Bent.  *See, e.g.,* ¶52 ("[w]e will not jeopardize our reputation, and the reputation of our

partners, by overlooking <u>the money fund principles we created nearly 40 years ago</u>"); ¶92 (Bent told

the *Wall Street Journal* that the Reserve's "tenets of safety, liquidity, and a reasonable rate of return" dated back to "when he first created the money-market fund in 1970"); *see also* ¶¶42, 56.  In this context, Fund investors were particularly vulnerable to Defendants' failure to adequately disclose the increased risk inherent in the Primary Fund's purchase of huge amounts of commercial paper and other risky investments.

Defendants built the reputation of the Fund and attracted investors by stressing the principles of conservative, risk-averse investing.  When they recklessly reversed their decades-old investment strategy, they did so as quietly as possible (and without conducting a shareholder vote), and failed to alert investors to the impact of this change on the Fund's risk profile.  None of the disclosures now touted by Defendants alters the fundamentally misleading nature of the disclosures made by Defendants during the Class Period.

Defendants' argument that the allegedly misleading statements were immaterial "puffery" is similarly meritless.  *See* Def. Mem. at 21.  Contrary to their claim that "there is no reason to believe that any investor would consider these statements . . . in making his or her investment decision" (Def. Mem. at 21), these are precisely the types of statements upon which investors were intended to – and did – rely.  Defendants themselves acknowledge that the purpose of a money market fund is to serve as a safe, secure alternative to holding cash, and the allegedly misleading statements were designed by Defendants to assure investors that the Primary Fund was just such an investment. *See, e.g.,* ¶¶34, 37, 41-43, 46-49.  Numerous courts in this district have held virtually identical statements about "conservative" investment standards and a "disciplined" investment strategy to be actionable.  *See, e.g., In re CIT Group Inc. Sec. Litig.*, No. 08 Civ. 6613 (BSJ), 2010 WL 2365846, at *2-3 (S.D.N.Y. June 10, 2010); *In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 266 (S.D.N.Y. 2010); *Freudenberg*, 2010 WL 1904314, at *16-18.

18

For instance, in a case with similar facts, the court sustained a securities fraud class action against the managers and officers of a mutual fund where defendants sold the fund as a safe, liquid and stable investment when, in fact, the fund was comprised of illiquid, risky and volatile securities. *Evergreen*, 2010 WL 1253114, at*4-5.  In *Evergreen*, Defendants' statements about the fund's objectives were actionable and not "general or indefinite" puffery because these statements were "key guidelines that established the [fund's] investment strategy," and when considered together in the context in which they appeared, these statements were "of utmost importance to potential investors."  *Id.* at *5.  Likewise, Defendants here accompanied their statements about the "safe," "conservative," "liquid," and generally "superior" nature of the Fund, with specific explanations of why and how the Fund was superior to and safer than its competitors.  These misrepresentations omitted material information regarding the Fund's investments in commercial paper and the added risks those investments incurred, which would be "of utmost importance to potential investors."[10]

Defendants' argument that the SEC authorizes money market funds to invest in commercial paper is unavailing.  *See* Def. Mem. at 16-17.  The mere fact that the SEC authorizes the purchase of commercial paper does not justify Defendants' decision to purchase so much risky commercial paper that the entire Fund imploded upon the bankruptcy of one company.  Indeed, as Defendant Bent himself stated in July 2008, it is not sufficient for managers of a money market fund to merely rely upon SEC guidelines or rating agencies to evaluate the risk of their investments.  ¶92 (a fund's "investment adviser [has] a fiduciary duty to the shareholders; this responsibility <u>is not diluted by the presence of ratings for securities in the fund</u>").

---

[10] For these same reasons, the cases cited by Defendants are distinguishable. In particular, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009), is distinguishable because the statements here are directly connected to a substantive policy – namely the ban on commercial paper that was eventually abandoned for a riskier fundamental investment objective without disclosing that risk to investors – rather than *ECA*'s conclusory allegation that "the significance of a bank's reputation is undeniable."

Finally, Defendants' attempt to hide behind the fact that other money market funds also invested in commercial paper (Def. Mem. at 5) ignores that Defendant Bent repeatedly assured investors that the Primary Fund was <u>more conservative</u> than other funds.  ¶¶41, 46, 48, 60.  And the fact that the Primary Fund was the only such fund to "break the buck" provides strong evidence that the Primary Fund's investments were, as alleged, far more concentrated and risky than those of other funds.

### B.    The Complaint Adequately Pleads That Defendants Acted With Scienter In Making Their Pre-September 15 Statements

Scienter may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (internal quotation marks and citations omitted); *see also Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001).  A court must consider plausible opposing inferences in determining whether the pleaded facts give rise to a "strong" inference of scienter.  *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323, 127 S. Ct. 2499, 2509 (2007).  An inference of scienter is strong "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*, 551 U.S. at 324.  The requisite inference of scienter need not be the "most plausible of compelling inferences," nor does it need to be "irrefutable, *i.e.*, of the 'smoking gun' genre." *Id*.  Moreover, a complaint should not be dismissed at the pleading stage if equally strong inferences exist for and against scienter. *Id*.  Put otherwise, when evaluating scienter at the pleading stage, "a tie ... goes to the plaintiff." *Sloman v. Presstek, Inc.*, No. 06 Civ. 377 (JD), 2007 WL 2740047, at *7 (D.N.H. Sept. 18, 2007).

Defendants do not dispute that they had an opportunity to commit fraud throughout the Class Period, nor do they dispute that they had a motive to commit fraud on September 15 and

afterwards.[11]  Defendants argue only that their "alleged desire to increase the management and

advisory fees earned by RMCI" prior to September 15, 2008 is inadequate to allege scienter for pre-

September 15, 2008 statements because "[c]ourts in this District 'are divided on whether the receipt

of fees alone is enough to satisfy the 'motive' requirement.'"  *See* Def. Mem. at 22 (quoting *Heller*

*v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008)).  However, this

Court, along with many other courts, has concluded that when the motive to earn management and

advisory fees is coupled with a material personal stake in the business by one or more Defendants, it

is sufficient to allege scienter under Section 10(b).  *See SEC Action*, February 24 Order, 2010 WL

685013, at *7 (holding that the Reserve Defendants' motive to commit fraud was sufficient to allege

scienter when the "desire to generate additional fee income" was accentuated by the defendants'

"personal stake in the business and the fee income").[12]

The Bents had "a direct, personal financial stake" in their decision to attract more capital by

investing in higher-yielding and riskier assets in order to "maximize not only their personal

financial investment but also their entities' management fees."  *SEC Action*, February 24 Order,

---

[11] Defendants once again attempt to artificially divide the Complaint into two separate "cases," and argue that Lead Plaintiff's allegations of scienter are inadequate with regard to the "Investment Strategy case."  Def. Mem. at 22.  This division is without support because the Complaint alleges one continual fraud, beginning with Defendants' decision to lift the ban on investments in commercial paper and aggressively investing in risky commercial paper without disclosing these new risks to investors.  Defendants' post-September 15th statements were designed to "cover up" the impact that their undisclosed risky investment policies had on the Fund, and are therefore part of the same fraudulent course of conduct.

[12] *See also Heller*, 590 F. Supp. 2d at 620-21 (finding sufficient motive where the defendants "possessed the unique incentive, as managers of a struggling, privately-owned investment fund in which they possessed a personal financial stake," to attempt to maximize not only their "personal financial investment" but also their "potential receipt of management fees"); *Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities*, 446 F.Supp.2d 163, 171, 187 (S.D.N.Y.2006) (holding that "[u]nlike a motive to increase stock prices, shared by all corporate insiders, a motive to generate increased fees based on inflated NAV figures would be 'a concrete and personal benefit to the individual defendants'" – who served as the administrators of the funds in question – "'resulting from the fraud'") (quoting *Kalnit*, 264 F.3d at 139).

2010 WL 685013, at *7; *see also* ¶¶68-72.   Moreover, the Bents were motivated to ensure that the Fund thrived in a difficult economy and remained a leader amongst competitor funds because "[t]he Bents also have an enormous reputational stake in the Primary Fund." *SEC Action*, February 24 Order, 2010 WL 685013, at *7.  Defendants had the same "direct, personal financial stake" and "reputational stake" in the Reserve between the start of the Class Period and September 15, 2008. Indeed, the Bents' motives were perhaps even greater from the start of the Class Period because they desired to make the Fund more attractive to potential buyers through greater returns, assets and higher yields. ¶¶73-74.

The Complaint also adequately alleges that Defendants had access to information demonstrating that their public statements were not accurate.  Indeed, Defendant Bent's own statements prior to the start of the Class Period demonstrate that Defendants themselves viewed commercial paper as an inherently risky investment for a money market fund.  *See* ¶46 ("we don't drink, smoke or buy commercial paper" and "commercial paper is anathema to the concept of the money fund"); *see also* ¶¶59-61; Exs A-B.  Thus, no matter how they try to spin it now, it is clear that Defendants aggressively invested in commercial paper with the knowledge that it increased the Fund's investment risks.  At the same time, Defendants made a conscious decision not to disclose to investors that the Fund was now inherently more risky (rather, they continued to state the opposite). Finally, Defendants cannot and do not deny that the Bent Defendants were intimately involved in all aspects of the Fund's management.  *See, e.g.*, ¶26.  When a complaint sufficiently alleges a defendant's awareness of facts that contradict the alleged misrepresentations, a strong inference of scienter has been alleged.  *See, e.g., Ambac*, 693 F. Supp. 2d at 268.

C.     The Complaint Adequately Alleges Reliance

Defendants contend that the Complaint fails to adequately allege reliance for the Section 10(b) claims because the fraud-on-the-market doctrine is unavailable.[13]  Def. Mem. at 23-25. Defendants are mistaken.

First, the Complaint repeatedly alleges that Lead Plaintiff (as well as other Class members) directly "reviewed and relied" upon the false statements issued by Defendants.  *See* ¶¶37, 44, 143, 228, 234.  Accordingly, the Complaint adequately pleads direct reliance at this stage even if the fraud-on-the market presumption is unavailable (an issue which is best addressed at the class certification stage).  Indeed, the Complaint notes in numerous places that Defendants themselves sent materially misleading marketing material directly to investors, including through targeted distributions of the "Reserve Insights" magazine and "blast emails" disseminated by Defendants. *See* ¶¶49, 53, 56, 127, 142-43, 147-49, 152, 156.  Given that numerous class members are alleged to have received and reviewed these materials directly from Defendants (¶¶37, 44, 143, 228, 234), it would be particularly inappropriate to dismiss the Complaint for failure to allege reliance at the pleading stage.

Second, Defendants completely ignore that Lead Plaintiff alleges that classwide reliance may be established through the presumption of reliance set forth in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 92 S.Ct. 1456 (1972), which provides that "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148,

---

[13] As discussed below, Defendants confine their reliance arguments to Lead Plaintiff's Section 10(b) claims because the Section 11 and Section 12(a)(2) claims asserted pursuant to the Securities Act do not have any reliance element.

159, 128 S.Ct. 761 (2008) (citing *Affiliated Ute,* 406 U.S. at 153-54).  *See* ¶188.[14]  Because Lead

Plaintiff's claims primarily involve material omissions, reliance can and should be presumed.[15]  *See,*

*e.g.*, *In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967 (LMM), 2010 WL 2541166, at *26

(S.D.N.Y. June 10, 2010) (*Affiliated Ute*'s presumption of reliance is appropriate in "a case

primarily involving omissions where reliance would be difficult to prove because Plaintiffs' claim is

based on a negative"); *In re Mutual Funds Inv. Litig.*, 384 F Supp. 2d 845, 863-64 (D. Md. 2005)

(in fraud case against mutual fund, the gravamen of the complaint was "not for specific

misrepresentations but for the funds' failure to disclose that they were permitting favored customers

to engage in late trades and market-timed transactions"); *Siemers v. Wells Fargo & Co.*, 243 F.R.D.

369, 374-75 (N.D. Cal. 2007) (applying *Affiliated Ute* presumption of reliance in granting

certification of a class of mutual fund investors).

    Third, contrary to Defendants' arguments, courts in this District have concluded that

investors in funds that are priced according to a NAV are entitled to a rebuttable presumption of

reliance "akin to the presumption applied in the case of a fraud on the market."  *See Cromer*

*Finance Ltd. v. Berger*, 205 F.R.D. 113, 131 (S.D.N.Y. 2001).  In *Cromer*, the Court held that:

> It is difficult to imagine an investor putting money into any fund
> without relying on the integrity of the process for calculating the
> fund's NAV. . . . Just as the [fraud on the market theory] presumes
> that investors rely on the integrity of a process-namely, that the
> market will incorporate material information about a security into its

---

[14] Defendants effectively concede the applicability of *Affiliated Ute* reliance by failing to address it in their brief.  The cases cited by Defendants to show that the fraud-on-the-market doctrine does not apply to plaintiff's claims (Def. Mem. at 25) did not involve actions based primarily on omissions. *See Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998).

[15] This case principally concerns omissions by Defendants concerning the scheme to remove the prohibition on commercial paper, to invest aggressively in commercial paper without disclosing the risk presented by these investments, and to conceal Defendants' inability to secure a credit support agreement, all while allowing investors to believe that the Fund's longstanding fundamental investment strategy remained intact and that Defendants were taking all necessary steps to "minimize risk."

> price-the theory advanced by the plaintiffs in this case also presumes
> that investors rely on the integrity of a process-namely, the processes
> by which the NAV of a private fund is determined. . . .
> *Id.*

Indeed, the Supreme Court has held that the purpose of the reliance requirement is to "provide[] the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978 (1988).  In *Basic*, just as it had done in *Affiliated Ute*, the Court held that a presumption of reliance under certain circumstances – in *Basic*, this circumstance was a viable theory of "fraud on the market" – is appropriate.  *Id*. at 250. The presumption of reliance supported by *Basic* is flexible: [t]here is . . . more than one way to demonstrate the causal connection."  *Id*. at 247.  The fact that most courts have interpreted *Basic*'s fraud-on-the-market language in the context of a typical securities case does not mean the presumption does not apply in the context of money market funds.[16]

## II.  THE COMPLAINT STATES CLAIMS UNDER THE SECURITIES ACT

The Complaint adequately pleads claims pursuant to Section 11, Section 12(a)(2) and Section 15 of the Securities Act.

**<u>Section 11.</u>**  Section 11 of the Securities Act imposes a "stringent standard of liability" and "places a relatively minimal burden on a plaintiff."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82, 103 S. Ct. 683, 687 (1983).  The plaintiff need only "allege that he purchased the security and that the registration statement contain[s] false or misleading statements concerning a material fact."  *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000).  Neither scienter nor reliance are elements of Section 11 claims.

---

[16] Because Lead Plaintiff has adequately alleged a Section 10(b) violation, and there is no dispute that the Bent Defendants are "control persons" within the meaning of Section 20 of the Exchange Act (Def. Mem. at 25 n.65), the Complaint adequately alleges a Section 20(a) claim.

The Complaint easily satisfies these threshold pleading requirements for asserting a Section 11 claim.[17]  The numerous misstatements that Defendants made are detailed above.  The untrue statements that were incorporated into the Registration Statements for the Primary Fund include statements relating to conservative investment strategy, safety and liquidity.  *See* ¶¶34-44.  The Registration Statements also failed to disclose (indeed, they affirmatively concealed) the heightened risk to the Primary Fund caused by Defendants' investments in commercial paper and other risky products.  *See* ¶¶63-68, 81, 85, 97-99.  Moreover, the Registration Statements included statements assuring investors that the Fund would not disclose "information about the Fund's portfolio holdings that is not publicly available to individual and institutional investors," which was violated when the Fund improperly "tipped" certain investors to the heightened risk caused by the Lehman Brothers bankruptcy filing.[18]  Finally, the Registration Statements included disclosures purporting to address how the fund would calculate the NAV and process redemption requests (¶44), statements which were revealed as false when Defendants published incorrect NAVs on September 15 and 16 and prioritized redemption requests of certain favored investors over others.  ¶¶100-24.  Thus, the Registration Statements told investors how the Fund <u>would</u> handle NAV calculations, redemption requests and communications about non-public information.  Defendants, however, failed to put into place any procedures that ensured these promises were carried out on September 15 and 16, 2008.

---

[17] The Court need not determine separately whether plaintiff's Securities Act claims sound in fraud "because plaintiff[] ha[s] met the Rule 9(b) standard by specifying the 'who, what, when, where and how' of the alleged misstatements in connection with" the Primary Fund.  *See Ambac*, 693 F. Supp. 2d at 275.

[18] *See* 2006 Prospectus, Statement of Additional Information at 6, *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465906063804/a06-20088_1485bpos.htm (Browne Decl., Ex. D); 2007 Prospectus, Statement of Additional Information at 9, *available at* http://www.sec.gov/Archives/edgar/data/83335/000110465907072142/a07-24381_1485bpos.htm (Browne Decl., Ex. E).

While Defendants' motion to dismiss is far from clear, it appears that Defendants – again relying on their artificial division of the Complaint into "two frauds" – argue that there can be no Securities Act violations based on their wrongful activities on and after September 15, 2008.  *See* Def. Mem. at 12 (describing the "NAV Case" as including "Section 10(b) claims only").  This is not correct.  Defendants' false statements in the Registration Statements were not fully revealed to be false until the Fund finally announced that it "broke the buck" on September 16, 2008.  Moreover, Defendants' improper calculation of the NAV, selective disclosure of non-public information, and inequitable treatment of redemption requests all occurred after September 15 and were directly contrary to statements made in the earlier-filed Registration Statements.  Defendants never disavowed their previous disclosures in the Registration Statements, and they cannot artificially cut-off their own liability under the Securities Act by wrongly characterizing Lead Plaintiff's case as consisting of "two frauds."

**Section 12**.  Contrary to Defendants' assertion that Lead Plaintiff's Section 12(a)(2) claims fail (Def. Mem. at 21, n.61), the Complaint adequately alleges that each defendant was a "seller" of securities who either "(1) passed title of the security to the plaintiff or (2) successfully solicited the purchase motivated at least in part by his own financial interest."  *In re Deutsche Telekom AG Sec. Litig.*, No. 00Civ. 9475 (SHS), 2002 WL 244597, at *5 (S.D.N.Y. Feb. 20, 2002) (citing *Pinter v. Dahl*, 486 U.S. 622, 108 S. Ct. 2063, 647 (1988)).  The Complaint alleges that RMCI, Resrv Partners and the Bents sold, offered and/or solicited shares of the Primary Fund to investors by, *inter alia*, preparing, signing and distributing the 2006 and 2007 Prospectuses and participating in road shows to market the Fund.  ¶¶23-26; 208.  Moreover, unlike the underwriter in *Deutsche Telekom* who sold no shares to investors, Resrv Partners, as the sole underwriter/distributor for the Primary Fund, unquestionably sold shares of the Primary Fund to investors.  ¶¶21, 208.

27

**Section 15**.  Defendants do not independently contest the adequacy of Lead Plaintiff's claims of control person liability under Section 15 of the Securities Act other than to contend (wrongly) that the underlying primary violation is not stated.  Def. Mem. at 25 n.65.

## III.   THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF THE INVESTMENT COMPANY ACT

### A.   The Complaint States A Claim Under Section 36(b) Of The ICA

The Complaint states a claim for excessive compensation under Section 36(b) of the Investment Company Act of 1940 ("ICA"), which permits "a security holder of [a] registered investment company" to bring an action "with respect to the receipt of compensation for services, or of payments of a material nature." The Complaint details how management and distribution fees accruing to Defendants skyrocketed as Fund assets increased and RMCI and Resrv Partners simultaneously hiked their fees, resulting in total compensation increases between $39 million and $243 million. ¶¶68-71.  It further alleges that Defendants failed to disclose to the Board of Trustees the reason for this substantially increased yield – that the Fund was precariously invested in risky assets such that the bankruptcy of a single company could lead to the $62 billion Fund's collapse – or the likely impact the change would have on their compensation. ¶¶63-65, 263. The Complaint also details the decline of the Fund.  ¶¶2, 161-67.  An analysis under the *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982), factors, which were recently affirmed in *Jones v. Harris Associates L.P.*, 130 S. Ct. 1418, 176 L.E.D. 2d 265 (2010), demonstrates that Lead Plaintiff's claim survives because: it describes the poor nature and quality of Defendants' investment advisory services, which led to the demise and eventual liquidation of the Fund; details the profitability to the investor-advisor by explaining how the Fund's management fees soared; and

explains how the independence and conscientiousness of the trustees was undermined by incomplete information from Defendants.[19]

Although Defendants point to the absence of the word "excessive" in the Complaint,[20] the 36(b) claim is clearly alleged.  By failing to provide full and complete information to the Board about the changed investment strategy, Defendants increased their fees by tens or hundreds of millions of dollars during the same time period when their risky investments and ill-considered concentration of risk in questionable securities, which was undisclosed to the Board, ran the Fund into the ground.  ¶12 ("Defendants continue to this day to seek lucrative management fees in exchange for the work they have done to liquidate the Fund they recklessly destroyed.").  *See also* ¶¶3-5, 262-64.  The exorbitant fees received here are clearly excessive because they bear no relationship to the fees that would have been the product of arm's length negotiations with a Board that had been given access to critical information by Fund management.[21]

### B.  The Complaint States A Claim Under Section 13(a)(3) Of The ICA

Under Section 13(a) of the ICA, 15 U.S.C. § 80a-13(a), the Reserve Fund cannot deviate from any fundamental policy identified in its registration statement without first obtaining

---

[19] A number of courts in this district have sustained 36(b) claims on similar allegations. *See Pfeiffer v. Bjurman, Barry & Assocs.*, No. Civ. 974 (DLC), 2004 WL 1903075, at *4 (S.D.N.Y. Aug. 26, 2004) (holding that trustee independence "[is] among the most important factors to be examined in evaluating the reasonableness of compensation under section 36(b)"); *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326 (S.D.N.Y. 1996) (plaintiff alleged, *inter alia*, that fees were excessive considering poor fund performance and certain trustees were not independent); *Langner v. Brown*, 913 F. Supp. 260, 267 (S.D.N.Y. 1996) (large percentage of fund's gross investment fund was paid to managers "over five years of declining returns and poor management").

[20] This omission results from a typographical error, which is evident in the sentence fragment at ¶264.

[21] Although the complaint properly alleges excessive compensation under 36(b), it should be noted that the issue of excessive compensation is also before the Court in the *SEC Action*, where the SEC and numerous investors, including Lead Plaintiff, have challenged Defendants' request for management fees. *SEC Action* (Doc. Nos. 257, 259).

authorization through the vote of a majority of outstanding securities.  Indeed, the Fund's own

guidelines reinforced the requirement of shareholder approval of changes to fundamental

investment policies.  ¶39.  The Complaint adequately alleges that Defendants changed the Fund's

fundamental investment objective of seeking "as high a level of current income as is consistent with

the preservation of capital and liquidity" without the required approval of shareholders when they

caused the Fund to remove its decades-long ban on commercial paper to chase yield and income,

sacrificing the Fund's conservative investment objectives in a manner inconsistent with the

preservation of capital and liquidity.  ¶¶37, 39, 60.  Defendants' argument that the Complaint does

not allege that investments in commercial paper were inconsistent with the Fund's fundamental

investment objective fails.  Def. Mem. at 26.  The Complaint details how Defendants, in filings with

the SEC and statements to the media, repeatedly trumpeted the view that investments in commercial

paper were "anathema to the concept of a money fund" and were generally inconsistent with the

Fund's fundamental investment objective of preserving capital and liquidity.  *See supra*, at 14-20.[22]

Courts have cited the decision in *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429 (2d

Cir. 2002), to conclude that Section 13(a)(3) creates no private right of action for investors.  Def.

Mem. at 25-26.  However, courts have noted that amendments made to Section 13 after *Olmsted,*

which expressly limit the types of actions a "person" may file, make clear that there is a private

right of action under the statute.  *See Northstar Fin. Advisors, Inc. v. Schwab Inv., Inc.*, 609 F. Supp.

---

[22] *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 732 (2d Cir. 1998) is
distinguishable because the investment objective in *Hunt* was "defined . . . in vague, subjective
terms, as that which the adviser 'considers to be a prudent investment risk'" and the *Hunt* plaintiffs
"allege[d] no facts that would support a claim that the Fund Adviser invested in any instrument he
considered an imprudent risk."  *Id.*

2d 938, 944-45 (N.D. Cal. 2009) ("If there were no private right of action under Section 13(a), there would be no need to restrict the actions that could be filed under Section 13.").[23]

## IV.       THE COMPLAINT ADEQUATELY PLEADS THE STATE LAW CLAIMS

### A.       Plaintiff Adequately Alleges Direct Claims For Breach Of Fiduciary Duty, Gross Negligence, And Unjust Enrichment Under Massachusetts Law

Defendants argue, without support, that Massachusetts law applies to the state law claims and that Lead Plaintiff's claims for breach of fiduciary duty, gross negligence, and unjust enrichment are derivative, not direct under Massachusetts law.  Def. Mem. at 29-32.  In reality, the Complaint's state law claims are asserted directly on behalf of investors, rather than on behalf of the Fund.  *See Hurley v. Fed. Deposit. Ins. Corp.*, 719 F. Supp. 27, 30 (D. Mass. 1989) (stating that where all shareholders themselves have been defrauded by material misrepresentations and omissions, they may sue the wrongdoer directly).  Here, the state law claims are targeted towards investors' particular losses, rather than losses to the Company, and any damages payments on these claims "would be made not to the corporate entity but to the plaintiff-investors to compensate them for their individual losses."  *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996) (noting that the fact that "many investors have been misled … does not convert the claim to a derivative one").

This is especially true given the unique posture of this case, which centers on a liquidating Fund that will cease to operate as a going concern in the immediate future.  Pursuant to the Court's November 25, 2009 order in the SEC Action, all of the Fund's remaining assets, with the exception of a fixed expense fund, are to be "liquidated and distributed on a pro rata basis" to shareholders.  Nov. 25, 2009 Order, at 1 ¶ 2, *SEC Action* (Doc. No. 202).  *See also* Dec. 11, 2009 Order, at 2,

---

[23] A court in this District has disagreed with *Northstar*.  *See Western Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*, No. 10-CV-1399, 2010 WL 1404208 (S.D.N.Y. Apr. 5, 2010).

SEC Action (D.I. 212) (ordering distribution of all "remaining Primary Fund assets to investors"). Thus, this Court has recognized that the Primary Fund's assets and investors' assets are one and the same. In similar circumstances, other courts have concluded that "as a practical matter, the only claim available after [a company has] liquidated is a direct action by the plaintiffs." *Shamrock Holdings Inc. v. Arenson*, 456 F. Supp. 2d 599, 608 (D. Del. 2006) (citation omitted). As a result, "the distinction between direct and derivative claims becomes irrelevant … where [an entity] is in liquidation and all non-defendant partners in the resulting litigation constitute a uniform class." *In re Cencom Cable Income Partners, L.P. Litig.*, No. CA. 14634 (MTS), 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000) (addressing issue in the partnership context). *See also Blasberg*, 934 F. Supp. at 26 (the principles underlying direct/derivative analysis are the same in the corporate and partnership contexts). Since Primary Fund investors are the only parties to whom any recovery based on these claims could be paid, the state law claims are properly pleaded directly.

### B. Plaintiff Adequately Alleges Direct Claims For Breach Of Fiduciary Duty, Gross Negligence, And Unjust Enrichment Under New York Law

Defendants apparently base their conclusion that Massachusetts law applies on the "internal affairs doctrine," pursuant to which the "internal affairs" of corporations are governed by the "law of the place of incorporation." However, the Second Circuit has noted that the New York Court of Appeals "reject[s] 'any automatic application'" of this doctrine. *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 263 (2d Cir. 1984) (quoting *Greenspun v. Lindley*, 36 N.Y.2d 473, 478, 330 N.E. 2d 79 (1975)). Accordingly, courts in this District conduct an interest analysis to determine the forum with the greatest interest in the litigation.[24] In this case, it is clear that New York has the greatest

---

[24] *See, e.g.*, *Pension Committee of University of Montreal Pension Plan*, 446 F. Supp. 2d at 191-95; *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427-28 (S.D.N.Y. 2006); *Stephens v. Nat'l Distillers and Chem. Corp.*, Case Nos. 91 Civ. 2901, 2902 (JSM), 1996 WL 271789, at *4-5 (S.D.N.Y. May 21, 1996). *See also Greenspun*, 36. N.Y. 2d at 478 (considering: "[1] where the business of the trust is transacted, [2] where its principal office is located or its records kept, [3] where the trustees

interest and that Massachusetts has "little more than a nominal connection" to the case.  *Pension*

*Committee of University of Montreal Pension Plan*, 446 F. Supp. 2d at 194.  Defendants conducted

their business and held their Board meetings at their principal office at 1250 Broadway in

Manhattan.  Moreover, this Court and the Judicial Panel on Multidistrict litigation ("JPM")

recognized the strong connection to New York by consolidating class actions and transferring

related actions here "to serve the convenience of the parties and witnesses" over opposition from a

plaintiff in Massachusetts.  *In re the Reserve Fund Sec. & Deriv. Litig.*, 598 F. Supp. 2d 1370, 1370

(S.D.N.Y. 2009).

  In New York, misrepresentation claims that arise from management's interactions with

investors, as opposed to with the fund itself, may be brought directly.  *Primavera Familienstiftung v.*

*Askin*, 130 F. Supp. 2d 450, 495 (S.D.N.Y. 2001).  Accordingly, the Court in *Pension Committee of*

*University of Montreal Pension Plan* denied defendants' motion to dismiss state law claims that

pertained to fraudulent misrepresentations that induced the plaintiffs to make and retain

investments, rather than to mere mismanagement of the funds.  446 F. Supp. 2d at 205.  Likewise,

the core misrepresentations here were directly targeted at investors, rather than at the Fund itself.

The state law claims center on Defendants' failure to inform investors of the fundamental change in

investment policy, which caused investors to maintain or increase their investments in the Fund.[25]

Indeed, the Complaint details how Bent routinely spoke directly to the investing public through

mass market financial publications.  *E.g.*, ¶¶46-48, 52.  As a result, Plaintiff's claims for breach of

---

meet, … [4] what proportion of the shareholders reside in New York State or [5] of other facts on
which a finding of such "presence" in New York State might be predicated").

[25] Moreover, even if the claims were derivative, the demand requirement would be waived because
demand would have been futile.  *Abramowitz v. Posner*, 672 F.2d 1025, 1033 (2d Cir. 1982)
(internal quotations and citations omitted) ("[W]here the directors and controlling shareholders are
antagonistic, adversely interested, or involved in the transaction attacked, a demand on them is
presumptively futile and need not be made.").  *See also Marx v. Akers*, 88 N.Y.2d 189, 201, 666
N.E. 2d 1034 (1996).

fiduciary duty, gross negligence, and unjust enrichment are properly asserted directly and must be sustained.[26]

### C.     If The Court Dismisses The Federal Claims, It Should Elect To Exercise Supplemental Jurisdiction

For the reasons detailed at length above, the Complaint's federal claims under the Securities Act, the Exchange Act, and the ICA should be sustained.  However, if the Court decides to dismiss these claims, it should – given the unique posture of this case – choose to retain supplemental jurisdiction over the remaining state law claims.  The Second Circuit has instructed that "a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated in *Gibbs*: economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004).   In this case, the *Gibbs* factors strongly counsel in favor of the exercise of supplemental jurisdiction.  In addition to this consolidated class action, the SEC Action and related litigation surrounding the collapse of the Reserve International Liquidity Fund are all consolidated before this Court, making the Court uniquely familiar with the facts of this case.  Remanding orphaned claims to state court would waste the resources of this court, the state court, and Defendants.  As the Court has recognized, such waste is of particular concern in this case, given the finite nature of the Fund.  Consolidation Order, D.I. 45, at 3 ("There is also a finite fund here. . . .  Multiple litigations and multiple counsel can only drain away assets from the limited pool available, to the detriment of the shareholders.").  *See also Fenn v. Verizon Commc'ns, Inc.*, No. 08 Civ. 2348 (PGG), 2010 WL 908918, at *7 n.5 (S.D.N.Y.

---

[26] Contrary to Defendants' assertion (Def. Mem. at 32 n.70), the Martin Act, N.Y. Gen. Bus. L. §§ 352, *et seq.*, does not preempt Plaintiff's non-fraud state law claims.  *See Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118 (VM), 2010 WL 3022848 (S.D.N.Y. July 29, 2010) (after conducting an exhaustive analysis of New York case law, concluding that the Martin Act does not preempt common law securities-related claims and rejecting contrary past precedent, including precedent cited by Defendants).

Mar. 15, 2010) (Gardephe, J.) ("Remand at this stage would be costly and burdensome to the parties and would substantially delay final resolution of Fenn's claims. Accordingly, the exercise of supplemental jurisdiction is appropriate.").

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss should be denied.

August 13, 2010                                **BERNSTEIN LITOWITZ BERGER**
                                                 **& GROSSMANN LLP**

                                               By:  _____/s/ John C. Browne_____

                                               John C. Browne (johnb@blbglaw.com)
                                               Lauren A. McMillen (lauren@blbglaw.com)
                                               Sean O'Dowd (seano@blbglaw.com)
                                               1285 Avenue of the Americas
                                               New York, New York 10019
                                               Tel:    (212) 554-1400
                                               Fax:    (212) 554-1444

                                               *Lead Counsel and Attorneys for Lead Plaintiff*

35