UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE THE RESERVE PRIMARY FUND SECURITIES & DERIVATIVE CLASS ACTION LITIGATION: | ) ) ) ) ) ) ) ) | No. 08-cv-8060 (PGG) <br><br> ECF Case <br><br> ORAL ARGUMENT REQUESTED |

REPLY MEMORANDUM OF LAW OF DEFENDANTS
RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS INC.,
RESERVE MANAGEMENT CORPORATION, BRUCE R. BENT,
BRUCE R. BENT II AND ARTHUR T. BENT III IN FURTHER SUPPORT
OF THEIR MOTION TO DISMISS THE COMPLAINT

Lyle Roberts *(Pro Hac Vice)*
DEWEY & LEBOEUF LLP
1101 New York Ave, NW
Washington, DC  20005
Tel: (202) 346-8000

Christopher J. Clark
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York  10019
Tel: (212) 259-8000

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ..........................................................................................................................1

ARGUMENT ..................................................................................................................................1

I.      The Complaint Contains Two Distinct Fraud Cases............................................................1

II.     Plaintiffs Do Not Adequately Plead Falsity As to the Investment Strategy Case ...............2

III.    Defendants' Statements Concerning the Fund's Goals Are Inactionable Puffery...............4

IV.    Plaintiffs Do Not Adequately Allege Scienter As to the Investment Strategy Case ...........6

V.     Plaintiffs' Attempt to Plead New Section 11 and Section 12 Claims in the
Opposition Must Be Rejected .............................................................................................8

VI.    Plaintiffs Cannot Establish a Presumption of Reliance .......................................................9

VII.   The Complaint Fails to State a Claim Under Section 13(a) of the ICA ............................12

VIII.  The Complaint Fails to Allege "Excessive Fees" Under Section 36(b) and in Any
Event Plaintiffs' Section 36(b) Claim Was Improperly Brought as a *Direct* Claim .........12

IX.    The Complaint Fails to Adequately Allege Claims for Breach of Fiduciary Duty,
Gross Negligence, and Unjust Enrichment Under Massachusetts *or* New York
Law ....................................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)..................................................................................................9

*Anwar v. Fairfield Greenwich Ltd.*,
No. 09 Civ. 0118, 2010 WL 3022848 (S.D.N.Y. July 29, 2010) ...........................15

*Blasberg v. Oxbow Power Corp.*,
934 F. Supp. 21 (D. Mass. 1996) ......................................................................13, 14

*Cromer Finance Ltd. v. Berger*,
205 F.R.D. 113 (S.D.N.Y. 2001) ......................................................................10, 11

*CIT Group Inc. Securities Litigation*,
No. 08 Civ. 6613, 2010 WL 2365846 (S.D.N.Y. June. 10, 2010) ...........................5

*Dawson v. Bumble & Bumble*,
246 F. Supp. 2d 301 (S.D.N.Y. 2003)......................................................................8

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)................................................................................5, 7

*Forsythe v. Sun Life Financial, Inc.*,
417 F. Supp. 2d 100 (D. Mass. 2006) ...................................................................13

*Freudenberg v. E\*Trade Financial Corp.*,
No. 07 Civ. 8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010)...........................5

*Greenhouse v. MCG Capital Corp.*,
392 F.3d 650 (4th Cir. 2004) .................................................................................5

*Halperin v. Ebanker USA.com, Inc.*,
295 F.3d 352, (2d Cir. 2002) .................................................................................1

*Higgins v. New York Stock Exchange, Inc.*,
No. 601646/2005, 2005 N.Y. Misc. LEXIS 1869 (Sup. Ct. Sept. 2, 2005)...........14

*In re Ambac Financial Group, Inc., Securities Litigation*,
693 F. Supp. 2d 241 (S.D.N.Y. Feb. 22, 2010).......................................................5

*In re Citigroup Auction Rate Securities Litigation*,
No. 08 Civ. 3095, 2009 U.S. Dist. LEXIS 83046 (S.D.N.Y. Sept. 11, 2009) .........6

*In re Deutsche Telekom AG Securities Litigation*,
No. 00 CIV 9475 SHS, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)......................9

*In re Evergreen Ultra Short Opportunities Ultra Short Opportunities*
*Fund Securities Litigation*,
   No. 08-cv-11064 (NMG), 2010 WL 1253114 (D. Mass. Mar. 31, 2010) ..................................5

*In re Merck & Co. Securities Litigation*,
   432 F.3d 261 (3d Cir. 2005)...................................................................................................3

*In re Morgan Stanley Information Fund Securitiess Litigation*,
   592 F.3d 347 (2d Cir. 2010)...................................................................................................2

*In re Mutual Funds Investment Litigation*,
   384 F. Supp. 2d 845 (D. Md. 2005) ......................................................................................10

*In re NationsMart Corp. Securities Litigation*,
   130 F.3d 309 (8th Cir. 1997) ...................................................................................................9

*In re Phillips Petroleum Securities Litigation*,
   881 F.2d 1236 (3d Cir. 1989)...................................................................................................7

*In re Reserve Fund Securities & Derivatives Litigation*,
   Nos. 09-MD-2011 and 09-cv-4346,
   2010 WL 685013 (S.D.N.Y. Feb. 24, 2010)...........................................................................6

*In re Salomon Smith Barney Mutual Fund Fees Litigation*,
   441 F. Supp. 2d 579 (S.D.N.Y. Dec. 3, 2007) .....................................................................12

*In re Security Capital Assurance, Ltd., Securities Litigation*,
   No. 07-cv-11086, 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010)...........................................7

*In re UBS Auction Rate Securities Litigation*,
   No. 08 Civ. 2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010).........................................10

*JSMS Rural LP v. GMG Capital Partners III, LP*,
   No. 04 Civ. 8591, 2006 U.S. Dist. LEXIS 46080 (S.D.N.Y. July 5, 2006)...........................15

*Kaplan v. Shapiro*,
   655 F. Supp. 336 (S.D.N.Y. 1987)........................................................................................15

*Malack v. BDO Seidman, LLP*,
   No. 09-4475, 2010 WL 3211088 (3d Cir. Aug. 16, 2010)....................................................11

*Northstar Financial Advisors, Inc. v. Schwab Investment*,
   609 F. Supp. 2d 938 (N.D. Cal. 2009) .................................................................................12

*Northstar Financial. Advisors, Inc. v. Schwab Investments*,
   No. 09-16347, 2010 WL 3169400 (9th Cir. Aug. 12, 2010) ................................................12

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................................................8

*O'Neill v. Warburg Pincus & Co.*,
   No. 116009/2003, 2005 N.Y. Misc. LEXIS 3608 (Sup. Ct. Feb. 14, 2005)...........................14

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management, LLC*,
   595 F.3d 86 (2d Cir. 2010)...................................................................................................12

*Siemers v. Wells Fargo & Co.*,
   243 F.R.D. 369 (N.D. Cal. 2007).........................................................................................10

*Slayton v. American Express Co.*,
   604 F.3d 758 (2d Cir. 2010)...................................................................................................3

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*,
   No. 05-cv-1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006).................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...............................................................................................................6

*Wardrop v. Amway Asia Pacific Ltd.*,
   99 Civ. 12093, 2001 U.S. Dist. LEXIS 2857 (S.D.N.Y. Mar. 19, 2001) ...............................15

*Western Investment, LLC v. DWS Global Commodities Stock Fund, Inc.*,
   No. 10 Civ. 1833, 2010 U.S. Dist. LEXIS 33788 (S.D.N.Y. Apr. 6, 2010) ...........................12

*Young v. Nationwide Life Inc. Corp.*,
   183 F.R.D. 502 (S.D. Tex. 1998)..........................................................................................10

*Yu v. State Street Corp.*,
   686 F. Supp. 2d 369 (S.D.N.Y. 2010).....................................................................................8

**STATUTES**

15 U.S.C. § 78bb(f)......................................................................................................................15

15 U.S.C. § 77p(b) ......................................................................................................................15

**OTHER AUTHORITIES**

*Special Comment: Sponsor Support Key to Money Market Funds*, Moody's Investors
   Service, Aug. 9, 2010...........................................................................................................4

Sam Mamudi, *Money Funds See Record $90 Billion One-Day Drop*, MarketWatch, Sept.
   18, 2008..............................................................................................................................4

## INTRODUCTION

Based on nothing more than Lehman's surprising decision to declare bankruptcy, and the subsequent effect this bankruptcy had on the Primary Fund's net asset value ("NAV"), Plaintiffs have concocted a wide-ranging theory of fraud that spans over two years.  Nothing in Plaintiffs' Opposition establishes that they have adequately pled their claims.

## ARGUMENT

**I.      The Complaint Contains Two Distinct Fraud Cases**

Plaintiffs protest that they have not pled "two distinct fraud cases" (i.e., the Investment Strategy and NAV cases) because the alleged misconduct on September 15-16, 2008 "was an effort to 'cover up' the impact that Defendants' increasingly risky investments ultimately had on the Fund."  Pls.' Opp'n 14.  Plaintiffs' argument is belied by their own factual allegations.  As the Complaint makes clear, Defendants' statements about the "conservative" nature of the Primary Fund's (the "Fund") investment strategy were supposedly revealed to be false "when Lehman Brothers filed for bankruptcy."  Compl. ¶ 182.  Plaintiffs could hardly allege otherwise – the Fund received an "enormous" amount of redemption requests immediately following the Lehman announcement precisely because investors had become concerned about the risks posed by the Fund's Lehman exposure.  Compl. ¶ 120.  Defendants' subsequent statements concerning their intent to enter into a credit support agreement, which are the gravamen of the NAV case, were anything but a "cover up" of this risk.  A credit support agreement is an express recognition that the Fund's NAV might go below $1.00.

Plaintiffs cannot escape the clear import of their own allegations: no investor who purchased Fund shares on September 15-16 relied upon Defendants' earlier statements concerning the "conservative" nature of the Fund's investment strategy.  *Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) ("[A] complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested.").  As a result, Plaintiffs' Section 11 and 12 claims, which are based entirely on alleged misstatements about the Fund's "investment objectives and fundamental investment

policies" (Compl. ¶ 195), and the similar Section 10(b) claims based on Defendants' alleged pre-September 15 misstatements are part of a separate Investment Strategy case.  As discussed below, these claims are subject to dismissal based on Plaintiffs' failure to adequately plead falsity, materiality and scienter.

## II.      Plaintiffs Do Not Adequately Plead Falsity As to the Investment Strategy Case

The Fund was a straightforward and transparent investment vehicle.  As with any other money market fund, the Fund was limited by SEC rule to investments in "high-quality, short-term instruments such as commercial paper, Treasury bills and repurchase agreements" and its investments were fully disclosed to investors.  Defs.' Mot. 5-7.  In light of this background, Plaintiffs' theory of liability as to Defendants' statements concerning the Fund's investment strategy is nonsensical.

Defendants did not mislead investors about the "conservative" nature of the Fund's investment strategy.  As a threshold matter, there is nothing inherently "risky" about investing in commercial paper.  As set forth at length in Defendants' opening brief, commercial paper was approved by the SEC, had historically low default rates, and Lehman commercial paper, in particular, was rated by both Moody's and Standard & Poor's in their top short-term ratings categories throughout the pre-bankruptcy period.  Defs.' Mot. 17-18.  Moreover, the Fund's investors had all of the information about the Fund's commercial paper investments, including the exact amounts invested in Lehman commercial paper and the relevant credit ratings, available to them.  In their opposition, Plaintiffs simply ignore all of these inconvenient facts.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) ("proper inquiry requires an examination of defendants' representations together and in context").[1]

---

[1] Plaintiffs' allegation that the Fund changed its investment strategy "as quietly as possible" (Pls.' Opp'n 18) is odd, to say the least.  The Fund's decision to invest in commercial paper was contained in a special, supplemental SEC filing.  Defs.' Mot. 16.  It is hard to know exactly how more open and public the announcement could have been.

Instead, Plaintiffs point to the Lehman bankruptcy and assert that this "proves" that the Fund's investment strategy was not conservative.  Plaintiffs' argument is an egregious example of pleading "fraud by hindsight" and must be rejected.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 775-76 (2d Cir. 2010) (plaintiffs may not plead fraud by hindsight).  Moreover, Plaintiffs add to the charade by relying on two key assertions concerning Plaintiffs' disclosures and the effect of the Lehman bankruptcy that are demonstrably false.

First, Plaintiffs claim that Defendants failed to "give any indication to investors that the largest and most renowned money market fund in the nation had made investments that could cause it to 'break the buck' upon the bankruptcy of <u>a single company</u>."  Pls.' Opp'n 2 (emphasis in original).  In fact, the Fund made this *exact disclosure*.  All of the Statements of Additional Information and Prospectuses available to investors during the class period clearly state: "[t]he *principal* risk factors associated with an investment in each Fund are the risk of fluctuations in short-term interest rates and the risk of default among *one or more* issuers of securities which comprise a Fund's assets."  Defs.' Mot. 10 (emphasis added).  Thus, the Fund disclosed that a default by even one issuer was a principal risk factor that could lead to a breaking of the buck.[2]

Second, Plaintiffs assert that "the fact that the Primary Fund was the only such fund to 'break the buck' provides strong evidence that the Primary Fund's investments were, as alleged, far more concentrated and risky than those of other funds."  Pls.' Opp'n 20.  This allegation is false on every level.  The Fund's other commercial paper investments did not default and therefore the Fund's collapse did not reveal them to be "risky" investments.  Indeed, the conservative nature of those investments is why the Fund's shareholders have been able to recoup 99 cents on every $1.00 invested.

---

[2] If the Fund's risk disclosure was not sufficiently express (and it certainly was), the Fund's investors also had all of the information about the Fund's portfolio available to them.  A simple math calculation would have revealed that a Lehman bankruptcy could lead to a breaking of the buck.  *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 270-71 (3d Cir. 2005) (market is assumed capable of making simple math calculations and incorporating that information into investment decisions).

Even more importantly, the Fund was *not* the only money market fund to break the buck. In the immediate aftermath of the Lehman bankruptcy, numerous media reports discussed the fact that other money market funds holding "commercial paper issued by Lehman Brothers Holdings . . . needed support from their parent companies to maintain their $1 a share net asset value." Sam Mamudi, *Money Funds See Record $90 Billion One-Day Drop* MarketWatch, Sept. 18, 2008, at 1 (Ex. 1, attached hereto). Indeed, a recent Moody's report has found that following the Lehman bankruptcy and into 2010, "at least 20 firms managing prime funds in the US as well as Europe expended a minimum of about $12.1 billion dollars (pre-tax) to preserve the net asset values of their CNAV [constant NAV] funds due to credit losses, credit transitions or liquidity constraints." *Special Comment: Sponsor Support Key to Money Market Funds* Moody's Investors Service, Aug. 9, 2010, at 5 (Ex. 2, attached hereto). The fact that these funds were backed by large financial institutions, which could cover the investment losses, does not mean that the funds' investment strategies did not lead to them breaking the buck. They clearly did, making the Fund merely one of a number of money market funds that were adversely affected by the credit crisis.

All that Plaintiffs can point to in support of their Investment Strategy case is that *one* issuer of commercial paper – Lehman – declared bankruptcy and caused the Fund's NAV to decline below $1.00. The fact that an extraordinary event occurred, however, does not render all of the Defendants' previous statements about the conservative nature of the Fund's investment strategy false. Completely missing from the Complaint are any facts establishing that the Defendants' statements were false when made and, in the absence of these allegations, the Investment Strategy case must be dismissed.

## III.   Defendants' Statements Concerning the Fund's Goals Are Inactionable Puffery

Defendants have demonstrated that their general statements concerning the Fund's "goals" were puffery and, therefore, immaterial as a matter of law. Defs.' Mot. 20-21. In response, Plaintiffs argue that a handful of district courts have found "statements about

4

'conservative' investment standards and a 'disciplined' investment strategy to be actionable."
Pls.' Opp'n 18.  This argument is specious.

Controlling Second Circuit precedent establishes that reasonable investors do not
consider "generalizations regarding [a company's] business practices," including statements
about its "highly disciplined" risk management, reputation for "integrity," and "focus on
financial discipline," in making their investment decisions.  *ECA & Local 134 IBEW Joint
Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).
Defendants' statements concerning the Fund's protection of investors' principal and boring
investment strategy are virtually identical to the statements that the *ECA* decision found
immaterial as a matter of law.

In a footnote, Plaintiffs attempt to distinguish *ECA* by arguing that Defendants'
statements were "connected" to a business policy.  Pls.' Opp'n 19 n.10.  Plaintiffs' argument
fundamentally misunderstands the nature of the materiality analysis.  The question is not whether
the statement "connects" to a business policy – the statements evaluated in *ECA*, including that
JP Morgan had a "focus on financial discipline," clearly related to that company's business
policies.  The question is whether reasonable investors would rely on generalizations like the
Fund is designed to "bor[e] you into a sound sleep" in making their investment decisions.
Compl. ¶ 43.  Based on the *ECA* decision (and a wealth of other Second Circuit precedent –
Defs.' Mot. 21), the answer is a clear no.[3]

_____

[3] The district court cases cited by Plaintiffs are either not puffery cases (*CIT Group Inc. Sec.
Litig.*, No. 08 Civ. 6613 (BSJ), 2010 WL 2365846, at *2-4 (S.D.N.Y. June, 10, 2010); *In re
Evergreen Ultra Short Opportunities Ultra Short Opportunities Fund Sec. Litig.*, No. 08-cv-
11064 (NMG), 2010 WL 1253114, at *4-6 (D. Mass. Mar. 31, 2010)) or incorrectly find that
generalizations about a company's business practices statements are actionable if false  (*In re
Ambac Fin. Group, Inc., Sec. Litig.*, 693 F. Supp. 2d 241, 270-73 (S.D.N.Y. Feb. 22, 2010);
*Freudenberg v. E*Trade Fin. Corp.*, No. 07 Civ. 8538, 2010 WL 1904314, at *16-18 (S.D.N.Y.
May 11, 2010).  As the Fourth Circuit has noted, the federal securities laws "do *not* prohibit *any*
misrepresentation – no matter how willful, objectionable, or flatly false – of *immaterial* facts."
*Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (emphasis in original).

**IV.     Plaintiffs Do Not Adequately Allege Scienter As to the Investment Strategy Case**

As to the Investment Strategy case, Plaintiffs have failed to allege that the Defendants acted with scienter.  Under *Tellabs*, this Court must examine "whether *all* facts alleged, taken collectively" give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 324 (2007).  In their opposition, Plaintiffs argue that this rigorous pleading standard has been met based on just two factual allegations:  (1) the Defendants were motivated to commit fraud by a desire to obtain management fees and make the Fund attractive to buyers; and (2) prior to the Fund's announced decision to invest in commercial paper, Defendants had made public statements suggesting that commercial paper was "more risky" than other securities invested in by money market funds.  Pls.' Opp'n 21-22.  These factual allegations fall well short of establishing a "strong inference" of scienter.

Plaintiffs assert that this Court has already "concluded that when the motive to earn management and advisory fees is coupled with a material personal stake in the business by one or more Defendants, it is sufficient to allege scienter under Section 10(b)."  Pls.' Opp'n 21.  In its SEC Order, however, this Court expressly did *not* apply the heightened scienter pleading standard established by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and elaborated upon by the Supreme Court in *Tellabs*.  *In re Reserve Fund Sec. & Derivatives Litig.*, Nos. 09-MD-2011 & 09-cv-4346, 2010 WL 685013, at *11-12 (S.D.N.Y. Feb. 24, 2010).  Pursuant to *Tellabs*, even if Plaintiffs' motive allegations created an inference of scienter, the significance that can be "ascribed to an allegation of motive . . . depends on the entirety of the complaint."  *Tellabs*, 551 U.S. at 325.  Plaintiffs' motive allegations must be set against the "plausible opposing inferences" created by all the facts properly before the Court.  *Id.* at 322-23.[4]

---

[4] The Court does not have to consider Plaintiffs' allegation that Defendants were motivated to commit fraud so as to make the Fund more profitable and, therefore, attractive to buyers, which is exactly the type of "general corporate motive" courts routinely find does *not* create any inference of scienter.  *See, e.g.*, *In re Citigroup Auction Rate Sec. Litig.*, No. 08 Civ. 3095, 2009 U.S. Dist. LEXIS 83046, at *19 (S.D.N.Y. Sept. 11, 2009) (no inference of scienter based on desire to increase profitability to make company more attractive to buyers).

Notably missing from the Complaint are any allegations establishing "strong circumstantial evidence of conscious misbehavior or recklessness" as to the Investment Strategy case. *ECA*, 553 F.3d at 198. Defendants' statements concerning the relative "riskiness" of commercial paper were all (a) public, and (b) made before the Fund announced that it was changing its investment strategy to include investments in commercial paper. In this context, Plaintiffs' assertion that Defendants "had access to information demonstrating that their public statements were not accurate" is farcical. Pls.' Opp'n 22.

First, not only did Defendants have access to this supposedly contrary information, but so did all of the Fund's investors. These were *public* statements made in the media or in the Fund's SEC filings. Compl. ¶¶ 46, 59-61. *In re Sec. Capital, Ltd.*, *Sec. Litig.*, No. 07-cv-11086, 2010 WL 1372688, at *26 (S.D.N.Y. Mar. 31, 2010) (scienter inadequately pled where "[p]laintiffs were just as aware of housing market crisis as they allege Defendants were, but they did not act on that information").

Second, the statements were made *before* the Defendants' decision to change the Fund's investment strategy. Defendants were certainly entitled to change their minds concerning whether it was appropriate for the Fund to invest in commercial paper, so long as they announced the change and the accompanying risks to the Fund's investors. *See, e.g.*, *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1245 (3d Cir. 1989) (defendant's change of intent does not, by itself, give rise to a cause of action under Section 10(b) and "all one can fairly require is that notice of a change of intent be disseminated in a timely fashion"). As explained in the opening brief, the Defendants took those exact steps, including disclosing the "risk of default among one or more issuers of securities which comprise a Fund's assets" (i.e., the exact risk that Plaintiffs allege materialized when Lehman announced its bankruptcy). Defs.' Mot. 4-10.

Finally, there was nothing knowingly or recklessly misleading about the Fund's decision to continue to describe its investment strategy as "conservative." Whatever the *relative* increase in risk caused by investing in commercial paper, it must be set against the backdrop of what was known to Defendants (and the Fund's investors) about commercial paper prior to the Lehman

7

bankruptcy.  The SEC permitted money market funds to hold commercial paper and viewed

commercial paper as a "low risk" investment, commercial paper had low default rates, and the

Lehman commercial paper held by the Fund had the highest possible credit ratings (which

*exceeded* the SEC's ratings requirement).  Defs.' Mot. 17-18.  In other words, exactly the type of

investments for which "conservative" would be an appropriate description.  Missing from the

Complaint are factual allegations suggesting that Defendants had contrary information about the

nature of *any* of its commercial paper investments before the calamitous events of September 15,

2008.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]s long as the public

statements are consistent with reasonably available data, corporate officials need not present an

overly gloomy or cautious picture of current performance and future prospects.").

In sum, there can be no strong inference of scienter where the totality of the facts

properly before this Court create a cogent and compelling opposing inference that Defendants

did *not* knowingly or recklessly make false statements about its investment strategy.

**V.     Plaintiffs' Attempt to Plead New Section 11 and Section 12 Claims in the Opposition
         Must Be Rejected**

In their Opposition, Plaintiffs suddenly assert a series of new Section 11 and Section 12

claims based on supposed misstatements in the Fund's prospectuses concerning topics *other* than

the Fund's investment strategy.  Opp'n 26.  Tellingly, Plaintiffs offer no cites to their Complaint

for these claims, because none exist.  It is black-letter law that plaintiffs cannot amend their

complaint in an opposition brief.  *See, e.g.*, *Dawson v. Bumble*, 246 F. Supp. 2d 301, 316

(S.D.N.Y. 2003) ("[Plaintiff's] purported clarification effectively endeavors to rewrite or amend

the Complaint through her opposition brief, a procedure not permitted by the Federal Rules.").

Even if these new claims could be considered by this Court (which they cannot), they

merely assert that various Fund policies discussed in the prospectuses were "violated" by the

Defendants' conduct on September 15 and 16.  Opp'n 26.  Later policy violations, assuming that

they even occurred, cannot establish that the statements in the prospectuses about the Fund's

policies were false when made.  *Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 377 (S.D.N.Y. 2010)

("the accuracy of offering documents must be assessed in light of information available at the time they were published").  Plaintiffs' new claims have no more merit than their Investment Strategy claims.[5]

## VI.    Plaintiffs Cannot Establish a Presumption of Reliance

Defendants have demonstrated that the fraud-on-the-market theory is unavailable to Plaintiffs and, on that basis alone, all of their Section 10(b) claims (both in the Investment Strategy case and the NAV case) must be dismissed for failure to adequately allege reliance. Defs.' Mot. 23-25.  In response, Plaintiffs raise three meritless objections.

First, Plaintiffs claim that because the Complaint baldly alleges "that Lead Plaintiff (as well as other Class members) directly 'reviewed and relied' upon the false statements issued by Defendants" their proposed securities fraud claims should be allowed to proceed on a class basis. Pls.' Opp'n 23.  Plaintiffs fail to cite a single case in support of this proposition.  Plaintiffs cannot satisfy their pleading obligations by simply alleging, with no factual support, that the "thousands" of putative class members (Compl. ¶ 28) all relied upon the Defendants' supposed false statements in purchasing their Fund shares.  *See, e.g.*, *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321-22 (8th Cir. 1997) (rejecting identical pleading as insufficiently specific).[6] Under these circumstances, Plaintiffs must adequately allege that a recognized presumption of reliance is applicable to their class claims.  *Id.*

Second, Plaintiffs assert that the relevant presumption of reliance is the one set forth in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), which applies to securities fraud claims based on omissions.  As the cases cited by Plaintiffs make clear, however, the

---

[5] Plaintiffs' assertion that they have sufficiently pled that all of the Defendants were "sellers" under Section 12(a)(2) is plainly incorrect.  Opp'n 27.  As Defendants stated in their opening brief, Plaintiffs' allegations amount to no more than "bald allegations of solicitation," which are insufficient to sustain a Section 12(a)(2) claim.  *See In re Deutsche Telekom AG Sec. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597, at *5 (S.D.N.Y. Feb. 20, 2002); Defs.' Mot. 21 n.61.

[6] Plaintiffs do not contest, as set forth in Defendants' opening brief, that all of their claims must be pled with particularity pursuant to Federal Rules of Civil Procedure 9(b).

*Affiliated Ute* presumption is only applicable to Section 10(b) claims "primarily involving omissions where reliance would be difficult to prove because Plaintiffs' claim is based on a negative." *In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967, 2010 WL 2541166, at *26 (S.D.N.Y. June 10, 2010) (emphasis added); *see also In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 845, 863-64 (D. Md. 2005) (same); *Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 374-75 (N.D. Cal. 2007) (same).  Even a cursory reading of the Complaint demonstrates that Plaintiffs' claims primarily involve affirmative misstatements.  The Investment Strategy case is based on Defendants' supposedly false statements to Fund investors "that their investments were safe, secure, and conservative."  Compl. ¶ 5.  The NAV case is based on Defendants' supposedly false statements to Fund investors concerning their intentions "to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund."  Compl. ¶ 10.  As one court in this District has held in rejecting a similar argument, there is actually "no shortage of alleged misstatements" on which Plaintiffs may show they relied when they purchased their Fund securities.  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898, 2006 WL 2161887, at *9 (S.D.N.Y. Aug. 1, 2006).[7]  The *Affiliated Ute* presumption is inapplicable.  *Id.*

Finally, Plaintiffs ignore Defendants' extensive argument and case law establishing the inapplicability of the fraud-on-the-market presumption of reliance to claims based on the purchase or sale of the Fund's shares.  Instead, they erroneously insist that in *Cromer Finance Ltd v. Berger*, 205 F.R.D. 113 (S.D.N.Y. 2001), the court broadly held "investors in funds that are priced according to a NAV are entitled to a rebuttable presumption of reliance." Opp'n. Mem. 24.

---

[7] In a footnote, Plaintiffs attempt to "convert" their affirmative misstatement claims into omissions claims by arguing that they have alleged omissions, *inter alia*, concerning the "scheme . . . to invest aggressively in commercial paper without disclosing the risk presented by these investments."  Pls.' Opp'n 24 n.15.  Courts routinely reject these convenient conversions, noting that "such a circular argument would result in every case of misrepresentation becoming a case of omission as a result of defendant's failure to correct a misrepresentation."  *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998); *see also Teamsters*, 2006 WL 2161887 at *9 (supposed omissions were "simply the flip side" of alleged affirmative misstatements).

10

As a threshold matter, the *Cromer* decision is far more limited than Plaintiffs suggest.  In *Cromer*, the plaintiffs alleged that the fund's share price was based on a fraudulently inflated NAV.  The *Cromer* court specifically found that a presumption of reliance was warranted in that case because it "is difficult to imagine an investor putting money into any fund without relying on the integrity of the process for calculating the fund's NAV."  *Cromer*, 205 F.R.D. at 131.  Even if this Court were inclined to adopt the *Cromer* presumption (which it should not – see below), Plaintiffs fail to allege that the Fund's NAV was miscalculated during the Investment Strategy case (i.e., between September 26, 2006 and September 15, 2008).  As a result, the *Cromer* presumption is inapplicable to the alleged investment strategy misstatements.  As for the NAV case, Plaintiffs allege that the Fund's NAV was miscalculated on September 15-16 because "had the Defendants properly valued the Lehman Brothers commercial paper at fair value on September 15, the Primary Fund would have 'broken the buck' the morning of September 15." Compl. ¶ 167.  This Court has already rejected that claim, however, in its ruling in the SEC case. SEC Order at 25-26 (rejecting claims based on Defendants' valuation of Lehman paper on September 15).  In other words, there are no actionable misstatements in the NAV case to which the *Cromer* presumption could be applied.

Moreover, for all of the reasons discussed in Defendants' opening brief, the *Cromer* decision is in the minority and unpersuasive.  As the *Cromer* court admits, the U.S. Supreme Court has only applied the fraud-on-the-market theory to securities traded on an efficient market (where all public information about the security is incorporated into its price) and the market for fund shares does *not* meet this requirement.  *Cromer*, 205 F.R.D. at 130-31.  In effect, the *Cromer* court creates a presumption of reliance simply based on the fact that a fund's shares are offered to the market at a certain price.  As other courts have noted, this type of presumption is "a kind of investor insurance that eliminates the need for proving reliance in *any* securities fraud case." *Malack v. BDO Seidman, LLP*, No. 09-4475, 2010 WL 3211088, at \*7 (3d Cir. Aug. 16, 2010) (rejecting "fraud-created-the-market" theory).  The *Cromer* court's creation of a new

11

presumption of reliance "akin to the fraud-on-the-market presumption" for fund shares whose NAVs are alleged to have been miscalculated represents an unwarranted extension of the law.

Plaintiffs fail to adequately allege direct reliance and there are no presumptions of reliance that are applicable to their securities fraud claims. All of the Complaint's Section 10(b) claims must be dismissed.

## VII.   The Complaint Fails to State a Claim Under Section 13(a) of the ICA

As demonstrated in Defendants' opening brief, it is well-established that there is no private right of action under Section 13(a) of the Investment Company Act. *See, e.g.*, *W. Inv. LLC v. DWS Global Commodities Stock Fund, Inc*., No. 10 Civ. 1833, 2010 U.S. Dist. LEXIS 33788 (S.D.N.Y. Apr. 6, 2010). In an ill-conceived effort to escape this fatal problem, Plaintiffs rely upon *Northstar Financial Advisors, Inc. v. Schwab Investment*, 609 F. Supp. 2d 938 (N.D. Cal. 2009). The trouble for Plaintiffs is that when they submitted their opposition brief, *Northstar* had *already been reversed by the Ninth Circuit*, which expressly rejected the holding and analysis on which Plaintiffs rely. *See Northstar Fin. Advisors, Inc. v. Schwab Invs*., No. 09-16347, 2010 WL 3169400, at \*15 (9th Cir. Aug. 12, 2010).

## VIII.   The Complaint Fails to Allege "Excessive Fees" Under Section 36(b) and in Any Event Plaintiffs' Section 36(b) Claim Was Improperly Brought as a *Direct* Claim

Plaintiffs do not dispute that the term "excessive" fees nowhere appears in the Complaint. Instead, Plaintiffs cite to a purported "typographical" error in paragraph 264 of the Complaint as the supposed reason "excessive" fees is not alleged. Plaintiffs should not be permitted to cure its acknowledged pleading defect in the Complaint under the guise of correcting a "typo." In any event, Plaintiffs do not address, much less disprove, Defendants' showing that a plaintiff can only seek damages under Section 36(b) through a derivative claim. *See, e.g.*, *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 98 (2d Cir. 2010); *In re Salomon Smith Barney Mut. Fund Fees Litig*., 441 F. Supp. 2d 579, 596 (S.D.N.Y. Dec. 3, 2007). On that ground alone, the Section 36(b) claim must be dismissed.

12

**IX.     The Complaint Fails to Adequately Allege Claims for Breach of Fiduciary Duty, Gross Negligence, and Unjust Enrichment Under Massachusetts *or* New York Law**

As the Complaint makes clear, and Defendants' opening brief discusses, the Plaintiffs' breach of fiduciary duty, gross negligence, and unjust enrichment claims are all predicated upon the same alleged failure to make investments in accordance with the Fund's investment objective that forms the basis of Plaintiffs' federal securities claims in the Investment Strategy case. Accordingly, Defendants' showing in their opening brief and above that the federal securities claims are inadequately pled applies with equal force to Defendants' common law claims and those claims should be dismissed.

Beyond that, Defendants showed in their opening brief that the common law claims also fail because they must be (but were not) brought as *derivative* claims.  Under Massachusetts law, the test for determining whether a claim is direct or derivative is as follows:

> [I]f the wrong underlying [a] claim results in harm to the plaintiff shareholder only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative.

*Forsythe v. Sun Life Fin*. Inc., 417 F. Supp. 2d 100, 112  (D. Mass. 2006).

Here, the Complaint does not allege any direct shareholder injury *distinct* from the injury allegedly suffered by the Fund.  The core allegation of Plaintiffs' breach of fiduciary duty, gross negligence, and unjust enrichment claims is that "Defendants failed to preserve the assets of the Primary Fund and failed to invest the assets in a manner that met with the Primary Fund's investment objective."  Compl. ¶ 282.  Any injury suffered by a shareholder as a result of the "fail[ure] to preserve" and properly "invest" fund assets is not distinct from the fund's injury.

Plaintiffs attempt to shore up their position with *Blasberg v. Oxbow Power Corp*., 934 F. Supp. 21 (D. Mass. 1996), but that decision is unavailing.  The court there stated that "if a plaintiff alleges that she . . . was *misled or defrauded* in the purchase of her investment, *this kind of claim* is a 'direct' claim."  *Id*. at 26 (emphasis added).  On its face, this refers only to a particular "kind of claim" – a misrepresentation or "fraud" claim.  It therefore has nothing to do with Plaintiffs' breach of fiduciary duty claim, or their negligence or unjust enrichment claims.

13

Indeed, the court in *Blasberg* expressly stated, "[i]f a plaintiff alleges . . . *breach of fiduciary duty* resulting in the *diminution of the value of the corporate stock or assets*, *the claim is held by the corporation itself, and is thus derivative if brought by an investor*."  *Id.* (emphasis added). The court went on to hold that the breach of fiduciary duty claim in the case was *derivative*.

In a further effort to preserve its breach of fiduciary duty, gross negligence, and unjust enrichment claims, Plaintiffs assert that New York law governs whether these claims are properly brought as direct claims in this case.  Plaintiffs are mistaken.  It is crystal clear that in determining whether a claim is derivative or direct, the court must look to the law of the state of the corporation.  Defs.' Mot. 29 n.68.  However, even assuming, *arguendo*, that New York law applies, Plaintiffs' common law claims still fail, because New York law is equivalent to Massachusetts law with regard to what types of claims must be brought derivatively.  *See, e.g.*, *O'Neill v. Warburg Pincus & Co.*, No. 116009/2003, 2005 N.Y. Misc. LEXIS 3608, at *12 (Sup. Ct. Feb. 14, 2005) (a claim can be brought as a direct claim only if the underlying alleged shareholder injury is *distinct* from the injury allegedly suffered by the Fund).

"New York courts have consistently held that diminution in the value of shares is quintessentially a derivative claim."  *Higgins v. N.Y. Stock Exch., Inc.*, No. 601646/2005, 2005 N.Y. Misc. LEXIS 1869, at * 6 (Sup. Ct. Sept. 2, 2005).  And, "[w]hile a decrease in share value is undoubtedly harmful to the individual shareholder, this harm is said to *derive* from the harm suffered principally by the corporation and only collectively to shareholders, and thus is derivative in nature." *Id.*  Accordingly, the Complaint fails to adequately allege direct claims for breach of fiduciary duty, gross negligence and unjust enrichment under *both Massachusetts and New York law*.

Plaintiffs make the additional argument that there are many cases in which misrepresentation claims have been successfully brought as direct, rather than derivative, claims. This is a red herring.  Plaintiffs' only stated "misrepresentation" claim is its claim for common law fraud, which Defendants demonstrated is preempted by Securities Litigation Uniform

14

Standards Act ("SLUSA"), 15 U.S.C. §§ 78bb(f), 77p(b).  *See* Defs.' Mot. at 32-33.[8]  Plaintiffs

do not, because they cannot, dispute that SLUSA preemption applies.[9]

**CONCLUSION**

For all of the reasons set forth herein and in Defendants' opening papers, Defendants

respectfully request that Plaintiffs' Complaint be dismissed with prejudice.

Respectfully submitted,

*/s/ Lyle Roberts*

Dated:  September 3, 2010

Lyle Roberts (*Pro Hac Vice*)
DEWEY & LEBOEUF LLP
1101 New York Ave, NW
Washington, DC  20005
Tel: (202) 346-8000
lroberts@dl.com

Christopher J. Clark
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York  10019
Tel: (212) 259-8000
cjclark@dl.com

*Attorneys for Defendants*

---

[8] While Judge Marrero recently issued an opinion rejecting Martin Act preemption for common law claims (*see Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118, 2010 WL 3022848 (S.D.N.Y. July 29, 2010)), his decision does not outweigh the many Southern District of New York and New York state court decisions holding that non-fraud state law claims are preempted. *Id*. at *2.  Accordingly, we ask the Court to follow this large body of precedent and dismiss, under the Martin Act, Lead Plaintiff's state law claims for breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty, gross negligence and unjust enrichment.

[9] Finally, on a separate note, Plaintiffs cite to two cases in support of their meritless argument that the Court should exercise supplemental jurisdiction if the federal securities claims are dismissed (as they should be).  Those two cases are easily distinguished because, *inter alia*, they did not involve federal securities claims.  New York district courts have routinely declined to exercise supplemental jurisdiction over state law claims after dismissing federal securities claims.  *See, e.g.*, *Kaplan v. Shapiro*, 655 F. Supp. 336, 342 (S.D.N.Y. 1987) (declining to exercise supplemental jurisdiction over state claims after concluding that plaintiffs' federal securities claims failed); *Wardrop v. Amway Asia Pac. Ltd.*, No. 99 Civ. 12093, 2001 U.S. Dist. LEXIS 2857, at *18 (S.D.N.Y. Mar. 19, 2001) (same); *JSMS Rural LP v. GMG Capital Partners III*, *LP*, No. 04 Civ. 8591, 2006 U.S. Dist. LEXIS 46080, at *23 (S.D.N.Y. July 5, 2006) (same).

15
