UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| THIRD AVENUE INSTITUTIONAL INTERNATIONAL | : | JURY TRIAL DEMANDED |
| VALUE FUND, L.P., On Behalf of Itself and | : | |
| All Others Similarly Situated, | : | 08 Civ. 8060 (PGG) |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| RESERVE MANAGEMENT COMPANY, INC., RESRV | : | ECF Case |
| PARTNERS, INC., RESERVE MANAGEMENT | : | |
| CORPORATION, BRUCE BENT SR., BRUCE R. BENT, | : | |
| ARTHUR T. BENT, individually and on behalf of | : | |
| The Reserve Primary Fund, | : | |
| | : | |
| Defendants/Third Party Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| RONALD J. ARTINIAN, SANTA ALBICOCCO, | : | |
| WILLIAM E. VIKLUND, EDWIN EHLERT, JR., | : | |
| WILLIAM J. MONTGORIS, and FRANK J. STALZER. | : | |
| | : | |
| Third Party Defendants. | : | |
| | : | |

------------------------------------------------------------------------x

### DEFENDANTS' ANSWER TO CONSOLIDATED CLASS ACTION COMPLAINT AND DEFENDANTS' THIRD PARTY COMPLAINT

DUANE MORRIS LLP
1540 Broadway
New York, NY  10036
(212) 692-1000

Attorneys for Defendants/Third Party Plaintiffs
Reserve Management Company, Inc., Resrv Partners, Inc.,
Reserve Management Corporation, Bruce Bent Sr.,
Bruce Bent II, and Arthur T. Bent

## ANSWER TO CONSOLIDATED CLASS ACTION COMPLAINT

Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc., Reserve Management Corporation, Bruce R. Bent, Sr., Bruce R. Bent II, and Arthur T. Bent III (collectively, "Defendants"), by and through their undersigned counsel, hereby answer the Consolidated Class Action Complaint ("Class Action Complaint")[1] brought by Plaintiff Third Avenue Institutional International Value Fund, L.P. ("Plaintiff") as follows:

1.      Denied.

2.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning reliance by Plaintiff and the proposed Class, which are therefore denied.  The remaining allegations in this paragraph are denied.

3.      Denied.

4.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning the referenced "investors," which are therefore denied.  The remaining allegations in this paragraph are denied.

5.      Denied.

6.      Denied.

7.      Denied.

8.      Defendants admit only that the Board of Trustees (the "Board") met multiple times soon after the announcement of Lehman Brothers' bankruptcy in order to address the potential impact of the bankruptcy filing on the Reserve Primary Fund (the "Fund").  The

---

[1]      Pursuant to the Order of the Court dated September 30, 2012 (the "September 30, 2012 Order"), Counts VII - XII of the Class Action Complaint were dismissed against all Defendants, and Count I was dismissed with respect to RMCI.  Accordingly, this Answer responds only to the remaining Counts.  In its Order, the Court indicated that: "The reasons for these rulings will be explained in a forthcoming written opinion."  Defendants reserve the right to revise this Answer as necessary once that opinion has been issued.

remaining allegations in this paragraph are denied.

9.      Denied.

10.     Denied.

11.     Denied.

12.     Denied.

13.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning "investors' confidence in the sanctity of money market funds," which are therefore denied.  The remaining allegations in this paragraph are denied.

14.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

15.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

16.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

17.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, which are therefore denied.

18.     Denied.

19.     Defendants admit only that in September 2008 the Fund was a Massachusetts business trust registered with the Securities and Exchange Commission (the "SEC"), which filed multiple Registration Statements, Prospectuses and Statements of Additional Information with the SEC.  Defendants refer to these documents for a true and complete statement of their contents.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the current status of the Fund.  The remaining allegations in this

paragraph are denied.

20.    Denied.

21.    Denied.

22.    The first sentence of this paragraph is denied.  The second sentence requires no response.

23.    Defendants admit only that Bent Sr. signed the 2006 and 2007 Prospectuses in the capacities noted thereon. The remaining allegations in this paragraph are denied.

24.    Defendants admit only that Bent II signed the 2006 and 2007 Prospectuses in the capacities noted thereon. The remaining allegations in this paragraph are denied.

25.    Defendants admit only that Arthur Bent signed the 2006 and 2007 Prospectuses in the capacities noted thereon. The remaining allegations in this paragraph are denied.

26.    Denied.

27.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

28.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

29.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

30.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

31.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

32.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

33.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

34.     This paragraph references documents that speak for themselves.  Defendants refer to these documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.  The remaining allegations in this paragraph are denied.

35.     This paragraph purports to reference an SEC document that speaks for itself.

36.     This paragraph purports to reference an SEC document that speaks for itself.

37.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning what Plaintiff and the proposed Class "reviewed and relied on," which are therefore denied.  In addition, this paragraph references the 2006 Prospectus and the 2007 Prospectus, which are documents that speak for themselves. Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.  The remaining allegations in this paragraph are denied.

38.     This paragraph references the 2006 Prospectus and the 2007 Prospectus, which are documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.

39.     This paragraph references documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.  The remaining allegations in this paragraph are denied.

40.     This paragraph references documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.

41.     This paragraph references the Fund's Semi-Annual Report for the period ended November 30, 2007, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

42.     This paragraph references the Fund's Semi-Annual Report for the period ended November 30, 2007, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents. Plaintiff's characterization of the document is denied.

43.     This paragraph references the Fund's Annual Report for the fiscal year ended May 31, 2008, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

44.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning what Plaintiff and the proposed Class "reviewed and relied on," which are therefore denied.  Further, this paragraph contains conclusions of law to which no response is required.  To the extent a response to those allegations is required, the allegations are denied.  In addition, this paragraph references documents and statements that speak for themselves.  Defendants refer to the documents and statements for a true and complete statement of their contents.  Plaintiff's characterization of the documents and statements is denied.  The remaining allegations in this paragraph are denied.

45.     This paragraph references documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.

46.     This paragraph references various media articles that speak for themselves.

-5-

Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.  The remaining allegations in this paragraph are denied.

47.     This paragraph references an article in the *New Zealand Herald*, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

48.     This paragraph references an article in *Financial Week*, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

49.     Denied.

50.     This paragraph references a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

51.     This paragraph references an article in *Crain's New York*, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

52.     This paragraph references an *Associated Press* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

53.     This paragraph references a legal pleading that speaks for itself.  Defendants refer to the pleading for a true and complete statement of the allegations contained therein.  Plaintiff's characterization of the pleading is denied, as are the allegations contained therein.

54.     This paragraph references an article in *Financial Week*, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

55.     This paragraph references a Fund brochure, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

56.     This paragraph references a *New York Times* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied

57.     This paragraph references a *Wall Street Journal* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

58.     This paragraph references a *Wall Street Journal* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

59.     This paragraph references the 2005 Prospectus and the Primary II Fund Registration Statement, which are documents that speaks for themselves.  Defendants refer to these documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.

60.     This paragraph references the Primary II Fund Registration Statement, which is a

document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

61.    This paragraph references the Fund's March 15, 2006 Semi-Annual Report, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

62.    This paragraph references a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

63.    Denied.

64.    Denied.

65.    This paragraph references a *Forbes* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

66.    This paragraph references documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.  The remaining allegations in this paragraph are denied.

67.    This paragraph references a *Wall Street Journal* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

68.    This paragraph references documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization

of the documents is denied.  The remaining allegations in this paragraph are denied.

69.     This paragraph references documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.

70.     This paragraph references a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

71.     Denied.

72.     Denied.

73.     Denied.

74.     This paragraph references *Wall Street Journal* articles, which are documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.

75.     Denied.

76.     This paragraph references a *Bloomberg.com* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

77.     Defendants admit only that in 2007-2008, the Fund invested in Lehman Brothers commercial paper in the amounts and on the dates set forth in the Fund's public filings. The remaining allegations in this paragraph are denied.

78.     This paragraph references a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

79.     This paragraph references documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.  Defendants admit only that in 2008, the Fund invested in Lehman Brothers commercial paper in the amounts and on the dates set forth in the Fund's public filings.  The remaining allegations in this paragraph are denied.

80.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, which are therefore denied.

81.     Denied.

82.     The paragraph references a statement by Federal Reserve Chairman Ben Bernanke which speaks for itself.  Defendants refer to the statement for a true and complete statement of its contents.  Plaintiff's characterization of the statement is denied.  The remaining allegations in this paragraph are denied.

83.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, which are therefore denied.

84.     The paragraph references a statement by an unidentified Fund trustee which speaks for itself.  Defendants refer to the statement for a true and complete statement of its contents.  Plaintiff's characterization of the statement is denied.  The remaining allegations in this paragraph are denied.

85.     Defendants admit only that Bent Sr. and Bent II met with Moody's representatives in July 2008, and lack knowledge or information as to what information Moody's was seeking from other funds.  The remaining allegations in this paragraph are denied.

86.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning Lehman Brothers' internal reasoning for raising capital in mid-2008, which are therefore denied.  In addition, this paragraph references a

*New York Times* report, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

87.     This paragraph references a *New York Times* report, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

88.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning what Plaintiff "reviewed and relied upon," which are therefore denied.  Indeed, this paragraph references a pleading that speaks for itself.  Defendants refer to the pleading for a true and complete statement of its contents.  Plaintiff's characterization of the pleading is denied, as are the allegations therein.  The remaining allegations in this paragraph are denied.

89.     This paragraph references a pleading that speaks for itself.  Defendants refer to the pleading for a true and complete statement of its contents.  Plaintiff's characterization of the pleading is denied, as are the allegations therein.

90.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning market rumors, which are therefore denied.  In addition, this paragraph references a *New York Times* report, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

91.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, which are therefore denied.

92.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning Lehman Brothers, which are therefore

denied.  In addition, this paragraph references a *Wall Street Journal* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.

93.   Defendants admit only that on the evening of Sunday, September 14, 2008, it was reported that Lehman Brothers would file for bankruptcy, and that Lehman Brothers thereafter did file for bankruptcy sometime on the morning of Monday, September 15, 2008.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, which are therefore denied.

94.   Denied.

95.   This paragraph references a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

96.   This paragraph references a pleading that speaks for itself.  Defendants refer to the pleading for a true and complete statement of its contents.  Plaintiff's characterization of the pleading is denied, as are the allegations therein.  The remaining allegations in this paragraph are denied.

97.   This paragraph references emails that speak for themselves.  Defendants refer to the emails for a true and complete statement of their contents.  Plaintiff's characterization of the emails is denied.  The remaining allegations in this paragraph are denied.

98.   This paragraph references documents that speak for themselves.  Defendants refer to the documents for a true and complete statement of their contents.  Plaintiff's characterization of the documents is denied.

99.   Denied.

100.   Defendants admit only that Lehman Brothers filed for bankruptcy on the morning

of Monday, September 15, 2008.  The remaining allegations in this paragraph are denied.

101.     Denied.

102.     This paragraph references a Board of Trustees meeting for which a complete transcript exists.  Defendants refer to the transcript for a true and complete statement of its contents.  Plaintiff's characterization of the meeting is denied.  The remaining allegations in this paragraph are denied.

103.     Denied.

104.     Denied.

105.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

106.     Denied.

107.     Denied.

108.     Denied.

109.     Denied.

110.     This paragraph references a Board of Trustees meeting for which a complete transcript exists.  Defendants refer to the transcript for a true and complete statement of its contents.  Plaintiff's characterization of the meeting is denied.  The remaining allegations in this paragraph, including the allegations in the SEC's Complaint, are denied.

111.     Denied.

112.     This paragraph references a Board of Trustees meeting for which a complete transcript exists.  Defendants refer to the transcript for a true and complete statement of its contents.  Plaintiff's characterization of the meeting is denied.  The remaining allegations in this paragraph, including the allegations in the SEC's Complaint, are denied.

113.     This paragraph references a Board of Trustees meeting for which a complete

transcript exists.  Defendants refer to the transcript for a true and complete statement of its contents.  Plaintiff's characterization of the meeting is denied.  The remaining allegations in this paragraph are denied.

114.    Denied.

115.    Denied.

116.    Denied.

117.    Denied.

118.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

119.    Denied.

120.    Defendants refer to the redemption records from September 15-16, 2008 for a true and complete record thereof. The remaining allegations in this paragraph are denied.

121.    Denied.

122.    Denied.

123.    Denied.

124.    Denied.

125.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning money market funds other than the Fund, which are therefore denied.  In addition, this paragraph references a *marektwatch.com* article, which speaks for itself.  Defendants refer to the article for a true and complete statement of its contents.  Plaintiff's characterization of the article is denied.  The remaining allegations in this paragraph are denied.

126.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning the thoughts of the proposed Class, which

are therefore denied.  The remaining allegations in this paragraph are denied.

127.   In addition, this paragraph references a *New York Times* article, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

128.   Defendants admit only that Bent Sr. and Bent II met with Moody's representatives in July 2008, and lack knowledge or information as to what information Moody's was seeking from other funds.  The remaining allegations in this paragraph are denied.

129.   Denied.

130.   Denied.

131.   Denied.

132.   This paragraph references emails that speak for themselves.  Defendants refer to the emails for a true and complete statement of their contents.  Plaintiff's characterization of the emails is denied.  The remaining allegations in this paragraph are denied.

133.   This paragraph references an email that speaks for itself.  Defendants refer to the email for a true and complete statement of its contents.  Plaintiff's characterization of the email is denied.  The remaining allegations in this paragraph are denied.

134.   Denied.

135.   This paragraph references a Board of Trustees meeting for which accurate minutes exist.  Defendants refer to the approved Board minutes for a true and complete statement of their contents.  Plaintiff's characterization of the meeting is denied.  The remaining allegations in this paragraph are denied.

136.   Denied.

137.   This paragraph references an email that speaks for itself.  Defendants refer to the

email for a true and complete statement of its contents. Plaintiff's characterization of the email is denied. The remaining allegations in this paragraph are denied.

138. Denied.

139. Denied.

140. Denied.

141. Denied.

142. Denied.

143. Denied.

144. Denied.

145. Denied.

146. This paragraph references emails that speak for themselves. Defendants refer to the emails for a true and complete statement of their contents. Plaintiff's characterization of the emails is denied. The remaining allegations in this paragraph are denied.

147. Denied.

148. Denied.

149. This paragraph references emails that speak for themselves. Defendants refer to the emails for a true and complete statement of their contents. Plaintiff's characterization of the emails is denied. The remaining allegations in this paragraph are denied.

150. Denied.

151. This paragraph references emails that speak for themselves. Defendants refer to the emails for a true and complete statement of their contents. Plaintiff's characterization of the emails is denied. The remaining allegations in this paragraph are denied.

152. Denied.

153. Denied.

154.    Denied.

155.    Denied.

156.    This paragraph references a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

157.    Denied.

158.    Denied.

159.    Denied.

160.    Defendants refer to the redemption records from September 15-16, 2008 for a true and complete record thereof. The remaining allegations in this paragraph are denied.

161.    Denied.

162.    This paragraph references so-called "executive session" minutes which speak for themselves.  Defendants refer to the minutes for a true and complete statement of their contents. Defendants aver that the account set forth in the "executive session" minutes is false.

163.    Denied.

164.    Defendants admit only that the Board continued to discuss Lehman valuation at the Tuesday noon meeting. The remaining allegations in this paragraph are denied.

165.    Denied.

166.    Denied.

167.    This paragraph references a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

168.    Denied.

169.    Denied.

170.    Denied.

171.    Denied.

172.    This paragraph references an email that speaks for itself.  Defendants refer to the email for a true and complete statement of its contents.  Plaintiff's characterization of the email is denied.  The remaining allegations in this paragraph are denied.

173.    Denied.

174.    Denied.

175.    Denied.

176.    This paragraph references the Plan of Liquidation, which is a document that speaks for itself.  Defendants refer to the document for a true and complete statement of its contents.  Plaintiff's characterization of the document is denied.  The remaining allegations in this paragraph are denied.

177.    Denied.

178.    Denied.

179.    This paragraph references a Court order that speaks for itself.  Defendants refer to the Court order for a true and complete statement of its contents.  Plaintiff's characterization of the Court order is denied.  The remaining allegations in this paragraph are denied.

180.    This paragraph references a fee application that speaks for itself.  Defendants refer to their Court submissions in support of RMCI's fee application for a true and complete statement of its contents.  Plaintiff's characterization of the fee application is denied.  The remaining allegations in this paragraph are denied.

181.    Denied.

182.    Denied.

183.    Denied.

184.    Denied.

185.    Denied.

186.    Denied.

187.    Denied.

188.    Denied.

189.    Denied.

190.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

### AS TO COUNT I
### (Section 11 of the Securities Act)

191.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  The remaining Defendants repeat and incorporate by reference their responses above as if fully set forth herein.

192.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  In addition, this paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

193.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  In addition, this paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

194.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.

The remaining Defendants deny the allegations of this paragraph.

195.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  The remaining Defendants deny the allegations of this paragraph.

196.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  The remaining Defendants deny the allegations of this paragraph.

197.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  The remaining Defendants deny the allegations of this paragraph.

198.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  The remaining Defendants deny the allegations of this paragraph.

199.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  The remaining Defendants deny the allegations of this paragraph.

200.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  The remaining Defendants deny the allegations of this paragraph.

201.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.  The remaining Defendants deny the allegations of this paragraph.

202.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI.

The remaining Defendants deny the allegations of this paragraph.

203.    Count I was dismissed pursuant to the September 30, 2012 Order with respect to RMCI.  Accordingly, no answer is required with respect to this paragraph on behalf of RMCI. The remaining Defendants deny the allegations of this paragraph.

### AS TO COUNT II
### (Section 12(a)(2) of the Securities Act)

204.    Defendants repeat and incorporate by reference their responses above as if fully set forth herein.

205.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

206.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

207.    Denied.

208.    Denied.

209.    Denied.

210.    Denied.

211.    Denied.

212.    Denied.

213.    Denied.

214.    Denied.

### AS TO COUNT III
### (Section 15 of the Securities Act)

215.    Defendants repeat and incorporate by reference their responses above as if fully set forth herein.

216.    This paragraph contains conclusions of law to which no response is required.  To

the extent a response is required, the allegations are denied.

217.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

218.    Denied.

219.    Denied.

220.    Denied.

221.    Denied.

## AS TO COUNT IV
### (Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder)

222.    Defendants repeat and incorporate by reference their responses above as if fully set forth herein.

223.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

224.    Denied.

225.    Denied.

226.    Denied.

227.    Denied.

228.    Denied.

229.    Denied.

230.    Denied.

## AS TO COUNT V
### (Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Thereunder)

231.    Defendants repeat and incorporate by reference their responses above as if fully set forth herein.

232.    This paragraph contains conclusions of law to which no response is required.  To

the extent a response is required, the allegations are denied.

233.    Denied.

234.    Denied.

235.    Denied.

236.    Denied.

**AS TO COUNT VI**
**(Section 20(a) of the Exchange Act)**

237.    Defendants repeat and incorporate by reference their responses above as if fully set forth herein.

238.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

239.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, the allegations are denied.

240.    Denied.

241.    Denied.

242.    Denied.

243.    Denied.

**AS TO COUNT VII**
**(Section 13(a) of the Investment Company Act)**

244.    Count VII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

245.    Count VII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

246.    Count VII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

247.    Count VII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

248.    Count VII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

249.    Count VII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

250.    Count VII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

251.    Count VII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

252.    Count VII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

253.    Count VII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

## AS TO COUNT VIII
### (Section 36(b) of the Investment Company Act)

254.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

255.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

256.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

257.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

258.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

259.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

260.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

261.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

262.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

263.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

264.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

265.    Count VIII was dismissed pursuant to the September 30, 2012 Order.

Accordingly, no answer is required with respect to this paragraph.

**AS TO COUNT IX**
**(Breach of Fiduciary Duty and/or Aiding and Abetting Breach of Fiduciary Duty)**

266.    Count IX was dismissed pursuant to the September 30, 2012 Order.  Accordingly,

no answer is required with respect to this paragraph.

267.    Count IX was dismissed pursuant to the September 30, 2012 Order.  Accordingly,

no answer is required with respect to this paragraph.

268.    Count IX was dismissed pursuant to the September 30, 2012 Order.  Accordingly,

no answer is required with respect to this paragraph.

269.     Count IX was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

270.     Count IX was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

271.     Count IX was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

272.     Count IX was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

### AS TO COUNT X
**(Fraud)**

273.     Count X was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

274.     Count X was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

275.     Count X was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

276.     Count X was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

277.     Count X was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

278.     Count X was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

### AS TO COUNT XI
**(Gross Negligence)**

279.     Count XI was dismissed pursuant to the September 30, 2012 Order.  Accordingly,

no answer is required with respect to this paragraph.

280.    Count XI was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

281.    Count XI was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

282.    Count XI was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

283.    Count XI was dismissed pursuant to the September 30, 2012 Order.  Accordingly, no answer is required with respect to this paragraph.

**AS TO COUNT XII**
**(Unjust Enrichment)**

284.    Count XII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

285.    Count XII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

286.    Count XII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

287.    Count XII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

288.    Count XII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

289.    Count XII was dismissed pursuant to the September 30, 2012 Order. Accordingly, no answer is required with respect to this paragraph.

## JURY TRIAL DEMAND

290.    Defendants demand a jury trial on all claims and third-party claims herein.

## PRAYER FOR RELIEF

291.    This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Defendants deny that this action should be certified as a class action and/or that Plaintiff and the proposed Class are entitled to any of the relief requested in the Prayer for Relief.

## <u>AFFIRMATIVE DEFENSES</u>

Defendants assert the following affirmative defenses and reserve the right to amend this Answer to assert any additional affirmative defenses when and if, in the course of their investigation, discovery, or preparation for trial, it becomes appropriate to assert such affirmative defenses.  In asserting these defenses, Defendants do not assume the burden of proof for any issue that would otherwise rest on Plaintiff and/or the proposed Class.

1.    The Class Action Complaint fails because Defendants did not knowingly or recklessly make false or misleading statements.

2.    The Class Action Complaint fails because Defendants did not knowingly or recklessly disseminate false or misleading information.

3.    The Class Action Complaint fails because Defendants did not make false or misleading statements nor did Defendants disseminate false or misleading information.

4.    The Class Action Complaint fails because Defendants did not knowingly or recklessly omit to state material facts necessary in order to make any statements not false or misleading.

5.    The Class Action Complaint fails because Defendants did not knowingly or recklessly omit to state material facts necessary in order to make any disseminated information

not false or misleading.

6.     The Class Action Complaint fails because Defendants did not omit to state material facts necessary in order to make any disseminated information or statements not false or misleading.

7.     The Class Action Complaint fails because any alleged false or misleading information, false or misleading dissemination, or false or misleading omission was not material.

8.     The Class Action Complaint fails because Defendants did not knowingly or recklessly engage in any acts or employ any schemes to defraud any involved parties.

9.     The Class Action Complaint fails because Defendants did not engage in any acts or employ any schemes to defraud any parties.

10.     The Class Action Complaint fails because Defendants did not knowingly or recklessly engage in any transactions, practices, or courses of business which would operate as a fraud upon any involved parties.

11.     The Class Action Complaint fails because Defendants did not engage in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative with respect to any involved parties.

12.     The claims in the Class Action Complaint are barred in whole or in part by the doctrines of estoppel, acquiescence, unclean hands, and/or waiver.

13.     The claims in the Class Action Complaint are barred in whole or in part by the "bespeaks caution" doctrine.

14.     The claims in the Class Action Complaint are barred by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

15.     The claims in the Class Action Complaint are barred by Defendants' good faith reliance on the advice of counsel.

-29-

16.     The Class Action Complaint inadequately pleads knowledge, and/or intent, and fails to state with particularity facts that give rise to a strong inference of scienter.

17.     Defendants are not liable for any alleged misstatements that were forward-looking statements and/or contained sufficient cautionary language and risk disclosure.

18.     Defendants are not liable because Plaintiff and/or the proposed Class did not rely on the market in making their purchases or sales of Fund securities.

19.     The claims in the Class Action Complaint are barred in whole or in part because Plaintiff and/or the proposed Class had actual or constructive knowledge of the misrepresentations or omissions complained of, and therefore assumed the risk of any alleged damages proximately caused thereby.

20.     The damages sought, if any, are speculative, and thus are not recoverable.

21.     The conduct of persons and/or entities other than Defendants was a superseding or intervening cause of any damage, loss, or injury sustained by Plaintiff and/or the proposed Class.

22.     Defendants are not liable to the extent that the alleged misstatements and/or omissions in the Class Action Complaint were not made in connection with the purchase or sale of any securities by Plaintiff and/or the proposed Class.

23.     The claims are barred in whole or in part because of the lack of transaction and/or loss causation.

24.     The claims in the Class Action Complaint are barred in whole or in part because the depreciation in the net asset value ("NAV") of the Fund resulted from factors other than the misstatements or omissions alleged in the Class Action Complaint.

25.     The claims in the Class Action Complaint are barred in whole or in part because Plaintiff and/or the proposed Class cannot establish primary liability necessary to assert a claim for control person liability.

26.     The claims in the Class Action Complaint are barred in whole or in part by the fact that Plaintiff and/or the proposed Class have failed to mitigate their alleged damages.

27.     Any alleged misstatements or omissions constitute inactionable statements of opinion or puffery.

28.     Plaintiff lacks standing to assert the claims alleged in the Class Action Complaint.

29.     Plaintiff has not established that the market for the securities at issue in this action was efficient.

30.     Defendants are not liable because some or all of the matters now claimed by the Class Action Complaint to be the subject of misrepresentations or omissions were publicly disclosed or were in the public domain and, as such, were available to Plaintiff and/or the proposed Class and were at all times reflected in the NAV of the Fund.

31.     Defendants are not liable because Plaintiff and/or the proposed Class did not rely on the market in making their purchases or sales of Fund securities.

32.     Plaintiff's claims are not properly maintainable as a class action.

33.     Plaintiff's claims include questions of law or fact that are not common to the proposed Class.

34.     Plaintiff's claims are not typical of the members of the proposed Class.

35.     Plaintiff will not fairly and adequately protect the interests of the members of the proposed Class.

36.     Plaintiff lacks standing to sue, individually or as a class representative, because it did not make any purchases during the Class Period.

WHEREFORE, Defendants respectfully request that the Court enter judgment in their favor on all of Plaintiff's claims, along with an award of attorney's fees and costs, and such other and further relief as the Court deems just and proper.

-31-

## THIRD PARTY COMPLAINT

Third Party Plaintiffs Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Reserve Management Corporation ("RMC"), Bruce Bent Sr. ("Bent Sr."), Bruce R. Bent ("Bent II") and Arthur T. Bent ("Arthur Bent") (collectively, the "Third Party Plaintiffs"), by their attorneys, Duane Morris LLP, bring this third party action directly in part and derivatively in part, the latter for the benefit of the Reserve Primary Fund (the "Fund"), against Third Party Defendants Santa Albicocco, Ronald J. Artinian, William E. Viklund, Edwin Ehlert, Jr., William J. Montgoris, and Frank J. Stalzer (collectively, the "Independent Trustees"), for contribution and indemnification, and on account of, *inter alia*, the Independent Trustees' misappropriation of Fund assets, fraud, and other misconduct.

### NATURE OF THE ACTION

1.      This third party action concerns the wrongful conduct of the Independent Trustees of the Fund before, during, and after September 2008.

2.      The Fund is a money market fund that held $785 million in Lehman Brothers' debt securities when Lehman's bankruptcy filing set off a global financial crisis on September 15, 2008.  As a result of the Fund's Lehman holdings, it "broke the buck."

3.      In September 2008, the Fund was governed and controlled entirely by a Board of Trustees (the "Board").  The Board was composed of eight Trustees: seven independent trustees[2] and the Chairman, Bent Sr.  The Independent Trustees were all sophisticated individuals, and some had extensive experience in the financial markets.  One had been the Chief Operating Officer of Bear Stearns for twenty years; another had been an executive vice president and senior managing director of Smith Barney; a third was a lawyer who had been Nassau County's

---

[2]      A seventh independent trustee, Stephen P. Zieniewicz, was largely inactive by September 2008 and so has not been named as a third-party defendant in this action.

Treasurer and a member of New York State's Banking Board.

4.     Since September 15, 2008, myriad lawsuits have been filed by investors in the Fund against Third Party Plaintiffs, the Fund, and the Independent Trustees.  The class action brought by Plaintiff Third Avenue Institutional International Value Fund, L.P. ("Third Avenue"), on behalf of a putative class of Fund shareholders/investors (the "Class") is among these suits (the "Class Action").  In addition, the U.S. Securities and Exchange Commission ("SEC") brought an enforcement action against certain of Third Party Plaintiffs falsely alleging securities fraud violations (the "SEC Action").  Most of these actions were consolidated under a Transfer Order issued by the U.S. Judicial Panel on Multidistrict Litigation.  *In re: The Reserve Fund Securities and Derivative Litigation*, MDL NO. 2011 (Feb. 10, 2009).

5.     The SEC Action was tried in this Court before a jury in October 2012.  At the heart of the SEC Action was the false allegation that certain of Third Party Plaintiffs had made fraudulent statements in order to induce investors not to redeem shares in the Fund on the day of Lehman Brothers' bankruptcy filing.  The jury rejected each and every one of the SEC's fraud claims and cleared the Defendants of all fraud allegations.

6.     The Class Action, which parrots many of the same false allegations in the SEC Action, remains unresolved.  As limited by the Court, the Class Action purports to asserts claims for numerous alleged violations of the federal securities laws on behalf of a Class of persons who purchased or held shares of the Fund from September 28, 2006 to September 16, 2008.  Third Avenue originally included the Independent Trustees as defendants in the Class Action and made numerous allegations against Third Party Plaintiffs and the Independent Trustees collectively and without distinction.  However, Third Avenue later dropped the Independent Trustees from the suit, electing to proceed only against Third Party Plaintiffs, with the apparent expectation that the Independent Trustees would provide helpful testimony in return.

7.      The rationale behind Third Avenue's choice of defendants aside, the fact remains that the Independent Trustees had a substantial, if not controlling, role in almost all the conduct with which Third Avenue takes issue in the Class Action Complaint.  The Independent Trustees held seven of the eight positions on the Board in September 2008, were provided all the relevant information known to Third Party Plaintiffs, and controlled all of the actions that form the basis of Third Avenue's claims.  To cite just a few prominent examples, the Independent Trustees vetted and approved the Fund's addition of Lehman Brothers paper to the list of eligible Fund investments.  They chose the $0.80 valuation of that commercial paper on September 15, 2008, followed by the $0.00 valuation the next day which resulted in the Fund "breaking the buck." And the trustees adopted and announced the Plan of Liquidation containing the $3.5 billion Special Reserve that Third Avenue labels as "shocking."

8.      RMCI, by contrast, provided investment advice and management services to the Fund through a Management Agreement, which required that RMCI would remain "subject to the overall control and direction of the Board of Trustees of the Trust."  RMC, in turn, provided administrative services to the Fund pursuant to a subcontract with RMCI, and thus was subject to the same Board control.  Resrv Partners was the Fund's distributor and broker-dealer pursuant to a Distribution Agreement which similarly required that it would be "subject at all times to the policies and control of Trust's Board of Trustees."  As for the three Bents, they were appointed as Fund officers directly by the Board and served at the Board's discretion.  The Board had the authority on proper notice, to terminate the aforementioned Agreements and remove the Bents, were they dissatisfied with any actions taken by any of those parties.

9.      To be clear, Third Party Plaintiffs deny any liability in the Class Action.  In the extremely unlikely event, however, Third Party Plaintiffs are found liable, the Independent Trustees should contribute and/or indemnify them for such liability.

10.     Third Party Plaintiffs, as Fund shareholders, also bring a derivative claim under Fed. R. Civ. P. 23.1 to redress the Independent Trustees' gross, reckless, and/or intentional mismanagement and misuse of Fund assets, much of it in contravention of a Court order and/or over the express, repeated objection of the Bents as Fund officers, including millions of dollars in cash payments to themselves and professionals under their employ.  The Independent Trustees should be compelled to return the misappropriated assets, so the Fund can properly distribute such assets to legitimate creditors and shareholders.

11.     Third Party Plaintiffs also bring direct third party causes of action against the Independent Trustees to redress the injury they have incurred from the Independent Trustees' wrongful conduct since September 2008.  First, among other things, the Independent Trustees promised to cause the Fund to reimburse RMCI for its advancements of the Fund's payment of their compensation for Board service.  RMCI did make those advancements, but then the Independent Trustees reneged on their promise to cause that reimbursement.  To the extent the Fund does not ultimately reimburse that amount, the Independent Trustees have been unjustly enriched and should return the compensation to RMCI

12.     Second, the Independent Trustees fraudulently induced RMCI to continue managing the Fund and advance millions of dollars in Fund expenses, by falsely promising Third Party Plaintiffs that they would cause the Fund to reimburse RMCI for, at a minimum, its out-of-pocket expenses.  RMCI successfully managed the Fund for over two years, returning $50+ billion (99.04%) to investors.  Once the work was complete, however, the Independent Trustees reneged on their promise, demanding Third Party Plaintiffs accept new, previously-unagreed-to conditions in exchange for any reimbursement.  As a result, RMCI has incurred substantial delay and expense to obtain those agreed-upon sums from the Court.

13.     Lastly, discovery in the SEC Action also revealed that the Independent Trustees

conspired to falsify evidence.  The Fund's activities on September 15 and 16, 2008 are well-documented through detailed Board minutes, which were adopted by the Independent Trustees at or around the time they were created in 2008.  Two years after the Lehman bankruptcy and in the midst of discovery in the SEC Action, the Independent Trustees suddenly decided to alter the unanimously-approved minutes from the September 15, 2008 Board meeting, by replacing true statements with fabrications designed to create the false impression that the Bents made untrue statements to them concerning redemptions on September 15, 2008.  This improper attempt to rewrite history occurred almost immediately after SEC attorneys had finished interrogating the Independent Trustees about the events of September 15, 2008.  Their long course of dishonest conduct caused substantial injury to the Third Party Plaintiffs.

14.     Accordingly, Third Party Plaintiffs now seek damages through the direct portion of this third party action.  Consistent with the injunction in the November 25, 2009 Order in the SEC Action, this third party action does not assert any claim against the Fund, nor does it assert any claim against any of the Fund's "Indemnitees" that seeks an award which would be payable or subject to indemnification by the Fund.

**PARTIES**

15.     Third Party Plaintiff RMCI, during relevant times, was the investment adviser of the Fund.  It is organized and existing under the laws of the State of New Jersey.  It is no longer active, but its former principal place of business was in the State of New York.

16.     Third Party Plaintiff RMC, now known as Double Rock Corporation, is an affiliate of RMCI which provided administrative services to the Fund through a subcontract relationship with RMCI.  It is organized and existing under the laws of the State of New York, with its principal place of business in the State of New York.

17.     Third Party Plaintiff Resrv Partners, during relevant times, was the distributor of

the Fund.  It is organized and existing under the laws of the State of New York.  It is no longer

active, but its former principal place of business was in the State of New York.

18.     Third Party Plaintiff Bent Sr., during relevant times, was Chairman, President,

and Treasurer of the Fund.  He is a resident of the State of New York.   In the early 1970s, Bent

Sr. and the late Harry Brown co-founded the world's first money market fund, which eventually

grew into a $4 trillion industry.  It is conservatively estimated that the invention of the money

market fund has resulted in a wealth transfer of several hundred billion dollars from banks to

money market fund investors.

19.     Third Party Plaintiff Bent II, during relevant times, was Co-Chief Executive

Officer, Senior Vice President, and Assistant Treasurer of the Fund.  He is a resident of the State

of New York.

20.     Third Party Plaintiff Arthur Bent, during relevant times, was Co-Chief Executive

Officer, Senior Vice President, and Assistant Treasurer of the Fund.  He is a resident of the State

of New York.

21.     Third Party Defendant Ronald J. Artinian is and, during relevant times, was an

Independent Trustee serving on the Board.  Upon information and belief, he is a resident of the

State of New York with a second home in the State of Colorado.

22.     Third Party Defendant Santa Albicocco is and, during relevant times, was an

Independent Trustee serving on the Board of Trustees of the Fund.  Upon information and belief,

she is a resident of the State of New York.

23.     Third Party Defendant William E. Viklund is and, during relevant times, was an

Independent Trustee serving on the Board.  Upon information and belief, he is a resident of the

State of New York.

24.     Third Party Defendant Edwin Ehlert, Jr., during relevant times, was an

Independent Trustee serving on the Board.  Upon information and belief, he is a resident of the State of New Jersey.

26.  Third Party Defendant William J. Montgoris, during relevant times, was an Independent Trustee serving on the Board.  Upon information and belief, he is a resident of the State of New Jersey.

26.  Third Party Defendant Frank J. Stalzer, during relevant times, was an Independent Trustee serving on the Board.  Upon information and belief, he is a resident of the State of New York.

## JURISDICTION AND VENUE

27.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over the subject matter of Third Party Plaintiffs' First Cause of Action for Contribution and/or Indemnification because that cause of action arises under the law of the United States.

28.  This Court has jurisdiction over the subject matter of all claims in this third party action pursuant to 28 U.S.C. § 1367(a) because these claims are part of the same case or controversy as the claims asserted in the Class Action.

29.  This Court has personal jurisdiction over the Independent Trustees by virtue of their doing business in New York and/or their commission of tortious acts inside and outside of New York that had an effect within New York.

30.  Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial portion of the acts and transactions that constitute the violations of law complained of herein occurred in this District.

31.  The portion of this action brought derivatively is subject to Fed. R. Civ. P. 23.1. This action is not brought collusively to confer jurisdiction on this Court or any other court of the United States.

## BACKGROUND FACTS RELEVANT TO ALL CLAIMS

32.     The Fund was a money market fund governed by SEC Rule 2a-7.  It was the

successor of the very first money market fund launched in the early 1970s by Bent Sr. and the

late Harry Brown.  As of the close of business on Friday September 10, 2008, it was one of the

largest money market funds in the United States, with over $60 billion of assets.

33.     At that time, approximately 1.18% of the Fund assets were invested in Lehman

Brothers commercial paper and medium term notes, which held the highest possible short-term

ratings by the then-prestigious Moody's and Standard & Poor's ratings agencies.  Lehman was

also a "Consolidated Supervised Entity" supposedly subject to heightened SEC supervision.  Its

financial statements showed its assets exceeding its liabilities by $26 billion.

34.     To the surprise of the market, on the evening of September 14, 2008, it was

reported that Lehman Brothers would be filing for bankruptcy the next morning, which in fact it

did.  At 6:28 A.M. on the morning of Monday, September 15, Bent II notified the Board that it

would have to meet "this morning ASAP to consider using fair valuation for the Lehman paper

that our funds currently hold which totals approximately $800 million."

35.     As of September 15, 2008, the Fund had eight Trustees, all but one of whom –

Bent Sr. – was "independent" under SEC rules.  The seven Independent Trustees had impressive

credentials in the financial services industry.  One of them – Ronald Artinian – had been

Executive Vice President and Managing Director at Smith Barney, Inc. for nine years and an

executive at Lehman Brothers, Inc. for thirteen years before that.  Another – William Montgoris

– had been the Chief Financial Officer and Chief Operating Officer of Bear Stearns for more

than a decade.  The Independent Trustees also had separate counsel, Stuart Strauss of Clifford

Chance LLP, a law firm with an extensive Investment Company Act practice.

36.     The Independent Trustees played an active role in overseeing the Fund and were

-39-

compensated accordingly.  As of September 10, 2008, the Independent Trustees were proposed to receive an annual retainer of $60,000 per year plus a payment of $5,000 per quarterly meeting. Audit Committee Members collected another $2,500 per meeting, while the Chairman of the Audit Committee was paid $25,000.  Bent Sr. was the only member of the Board who received no compensation for his service as a trustee.

37.     The fact that the Fund held Lehman paper was not news to the Board.  One of the Board's responsibilities was reviewing the list of approved securities in which the Fund could invest.  Before a new issuer of debt security was proposed for investment by the Fund, the name of the issuer would be provided to the Board of Trustees for oversight and approval.  The Board thus knew that the Fund could invest in Lehman paper and indeed approved of the prospect of its doing so.  The investment was reviewed at the Board's quarterly Board meeting on September 10, 2008, just days before the Lehman bankruptcy.

38.     The investment in Lehman paper was also public knowledge.  The Fund's May 31, 2008 Annual Report disclosed all of the Fund's Lehman holdings, and the Fund made a current list of its holdings available to anyone on demand – something no other money fund did at that time.  The Fund's investment in Lehman complied with all applicable SEC money fund investment guidelines:  Lehman paper was highly rated and the Fund's holdings fell well below the maximum permissible amount of securities of any one issuer.

39.     Six Trustees took part in a telephonic Board meeting at 8:00 A.M. on September 15, including Bent Sr.  Also participating was, among others, Stuart Strauss of Clifford Chance an experienced Investment Company Act lawyer.  Bent Sr. began the meeting by stating that, based on the Fund's total assets, its NAV would drop to $0.9949 if Lehman were valued at 55% of par, which in turn would cause the Fund to "break the buck."  None of the Independent Trustees, however, suggested Lehman should be valued that low.  Independent Trustee

Montgoris called the prospect of valuing Lehman at zero "ridiculous."

40.     During the same meeting, the Bents candidly explained the Fund's situation to the Independent Trustees.  Bent II reported that investors had already placed $5.2 billion in redemption orders, presumably because of the Fund's Lehman holdings, and Bent Sr. added that "as the assets of the fund go down, the more significant the Lehman holdings become relative to the total assets of the fund."  The Board agreed to reconvene at 9:30 A.M.

41.     At the 9:30 A.M. meeting, Bent Sr. recommended that Lehman continue to be valued at par, based on the financial statement Lehman had filed with its bankruptcy petition, which listed assets well in excess of liabilities, and the lack of trades at any other value.  Despite this recommendation, the Board voted to value Lehman at 80% of par, and Bent Sr. concurred.  During the same meeting, Bent II reported on another development:  "our custody bank [State Street] is not necessarily sending out wires [in payment of redemption requests] as soon as they get instructions from us."

42.     Thereafter, based on advice from RMCI's General Counsel, Bent II set up another telephonic Board meeting for 1:00 P.M. to discuss a potential credit support agreement.  All the Independent Trustees except Ronald Artinian were present.  At that meeting, Bent II explained that RMCI was proposing such an agreement because redemption requests "continued unabated throughout the morning," and there "appeared to be a run on the [ ] Fund."  The approved Board minutes also reflect the Board being informed that, "[a]s of the beginning of the 1:00 PM call, redemption requests from the [ ] Fund were approximately $16.5 billion."

43.     At the conclusion of the 1:00 P.M. meeting, the Board authorized the Fund's outside securities lawyers, Joel Goldberg and Rose DiMartino of Willkie Farr & Gallagher, to contact the SEC to inquire about putting a support agreement in place.  However, those counsel thereafter did not complete a first draft of such an agreement until around 7:16 P.M.  Moreover,

even that draft was never sent to the Bents.  It soon became moot.

44.     By close of business on September 15, redemptions exceeded $20 billion.  The market remained illiquid and had not rebounded.  It became clear to the Bents that, because of the unforeseeable, unprecedented market collapse the Lehman bankruptcy had caused, the level of support that would be needed to keep the Fund's NAV at $1.00 far exceeded RMCI's liquid resources, and a support agreement would not be viable.

45.     At 8:00 A.M., they notified the SEC of their decision.  Shortly after that call with the SEC concluded, at the Board's next meeting at 10:00 A.M. on September 16, Bent II reported on developments since the prior meeting:  redemption requests had reached $24.6 billion; State Street had stopped paying redemptions; RMCI could not provide the credit support necessary to maintain the Fund's $1.00 NAV; and the Fund would likely "break the buck."  The Bents then recommended that the Board suspend purchases into and redemptions out of the Fund, and that the Fund begin the process of liquidating.  The Independent Trustees unanimously rejected this recommendation, opting to wait and see if the Fed would bail out the Fund.

46.     When all of this information was disclosed to the Independent Trustees at 10:00 A.M. on September 16, they initially did nothing with it:  they did not set a new Lehman value; they did not vote to suspend sales or redemptions.  Indeed, only after four more meetings that Tuesday did the Independent Trustees finally accept the Bents' recommendation to shut down the Fund.  At about 3:45 P.M., the Board voted to drop the value of the Fund's Lehman holdings to $0.00, thereby causing the Fund to "break the buck."

47.     Instead of following the Bents' recommendations to take proactive steps to protect investor assets through an orderly liquidation of the Fund, the Independent Trustees – upon learning the bad news – almost immediately began scheming to protect themselves, by creating an alternative version of events.  At the conclusion of the 10:00 A.M. Board meeting,

the Independent Trustees met in so-called "executive session" – basically, the entire Board

except for Bent Sr.  As recorded by their counsel, Stuart Strauss:

> [T]he Independent Trustees indicated how <u>shocked</u> they were by the information
> relayed to them by Reserve Management during the morning's earlier call.  <u>The
> Trustees noted that at [the] 1:30 p.m. meeting yesterday Management had
> indicated that redemptions were approximately $5 billion</u>[.]

(Emphases added).

48.      Quite plainly, that is impossible.  What the Independent Trustees did not know at

the time, but discovery in the SEC Action has since uncovered, is that by happenstance, the 8:00

AM and 9:30 A.M. September 15 Board meetings were tape-recorded, because Chief Investment

Officer Patrick Ledford dialed into the call from his recorded phone line used for trades.   Thus,

it is now known that by 8:00 A.M. that morning – before the market had even opened – Bent II

had already told the Independent Trustees that redemptions were at $5.2 billion.  Then those

same Trustees were called back two more times, in the face of a burgeoning crisis, and were told

a support agreement was needed to deal with these "heavy redemptions."  Thus, the Independent

Trustees clearly were not told that the Fund had received negative $200 million redemptions

during the day.  Rather, they were already in spin control.

49.      Unfortunately, the SEC came to rely upon that spin control, eventually making it

the centerpiece of its Complaint against the Bents, RMCI, and Resrv Partners.  Caught in a lie,

the Independent Trustees had two choices: either admit the truth and accept the consequences, or

try to perpetuate the lie even further.  As discussed below, the Independent Trustees chose the

latter course, eventually going so far as to "clarify" two-year old Board minutes, in response to

the SEC, in an effort to bolster the SEC's faltering claim.

50.      While the SEC was pursuing its "fraud" case against the Bents, inspired in part by

the Independent Trustees' falsified "executive session" minutes – a case which a federal jury has

since rejected – private Fund investors were bringing meritless lawsuits as well, suits which eventually came to parrot the SEC's meritless fraud claims.

51.     The Class Action is the outgrowth of one of those private investor suits.  In it, Third Avenue challenges the conduct of Third Party Plaintiffs with respect to the Fund's holding of Lehman debt securities in general and specifically with respect to their conduct on September 15 and 16, 2008.  When Third Avenue originally brought this suit back in September 2008, it named the Independent Trustees as co-defendants alongside Third Party Plaintiffs, asserting largely collective allegations against all the "Defendants."

52.     In January 2010, Third Avenue filed the amended Consolidated Class Action Complaint.  The amended Class Action Complaint set forth some of the same operative facts alleged by Third Avenue in its original pleading.  However, it removed the Independent Trustees as co-defendants.  Upon information and belief, Third Avenue dropped the Independent Trustees from this lawsuit with the expectation, or at least hope, that they would provide information and/or testimony helpful to the Class Action.

53.     Despite this pleading tactic, the Class Action Complaint remains premised upon supposed misconduct by Third Party Plaintiffs which, in reality, is more properly chargeable to the Independent Trustees.  For example, Third Avenue cites to numerous statements in the Fund's public filings concerning investment objectives.  While Third Avenue attributes these statements to Third Party Plaintiffs, it was the Board, dominated by the Independent Trustees, which controlled and approved of the Fund's public filings.  Similarly, the Fund's decisions to invest in Lehman Brothers paper and, following Lehman's bankruptcy filing, to initially value that paper at $0.80 and then drop that value to $0.00, could not have been made without Board approval.  The Fund's NAV was at all times, including September 15 and 16, 2008, set by the Board, which was dominated and controlled by the Independent Trustees.

-44-

54.     Accordingly, Third Party Plaintiffs now bring the First Cause of Action below for contribution and/or indemnification from the Independent Trustees.

### ADDITIONAL FACTS RELEVANT TO DERIVATIVE CLAIM

55.     While endeavoring to pass the buck on to Third Party Plaintiffs for their own decisions and actions, the Independent Trustees, in the aftermath of September 2008, exploited their positions on the Board of Trustees by misappropriating and misusing Fund assets for their personal gain, in abject violation of a Court order.  The Independent Trustees' mismanagement and waste of Fund assets was made knowingly and in bad faith.

56.     On June 8, 2009, the Court entered a Stipulation and Order (the "June 8, 2009 Order") prohibiting the Fund from making any distributions except for pro-rata shareholder distributions and "necessary and ordinary business expenses incurred in the ordinary course." The purpose of this Order was to enable the Court to oversee and supervise the Fund for the protection of the Fund's investors.  Unfortunately, the Independent Trustees pretended the June 8, 2009 Order did not exist whenever it might inconvenience them, spending at least $17 million in Fund assets for extraordinary expenses without prior Court authorization.

57.     Many of these expenditures were for their own personal benefit, and none of them can be fairly categorized as "necessary and ordinary business expenses incurred in the ordinary course."  Through November 23, 2010, the Independent Trustees spent $1,862,373 on direct compensation to themselves, and $5,163,683 for "Legal Services" for themselves, even though they were dropped from the Class Action, and even though the Fund had separate legal counsel (Willkie Farr & Gallagher) which reported directly to them, for which the Fund was billed over $7 million.  And they spent $2,204,786 on unidentified "Consultants" they hired.

58.     It is questionable what, if any, value the Fund obtained from these extraordinary expenditures.  Almost all of the work in administering the Fund was performed by Third Party

Plaintiffs, with the Trustees exercising an "oversight" role which mainly involved an occasional telephonic Board meeting (essentially just a phone call). Unfortunately, neither the SEC nor the "lead plaintiff" in the Class Action – both charged with representing investors – has ever shown any interest in reviewing the propriety and wisdom of these expenditures.

59. The Bents, by contrast, as Fund officers, did repeatedly ask the Independent Trustees to rein in their spending. The Independent Trustees refused all such entreaties. In a July 16, 2009 email communication to the Independent Trustees, Bent II wrote:

> I want to mention something else in terms of expenses as well. As an officer of the Funds, you know I have voiced my complaints about Willkie Farr's work and the amount they have charged the shareholders and the other entities. I believe they have been grossly overpaid and took advantage of the Funds being under heavy fire very quickly in an unprecedented crisis.
>
> …
>
> I want to reinforce that I have asked them several times both verbally and In writing to get approval for their legal fees before they do work. That is, they must give us budgets for work to be performed and an estimate for each Upcoming month in terms of the matters they will address and the cost associated. Trustee approval of these budgets must be obtained prior to this work being performed. Fee discounts should also be negotiated and bills should be reviewed to ensure that matters are staffed and worked efficiently and appropriately. Willkie lawyers have continued to ignore me in this regard which is wrong and concerning, and, since I am an officer of the Funds, I have to continue to raise this point.
>
> …
>
> Finally, all outside counsel and consultants doing work for the Funds should follow the same procedure outlined above of obtaining prior approval by dollar amount and matter before any work is commenced. Thank you.

Unfortunately, the Independent Trustees – and, in particular, Lead Independent Trustee Ronald Artinian – responded to this good faith effort to protect Fund assets with disparaging, puerile remarks. None of the Independent Trustees wrote back to disagree with Artinian, nor to suggest a more constructive approach.

60. Only a few months later did the Independent Trustees finally get around to providing a more formal response to Bent II's request, but not one that demonstrated any greater commitment to safeguarding Fund assets. Rather, in a November 13, 2009 letter, the

Independent Trustees' counsel, Mark Holland of Goodwin Procter LLP (which by that point had replaced Clifford Chance) wrote: "it has long been an industry 'best practice' for independent trustees to determine their own compensation and compensation for their independent legal counsel [meaning himself], and for management (and management's representative on the Board) [meaning the Bents] to remain uninvolved in that process and the determination" and that any involvement by the Fund's management [again meaning the Bents] "could be construed as improperly interfering with the independence of the Independent Trustees."

61.     Presumably, if the Independent Trustees were concerned for sparing the Bents the misperception of "improperly interfering" with Trustee independence, they could have sought Court approval for these expenditures.  Indeed, the June 8, 2009 Order required them to do just that.  The Independent Trustees, however, chose to subject none of their expenditures to judicial scrutiny.  After failing to convince the Independent Trustees to do the right thing, Third Party Plaintiffs mentioned the issue to the Court.  The Independent Trustees responded on October 6, 2010 by directing the Fund's counsel, Rose DiMartino of Willkie Farr, to threaten to RMCI's General Counsel, Catherine Birch, that if the Bents did not stop pointing out the Independent Trustees' waste of Fund assets, those Trustees would issue a press release attacking Bent Sr. on an irrelevant and untrue matter.  DiMartino delivered that threat as she was told to do, but the Bents, consistent with the fiduciary duties, declined to accede to it.

62.     When Third Party Plaintiffs rejected the Independent Trustees' threats and intimidation, the Independent Trustees retaliated by voting to remove Bent Sr. from the Fund's Board of Trustees, without cause, by virtue of a by-law amendment, notwithstanding that Bent Sr. had been duly elected as Chairman by the Fund's shareholders.  They then proceeded to remove all three Bents – the only real watchdogs against the Independent Trustees' waste of corporate assets – from their positions as Fund officers.

63.     Amending corporate by-laws to remove an incumbent director before his term expires is void as a matter of basic corporate law.   Accordingly, the Independent Trustees, in their zeal to retaliate against Bent Sr., created a situation in which the Fund has, for the last few years, been operated by an unlawful Board whose every action is a nullity.  Since removing the Bents in November 2010, the Independent Trustees have concealed their expenditures of Fund assets.  Upon information and belief, they continue to expend Fund assets at a rate of $120,000 per month, an extraordinary sum for merely watching over a bank account.

64.     Third Party Plaintiffs now bring the Second Cause of Action below derivatively, in the right of and for the benefit of the Fund, in order to redress injuries suffered by the Fund as a direct result of the Independent Trustees' wrongdoings.  Third Party Plaintiffs will adequately and fairly represent the interests of the Fund and its shareholders in enforcing and prosecuting their rights.  This action is brought to remedy violations of applicable law as set forth herein. Third Party Plaintiffs have not made a demand on the Board to institute this action because such demand would be a futile act because the Independent Trustees, who still hold all of the current positions on the Board, participated in, benefitted from, were interested in, and/or approved the acts or omissions which are complained of herein.

## ADDITIONAL FACTS RELEVANT TO DIRECT CLAIMS

65.     From September 15, 2008 through November 23, 2010, Third Party Plaintiffs faithfully served the Fund, performing all of the services called for under the Amended Comprehensive Fee Investment Management Agreement between the Fund and RMCI (the "Management Agreement") and the Fund's Distribution Agreement (the "Distribution Agreement").  Neither Agreement was terminated, revoked, or breached by RMCI during this period, and the Independent Trustees agreed at the Board's February 20, 2009 meeting that, at a minimum, "actual operating expenses . . . would be paid."

66.    Pursuant to the terms of the Management Agreement, RMCI managed the investment portfolio of the Fund and, through its sub-contractor, affiliate RMC, it provided an array of additional services essential for the continued operation of the Fund.  These services, as detailed in the Management Agreement, included furnishing other executive officers for the Fund, providing office space in New York, maintaining Fund records not otherwise kept by the Fund's custodian, distributor, or sub-investment managers, and furnishing all of the accounting, administrative, clerical, secretarial, and statistical services needed by the Fund.  RMCI also advanced all of the Fund's operating and other expenses.

67.    As of close of business on September 16, 2008, the Fund had approximately $50.5 billion in net assets, with shareholders seeking to redeem a large majority of those assets at a time when credit markets were essentially frozen.  Had the Fund's entire position been liquidated immediately, shareholders would have received pennies on the dollar.  Instead, RMCI, through its portfolio management, evaluated all the Fund's holdings, identifying those assets that could be sold at or above par value in the secondary markets, and those that should be held to maturity. For those that could be profitably sold in advance of maturity, timing of sales had to be negotiated as close to the distribution date as possible, so as to maintain the highest yields until the funds were ready to be distributed.

68.    RMCI's active management process resulted in the return of $50.7 billion, a 99.04% return on investment.  This figure includes $230 million in income that RMCI earned for the Fund through December 31, 2009.  Indeed, Judge Gardephe acknowledged the time and effort that maximizing the return to investors entailed.  In his March 28, 2012 summary judgment decision in the SEC Action, Judge Gardephe made the following observation about Third Party Plaintiffs' ongoing work to manage the Fund:

> Here, it is undisputed that between September 15th, 2008, and November 2010, defendants [meaning Third Party Plaintiffs] managed the money of investors who had not sought to redeem or had not successfully redeemed as of September 15th, 2008. During the period between September 15th, 2008, and November 2010, the Fund, under Court supervision, returned to investors approximately 99 percent of the monies they had invested in the Primary Fund. <u>But the process of returning tens of billions of dollars to investors was quite complicated, and the Fund's assets required care, custody and management during the time it took to accomplish that task</u>.

(Emphasis added).

69.     Nevertheless, Third Party Plaintiffs have yet to be duly compensated for their "care, custody and management". Under the Management Agreement, the Fund had agreed to pay RMCI management fees at annual rates ranging from 0.13 - 0.81% of "the average daily net assets," depending upon the class of Fund shares. The fees were to be computed and paid to RMCI daily. The Management Agreement was then renewed in September 2009 based on the Independent Trustees' promise that the Fund would thereafter reimburse RMCI's expenses since, by that point, the net assets remaining in the Fund were no longer sufficient even to cover costs. The Agreement was terminated effective November 23, 2010.

70.     Unfortunately, after Third Patty Plaintiffs undertook the work, the Independent Trustees reneged on their commitment, adding a new condition: that RMCI's expenses be vetted by the Fund's auditor, KPMG. The Court granted the Independent Trustees' request, and KPMG vetted and confirmed RMCI's expenses in principal part.

71.     Yet even after the KPMG audit, the Independent Trustees have still refused to honor their commitment, instead adding yet a further condition to payment – namely, that RMCI first abandon its contractual right to management fees. Had the Independent Trustees articulated this condition from the outset, Third Party Plaintiffs would not have agreed to it.

72.     Four and a half years later, Third Party Plaintiffs are still awaiting reimbursement of millions of dollars advanced on behalf of the Fund. This payment delay was not motivated by

any sense of fiscal prudence.  As noted above, the Independent Trustees have lavished millions of dollars in payments of extraordinary fees to themselves and to the litany of professionals and consultants of questionable value, all without ever bothering to seek advanced approval from the Court or (as Bent II had repeatedly asked them to do) set a budget or negotiate a fee discount. Nor was this payment delay required under the June 8, 2009 Order, in which the Court expressly permitted the Fund to pay "necessary and ordinary business expenses incurred in the ordinary course" such as RMCI's expenses without Court approval.

73.    Indeed, to the extent the Independent Trustees incorrectly believed otherwise, the Court corrected that misimpression at a January 11, 2011 conference (attended by the Trustees' counsel Matthew Tulchin of Goodwin Procter): "it would be helpful to me to not have to resolve disputes about fees and expenses, obviously that goes without saying."  Nevertheless, even after that judicial entreaty, the Independent Trustees refused all efforts to reach a resolution.

74.    Instead, the Independent Trustees continued to single out Third Party Plaintiffs for non-payment so as to curry favor with the SEC, which has spent the last four years suing RMCI, Reserv Partners and the Bents in main part for the Independent Trustees' conduct.  For instance, the SEC claimed the decision to continue selling Fund shares on Tuesday, September 16, 2008 constituted securities fraud.  However, it was the Independent Trustees who made that decision, rejecting the Bents' recommendation to immediately shut down the Fund.

75.    The Independent Trustees made no secret of their reasoning.  At a  meeting with the Independent Trustees in Summer 2009, the Independent  Trustees told the Bents that they had been  instructed not to make any payments whatsoever to Third Party Plaintiffs.  When asked by whom, one Independent Trustee, Santa Albicocco, answered: "Where does the gorilla sleep?"  In a subsequent meeting, their counsel Mark Holland confirmed to the Bents that the SEC had made clear to the Independent Trustees that if they paid Third Party Plaintiffs any amount without the

SEC's consent, then the SEC would sue them as well.

76.     The Independent Trustees have benefitted from their willingness to put their own personal interests ahead of those of the Fund and its shareholders – the SEC never did sue them, and all the private litigants who originally had, such as Third Avenue, quietly dropped them from such lawsuits.  However, this breach of loyalty has substantially injured the Fund, which now will be liable for prejudgment interest on these unpaid sums of between nine and twelve percent per annum, which amounts to millions of additional dollars in Fund liabilities that could have, and would have, been avoided had the Independent Trustees acted properly.

77.     A similar situation developed with respect to Independent Trustee compensation. The Independent Trustees set their own compensation, without input from Third Party Plaintiffs, the SEC or the Court – which their counsel dubiously calls "best practice."

78.     Between September 15, 2008 and November 23, 2010, the Independent Trustees paid themselves direct compensation in the amount of $1,862,373 for their service on the Fund's Board of Trustees.  Payment of Trustee fees are the express obligation of the Fund.  RMCI advanced those fees to the Fund to pay the Trustees, consistent with the historical practice of the Fund, and RMCI should be reimbursed for all Trustee fees advanced.

79.     Unfortunately, despite repeated requests, and submission of all the backup documentation, $855,573 in Trustee fees remains unreimbursed from the Fund.  Additionally, $150,983 in Trustee fees remains unreimbursed from the Reserve Yield Plus Fund, a related mutual fund that the very same Independent Trustees also oversee.  (The Fund and the Reserve Yield Plus Fund are, together, the "Funds.")

80.     Third Party Plaintiffs now bring the Third through Seventh direct Causes of Action below, based on principles of unjust enrichment, fraudulent inducement, breach of contract, promissory estoppel, and tortious interference with contract, respectively, to redress the

injury they incurred as a result of the Independent Trustees' misconduct.

## THE MINUTES FRAUD

81.     In connection with the SEC Action, Third Party Plaintiffs were forced to incur substantial legal fees proving that the Independent Trustees were not misled about redemption levels on September 15, 2008.  This issue was trumped up by the SEC with the help of the Independent Trustees.

82.     According to the SEC, Third Party Plaintiffs never told the Independent Trustees that the Fund was experiencing a run on September 15.  Since it was clear from the minutes of the Board meetings that this information was shared with the Independent Trustees, the only way the SEC could have argued otherwise was if the Independent Trustees claimed that the minutes were wrong – and the Independent Trustees obliged even if it meant that they would have to rewrite history in the process.

83.     The Board's first meeting at 8:00 A.M. on September 15 was recorded.  At that time, the Board was told that redemption levels had already reached $5.2 billion – and that was before the market had even opened.  Third Party Plaintiffs plainly were not trying to hide from the Independent Trustees the fact that a crisis was brewing.

84.     The Board met twice more on September 15.  Although the third meeting at 1:00 P.M. was not recorded, the minutes of that meeting, which were unanimously approved by the Board a month later, state that Bent II "began by advising the Trustees that redemption requests . . . continued unabated throughout the morning," that redemptions were approximately "$16.5 billion" as of 1:00 P.M., and that there "appeared to be a run on the Fund."

85.     Two years later, on September 30, 2010, the Independent Trustees sought to "clarify" the minutes, claiming the Board was actually given a "substantially lower" redemption number.  When Third Party Plaintiffs asked about the circumstances surrounding the attempt to

alter approved minutes, Mitchell J. Auslander, the Co-Chairman of Willkie Far, which was still serving as Fund counsel, stated that it was "in response to the SEC."

86.     Third Party Plaintiffs subsequently learned in discovery that, starting in late August 2010 and culminating a few hours before the attempted "clarification" of the previously approved minutes, the five remaining Independent Trustees had met with the SEC, one by one, for half a day each, and were questioned about the September 15 Board meetings.  Confronted by the reality of what occurred, the Independent Trustees initially sought to deepen the cover-up. At an April 6, 2011 hearing, the Independent Trustees' counsel, Mark Holland, represented to the Court that:  "What happened was there was a draft of the minutes of September 15th circulated which had an $8 billion number for redemptions in it in brackets. . . . The trustees approved it with the number blank . . . . and then subsequently RMCI filled in the $16 billion number and provided those minutes to the SEC in response to its request."

87.     Nothing about the counsel's statement was accurate.  No draft of the September 15, 2008 minutes was ever circulated with a blank redemption level.  Further, the Board minutes were prepared not by RMCI but by the Secretary of the Board of Trustees under their direction, with the assistance of the Fund's lawyers at Willkie Farr.  As for the redemption figure, it was specifically approved by Stuart Strauss, the Independent Trustees' counsel.

88.     When discovery revealed the foregoing representations made to the Court to be untrue, the story abruptly changed yet again.  On the eve of trial, the SEC abandoned its claim that "RMCI and the Bents omitted or misrepresented material facts concerning redemption activity" and conceded that the September 15 minutes – which the Independent Trustees had tried to alter in response to the SEC – were correct all along.

89.     The Independent Trustees' misconduct has nevertheless taken its toll on Third Party Plaintiffs in terms of financial and reputational  injury.  Even today, anyone with access to

the Internet can still log on to the SEC's web site and read false allegations in the SEC's

Complaint as to how RMCI supposedly "vastly understated the actual level of redemptions as of

1:00 p.m." – allegations the Independent Trustees have always known to be false.  One can also

read a block quote from the Independent Trustees'  "executive session" minutes, including their

feigned "shock" at redemption levels.  *See*

www.sec.gov/litigation/complaints/2009/comp21025.pdf. These are the rotten fruits of the

Independent Trustees' fraud.

     90.     Third Party Plaintiffs now bring the Eighth Cause of Action in order to seek

redress for this egregious fraud by the Independent Trustees.

**FIRST CAUSE OF ACTION**
**DIRECT CLAIM FOR CONTRIBUTION AND/OR INDEMNIFICATION**

     91.     Third Party Plaintiffs incorporate by reference every allegation above.

     92.     The Class Action Complaint alleges that some or all of Third Party Plaintiffs are

liable to the Class for violations of the federal securities laws, including alleged violations of

Section 11 of the Securities Act, 15 U.S.C. § 77k (Count I); Section 12(a)(2) of the Securities

Act (Count II); Section 15 of the Securities Act (Count III); Section 10(b) of the Exchange Act,

15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), thereunder (Count IV); Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) & (c), 17 C.F.R. § 240.10b-

5(a) & (c), thereunder (Count V); Section 20(a) of the Exchange Act (Count VI); Section 13(a)

of the Investment Company Act, 15 U.S.C. § 80a-13(a) (Count VII); and Section 36(b) of the

Investment Company Act, 15 U.S.C. § 80a-36b (Count VIII).[3]  Counts I through VIII are

collectively referred to herein as the "Federal Securities Law Claims."

---

[3]     Pursuant to the September 30, 2012 Order, Counts VII and VIII were dismissed against all Third Party Plaintiffs and Count I was dismissed with respect to RMCI.  Third Party Plaintiffs include these dismissed claims in their First Cause of Action to preserve their rights against the Independent Trustees in the event of an appeal of the September 30, 2012 Order.

93.     Third Party Plaintiffs deny liability on all of the Federal Securities Law Claims.

94.     Without waiver of the Third Party Plaintiffs' denial of the allegations in the Class Action Complaint as set forth above, Third Party Plaintiffs incorporate herein by reference the existence of those allegations (but not their truth) as part of the basis for Third Party Plaintiffs' claim for contribution and/or indemnification.

95.     Specifically, should any of Third Party Plaintiffs be found liable to Third Avenue and/or the Class on any Federal Securities Law Claim, Third Party Plaintiffs' liability could only arise, in whole or in part, from the Independent Trustees' own violations of the federal securities laws.  Accordingly, Third Party Plaintiffs demand contribution and/or indemnification from the Independent Trustees pursuant to federal law and/or other applicable authority for any damages that may be awarded to Third Avenue and/or the Class.

**SECOND CAUSE OF ACTION**
**DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY**

96.     Third Party Plaintiffs incorporate by reference every allegation above.

97.     This cause of action is brought derivatively by Third Party Plaintiffs (other than Resrv Partners) on behalf of the Fund against the Independent Trustees.

98.     The Independent Trustees are fiduciaries of the Fund and all of its shareholders, and as such owe them an undivided duty to conduct the business of the Fund loyally, faithfully, carefully, diligently, and prudently.

99.     Third Party Plaintiffs (other than Resrv Partners) are presently shareholders of the Fund and were shareholders of the Fund at the time of the conduct at issue.

100.     The Independent Trustees have abdicated their duties and responsibilities by misappropriating and mismanaging Fund assets.

101.     The Independent Trustees have abused the control vested in them by virtue of

their positions as Trustees of the Fund.

102.    The Independent Trustees have breached their fiduciary duty of loyalty to the Fund and its shareholders, and have gross negligently, recklessly, and/or intentionally breached their fiduciary duty of care to the Fund and its shareholders.

103.    The Fund and its shareholders have been injured by reason of the Independent Trustees' grossly negligent, reckless, and/or intentional breaches of their fiduciary duty.

104.    Third Party Plaintiffs (other than Resrv Partners), as shareholders and derivative representatives of the Fund, seek damages for the Fund in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**DIRECT CLAIM FOR UNJUST ENRICHMENT**

105.    Third Party Plaintiffs incorporate by reference every allegation above.

106.    In taking compensation from RMCI that RMCI was not otherwise obligated to pay them, and then reneging on their promise to cause the Funds to reimburse RMCI for that amount, the Independent Trustees have been unjustly enriched.

107.    The Independent Trustees' enrichment came at RMCI's expense, and equity and good conscience demand that the Independent Trustees return to RMCI the money they unjustly received from RMCI under false pretenses.

108.    So that this Cause of Action, and all of the successive Causes of Action, do not assert claims against any of the Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Fund because, with respect to the challenged conduct, Third Party Plaintiffs assert this Cause of Action against the Independent Trustees based solely on their actions that constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

## FOURTH CAUSE OF ACTION
## DIRECT CLAIM FOR FRAUDULENT INDUCEMENT

109.    Third Party Plaintiffs incorporate by reference every allegation above.

110.    The Independent Trustees promised Third Party Plaintiffs that they would cause the Fund to reimburse RMCI for its out-of-pocket Fund expenses, and for Trustee compensation, if RMCI advanced these sums to the Fund and continued to manage the Fund.  However, the Independent Trustees never intended to do so.

111.    Third Party Plaintiffs relied on the Independent Trustees' representation and caused RMCI to advance these amounts and continue to manage the Fund.

112.    Thereafter, the Independent Trustees refused in bad faith to reimburse RMCI and instead frustrated RMCI's efforts to obtain reimbursement.

113.    As a result, RMCI has not received reimbursement.

114.    The Independent Trustees knew their promises to RMCI were false when they were made, and they did so for the sole purpose of defrauding Third Party Plaintiffs into causing RMCI to advance these amounts and continue to manage the Fund.

115.    Third Party Plaintiffs seek damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## DIRECT CLAIM FOR BREACH OF CONTRACT

116.    Third Party Plaintiffs incorporate by reference every allegation above.

117.    The Independent Trustees promised to Third Party Plaintiffs that the Fund would reimburse RMCI for its out-of-pocket Fund expenses, and for all Trustee compensation, if RMCI advanced these sums to the Fund and continued to manage the Fund.

118.    Third Party Plaintiffs agreed to proceed on this basis, without waiver of their right to also seek management and broker's fees otherwise owed under the Management Agreement and Distribution Agreement (the "Agreements").

119.    The foregoing agreement between the Independent Trustees and Third Party Plaintiffs is a binding and enforceable contract.

120.    Third Party Plaintiffs performed under this contract by causing RMCI to advance these sums to the Fund and continue to manage the Fund.

121.    The Independent Trustees, by contrast, breached this contract by failing to perform and instead frustrated RMCI's efforts to obtain the benefits of the contract.

122.    Third Party Plaintiffs have been injured as a result, and are entitled to damages in an amount to be determined at trial.

123.    So that this Cause of Action does not assert any claim against any of the Fund's Indemnitees that seeks an award that would be payable or subject to indemnification by the Fund because, with respect to the challenged conduct, Third Party Plaintiffs assert this Cause of Action against the Independent Trustees based solely on their actions that constitute willful misfeasance, bad faith, gross negligence and/or reckless disregard of their obligations and/or duties

## SIXTH CAUSE OF ACTION
## DIRECT CLAIM FOR PROMISSORY ESTOPPEL

124.    Third Party Plaintiffs incorporate by reference every allegation above.

125.    The Independent Trustees made a clear and unambiguous promise to Third Party Plaintiffs that the Fund would reimburse RMCI for out-of-pocket Fund expenses, and for Trustee compensation, if RMCI advanced these sums to the Fund and continued to manage the Fund.

126.    Third Party Plaintiffs agreed and RMCI did so.

127.    Third Party Plaintiffs reasonably and foreseeably relied on the Independent Trustees' promise in causing RMCI to do so.

128.    The Independent Trustees thereafter refused to reimburse RMCI.

129.    Third Party Plaintiffs have been injured as a result, and are entitled to damages in

an amount to be determined at trial.

130.    So that this Cause of Action does not assert any claim against any of the Fund's

Indemnitees that seeks an award that would be payable or subject to indemnification by the Fund

because, with respect to the challenged conduct, Third Party Plaintiffs assert this Cause of Action

against the Independent Trustees based solely on their actions that constitute willful misfeasance,

bad faith, gross negligence and/or reckless disregard of their obligations and/or duties.

## SEVENTH CAUSE OF ACTION
## DIRECT CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT

131.    Third Party Plaintiffs incorporate by reference every allegation above.

132.    During the relevant time, the Agreements were binding and enforceable contracts.

133.    Pursuant to the Agreements, Third Party Plaintiffs are entitled to receive certain

payments, including management fees and expenses and broker's fees.

134.    The Independent Trustees control the Fund through their domination of the Board.

135.    The Independent Trustees had actual knowledge of the Agreements.

136.    The Independent Trustees have refused to approve payment of management fees

and expenses and broker's fees as required under the Agreements, in bad faith and for the

purpose of injuring Third Party Plaintiffs.

137.    The Independent Trustees have also improperly interfered with Third Party

Plaintiffs' efforts to obtain the foregoing payments by making repeated false representations as

described above.

138.    The Independent Trustees have thus induced the Fund to breach the Agreements

with Third Party Plaintiffs.

139.    The Independent Trustees have acted outside the scope of their duties as Trustees

of the Board in refusing to approve the foregoing payments and in interfering with Third Party

Plaintiffs' efforts to obtain payment.

140.     Third Party Plaintiffs have been injured as a result, and are entitled to damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
## DIRECT CLAIM FOR THE MINUTES FRAUD

141.     Third Party Plaintiffs incorporate by reference every allegation above.

142.     The Independent Trustees made multiple representations – in their "executive session" minutes from September 16, 2008, in their interviews with the SEC, and in their September 30, 2010 "clarification" – to the effect that Third Party Plaintiffs had concealed the true level of redemptions at the September 15, 2008 1:00 P.M. Board meeting.

143.     Those representations were received and relied upon by third parties, as reflected in, *inter alia*, the SEC Complaint and the Class Action Complaint.

144.     The Independent Trustees' representations were false.

145.     Those misrepresentations were material.

146.     The Independent Trustees' misrepresentations were made knowingly, with the intention of creating the false impression that Third Party Plaintiffs provided the Board with false information concerning redemption requests on September 15, 2008.

147.     Third Party Plaintiffs were injured by Independent Trustees' misrepresentations, in an amount to be determined at trial.

## PRAYER FOR RELIEF
## ALL CAUSES OF ACTION

WHEREFORE, Third Party Plaintiffs pray for judgment and relief on all causes of action, and as might be appropriate for each particular cause of action, in their favor and in favor of the Fund, as appropriate, against the Independent Trustees as follows:

1.      For judgment against the Independent Trustees and in favor of Third Party

        Plaintiffs for contribution and/or indemnification with respect to any

        damages that may be awarded to Plaintiff and/or to any class in the Class

        Action;

2.      For compensatory, general, special, and other damages on behalf of

        themselves and on behalf of the Fund, in amounts to be determined

        according to the proof presented during the course of trial, along with

        pre-judgment and post-judgment interest at the statutory rate;

3.      For punitive damages in an amount to be determined according to the

        proof presented during the course of trial;

4.      For attorneys' fees and costs; and

5.      For such other relief as the Court deems and proper.

Dated: New York, New York
       January 22, 2013

                                DUANE MORRIS LLP

                                    *s/John Dellaportas*
                                By:_____
                                    John Dellaportas
                                    Fran M. Jacobs
                                1540 Broadway
                                New York, New York  10036
                                (212) 692-1000

                                Attorneys for Defendants and Third Party Plaintiffs
                                  Reserve Management Company, Inc., Resrv
                                  Partners, Inc., Reserve Management Corporation,
                                  Bruce R. Bent, Sr., Bruce Bent II, and Arthur T.
                                  Bent II

DM1\3682131.6

-62-

**VERIFICATION**

I, BRUCE R. BENT II, pursuant to 28 U.S.C. § 1746(2), verify as follows:

1.      I am a Third Party Plaintiff in this action, a duly appointed officer of Third Party Plaintiffs Reserve Management Company, Inc., Resrv Partners, Inc., and Reserve Management Corporation, the son of Third Party Plaintiff Bruce R. Bent, Sr., and the brother of Third Party Plaintiff Arthur T. Bent III. I am authorized to execute this Verification on behalf of all of the aforesaid parties. I have read Defendants' Third Party Complaint, know the contents thereof, and hereby verify the same are true to the best of my knowledge and based on my review of the relevant documents, except as to those matters which are stated to be on information and belief and, as to those matters, I believe them to be true.

2.      I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       January  22,2013

_____
BRUCE R. BENT II