**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE THE RESERVE PRIMARY FUND SECURITIES & DERIVATIVE CLASS ACTION LITIGATION | No. 08-cv-8060-PGG (Class Action) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**LEAD PLAINTIFF'S MOTION FOR (I) PRELIMINARY APPROVAL OF**
**SETTLEMENT, (II) CERTIFICATION OF THE CLASS FOR PURPOSES OF**
<u>**SETTLEMENT, AND (III) APPROVAL OF NOTICE TO THE CLASS**</u>

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
Max W. Berger
John C. Browne
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Lead Plaintiff and the Class*

<u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 6

I.     DESCRIPTION OF THE LITIGATION .................................................. 6

II.    SETTLEMENT DISCUSSIONS AND MEDIATIONS .............................. 12

III.   TERMS OF THE SETTLEMENT ........................................................... 15

IV.   THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL ............ 17

      A.    The Settlement Is The Result Of Good Faith, Arm's-Length
           Negotiations By Well-Informed And Experienced Counsel ................. 18

      B.    The Substantial Benefits For The Class, Weighed Against
           Litigation Risks, Strongly Support Preliminary Approval ................... 19

V.     THE CLASS SHOULD BE CERTIFIED FOR SETTLEMENT
      PURPOSES ........................................................................................ 22

      A.    The Class Satisfies The Requirements Of Rule 23(a) ........................ 23

           1.    The Class Members Are Too Numerous To Be Joined ........... 23

           2.    There Are Common Questions Of Law And Fact ................... 23

           3.    Lead Plaintiff's Claims Are Typical Of The Class .................. 24

           4.    Lead Plaintiff Will Fairly And Adequately Protect The
                Interests Of The Class .......................................................... 25

      B.    The Class Satisfies The Requirements Of Rule 23(b)(3) .................... 26

           1.    Common Legal And Factual Questions Predominate ............. 26

           2.    A Class Is Superior To Other Methods Of Adjudication ........ 27

VI.   NOTICE TO THE CLASS SHOULD BE APPROVED ............................ 27

VII.  PROPOSED SCHEDULE ..................................................................... 29

VIII. CONCLUSION .................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchen Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)..................................................................................22, 26

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
222 F.3d 52 (2d Cir. 2000)...............................................................................25

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.,*
909 F. Supp. 2d 259, (S.D.N.Y. 2012)..............................................................18

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,*
504 F.3d 229 (2d Cir. 2007)......................................................................23, 24

*Consol. Rail Corp. v. Town of Hyde Park,*
47 F.3d 473 (2d Cir. 1995)...............................................................................23

*In re Deutsche Telekom AG Sec. Litig.,*
229 F. Supp. 2d 277 (S.D.N.Y. 2002)..........................................................24, 26

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.,*
No. 02-CV-3400 (CM) (PED),
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .........................................................18

*In re Giant Interactive Grp., Inc. Sec. Litig.,*
279 F.R.D. 151 (S.D.N.Y. 2011) .......................................................................18

*In re Gilat Satellite Networks, Ltd.,*
2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ....................................................28

*In re Global Crossing Sec. and ERISA Litig.,*
225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................28

*In re Globalstar Sec. Litig.,*
No. 01 Civ 1748 (PKC),
2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ....................................................23

*In re Initial Pub. Offering Sec. Litig.,*
243 F.R.D. 79 (S.D.N.Y. 2007) ....................................................................6, 18

*In re Marsh & McLennan Cos., Inc. Sec. Litig.,*
No. 04 Civ. 8144 (CM),
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ....................................22, 24, 25, 26

*In re Monster Worldwide, Inc. Sec. Litig.*,
   251 F.R.D. 132 (S.D.N.Y. 2008) ....................................................................27

*In re NASDAQ Market-Makers Antitrust Litig.*,
   176 F.R.D. 99 (S.D.N.Y. 1997) ......................................................................18

*Ne. Trading, Inc. v. Ven-Co Produce, Inc.*,
   No. 09 Civ. 7767 (PGG),
   2011 WL 4444511 (S.D.N.Y. Sept. 26, 2011)................................................17

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) .............................................................19, 26

*In re Pfizer Inc. Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012) ......................................................................23

*In re Polaroid ERISA Litig.*,
   240 F.R.D. 65 (S.D.N.Y. 2006) ......................................................................25

*In re Prudential Sec. Ltd. P'ships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) ....................................................................22

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001)............................................................................23

*In re Sadia, S.A. Sec. Litig.*,
   269 F.R.D. 298 (S.D.N.Y. 2010) .............................................................24, 25

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ....................................................................26

*In re Veeco Instruments Inc. Sec. Litig.*,
   No. 05 MDL 0165 (CM),
   2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)..................................................19

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ......................................................................25

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d. Cir. 2005)..............................................................17, 18, 28

*Weingberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982)..............................................................................22

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) .............................................................24, 26

**STATUTES AND RULES**

15 U.S.C. § 77z-1(a)(7) ............................................................................................................28

Fed. R.Civ. P.
    Rule 23 ................................................................................................................... passim

Lead Plaintiff Third Avenue Institutional International Value Fund, L.P. ("Lead Plaintiff" or "Third Avenue") respectfully submits this memorandum in support of its motion for (i) preliminary approval of the proposed Settlement; (ii) certification of the Class for settlement purposes; (iii) approval to disseminate notice of the proposed Settlement to the Class, in substantially the same form as the Notice attached as Exhibit A-1 to the Stipulation and Agreement of Settlement Dated August 14, 2013 (the "Stipulation") submitted herewith[1]; and (iv) scheduling of a hearing to consider final approval of the Settlement (the "Final Approval Hearing").[2]

## PRELIMINARY STATEMENT

Lead Plaintiff, Defendants, the Independent Trustees of the Primary Fund (the "Primary Fund" or the "Fund"), and the Primary Fund have reached an agreement to settle this securities class action (the "Action" or "Class Action").  If the Settlement is approved by the Court, it will result in a substantial payment to Class Members, resolve this Class Action in its entirety, and allow for the prompt distribution of the majority of the approximately $97 million in shareholder funds that are currently being withheld in an Expense Fund pursuant to this Court's November 25, 2009 Order (ECF No. 348 in the SEC Action; the "November 25, 2009 Order").[3]  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiff now seeks the Court's preliminary approval of the Settlement so that Notice can be disseminated to Members of the Class and a Final Approval Hearing scheduled.

––––––––––––––––––––––––

[1] The Stipulation is attached as Exhibit 1 to Lead Plaintiff's Notice of Motion and Motion for (I) Preliminary Approval of Settlement, (II) Certification of the Class for Purposes of Settlement, and (III) Approval of Notice to the Class ("Notice of Motion"), filed herewith.

[2] All capitalized terms not otherwise defined have the meaning set forth in the Stipulation.

[3] "SEC Action" refers to *Securities and Exchange Commission v. Reserve Management Company, Inc.,* 09-cv-4346-PGG (S.D.N.Y.).

The Settlement, which is described in more detail in the Stipulation and below, is extremely beneficial to the Class.  It requires Defendants to pay $10 million in cash (the "Cash Contribution"), and to relinquish more than $42 million of the approximately $72 million in claims for indemnification, expenses and attorneys' fees that Defendants have asserted against the Expense Fund.  The Settlement also requires Defendants to release all potential claims involving State Street Bank and Trust Company ("State Street") relating to the Primary Fund, which enables the $2.5 million holdback established by this Court's November 30, 2010 Order (ECF No. 351 in the SEC Action) to be released and distributed to shareholders.  In addition, the Settlement requires Defendants to release the claims asserted in their January 22, 2013 Third Party Complaint against the Independent Trustees and to make their "best efforts" to resolve the malpractice lawsuit Reserve Management Company, Inc. ("RMCI") filed against Willkie Farr & Gallagher LLP.  The Settlement also requires the Independent Trustees to submit a proposed budget for future costs and expenses relating to the Fund.  Finally, the Settlement required Defendants to substantiate to an independent mediator, the Honorable Layn R. Phillips (Fmr.), that they do not have substantial personal assets with which to pay a judgment of the magnitude sought by the Class.  Based upon his review, Judge Phillips concluded that Defendants would be unable to pay a material judgment to the Class.

The proposed Settlement is the product of intensive arm's-length negotiations involving the direct participation of principals from Lead Plaintiff and Defendants, and extensive involvement from representatives for the Independent Trustees.  The Settlement was ultimately reached under the supervision of an experienced and highly respected mediator, Judge Phillips, who is a former Federal District Court Judge and the former United States Attorney for the Northern District of Oklahoma.  As described in more detail below, Judge Phillips reviewed multiple mediation statements and other submissions, held formal face-to-face mediation sessions

with the parties, and conducted numerous individual conferences with the parties separately.  In the course of these intense negotiations, the parties benefited from hearing Judge Phillips' candid assessments of their positions and were able to resolve numerous complicated and hotly-disputed issues.  At the final approval stage, Judge Phillips will submit a declaration in support of the Settlement that will set forth the arms'-length nature of the negotiations and the reasons why the Settlement, in his view, is fair and reasonable.

The Settlement provides many benefits to shareholders.  Chief among the Settlement's many positive attributes is that it provides the Class with a true, tangible economic benefit as a result of the $10 million Cash Contribution being made by Defendants, the relinquishment of more than $42 million in claims that Defendants have asserted against the Fund, and the extinguishment of the $2.5 million holdback for State Street.  Just as importantly, the Settlement will resolve this long-running matter and allow for the prompt distribution of tens of millions of dollars of shareholder money that has not been distributed for more than four years – and has been steadily depleted during that time – because of competing claims to the assets in the Primary Fund.  If this case continues to be litigated through further discovery, trial and appeals, tens of millions of dollars in shareholder funds would be held back for many more years while more operational costs would be incurred against the Fund and additional – and potentially significant – expense and legal claims would be lodged.

For instance, the Independent Trustees contend that they are entitled to indemnification and reimbursement of their attorneys' fees and expenses in connection with the claims asserted in Defendants' Third Party Complaint.  By securing the release and dismissal of these claims, the Settlement ensures that millions of dollars that otherwise would be held back (and potentially expended) to cover defense costs of those claims are instead promptly distributed to shareholders.  Similarly, Defendants have taken the position that, unless the Class is able to prove at trial that

they acted with fraudulent intent, they are entitled to reimbursement from the Fund of defense costs and attorneys' fees incurred in defending this case. Thus, absent the proposed Settlement, it is likely that tens of millions of dollars in shareholder funds also would be held back throughout the duration of this litigation to account for Defendants' indemnity claims. Given the many hurdles to establishing fraud in this case, which are discussed in more detail below (*see* Section IV.B), there was a significant risk that, absent the Settlement, this money eventually would have been paid to Defendants and their attorneys and never distributed to shareholders.

By achieving a voluntary resolution of the $72 million in claims for indemnification, expenses and attorneys' fees that Defendants have already asserted, the Settlement also eliminates a significant uncertainty regarding shareholder funds. As the Court is aware, Defendants' pending applications for indemnification, expenses and attorneys' fees raise numerous complex and nuanced issues that have been *sub judice* for more than three years and have been the subject of multiple submissions by multiple parties. It is extremely difficult to predict when these complicated claims will be resolved by the Court, or the amount that Defendants ultimately will be awarded on these claims.[4] Moreover, no matter how the Court decided those applications, it was a virtual certainty that appeals would be lodged by Lead Plaintiff, Defendants, the Independent Trustees, or other interested parties – which would have resulted in potentially significant additional delays and costs before any shareholder funds could be distributed. By contrast, the negotiated resolution of these claims allows for the immediate distribution to shareholders of more than $42 million that Defendants contend should be paid to them, while eliminating the substantial delay, costs, and uncertainty that would result if these issues continued to be litigated.

---

[4] There was essentially no dispute that Defendants were entitled to a minimum payment of approximately $12 million to reimburse them for certain expenses they had incurred while managing the Fund.

The proposed Settlement is fully supported by Lead Plaintiff and the Independent Trustees of the Primary Fund.  The Independent Trustees, in the exercise of their reasonable business judgment, believe strongly that the terms and conditions of the Settlement are fair and reasonable and in the best interests of the Primary Fund and its shareholders.  Lead Plaintiff is a sophisticated institutional investor of the type favored by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and has been actively involved in litigation against Defendants since the earliest days of the crisis at the Primary Fund.  Lead Plaintiff was represented by experienced in-house legal counsel throughout the litigation and was directly involved in all significant aspects of the litigation and mediation process.  Finally, the Settlement was reached at a time when all parties were well-informed as to the strengths and weaknesses of the claims and defenses asserted in the case.  In short, the fact that Lead Plaintiff and the Independent Trustees wholeheartedly endorse the Settlement is further evidence that it is fair and reasonable.

Finally, the Settling Parties have worked diligently, both collectively and separately, to explore whether a resolution of the SEC Action – including the resolution of the parties' competing post-trial motions in that action – could be reached in time for any additional amounts obtained in that action to be distributed to Class Members along with the funds to be distributed pursuant to this Settlement.  While we believe that the parties made substantial progress towards reaching a resolution of the SEC Action (and have made certain adjustments to this settlement in response to concerns raised by the SEC), the parties in the SEC Action were unable to reach a dispositive settlement prior to the filing of this Motion.  Lead Plaintiff will continue to work diligently with the SEC, the Independent Trustees, and Defendants to assist in resolving all outstanding issues as promptly as possible.

At the Final Approval Hearing, the Court will have before it more extensive motion papers in support of the Settlement, and will be asked to make a determination as to whether the

Settlement is fair, reasonable, and adequate under all of the circumstances surrounding the case. At this time, Lead Plaintiff only requests that the Court grant preliminary approval of the Settlement so that notice of the Settlement may be disseminated to the Class and the Final Approval Hearing may be scheduled.[5]  The preliminary approval sought here merely requires an initial fairness evaluation to ensure that the proposed Settlement "falls within the range of possible approval."  *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007).

## FACTUAL BACKGROUND

## I.     DESCRIPTION OF THE LITIGATION

The history of this litigation and the facts underlying it are well-known to the Court and will not be repeated at length here.  This Class Action arises from the Primary Fund's disclosure on September 16, 2008 that its Net Asset Value ("NAV") had declined below $1.00 per share – called "breaking the buck" – due to losses on more than $785 million in investments in commercial paper and other debt issued by Lehman Brothers Holdings, Inc. ("Lehman").  The Primary Fund subsequently entered into liquidation, the U.S. Securities and Exchange Commission ("SEC") filed a civil lawsuit, and billions of dollars in shareholder money was effectively frozen for more than a year.  Even now, more than four years after the Fund broke the buck, approximately $97 million in shareholder money is being withheld in a Court-ordered fund as litigation against Defendants and others continues.[6]

_____

[5] As discussed below, Notice and Administration Costs in this case are expected to be less than are typically expended because, among other things, the *pro rata* plan of allocation is relatively straightforward, and prior distributions made to investors under Court supervision provide a framework for distributing the settlement proceeds.  In addition, for these same reasons, Class Members will not be required to complete and submit claim forms.

[6] As stated in the agreed-upon form of Notice to be sent to the Class, the current trustees of the Primary Fund represent that, as of the end of April 2013, the Primary Fund included approximately $97 million in assets.  With the addition of the $10 million Cash Contribution, there will be approximately $107 million in assets in the Primary Fund, which will be distributed to

Lead Plaintiff was one of the first investors to respond to the crisis at the Primary Fund. On September 17, 2008, the day after the Fund announced that it had broken the buck, Third Avenue contacted Lead Counsel to discuss potential claims against Defendants and others, with an eye towards protecting all shareholders of the Fund.  On September 19, 2008, following an investigation into potential claims involving the Primary Fund, Lead Plaintiff and Lead Counsel filed a class action complaint asserting claims under the federal securities laws and state law.  *See Third Avenue Institutional International Value Fund, L.P. v. The Reserve Fund, et al.,* Civ. Act. No. 08-cv-8103 (PGG).  Lead Plaintiff also filed papers on that day seeking a temporary restraining order ("TRO") preventing the Primary Fund from distributing assets in a manner that may have benefited a limited group of shareholders while causing substantial harm to others.

Lead Plaintiff's initial complaint was filed at a time of considerable uncertainty for Primary Fund shareholders.  As of that date, the Fund's previous announcements suggested that it intended to make distributions that would favor certain shareholders (by honoring their redemption requests at $1.00) over others (by honoring their requests at $0.97).  Thus, Lead Plaintiff and Lead Counsel acted in an effort to preserve assets for all shareholders and to prevent the Fund from distributing assets in a potentially inequitable manner.  Lead Plaintiff's actions were particularly important for shareholders because they occurred at a time when shareholders lacked clear information regarding the value of the Fund's remaining assets, the Fund's calculation of its NAV, and valuation of the Fund's Lehman investments and other debt.

On September 19, 2008, the Court issued an order scheduling a hearing on Lead Plaintiff's request for a TRO for the following Monday, September 22, 2008.  *See* ECF No. 3 in 08-cv-8103-

---

Shareholders after effecting the payments and holdbacks contemplated in the Stipulation and any fees and expenses approved by the Court.  "Shareholder" is defined in the Stipulation as a shareholder of the Reserve Primary Fund still having an outstanding balance as of the applicable date(s) that the Claims Administrator determines the applicable distribution amounts.

PGG.  Over the course of the weekend, as the parties prepared for the Monday hearing, Lead Plaintiff, Lead Counsel, and Defendants were able to negotiate a stipulation ensuring that no distributions from the Fund were made.

In the ensuing months, as a number of other class action complaints were filed, Lead Plaintiff and Lead Counsel were in regular contact with Defendants' counsel and were active in various related litigations as events surrounding the Primary Fund continued to unfold.  On November 18, 2008, Third Avenue filed a motion seeking appointment as lead plaintiff under the PSLRA.  Competing motions for lead plaintiff appointment were fully briefed on or about December 22, 2008.

On May 5, 2009, while lead plaintiff motions were pending, the SEC filed a complaint against Bent, Bent II, RMCI and Resrv Partners asserting claims under the Exchange Act and the Securities Act.  Unlike the class action filed against the Fund by Lead Plaintiff, which alleges that Defendants had made misleading statements to investors over the course of nearly two years, the SEC Action focused solely on Defendants' conduct on September 15 and 16, 2008.  The SEC asserted that during September 15 and 16, 2008, in the wake of the Lehman bankruptcy, Defendants made materially false statements to investors, ratings agencies and the Fund Board and were therefore liable for (1) fraud under Section 10(b) of the Exchange Act; (2) fraud and negligence under Section 17(a) of the Securities Act; and (3) fraud and negligence under Section 206 of the Investment Advisers Act.

On August 5, 2009, the Court held a hearing on the motions for appointment of Lead Plaintiff.  On August 26, 2009, the Court appointed Third Avenue as Lead Plaintiff pursuant to the PSLRA, and appointed the firm of Bernstein Litowitz Berger & Grossmann LLP to serve as Lead Counsel.  *See* ECF No. 45.  In its role as Court-appointed Lead Plaintiff, Third Avenue and Lead Counsel continued to investigate potential claims against Defendants and others.  *See* ECF No. 46.

Lead Plaintiff was also closely involved in the negotiations surrounding the SEC's request for injunctive relief regarding distributions from the Fund, which ultimately led to the Court's November 25, 2009 Order establishing the Expense Fund.  *See* Declaration of John C. Browne in Support of Lead Plaintiff's Motion for (i) Preliminary Approval of Settlement, (ii) Certification of the Class for Purposes of Settlement, and (iii) Approval of Notice to the Class ("Browne Decl."), Ex. 1.  On January 5, 2010, Lead Plaintiff filed the consolidated class action complaint, which asserted three types of claims:

- <u>Securities Act</u>.  Counts I, II and III assert claims for violations of Section 11, 12(a)(2) and 15 (control person) of the Securities Act in connection with allegedly false and misleading registration statements and SEC filings issued by the Primary Fund prior to September 15, 2008;

- <u>Exchange Act</u>.  Counts IV, V and VI assert claims for violations of Section 10(b) and 20 (control person) of the Exchange Act for false statements made both pre- and post-September 15, 2008; and

- <u>State Law and Investment Company Act</u>.  Counts VII, VIII, IX, X, XI and XII assert a number of state law claims and claims asserted under the Investment Company Act of 1940 ("Investment Company Act").

During this time, Lead Plaintiff also reviewed Defendants' applications for expenses, indemnification, management fees and insurance proceeds, and on January 25, 2010, filed an opposition to those requests with this Court.  *See* SEC Action, ECF No. 259.

As discussed below, in the months after the Complaint was filed, Lead Plaintiff participated in settlement discussions with Defendants and the SEC.  *See, e.g.,* SEC Action, ECF No. 136.  Moreover, throughout this litigation, Lead Plaintiff was proactive in coordinating its case with the SEC Action.  Among other things, Lead Plaintiff developed and maintained an open line of communication with the SEC, attended numerous Court conferences relating to matters in the SEC Action that were relevant to Lead Plaintiff's case, and made constructive suggestions to the SEC, Defendants and the Court as to how to coordinate discovery between the Class Action

and the SEC Action.  For instance, on June 17, 2010, Lead Plaintiff submitted a discovery and case-management proposal to the Court that allowed Lead Plaintiff to participate, in a narrowly-tailored fashion, in discovery that was taking place in the SEC Action.  *See* Browne Decl., Ex. 2. On June 24, 2010, the Court issued an order "adopt[ing] Lead Plaintiff's proposal."  *See* SEC Action, ECF No. 142.  As a result of this order, Lead Plaintiff was able to review document discovery that was being exchanged in the SEC Action, attend depositions, and review transcripts obtained in that case.  This was critical because, as discussed below, it allowed Lead Plaintiff to conduct settlement discussions with the SEC and Defendants throughout the case on a fully-informed basis.

On June 25, 2010, Defendants moved to dismiss Lead Plaintiff's complaint and that motion was fully briefed by September 3, 2010.  Defendants argued that the Complaint should be dismissed in its entirety.  As for the Securities Act and Exchange Act claims, Defendants argued that the Complaint (1) did not adequately allege that statements made pre-September 15, 2008, were materially false or misleading; (2) did not contain adequate allegations of scienter; and (3) did not adequately plead reliance on a class-wide basis.  Defendants further argued that there was no private right of action for the Investment Company Act claims and the state law claims were preempted by the Securities Litigation Uniform Standards Act.  On September 30, 2012, the Court denied in part and granted in part Defendants' motion, dismissing the state law and Investment Company Act claims, but sustaining claims under Section 10(b) and 20(a) of the Exchange Act against all Defendants and Sections 11, 12(a)(2) and 15 of the Securities Act against all Defendants other than RMCI.  The Court stated that "the reasons for these rulings will be explained in a forthcoming written opinion."  *See* ECF No. 78.

As the Court is aware, a trial in the SEC Action began on October 9, 2012, and continued for several weeks.  On November 12, 2012, the jury returned a verdict that found Bent not liable

on all counts asserted against him; Bent II was found liable only for a single negligent violation of Sections 17(a)(2) or (3) of the Securities Act; Resrv Partners was liable for violating Section 17(a)(2) or (3) of the Securities Act; and RMCI was liable for violating Section 17(a)(2) or (3) of the Securities Act and Section 206 of the Investment Advisers Act.  *See* SEC Action, ECF No. 571.  The Court entered its judgment on November 15, 2012, and on December 21, 2012, the parties submitted competing post-verdict motions for judgment as a matter of law.[7]

On January 23, 2013, Defendants filed a Third Party Complaint asserting claims against the Independent Trustees.  *See* ECF No. 80.  Specifically, Defendants asserted claims for (1) Indemnification/Contribution based on allegations that the Independent Trustees "dominated and controlled" the Fund; (2) Derivative Claims for Breach of Fiduciary Duty for payment of fees to the Independent Trustees from the Fund; (3) Direct Claims for Unjust Enrichment, Fraudulent Inducement, Breach of Contract, Promissory Estoppel, and Tortious Interference with Contract for, *inter alia*, a supposed failure to pay Bent, Bent II and Bent III's management fees and expenses; and (4) a direct claim for fraud based on the Independent Trustee's alleged alteration of minutes from a 1:00 p.m. ET Board Meeting on September 15, 2008.

---

[7] In their post-verdict motions, the SEC and Defendants had sharply divergent views as to the meaning of the jury's verdict as it related to RMCI and Resrv Partners.  As the Court is aware, although the jury found that RMCI and Resrv Partners were not liable for violating the fraud counts asserted by the SEC under the Exchange Act, the Securities Act or the Advisers Act, in finding that those two Defendants violated the negligence provisions of Section 17(a)(2) or (3) of Securities Act and Section 206(4) of the Advisers Act, the jury indicated that those Defendants had acted "knowingly or recklessly" – even though neither statute contains a scienter requirement. The SEC contends that the jury must have found that both entities had violated Sections 17(a)(2) or (3) of the Securities Act with scienter, and that RMCI had also violated Section 206(4) of the Investment Advisers Act with scienter.  Defendants, by contrast, took the position that the jury had rejected the true "fraud" claims against RMCI and Resrv Partners, and "since scienter is not an element of claims under Sections 17(a)(2) or (3) of the Securities Act or Section 206(4) of the Advisers Act, the jury's findings on this point were surplusage and, as such, they should be struck from the judgment."  *See* SEC Action, ECF No. 628.

On February 6, 2013, counsel for the Independent Trustees wrote to the Court attaching the Third Party Complaint and stating that the Independent Trustees were entitled to be indemnified by the Primary Fund for the claims asserted in the Third Party Complaint.

## II.   SETTLEMENT DISCUSSIONS AND MEDIATIONS

Although Lead Plaintiff has aggressively litigated its claims against Defendants for the benefit of all shareholders since the very first days of the crisis at the Primary Fund, Lead Plaintiff always held the view that shareholders of the Fund would benefit immensely if the disputes surrounding the Primary Fund could be resolved voluntarily.  Consequently, throughout the course of this litigation, Lead Plaintiff endeavored to negotiate a settlement of the Class Action as well as the partially-related SEC Action.

Starting in late 2009, as Lead Plaintiff was drafting the Complaint, Defendants and Lead Plaintiff discussed potential frameworks for reaching a global resolution of these cases.   In furtherance of that effort, in April 2010, counsel for Lead Plaintiff reached out to the SEC and set up a direct meeting between representatives of the SEC and Lead Counsel, which took place on or about April 21, 2010 at the SEC's offices.  Lead Plaintiff wrote to the Court on April 22, 2010, noting that the parties were involved in settlement negotiations and that Lead Plaintiff had consulted with the SEC about participating in a mediation that was scheduled in the SEC Action.

On May 14, 2010, Lead Plaintiff wrote to the Court again seeking to participate in a second round of negotiations between Defendants and the SEC – this time, the negotiations were to be overseen directly by the Court and were scheduled for June 9, 2010.  On May 19, 2010, the Court issued an order inviting Lead Plaintiff to make itself available in the courtroom "to permit the parties to this [SEC] action to include them in the settlement conference should their participation be deemed valuable as the conference progresses."  *See* SEC Action, ECF No. 136.

Counsel for Lead Plaintiff attended the June 9, 2010 mediation along with a representative of Lead Plaintiff, but the discussions between the SEC and Defendants were unavailing.

On numerous additional occasions throughout 2010 and 2011, Lead Plaintiff was involved in settlement discussions with the various counsel that represented Defendants at different points in time.  Lead Plaintiff also kept an open line of communication with the SEC regarding efforts to settle the Class Action and resolve other matters relating to the Primary Fund.  On April 6, 2012, following denial of summary judgment motions in the SEC Action, and with settlement discussions stalled, Lead Plaintiff wrote to the Court asking the Court to order "the parties in the SEC action and the class action to conduct by April 30 an in-person conference to explore whether progress can be made towards settlement."  Browne Decl., Ex. 3.  The SEC and Defendants responded, and Lead Plaintiff sent a follow-up letter on April 12, 2012.  *See* Browne Decl., Ex. 4.

On May 22, 2012, the Court held a conference in the SEC Action.  Counsel for Lead Plaintiff attended the conference and asked to be heard.  At the conference, counsel for Lead Plaintiff again requested that all parties be ordered to conduct settlement discussions and Lead Plaintiff offered to pay for a private mediator.  The Court directed the parties to hold a "tripartite" settlement meeting after June 15, 2012.  Lead Plaintiff acted quickly to coordinate with Defendants and the SEC, and on June 19, 2012, an all-day in-person settlement conference was held at Lead Counsel's office with counsel for all parties, including the SEC, and representatives from Defendants (Bent II) and Lead Plaintiff (the General Counsel) attending in person.  Although significant progress was made during that meeting and in several follow-up discussions held over the ensuing weeks, no resolution was ultimately reached.

As discussed above, the trial in the SEC Action began on October 9, 2012, and concluded on November 12, 2012, with a jury verdict that found Bent not liable, Bent II liable for negligence, and RMCI and Resrv Partners liable for negligence with (arguably) "knowing or reckless intent."

-13-

Following the jury's verdict, Defendants and Lead Plaintiff began once again to explore the possibility of settlement.  The parties retained the services of the Honorable Layn R. Phillips (Fmr.) and exchanged lengthy mediation statements and exhibits setting out their respective settlement positions.  An all-day formal mediation session was held on Saturday, February 2, 2013, which was attended by representatives of Defendants and Lead Plaintiff.  Over the next week, there were numerous follow-up communications with Judge Phillips and between the parties directly.  Judge Phillips then reached out to counsel for the Independent Trustees and asked them to attend a second mediation session held into the evening on February 8, 2013.  Over the course of the next several weeks the parties and Judge Phillips exchanged several proposals and continued to vigorously negotiate a possible settlement.  Finally, on February 27, 2013, a term sheet was entered setting forth the major points of a settlement between the Class, Defendants, and the Independent Trustees.

Throughout the mediation process the parties were well informed as to the strengths and weaknesses of the case.  For example, Lead Plaintiff's knowledge about the case was strengthened by its participation in discovery obtained in the SEC Action, including review of documents and deposition transcripts, as well as the evidence introduced at the trial in the SEC Action.  As Judge Phillips will attest to at the time of final approval, during the nearly month-long process of negotiations between counsel and through the mediator, all counsel advocated vigorously for their clients' positions.  They also had the opportunity to receive the mediator's candid assessments of their respective stances, which allowed counsel and the parties to further assess the strengths and weaknesses of the actions.  With this base of knowledge, the intensive efforts of highly-experienced counsel – and the enormous effort of Judge Phillips – Lead Plaintiff was able to obtain the favorable Settlement described herein.

III.    **TERMS OF THE SETTLEMENT**

As outlined above, the Settlement resolves a host of outstanding issues, claims, and litigation surrounding the Primary Fund and, if approved by the Court, will enable the majority of the funds remaining in the Court-ordered Expense Fund to be distributed to shareholders.  The principal terms of the Settlement are as follows:

1.  Defendants were required to substantiate to the Mediator that they do not have substantial personal assets with which to pay a judgment of the magnitude sought by the Class in this case.

2.  Defendants will pay $10 million in cash to the Class.

3.  Defendants will relinquish more than $42 million of the approximately $72 million in claims for indemnification, expenses and management fees from the Expense Fund (Defendants will receive $29.95 million from that account in settlement of all such claims).

4.  Defendants will release all claims against State Street, which will allow for the distribution to shareholders of the $2.5 million holdback established by this Court's November 30, 2010 Order (ECF No. 170 in the SEC Action).

5.  A hold-back from the Expense Fund, in the maximum amount of $4 million will be created for the exclusive use of covering the future defense costs of defendants in the SEC Action, the Massachusetts Action, this Class Action or other Private Investor Suits that may choose to opt out of this Settlement. Any defense costs purportedly incurred in connection with this provision must be submitted to Judge Phillips and he will review them for reasonableness before authorizing payment.  This holdback will be reduced to $500,000 (with the $3.5 million difference being distributed to shareholders) if the SEC and Defendants reach a negotiated resolution of the SEC Action prior to the Final Approval Hearing for this Settlement.

6.  The parties will release claims asserted against one another including but not limited to the Defendants' claims against the Independent Trustees as set forth in Defendants' Third Party Complaint filed on January 22, 2013 (ECF No. 80).

7.  Defendants are required to use their "best efforts" to resolve their malpractice lawsuit against the law firm of Willkie Farr & Gallagher, captioned *Reserve Management Company, Inc. v. Willkie Farr & Gallagher LLP, et al.,* 11 Civ. 7045 (PGG) (S.D.N.Y.).

8.  The Independent Trustees will submit for Court approval a proposed budget setting forth anticipated future expenditures for the Fund and the payments

-15-

that the Independent Trustees will be seeking.  All parties will have an opportunity to object to the Independent Trustees' proposed budget.

9.   All remaining shareholder funds in the Primary Fund will be available for immediate distribution to shareholders upon the Effective Date of the Settlement, after accounting for the payments authorized under the terms of the Settlement.

As discussed herein, the proposed Settlement is an excellent result for the Class for multiple reasons.  <u>First</u>, the Class will receive a true, tangible economic benefit as a result of the personal Cash Contribution of $10 million being made by Defendants, as well as the relinquishment of more than $42 million in claims Defendants have asserted against the Fund, and the extinguishment of the $2.5 million holdback for State Street.  This represents a significant value to Class Members, particularly in light of the fact that the Settlement required Defendants to verify that they do not have sufficient assets to satisfy a judgment of the magnitude sought by the Class.  Moreover, in more than four years of litigation by numerous private parties and regulatory agencies, including a multi-week trial by the SEC, this Settlement will be the first payment obtained by <u>any plaintiff in any case</u> against Defendants relating to the Primary Fund.

<u>Second</u>, and just as importantly, the Settlement brings this long-running matter to a conclusion and allows for the immediate distribution of tens of millions of dollars of shareholder money that have been effectively frozen since September 15, 2008.  During that time, these Funds have been steadily depleted as operational costs associated with the Fund have been incurred and ever-increasing claims for legal and other costs have been lodged.  If this case continued to be litigated through further discovery, trial and appeals, tens of millions of dollars in shareholder funds would be held back for many more years while costs would continue to be incurred and additional – and potentially significant – expense and legal claims would be asserted.

The Settlement also eliminates the risk that substantial amounts of shareholder funds would go to pay Defendants' attorneys' fees and legal costs in the event that Lead Plaintiff were

unable to establish that Defendants acted with fraudulent intent.  As noted, Defendants argue that they are entitled to reimbursement from the Fund of defense costs and attorneys' fees incurred in defending this case unless the Class is able to prove at trial that they committed fraud.  Thus, absent the proposed Settlement, it is likely that tens of millions of dollars in shareholder funds also would be held back throughout the duration of this litigation – and given the many hurdles to establishing fraud in this case (discussed below in Section IV.B.), there was a significant risk that, absent the Settlement, this money would eventually have been paid to Defendants and never distributed to shareholders.

Finally, by achieving a voluntary resolution of Defendants' claims for indemnification, expenses and attorneys' fees, the Settlement also eliminates a significant uncertainty regarding shareholder funds.  Defendants' applications for indemnification, expenses and attorneys' fees raised numerous complex and nuanced issues, and it was difficult to predict when these complicated claims would be resolved by the Court and the amount that Defendants ultimately would be awarded on these claims (there was essentially no dispute that Defendants were entitled to at least $12 million of these funds).  Moreover, any decision by the Court would almost certainly have been appealed, which would have resulted in potentially significant additional delays and costs before any shareholder funds could be distributed.

## IV.    THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL

The settlement of complex class action litigation is favored by public policy and strongly encouraged by the courts.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116-17 (2d. Cir. 2005) (there is a "strong judicial policy in favor of settlements, particularly in the class action context.  The compromise of complex litigation is encouraged by the courts and favored by public policy") (internal quotations and citation omitted); *see also Ne. Trading, Inc. v. Ven-Co Produce, Inc.*, No. 09 Civ. 7767 (PGG), 2011 WL 4444511, at *4 (S.D.N.Y. Sept. 26, 2011) (Gardephe, P.)

(recognizing "the strong judicial policy in favor of settlements") (internal quotations and citation omitted).

Under Rule 23(e) of the Federal Rules of Civil Procedure, judicial review of a proposed class action settlement consists of a two-step process: preliminary approval and a subsequent settlement fairness hearing.   In the context of preliminary approval, "'[w]here the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.'"   *Initial Pub. Offering*, 243 F.R.D. at 87 (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)).   Lead Plaintiff requests that the Court take the first step in the settlement approval process and grant preliminary approval of the Settlement. As summarized below, and as will be detailed further in the motion for final approval, the Settlement is well "within the range of possible approval." *Initial Pub. Offering*, 243 F.R.D. at 87.

### A.   The Settlement Is The Result Of Good Faith, Arm's-Length Negotiations By Well-Informed And Experienced Counsel

Courts presume that a proposed settlement is fair and reasonable when it is the result of arm's-length negotiations between well-informed counsel.  *See Wal-Mart*, 396 F.3d at 116 (strong "presumption of fairness" where settlement is product of arm's-length negotiations conducted by experienced, capable counsel after meaningful discovery); *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *13 (S.D.N.Y. Nov. 8, 2010) (same).   The use of an experienced mediator in settlement negotiations further supports this presumption of fairness and the conclusion that the Settlement was free of collusion.  *See In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (parties "engaged in extensive arm's length negotiations, which included multiple sessions mediated by retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of

complex securities cases"); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (finding settlement was entitled to a presumption of fairness where it was "the product of prolonged, arms-length negotiation" facilitated by Judge Phillips, "a respected mediator").

Here, Lead Plaintiff was involved in extensive settlement discussions at various points in time throughout the case.  Moreover, the Settlement was achieved only after arm's-length negotiations conducted under the auspices of a highly respected and experienced mediator, Judge Phillips.  Given the length of the SEC investigation and litigation and Lead Plaintiff's active role in the litigation, as well as its own independent investigation into the relevant factual and legal issues, the parties and their counsel are well informed about the strengths and weaknesses of the claims and defenses in the Class Action.

Finally, the judgment of Lead Plaintiff, who is a sophisticated institutional investor, and Lead Counsel, which is highly experienced in securities class action litigation, as well as the judgment of the Independent Trustees, that the Settlement is an excellent recovery and is in the best interests of the Class should be given considerable weight.  *See, e.g., In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 0165 (CM), 2007 WL 4115809, at *12 (S.D.N.Y. Nov. 7, 2007) (courts should "consider the opinion of experienced counsel with respect to the value of the settlement"); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

### B.    The Substantial Benefits For The Class, Weighed Against Litigation Risks, Strongly Support Preliminary Approval

The substantial recovery achieved by the proposed Settlement provides an extremely significant benefit to the Class.  The benefits of the Settlement are particularly noteworthy when

compared to the risk that no recovery or a lesser recovery might be achieved after summary judgment, trial and likely appeals, which could take many additional months or years.

If this case were to proceed through dispositive motions and trial, Lead Plaintiff would have to overcome numerous defenses as to both liability and damages. Among other things, the parties disagree on whether Defendants made any material misstatements. Defendants argued that their pre-September 15, 2008 statements accurately described the level of risk at the Primary Fund and, at best, amounted to nothing more than non-actionable "puffery." Defendants also contend that the Primary Fund's small (approximately 1%) investment in Lehman commercial paper was fully disclosed to investors in each Registration Statement and in multiple other public filings disseminated during the Class Period. This fact alone presented a stark challenge to Lead Plaintiff proving its claim that Defendants misstated the riskiness of the Primary Fund.

Moreover, Defendants argued that all investments made by the Primary Fund – including the Lehman debt – were rated Triple A or higher and were widely perceived to be safe investments. At summary judgment and trial, Defendants would have advanced compelling arguments that the bankruptcy filing by Lehman and the subsequent panic in the financial markets was completely unanticipated, and prior to Lehman's bankruptcy, Defendants reasonably assumed, consistent with their public statements, that the approximately 1% Lehman investment was safe and would not endanger the Fund. In short, Lead Plaintiff faced significant risks in establishing that Defendants made material misstatements prior to September 15, 2008.

The Court is fully familiar with the facts surrounding Lead Plaintiff's claim that Defendants made material misstatements after September 15, 2008. As they did during the SEC trial, at summary judgment and trial in this case, Defendants would have argued vigorously that in the day or two after the Lehman bankruptcy filing, they were doing their best to provide accurate information in light of a fast-changing and unprecedented market collapse. They also point to the

fact that they hired attorneys, consulted with the Independent Trustees, and were in repeated contact with the SEC during the short period of time between Lehman's bankruptcy and the September 16, 2008 announcement that the Fund had broken the buck.  Indeed, it appears that these arguments had traction in the SEC Action, where the jury found that Bent did not make any misstatements, and found Bent II liable only for a single count of negligence under the Securities Act (a claim that the SEC could pursue but is not available to private plaintiffs).  Moreover, Defendants had a credible argument that the liability for RMCI and Resrv Partners was premised on statements made not by any Defendant in this case, but by Patrick Ledford (and potentially based on statements he made to Moody's rather than to investors).

Lead Plaintiff also faced significant legal hurdles that the SEC did not.  For instance, in order to maintain this case as a class action, Lead Plaintiff would have had to rely on the "fraud on the market" theory of reliance.  Defendants, however, contended that the fraud on the market theory is not available here because the calculation of the NAV did not depend on information disseminated to the market.  Moreover, Defendants would have argued that the vast majority of potential Class Members merely "held" shares after September 15, 2008, and therefore could not have relied on any misrepresentations in deciding to "purchase or sell" securities on or after that date.  Defendants would have argued that Lead Plaintiff was not permitted to bring Section 10(b) claims on behalf of these "holders."  Finally, Lead Plaintiff faced significant issues in establishing damages in this case.  Defendants contended that Lead Plaintiff would be unable to demonstrate the required element of loss causation for the Section 10(b) claims, and Defendants would have also stressed to a jury that Class Members have recovered 99% of their damages.

In sum, the parties disagreed on numerous complex issues of law and fact, and the Settlement enables the Class to recover a very substantial sum without incurring the risk that Defendants would prevail on these issues at summary judgment, trial, or in subsequent appeals.

-21-

## V.    THE CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES

In granting preliminary settlement approval, the Court should also certify the Class for purposes of the Settlement under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The proposed Class, which has been stipulated to by the Parties, consists of:

> all Persons who (i) purchased or held shares of the Primary Fund during the period from September 28, 2006 through September 15, 2008 and held them as of 4:00 p.m. ET on September 15, 2008; or (ii) purchased shares of the Primary Fund during the period between 4:00 p.m. ET on September 15, 2008 and September 17, 2008.  Excluded from the Class are:  (a) Defendants; (b) members of the immediate families of Bent, Bent II, and Bent III; (c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner, executive officer, director, trustee or controlling person of the Reserve Defendants or the Primary Fund (including any of their subsidiaries or affiliates); (e) any entity in which any Defendant has a controlling interest; (f) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.[8]  Also excluded is any Person who validly excludes himself, herself or itself from the Class.

The Second Circuit has long acknowledged the propriety of certifying a class solely for the purposes of a class action settlement.  *See Weingberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *8 (S.D.N.Y. Dec. 23, 2009).  Indeed, certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants."  *In re Prudential Sec. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995).  While a settlement class, like other certified classes, must satisfy Rules 23(a) and (b), the manageability concerns of Rules 23(b)(3) are not at issue for a settlement class.  *See Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 593 (1997).

---

[8] Notwithstanding the foregoing, neither the Yield Plus Fund (YP) nor the Independent Trustees of the Primary Fund are excluded from the definition of the Class.

**A.**   **The Class Satisfies The Requirements Of Rule 23(a)**

Certification is appropriate under Rule 23(a) if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

### 1.   The Class Members Are Too Numerous To Be Joined

Class certification under Rule 23(a)(1) is appropriate where a class contains so many members that joinder of all would be "impracticable."  Fed. R. Civ. P. 23(a).  Numerosity is presumed when a class consists of forty members or more.  *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  Here, the Class easily satisfies the numerosity requirement.  The Class includes, among other investors, the approximately 90,000 shareholders in the Primary Fund that held shares at least as of close of trading on September 15, 2008.

### 2.   There Are Common Questions Of Law And Fact

Rule 23(a)(2) requires the existence of at least one question of law or fact common to the class.  *See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007); *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001).   Securities cases like this one easily meet the commonality requirement, which is satisfied where it is alleged that "putative class members have been injured by similar material misrepresentations and omissions."  *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 44 (S.D.N.Y. 2012); *see In re Globalstar Sec. Litig.*, No. 01 Civ 1748 (PKC), 2004 WL 2754674, at *4 (S.D.N.Y. Dec. 1, 2004) ("Common questions of law and fact in this action include whether certain statements were false and misleading, whether those statements violated the federal securities laws, . . . and ensuing causation issues.").

This Action raises numerous common issues of law and fact.  With respect to Lead Plaintiff's Section 10(b) Exchange Act claims, Lead Plaintiff alleges that Defendants made materially false and misleading statements and omissions concerning the safety and soundness of the Primary Fund throughout the Class Period and regarding Defendants' willingness and ability to protect the NAV of the Primary Fund on September 15, 2008, after the announcement that Lehman would be filing for bankruptcy.  Common questions of fact include whether these statements and omissions were false or misleading, whether any such misstatements or omissions were material, and whether the various Defendants may be held liable for these alleged misstatements and omissions.  Furthermore, the Section 11, 12(a)(2) and 15 Securities Act claims also involve common questions of law and fact, mainly whether or not the Registration Statements and supporting materials contained misstatements or omissions that were material and whether or not Defendants may be held liable for the alleged misstatements and omissions.  To be sure, Lead Plaintiff's Securities Act claims raise numerous prototypical common issues of law and fact.  *See In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277, 281 (S.D.N.Y. 2002) (common questions included existence of "material misrepresentations and omissions . . . [in] the registration statement"); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280, 288, 293 n.30 (S.D.N.Y. 2003) (finding that "nature and extent of misrepresentations" are common questions of fact; the liability of defendants under Section 11 for such statements is a common question of law; and most defenses to liability also present issues of law and fact that are common to the class).

### 3. Lead Plaintiff's Claims Are Typical Of The Class

Rule 23(a)(3) requires that the claims of the class representatives be "typical" of the claims of the class.  Fed. R. Civ. P. 23(a)(3).  Typicality is established where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Central States*, 504 F.3d at 245 (internal quotations and citation

omitted); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 304-5 (S.D.N.Y. 2010).  "Typical" does not mean "identical."  *See Marsh & McLennan*, 2009 WL 5178546, at *10.  It is well-established that "[f]actual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements . . . ."  *Id.*; *see also WorldCom*, 219 F.R.D. at 280.

Here, the claims of the Lead Plaintiff and absent Class Members are based on the same alleged misleading misrepresentations and omissions incorporated into the Registration Statements and supporting materials and the same alleged false and misleading statements concerning Defendants' ability and willingness to support the NAV of the Primary Fund.  Thus, Lead Plaintiff's claims arise from the same course of events as the claims of all Class Members.  Lead Plaintiff's claims and the claims of absent Class Members are based on the same legal theories and would be proven by the same evidence.

### 4. Lead Plaintiff Will Fairly And Adequately Protect The Interests Of The Class

Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To determine whether a plaintiff is an adequate class representative, courts look to whether: "1) plaintiff's interests are antagonistic to the interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *Sadia*, 269 F.R.D. at 305; *Marsh & McLennan*, 2009 WL 5178546, at *10.  "[M]any courts have observed [that] issues of typicality and adequacy tend to merge because they 'serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'"  *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007) (citation omitted).

There is no antagonism or conflict of interest between Lead Plaintiff and the proposed Class. Lead Plaintiff and other Members of the Class share the common objective of maximizing their recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.") Lead Plaintiff has further demonstrated its adequacy by vigorously pursuing the claims in this Action – indeed, as described above, Lead Plaintiff was among the very first investors in the Primary Fund to take action on behalf of all shareholders. In addition, Lead Counsel Bernstein Litowitz Berger & Grossmann LLP has extensive experience and expertise in complex securities litigation and class action proceedings throughout the United States. Therefore, Rule 23(a)(4) is satisfied.

### B.     The Class Satisfies The Requirements Of Rule 23(b)(3)

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3)

### 1.     Common Legal And Factual Questions Predominate

As the Supreme Court has noted, predominance is a test "readily met" in cases alleging violations of the securities laws. *Amchen*, 521 U.S. at 625. Common issues will predominate where each class member is alleged to have suffered the same kind of harm pursuant to the same legal theory arising out of the same alleged course of conduct, and the only individualized questions concern the amount of damages. *See Marsh & McLennan*, 2009 WL 5178546, at *11; *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 240 (S.D.N.Y. 2006) ("'In determining whether common questions predominate, a court's inquiry is directed toward whether the issue of liability is common to members of the class.'") (citation omitted).

-26-

Here, the same alleged course of conduct by Defendants forms the basis of all Class Members' claims. There are numerous common issues relating to Defendants' liability, including the existence of material misrepresentations or omissions, which predominate over any individualized issues. *See PaineWebber*, 171 F.R.D. at 123 (in case involving Section 11 claims, common questions of law and fact "overwhelmingly predominate"); *Deutsche Telekom*, 229 F. Supp. 2d at 282; *WorldCom*, 219 F.R.D. at 293.

### 2.   A Class Is Superior To Other Methods Of Adjudication

This consolidated Class Action is clearly "superior to other available methods for fairly and efficiently adjudicating" the Securities Act and Exchange Act claims of the large number of purchasers or acquirors of securities. *See* Fed. R. Civ. P. 23(b)(3). Indeed, courts have concluded that the class action device in securities cases is usually the superior method by which to redress injuries to a large number of individual plaintiffs in light of the large and geographically dispersed nature of shareholder classes, the inefficiency of multiple lawsuits and the size of individual recoveries in comparison to the costs of litigation. *See, e.g., In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 139 (S.D.N.Y. 2008) ("as a general rule," securities cases "'easily satisfy the superiority requirement [as] [m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible'") (citation omitted).

## VI.   <u>NOTICE TO THE CLASS SHOULD BE APPROVED</u>

As outlined in the proposed Preliminary Approval Order, Lead Counsel will notify the Class Members of the Action and the proposed Settlement by mailing the Notice to all Class Members who can be identified with reasonable effort. Specifically, the proposed Claims Administrator for the Settlement, Crederian Fund Services LLC ("Crederian"), which is the current Fund liquidation agent, will disseminate the Notice, substantially in the form agreed to by

the parties and annexed to the Stipulation as Exhibit A-1, to the record holders pursuant to the contact information that Crederian previously obtained in connection with this Court's November 18, 2010 Order (ECF No. 348 in the SEC Action) and subsequent related orders. Crederian will also use reasonable efforts to give notice to nominee owners such as brokerage firms and other persons or entities who purchased or otherwise acquired the securities as record owners but not as beneficial owners, and such nominees will be directed to forward a copy of the Notice to the beneficial owners or provide their contact information to Crederian for forwarding the Notice. As explained in the Notice, distributions made pursuant to the Settlement will also be made through the record holders, consistent with prior distributions from the Fund.

The Notice will advise Class Members of (i) the pendency of the Action as a class action; (ii) the essential terms of the Settlement; (iii) the proposed Plan of Allocation[9]; and (iv) information regarding Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses. The Notice will also provide specifics on the date, time and place of the Final Approval Hearing and set forth the deadlines, for opting out of the Class, and for objecting to the Settlement, the proposed Plan of Allocation and/or motion for attorneys' fees and reimbursement of Litigation Expenses. The proposed Preliminary Approval Order also requires Lead Counsel to cause the Summary Notice to be published once in the *Investor's Business Daily* and transmitted over the

---

[9] As explained in the Notice agreed to by the parties, the proposed Plan of Allocation is the pro rata distribution plan in this Court's November 25, 2009 Order in the SEC Action, and all subsequent orders of the Court related to the pro rata distribution of the Expense Fund, with the addition that if the prorated payment calculates to less than $10.00, it will not be included in the calculation and no distribution will be made for that Class Member. *See, e.g., In re Global Crossing Sec. and ERISA Litig*., 225 F.R.D. 436, 463 (S.D.N.Y. 2004) ($10 minimum allowed); *In re Gilat Satellite Networks, Ltd*., 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007) ("*de minimus* thresholds for payable claims are beneficial to the class as a whole since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs and courts have frequently approved such thresholds, often at $10").

*PR Newswire* within five (5) business days of the initial mailing. The Independent Trustees will also cause a copy of the Notice to be posted on the Primary Fund's website.

The form and manner of notice to the Class satisfy the requirements of due process, Rule 23, and the PSLRA, 15 U.S.C. §§ 77z-1(a)(7). The Notice and Summary Notice "fairly apprise the prospective members of the class of the terms of the proposed settlement[s] and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114 (internal quotations and citation omitted).

## VII.   PROPOSED SCHEDULE

As outlined in the proposed Preliminary Approval Order submitted herewith, no later than ten (10) business days after the entry of the Preliminary Approval Order (the "Notice Date"), Crederian will disseminate the Notice to record holders.

In connection with preliminary approval of the Settlement, the Court must set a final approval hearing date, dates for mailing and publication of the Notice and Summary Notice, and deadlines for objecting to the Settlement or opting out of the Class. The parties respectfully propose the following schedule for the Court's consideration, as agreed to by the parties and set forth in the proposed Preliminary Approval Order:

| Event | Time for Compliance |
|---|---|
| Deadline for mailing the Notice (the "Notice Date") | 10 business days after entry of the Preliminary Approval Order |
| Deadline for publishing Summary Notice | 5 business days after the Notice Date |
| Filing of papers in support of final approval of Settlement, Plan of Allocation, and Lead Counsel's fee and expense report | 35 calendar days before the Final Approval Hearing |
| Receipt deadline for objections and requests for exclusion from the Class | 21 calendar days before the Final Approval Hearing |
| Filing of reply papers in support of final approval of Settlement, Plan of Allocation, and Lead Counsel's fee and expense request | 7 calendar days before the Final Approval Hearing |
| Final Approval Hearing | (100 days after the filing of this Motion)<br>On December 16, 2013, or at the Court's |

| | earliest convenience thereafter |
|---|---|

## VIII. <u>CONCLUSION</u>

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant preliminary approval of the proposed Settlement; certify the Class and appoint Lead Plaintiff as class representatives and Lead Counsel as class counsel, for purposes of the Settlement; approve the form and manner of providing notice of the Settlement to the Class; and enter the accompanying proposed Preliminary Approval Order attached as Exhibit 2 to the Notice of Motion filed herewith.

Dated: September 6, 2013
        New York, New York


                                        **BERNSTEIN LITOWITZ BERGER**
                                        **& GROSSMANN LLP**


                                        _____*/s/ John C. Browne*_____
                                        JOHN C. BROWNE

                                        Max W. Berger
                                        John C. Browne
                                        1285 Avenue of the Americas
                                        New York, NY 10019
                                        Telephone: (212) 554-1400
                                        Facsimile: (212) 554-1444

                                        *Attorneys for Lead Plaintiff*