**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE THE RESERVE PRIMARY FUND SECURITIES & DERIVATIVE CLASS ACTION LITIGATION | No. 08-cv-8060-PGG (Class Action) |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD**
**COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS'**
**FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Max W. Berger
John C. Browne
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Lead Plaintiff and the Class*

Dated:  November 11, 2013

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES……………………………………………………………ii

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ..............................................................................................................7

I.  THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER BOTH
    THE PERCENTAGE-OF-THE-FUND METHOD AND THE LODESTAR
    METHOD .............................................................................................................7

    A.  The Requested Attorneys' Fees Are Reasonable Under The Percentage-
        Of-The-Fund Method ...................................................................................7

    B.  The Requested Attorneys' Fees Are Reasonable Under The Lodestar
        Method ........................................................................................................10

II.  THE *GOLDBERG* FACTORS CONFIRM THAT THE REQUESTED FEE IS
     FAIR AND REASONABLE ...............................................................................12

    A.  The Time And Labor Expended By Plaintiffs' Counsel Support The
        Requested Fee ..............................................................................................12

    B.  The Risks Of The Litigation Support The Requested Fee .........................19

    C.  The Magnitude And Complexity Of The Action Support The Requested
        Fee ................................................................................................................25

    D.  The Quality Of Lead Counsel's Representation Supports The Requested
        Fee ................................................................................................................26

    E.  The Requested Fee In Relation To The Settlement ....................................28

    F.  Public Policy Considerations Support The Requested Fee .........................28

    G.  The Approval Of Lead Plaintiff And The Reaction Of The Class To Date
        Support The Requested Fee .........................................................................29

III.  PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND WERE
      NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED .................30

CONCLUSION.........................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*In re Adelphia Commc'ns Corp. Sec. and Deriv. Litig.*,
  No. 03 MDL 1529, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006), *aff'd*, 272
  F. App'x. 9 (2d Cir. 2008) ....................................................................................................27

*In re AremisSoft Corp. Sec. Litig.*,
  210 F.R.D. 109 (D.N.J. 2002)...............................................................................................12

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985)................................................................................................................7

*In re Bisys Sec. Litig.*,
  No. 04 Civ 3840, 2007 WL 2049726 (S.D.N.Y. July 16, 2007) ......................................9, 12

*In re Cardinal Health Inc. Sec. Litig.*,
  528 F. Supp. 2d 752 (S.D. Ohio 2007) ..................................................................................11

*In re China Sunergy Sec. Litig.*,
  No. 07 Civ. 7895 (DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011)...............................30

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)...................................................................................................19

*In re Comverse Tech., Inc. Sec. Litig.*,
  No. 06-CV-1825 (NGG) (RER), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) .........7, 11, 19

*Cullen v. Whitman Med. Corp.*,
  197 F.R.D. 136 (E.D. Pa. 2000)...............................................................................................9

*Davis v. J.P. Morgan Chase & Co.*,
  827 F. Supp. 2d 172 (W.D.N.Y. 2011) ...............................................................................7, 11

*Desantis v. Snap-On Tools Co., LLC*,
  No. 06-cv-2231 (DMC), 2006 WL 3068584 (D.N.J. Oct. 27, 2006) ......................................8

*In re Deutsche Telekom AG Sec. Litig.*,
  No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798 (S.D.N.Y. June 9, 2005)..........10, 12

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  No. 02-CV-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)..........................10, 25, 28, 30

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ...........................................................................................27

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000)..................................................................10, 19, 27

*Hall v. AT&T Mobility LLC*,
  No. 07-5325 (JLL), 2010 WL 4053547 (D.N.J. Oct. 13, 2010) ................................9

*Hicks v. Morgan Stanley*,
  No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. 2005) ........................7, 28

*In re Interpublic Sec. Litig.*,
  No. 02 Civ. 6527 (DLC), 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004)...............................10

*J.I. Case Co. v. Borak*,
  377 U.S. 426 (1964)...........................................................................................7

*Kurzweil v. Philip Morris Cos., Inc.*,
  Nos. 94 Civ. 2373 (MBM) and 94 Civ. 2546 (BMB), 1999 WL 1076105
  (S.D.N.Y. Nov. 30, 1999) ..............................................................................10

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002)..............................................................8, 28

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................25, 27

*McMahon v. Olivier Cheng Catering and Events, LLC*,
  No. 08 CIV 8713 (PGG), 2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010)...........................10, 12

*In re Monster Worldwide, Inc. Sec. Litig.*,
  No. 07-cv-2237 (JSR), 2008 WL 9019514 (S.D.N.Y. Nov. 25, 2008) ................................10

*Parker v. Time Warner Entm't Co.*,
  631 F. Supp. 2d 242 (E.D.N.Y. 2009) ..............................................................19

*In re Philip Servs. Corp. Sec. Litig.*,
  No. 98 Civ. 835 (AKH), 2007 WL 959299 (S.D.N.Y. March 28, 2007) .............................10

*In re Priceline.com, Inc. Sec. Litig.*,
  No. 3:00-CV-1884 (AVC), 2007 WL 2115592 (D. Conn. July 20, 2007) ............................9

*In re Prudential Sec. Inc. Limited P'ships Litig.*,
  912 F. Supp. 97 (S.D.N.Y. 1996) ....................................................................10

*Savoie v. Merchs. Bank*,
  166 F.3d 456 (2d Cir. 1999).............................................................................7

*Silva v. Little Fish, Corp.*,
  No. 10-CV-7801, 2012 WL 2458214 (S.D.N.Y. May 1, 2012) ............................................10

iii

*In re Sumitomo Copper Litig.*,
   189 F.R.D. 274, 281 (S.D.N.Y. 1999) ...................................................................25

*Swift v. Direct Buy, Inc.*,
   No. 2:11-CV-401-TLS, 2013 WL 5770633 (N.D. Ind. Oct. 24, 2013) ....................9

*Teachers' Ret. Sys. v. A.C.L.N., Ltd.*,
   No. 01-CV-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004)................27

*In re Telik Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008*)*........................................................8, 12, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................................7

*In re Veeco Instruments Inc. Sec. Litig.*,
   No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ...................5, 27, 29

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)...................................................................................7, 11

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005).......................................................................8

*Yuzary v. HSBC Bank USA, N.A.*,
   No. 12 Civ 3693 (PGG), 2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013)............10, 12

## **OTHER AUTHORITIES**

15 U.S.C. § 77z-1(a)(6)......................................................................................................8

H.R. Conf. Rep. No. 104-369 (1995)
   reprinted in U.S.C.C.A.N. 730, 731.........................................................................29

Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel" or "Bernstein Litowitz"), having achieved an excellent Settlement for the benefit of the Class, respectfully submits this memorandum of law in support of its motion for an award of attorneys' fees in the amount of $5 million and reimbursement of litigation expenses incurred by Plaintiffs' Counsel in the amount of $126,008.62.[1]

## PRELIMINARY STATEMENT

The proposed Settlement represents an excellent recovery for the Class. As detailed in the accompanying Browne Declaration, the Settlement will result in a substantial payment to Class Members, resolve this Class Action in its entirety, and allow for the prompt distribution to shareholders of the majority of the approximately $97 million in funds that are currently being withheld in the Expense Fund established by this Court. The Settlement requires Defendants to pay $10 million in cash and to relinquish more than $42 million of the approximately $72 million in claims for indemnification, expenses and attorneys' fees that they have asserted against the Expense Fund. The Settlement also provides for the release of the $2.5 million hold-back this Court reserved for potential claims against State Street, so that those funds also can be distributed to investors. *See* Browne Decl., ¶¶110-14.

Moreover, the Settlement obtains the release and dismissal of Defendants' January 22, 2013 Third Party Complaint against the Independent Trustees, which will eliminate the need to hold back (and potentially expend) millions of dollars in shareholder funds to defend

---

[1] Lead Plaintiff is simultaneously submitting herewith the Declaration of John C. Browne in Support of Motion For Final Approval of Settlement And Motion For Approval of Attorneys' Fees and Expenses ("Browne Declaration"), which is an integral part of this submission. For the sake of brevity, the Court is respectfully referred to the Browne Declaration for a detailed description of the history of the Action; the nature of the claims asserted; the negotiations leading to Settlement; and the services Lead Counsel provided for the benefit of the Class.

against those claims.  Defendants are further required to use good faith efforts to resolve their malpractice lawsuit against Willkie Farr & Gallagher.  Finally, the Settlement, which was the product of intensive arm's-length negotiations and a "Mediator's Recommendation" by Judge Layn R. Phillips, a former federal judge and highly respected mediator, required Defendants to substantiate to Judge Phillips that they do not have substantial personal assets with which to pay a judgment of the magnitude sought by the Class.[2]  Based upon his review, Judge Phillips concluded that Defendants would be unable to pay a material judgment to the Class.  *See* Declaration of Layn R. Phillips (Former U.S. District Judge) in Support of Final Approval of Class Action Settlement ("Phillips Decl.," attached as Exhibit A to the Browne Declaration), ¶6.

In addition to the true, tangible economic benefits it provides, the Settlement will also greatly benefit shareholders by resolving this long-running matter.  The comprehensive Settlement negotiated among Lead Plaintiff, Defendants and the Independent Trustees of the Primary Fund resolves numerous complex and uncertain issues involving multiple parties.  If this case continued to be litigated through additional discovery, dispositive motions, trial and appeals, tens of millions of dollars in shareholder money would be held back for many more years while substantial operational costs would be incurred against the Fund and additional – and potentially significant – expense and legal claims would be lodged.

Lead Counsel respectfully submits that this extremely beneficial Settlement was achieved through the skill, tenacity and effective advocacy of Lead Counsel, who litigated this case for

---

[2] The specific terms of the Settlement are set forth in the Stipulation and Agreement of Settlement, dated August 14, 2013, which was previously filed with the Court on September 6, 2013 (ECF No. 91-1), as amended by the Amendment No. 1 to the Stipulation and Agreement of Settlement Dated August 14, 2013 (ECF No. 94-2) (collectively, the "Stipulation" or the "Settlement").  Unless otherwise noted, capitalized terms have the meanings set out in the Stipulation.

more than five years on an entirely contingent basis in the face of very significant risks.  Indeed, Lead Counsel and Lead Plaintiff have been involved in this litigation since the very first days of the crisis at the Primary Fund.  On September 19, 2008, just two days after the Primary Fund announced that it had "broken the buck," Third Avenue and Lead Counsel filed a complaint in this Court asserting federal and state law claims on behalf of all shareholders of the Fund and seeking a temporary restraining order ("TRO") to prevent Defendants from distributing shareholder money in a potentially inequitable manner.  These efforts resulted in a Court-ordered stipulation ensuring that Defendants would not make distributions from the Fund in a way that may have benefited certain shareholders at the expense of others, at a time when there was considerable uncertainty regarding the calculation of the Fund's Net Asset Value ("NAV"), the valuation of the Fund's Lehman investments, and multiple other issues.  *See* Browne Decl., ¶¶17-20.

During the ensuing five years, Lead Counsel worked diligently to advance the interests of all investors in the Primary Fund.  Indeed, for nearly ten months *before* the Court's appointment of Third Avenue as the Lead Plaintiff, Lead Counsel regularly made submissions to this Court and other courts overseeing litigation relating to the Primary Fund.  *Id.* ¶¶21-27.  In its role as Court-appointed Lead Counsel, Bernstein Litowitz worked closely with the parties and the Court in connection with the SEC's request for injunctive relief regarding the Fund.  *Id.* ¶¶28-29.  Lead Counsel also filed a detailed amended Complaint alleging a theory of wrongdoing that was much broader than the theory pursued by the SEC in the related SEC Action.  As discussed below, while the SEC confined its case to Defendants' activities and statements on and after September 15 and 16, 2008, Lead Plaintiff's Complaint alleged that Defendants' wrongdoing began as early as September 2006.  As the Court is aware, the core claims in Lead Plaintiff's

Complaint survived Defendants' motions to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Ultimately, Lead Counsel's strategic decision to assert claims broader than those asserted in the SEC Action was a critical factor in allowing investors to negotiate the beneficial Settlement achieved here.  Browne Decl., ¶33.

Moreover, although Lead Counsel has aggressively litigated its claims against Defendants since the very beginning of this matter, Lead Counsel and Lead Plaintiff always held the view that shareholders of the Fund would benefit immensely if the disputes surrounding the Primary Fund could be resolved voluntarily.  Accordingly, throughout the litigation, Lead Counsel engaged in repeated efforts to negotiate a settlement of the Class Action as well as the partially-related SEC Action. *Id.* ¶¶82-109.

Lead Counsel undertook all of these efforts and achieved this excellent result in the face of extremely significant litigation risks. *Id.* ¶¶115-35.  As detailed in the Browne Declaration, this was a unique and extraordinarily difficult case where there was no clear path to recovery for investors.  Lead Counsel had substantial concerns from the outset that the many legal challenges presented in this case, such as the "puffery," "bespeaks caution," "fraud-on-the-market," "reliance" and "loss causation" issues raised by Defendants could have resulted in the Class recovering nothing.  Among the many substantial arguments Defendants raised as defenses to liability and damages, were that (i) Defendants fully disclosed the Primary Fund's investments in all assets, including its investment in Lehman, in numerous public filings disseminated during the Class Period, (ii) nearly all investments made by the Primary Fund were Prime-rated and were widely perceived to be safe and conservative, (iii) Defendants relied in good faith on Lehman's financial statements, which were themselves false and misleading, and (iv) the

4

collapse of the Primary Fund was not caused by any wrongdoing on the part of Defendants but by an unprecedented panic in the financial markets. Each of these arguments posed substantial risk to the Class's ability to recover. Indeed, as this Court recognized many times, the Defendants in this case "confronted conditions not seen since the Great Depression" during a time when the markets "were in chaos" and the Lehman bankruptcy filing surprised even the most sophisticated market observers. ECF No. 649 in SEC Action, at p. 37.

In addition, this case presented unique challenges because of the indemnity, expense and other claims that have been lodged (and would be lodged in the future) against shareholder money held in the Expense Fund. If at any point during dispositive motions, trial, or appeals, Defendants were to defeat Lead Plaintiff's fraud claims, not only would the Class have recovered nothing, but it was a virtual certainty that Defendants' legal expenses would then have been paid from *investor money* held in the Expense Fund. Browne Decl., ¶¶127-35.

The risks faced by Lead Plaintiff are further confirmed by the jury verdict in the SEC Action. In that case, the jury found that Bent Sr. was not liable on all counts asserted against him, Bent II was liable only for a single negligent violation of the securities laws, and RMCI and Resrv Partners were liable for violating negligence provisions of the securities laws, though the jury indicated that those entities did so knowingly or recklessly. *Id.* ¶¶12, 74-81, 120. In so doing, the jury rejected each of nine separate fraud counts asserted by the SEC against the Defendants. *See* ECF No. 648 in SEC Action. Based on this verdict, the Court awarded $750,000 in penalties in the SEC Action. Notably, Lead Plaintiff and the Class faced significant legal hurdles that the SEC did not – including questions of reliance and the applicability of the fraud-on-the-market presumption to money market funds.

In light of these risks, the proposed Settlement obtained by Lead Counsel demonstrates

the quality of Lead Counsel's representation of the Class.  As compensation for their significant efforts over more than five years, Lead Counsel, on behalf of all Plaintiffs' Counsel, requests a fee award of $5 million, which is approximately 9.2% of the minimum value of the Settlement (*see* Phillips Decl. ¶5), and reimbursement of litigation expenses in the amount of $126,008.62. The requested fee is on the very low end of fees awarded in comparable settlements, whether considered as a percentage of the Settlement or on a lodestar multiplier basis.  Indeed, the requested fee represents a multiplier of just 1.33 on Plaintiffs' Counsel's total lodestar, which is far below the range of multipliers routinely awarded in complex class actions with substantial contingency risks such as this one.  In addition, the fee request is supported by the sophisticated institutional investor serving as Court-appointed Lead Plaintiff.  *See* Declaration of Lead Plaintiff, Third Avenue Institutional International Value Fund, L.P. ("Lead Plaintiff Decl.," attached as Exhibit B to Browne Decl.).

The reaction of the Class to date further supports Lead Counsel's fee request.  Pursuant to the Court's Preliminary Approval Order (ECF No. 95), more than 27,000 copies of the Notice have been sent to potential Class Members and record holders and a Summary Notice was published in *The Investors' Business Daily* and over the *PR Newswire*.[3]  The Notice advised potential Class Members that Lead Counsel would seek fees in an amount not to exceed $5 million and reimbursement of litigation expenses in an amount not to exceed $250,000.  *See* Exhibit 1 to Grace Decl., ¶¶ 5, 37.  While the deadline for Class Members to object to the requested attorneys' fees and expenses has not yet passed, to date no objection to Lead Counsel's application for fees and expenses has been received.

---

[3] *See* Declaration of Eugene P. Grace Regarding Notice ("Grace Decl."), attached as Exhibit C to the Browne Decl., ¶¶2-7.

**ARGUMENT**

**I.    THE REQUESTED ATTORNEYS' FEES ARE
REASONABLE UNDER BOTH THE PERCENTAGE-
OF-THE-FUND METHOD AND THE LODESTAR METHOD**

The Supreme Court has emphasized that private securities actions, such as this Action, are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC.[4]   Compensating plaintiffs' counsel for the risks they take, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class."   *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. 2005).

This rings especially true here, where, even in the uniquely trying circumstances of this case, Lead Counsel was able to negotiate this extremely beneficial settlement.

**A.    The Requested Attorneys' Fees Are
Reasonable Under The Percentage-Of-The-Fund Method**

The Second Circuit has expressly approved the percentage method for awarding fees in a common fund cases.   *See Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases").   Indeed, the Second Circuit has noted that the "trend in this Circuit is toward the percentage method."   *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *see also Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 3d 172, 183-84 (W.D.N.Y. 2011); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *2 (E.D.N.Y. June 24, 2010).

---

[4] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'") (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

The text of the PSLRA also supports awarding attorneys' fees using the percentage-of-the-fund method, as it provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount" recovered for the class.  15 U.S.C. § 77z-1(a)(6) (emphasis added); *see In re Telik Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 586 (S.D.N.Y. 2008); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002).

The fee requested here – $5 million – is less than 9.2% of the minimum value of the Settlement Fund.  As detailed in the Declaration of Judge Phillips, who presided over the extensive negotiations and ultimately made the Mediator's Recommendation that resulted in the Settlement, the benefit of the Settlement to the Class and other Primary Fund investors is in excess of $54.5 million.  Phillips Decl. ¶5.  Specifically, in addition to the non-monetary relief obtained through the Settlement and the significant value to investors in resolving this matter, on a monetary basis, the Settlement requires Defendants to:  (i) pay $10 million in cash personally; (ii) relinquish more than $42 million of the approximately $72 million in claims for indemnification, expenses and attorneys' fees they have asserted against the Expense Fund[5]; and (iii) release all potential claims involving State Street relating to the Primary Fund, enabling the $2.5 million hold-back to be released and distributed to shareholders.  The direct economic benefit to the Class and other Reserve Fund investors, in the amount of at least $54.5 million, should be considered and further supports Lead Counsel's fee request as reasonable.  *See, e.g., Desantis v. Snap-On Tools Co., LLC,* 2006 WL 3068584, at *9 (D.N.J. Oct. 27, 2006) (in awarding $13 million in attorneys' fees in franchisee class action, the court considered the fees

---

[5] There was essentially no dispute that Defendants were entitled to a minimum payment of at least $11 million to reimburse them for certain expenses they had incurred while managing the Fund.

as a percentage of the $125 million total settlement value, which included $25 million in cash payments and $61.6 million in debt forgiveness of franchisees); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 147 (E.D. Pa. 2000) (finding it reasonable to award attorneys' fees based on the total value of the settlement, which included the forgiveness of debt for students who were delinquent in paying back their loans, as well as cash fund); *see also Swift v. Direct Buy, Inc.*, 2013 WL 5770633, at *8 (N.D. Ind. Oct. 24, 2013) (awarding attorneys' fees based on total value of the settlement which included $1.9 million in cash and "$3 million in charged and unpaid late fees that were incurred by defaulted members and which the Defendants agree not to collect"); *Hall v. AT&T Mobility LLC*, 2010 WL 4053547, at *15-*24 (D.N.J. Oct. 13, 2010) (awarding $6 million in attorneys' fees, or one-third of $18 million total settlement benefit, which included $16 million in cash and $2 million in pre-paid calling cards).

Finally, the requested fee is fully endorsed by Lead Plaintiff and is well within the range of percentage fees awarded within the Second Circuit in other securities cases.  *See, e.g., Freudenberg v. E*Trade Fin. Corp.*, No. 07 Civ. 8538 (JPO) (MHD), slip op. at 6 (S.D.N.Y. Oct. 20, 2012), ECF No. 154 (awarding 28% of $79 million settlement fund; 1.3 multiplier); *In re MBIA, Inc. Sec. Litig.*, No. 08-CV-264-KMK, slip op. at 2 (S.D.N.Y. Dec. 19, 2011), ECF No. 92 (awarding 22% of $68 million settlement fund; 2.89 multiplier); *Rubin v. MF Global, Ltd.*, No. 08 Civ. 2233 (VM), slip op. at 2 (S.D.N.Y. Nov. 18, 2011), ECF No. 198 (awarding 18% of $90 million settlement fund; 2.67 multiplier); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), slip op. at 1-2 (S.D.N.Y. July 18, 2011), ECF No. 117 (awarding 27.5% of $70 million settlement fund; 4.7 multiplier); *In re Priceline.com, Inc. Sec. Litig.*, 2007 WL 2115592, at *5 (D. Conn. July 20, 2007) (awarding 30% of $80 million settlement fund; 1.98 multiplier); *In re Bisys Sec. Litig.*, 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007) (awarding fees of 30% of

$65.87 million settlement; 2.99 multiplier); *In re Philip Servs. Corp. Sec. Litig.*, 2007 WL 959299, at *1, *3 (S.D.N.Y. March 28, 2007) (awarding 26% of $79.75 million settlement fund; 1.37 multiplier).[6]   The requested fee percentage is also consistent with, or lower than, percentages awarded by this Court in common fund cases.[7]

### B.   The Requested Attorneys' Fees Are Reasonable Under The Lodestar Method

The Second Circuit also encourages district courts to determine the reasonableness of a requested fee pursuant to the lodestar method. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). In cases of this nature, fees representing multiples above the lodestar are regularly awarded to reflect the contingency fee risk and other relevant factors. *See, e.g., In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *26 (S.D.N.Y. Nov. 8, 2010) ("Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the

---

[6] *See also In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), slip op. at 8 (S.D.N.Y. July 18, 2007), ECF No. 170 (awarding 27% of $100 million settlement fund; 2.82 multiplier); *In re Interpublic Sec. Litig.*, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) (awarding 12% of $96.4 million settlement fund; 3.96 multiplier); *In re Monster Worldwide, Inc. Sec. Litig.*, 07-cv-2237 (JSR), 2008 WL 9019514, at *1-2 (S.D.N.Y. Nov. 25, 2008) (awarding 25% of $45 million settlement fund; 1.3 multiplier); *In re Deutsche Telekom AG Sec. Litig.*, 2005 U.S. Dist. LEXIS 45798, at *12-13 (S.D.N.Y. June 9, 2005) (awarding 28% of $120 million settlement fund; 3.97 multiplier); *Kurzweil v. Philip Morris Cos., Inc.*, 1999 WL 1076105, at *1-2 (S.D.N.Y. Nov. 30, 1999) (awarding 30% of $123.8 million settlement fund; 2.46 multiplier); *In re Prudential Sec. Inc. Limited P'ships Litig.*, 912 F. Supp. 97, 103-04 (S.D.N.Y. 1996) (awarding 27% of $110 million settlement fund; 1.46 multiplier).

[7] *See, e.g., Yuzary v. HSBC Bank USA, N.A.,* 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (Gardephe, J.) (awarding approximately $5 million fee in FLSA case, equaling more than 30% of the settlement fund, and a 7.6 multiplier); *Silva v. Little Fish, Corp.,* 2012 WL 2458214 (S.D.N.Y. May 1, 2012) (Gardephe, J.) (awarding attorneys' fees in the amount of one-third of the settlement fund in FLSA action, with a 2.08 multiplier); *McMahon v. Olivier Cheng Catering and Events, LLC,* 2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) (Gardephe, J.) (awarding attorneys' fees in the amount of one-third of the settlement fund in FLSA action, with a 1.4 multiplier).

engagement, the skill of the attorneys, and other factors."); *Comverse*, 2010 WL 2653354, at \*5 ("Where … counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar"); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 761 (S.D. Ohio 2007) ("the Court rewards [] lead counsel that takes on more risk, demonstrates superior quality, or achieves a greater settlement with a larger lodestar multiplier").

Here, the lodestar method powerfully demonstrates the reasonableness of the requested fee.  In this entirely contingent action that raised myriad complex and novel issues, Plaintiffs' Counsel collectively devoted more than 7,596.55 hours of attorney and other professional support time in investigating, prosecuting and ultimately settling the Action.  *See* Browne Decl. Section VIII.B., and the declarations of Plaintiffs' Counsel attached thereto as Exhibits D-1 and D-2.[8]  Plaintiffs' Counsel's total lodestar, derived by multiplying the hours spent by each attorney and paraprofessional by their current hourly rates, is approximately $3.76 million. Browne Decl., Exhibit D-1 ¶3.  The requested fee in the amount of $5 million represents only 1.33 times Plaintiffs' Counsel's lodestar amount, which is far *below* the range awarded in cases of this type.

Indeed, in complex contingent litigation, lodestar multipliers between 2.5 and 5 are commonly awarded.  *See Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Davis*, 827 F. Supp. 2d at 185 (awarding fee representing a multiplier of 5.3, which was "not atypical" in similar cases); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), slip op. at 4 (S.D.N.Y. July 18, 2011) (awarding fee representing a multiplier of 4.7) (attached hereto as Exhibit 6); *Comverse*, 2010 WL 2653354, at \*5 (awarding fee representing a 2.8 multiplier);

---

[8]  Plaintiffs' Counsel consist of Bernstein Litowitz Berger & Grossmann LLP, the Court-appointed Lead Counsel for the Class and Girard Gibbs LLP, who worked at the direction of Lead Counsel on certain discrete matters.  *See* Exhibit D-2 to Browne Decl.

*Telik*, 576 F. Supp. 2d at 590 ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *In re Bisys Sec. Litig.*, 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007) (awarding 30% fee representing a 2.99 multiplier and finding that the multiplier "falls well within the parameters set in this district and elsewhere"); *Deutsche Telekom*, 2005 U.S. Dist. LEXIS 45798, at *13-*14 (awarding fee representing a 3.96 multiplier); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135 (D.N.J. 2002) (a 4.3 multiplier was appropriate in light of the contingency risk and the quality of the result achieved); *Maley*, 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country").[9]

## II.   THE *GOLDBERG* FACTORS CONFIRM
## THAT THE REQUESTED FEE IS FAIR AND REASONABLE

The Second Circuit has set forth the following criteria that courts should consider when reviewing a request for attorneys' fees in a common fund case:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (internal quotes and citation omitted).  Consideration of these factors demonstrates that the fee requested by Lead Counsel is plainly reasonable.

### A.   The Time And Labor Expended By
### Plaintiffs' Counsel Support The Requested Fee

Lead Counsel respectfully submits that achieving the successful resolution of this case has been challenging and required a substantial commitment of resources.  As noted above and in

---

[9] *See also HSBC Bank USA, supra* (Gardephe, J.) (awarding fee in FLSA case amounting to a 7.6 multiplier); *Little Fish, Corp., supra* (Gardephe, J.) (same; 2.08 multiplier); *McMahon, supra* (Gardephe, J.) (same; 1.4 multiplier).

Exhibits D-1 and D-2 to the Browne Declaration, Plaintiffs' Counsel expended more than 7,500 hours prosecuting this Action for the benefit of Primary Fund investors.

As detailed in the Browne Declaration (Section II), Lead Counsel's efforts began when Third Avenue contacted Lead Counsel on September 17, 2008, only one day after the Primary Fund announced that it had broken the buck. Then, only two days later, on September 19, 2008, following an investigation into potential claims involving the Primary Fund, Lead Counsel filed a class action complaint asserting claims under the federal securities laws and state law. Lead Plaintiff also filed papers on that day seeking a temporary restraining order ("TRO") preventing the Primary Fund from distributing assets in a manner that may have benefited a limited group of shareholders while causing substantial harm to others.

Lead Plaintiff's initial complaint was filed at a time of considerable uncertainty for Primary Fund shareholders (for instance, this was before the involvement of the SEC was known). Indeed, the Primary Fund's previous announcements suggested that it was uncertain whether the Primary Fund would be required to make distributions that would favor certain shareholders (by honoring their redemption requests at $1.00) over others (by honoring their requests at $0.97). In response to Lead Plaintiff's initial complaint and request for a TRO, Lead Plaintiff and Defendants negotiated a stipulation ensuring that Defendants would not make distributions from the Fund in an inequitable manner. On September 22, 2008, the Court so-ordered that stipulation, which helped preserve assets for all shareholders. Browne Decl., ¶¶17-20.

In the ensuing months, as a number of other class action complaints were filed, Lead Plaintiff and Lead Counsel were in regular contact with Defendants' counsel and were active in various related litigations as events surrounding the Primary Fund continued to unfold. Among

other things, Lead Counsel filed papers in the District of Minnesota in the case captioned, *Ameriprise Financial, Inc. and Securities America, Inc. v. The Reserve Fund, et al.,* No. 08-CV-5219 (PAM/JK) (D. Minn. 2008), which sought to unseal documents and deposition transcripts relating to the Primary Fund that were filed in that case.  Lead Counsel also closely monitored related litigation involving the Reserve International Liquidity Fund, Ltd., which was then pending in the Supreme Court in New York before Justice Kapnick.  *See Caxton International Limited, et al., v. Reserve International Liquidity Fund, Ltd.,* Index No. 08/602875 (Sup. Ct. NY).  These efforts included attending multiple hearings, seeking and obtaining permission to address the court on issues that overlapped with issues in the Primary Fund litigation, and developing a beneficial working relationship with the plaintiffs in the *Caxton* case.  Browne Decl., ¶¶21-23.

On November 18, 2008, Third Avenue filed a motion seeking appointment as lead plaintiff under the PSLRA.  Lead Counsel recognized that the Primary Fund was a wasting asset and that the interests of all investors would be best served by a single class action led by one lead plaintiff who asserted all claims in one complaint.  Accordingly, Lead Plaintiff argued that divvying the case into separate actions for each type of claim would not serve judicial efficiency and would result, ultimately, in shareholders recovering less than they would if the case was consolidated under one leadership structure.  *See* ECF Nos. 17, 24, 45; Browne Decl., ¶23.

Lead Counsel continued to take an active role in asserting the rights of all shareholders during the time that Lead Plaintiff motions were pending.  *Id.* ¶¶22-27.  Among other things, Lead Counsel initiated discussions with Defendants regarding a case management plan and discovery schedule.  Lead Counsel also continued to monitor and participate in related actions, including the ongoing state court litigation before Justice Kapnick and others.  While lead

plaintiff motions were pending, the SEC filed a complaint against Bent, Bent II, RMCI and Resrv Partners asserting claims under the Exchange Act, the Securities Act, and the Investment Advisers Act of 1940 ("Investment Advisers Act").  Unlike the class action filed against the Fund by Lead Plaintiff, which alleges that Defendants had made misleading statements to investors over the course of nearly two years, the SEC Action focused solely on Defendants' conduct on September 15 and 16, 2008.  *Id.,* ¶¶24-26.

On August 26, 2009, the Court appointed Third Avenue as Lead Plaintiff and Bernstein Litowitz as Lead Counsel.  *See* ECF No. 45.  In its role as Court-appointed Lead Plaintiff, Third Avenue and Lead Counsel continued to investigate potential claims against Defendants and others.  *See* ECF No. 46.  Lead Plaintiff was also closely involved in the negotiations surrounding the SEC's request for injunctive relief regarding distributions from the Fund, which ultimately led to the Court's November 25, 2009 Order establishing the Expense Fund.  *See* ECF No. 202 in SEC Action.  Furthermore, Lead Counsel continued to investigate potential claims and began drafting the consolidated Complaint.  As part of this process, Lead Counsel discussed potential case theories and evidence with counsel for numerous individual plaintiffs and also shared drafts of the Complaint.  One of Lead Plaintiff's goals in doing so was to increase the likelihood that the individual actions would dismiss their claims and become part of the putative class.  This effort was largely successful and numerous individual actions were dismissed or no longer actively litigated following the filing of Lead Plaintiff's consolidated complaint.  This, in turn, reduced the amount of money the Primary Fund had to spend on litigation-related expenses, and increased efficiencies for the Court.  Browne Decl., ¶¶30-33.

On January 5, 2010, Lead Plaintiff filed the consolidated class action Complaint, which asserted claims under the Securities Act, the Exchange Act, state law, and the Investment

Company Act of 1940 ("Investment Company Act").  As discussed in the Browne Declaration, based on its comprehensive investigation, Lead Plaintiff was able to draft a Complaint alleging that Defendants' wrongdoing began several years prior to the September 15, 2008 date identified in the SEC's complaint.  Ultimately, Lead Plaintiff's strategic decision to assert broader claims than those asserted in the SEC Action was critical in allowing investors to negotiate the beneficial settlement obtained here.  Indeed, even after the jury verdict in the SEC's case, Lead Plaintiff was able to achieve the substantial additional recovery this Settlement represents for investors.  Browne Decl., ¶¶34-43.

In the months after Lead Plaintiff's Complaint was filed, Lead Counsel reviewed Defendants' applications for expenses, indemnification, management fees and insurance proceeds, and on January 25, 2010, filed an opposition to those requests.  *See* ECF No. 259 in SEC Action.  Moreover, throughout this litigation, Lead Counsel was proactive in coordinating its case with the SEC Action in order to promote efficiency and minimize duplication.  For instance, on June 17, 2010, Lead Plaintiff submitted a discovery and case-management proposal to the Court that allowed Lead Plaintiff to participate, in a narrowly-tailored fashion, in discovery that was taking place in the SEC Action.  On June 24, 2010, the Court issued an order "adopt[ing] Lead Plaintiff's proposal."  *See* ECF No. 321 in SEC Action.  As a result of this order, Lead Plaintiff was able to review document discovery that was being exchanged in the SEC Action, attend depositions, and review transcripts obtained in that case.  Consequently, Lead Plaintiff obtained and reviewed over 500,000 pages of documents.  This was critical because, as discussed below, it allowed Lead Plaintiff to conduct settlement discussions with the SEC and Defendants throughout the case on a fully-informed basis.  Browne Decl., ¶¶44-48.

Lead Counsel then successfully opposed Defendants' motions to dismiss the core claims asserted in the Complaint.   On June 25, 2010, Defendants moved to dismiss Lead Plaintiff's complaint and that motion was fully briefed by September 3, 2010.   Defendants argued that the Complaint should be dismissed in its entirety.   As for the Securities Act and Exchange Act claims, Defendants argued that the Complaint (1) did not adequately allege that pre-September 15, 2008 statements were materially false or misleading; (2) did not contain adequate allegations of scienter; and (3) did not adequately plead reliance on a class-wide basis. Defendants further argued that there was no private right of action for the Investment Company Act claims and the state law claims were preempted by the Securities Litigation Uniform Standards Act.   Lead Counsel opposed on August 11, 2010.   On September 30, 2012, the Court denied in part and granted in part Defendants' motion, dismissing the state law and Investment Company Act claims, but sustaining claims under Section 10(b) and 20(a) of the Exchange Act against all Defendants and Sections 11, 12(a)(2) and 15 of the Securities Act against all Defendants other than RMCI.   The Court stated that "the reasons for these rulings will be explained in a forthcoming written opinion."   *See* ECF No. 78.

Finally, although Lead Counsel aggressively litigated the Class's claims since the very first days of the crisis at the Primary Fund, Lead Counsel always held the view that shareholders of the Fund would benefit immensely if the disputes surrounding the Primary Fund could be resolved voluntarily.   Consequently, as detailed in the Browne Declaration (Section III) and as the Court is aware, throughout the course of this litigation, Lead Plaintiff undertook enormous efforts to negotiate a settlement of the Class Action as well as the partially-related SEC Action. These efforts included discussions with the Court, in-person meetings with Defendants, the

Independent Trustees and the SEC and the exchange of voluminous materials and settlement proposals between the parties throughout 2009 through the fall of 2012. *Id.* ¶¶83-90.

As this Court is aware, the trial in the SEC Action began on October 9, 2012, and concluded on November 12, 2012, with a jury verdict that found Bent not liable, Bent II liable for negligence, and RMCI and Resrv Partners liable for negligence with "knowing or reckless intent." Following the jury's verdict, Defendants and Lead Plaintiff began once again to explore the possibility of settlement. Browne Decl., ¶¶63-77. The parties retained the services of Judge Phillips and exchanged lengthy mediation statements and exhibits setting out their respective settlement positions. An all-day formal mediation session was held on Saturday, February 2, 2013, which was attended by representatives of Defendants and Lead Plaintiff. Judge Phillips then reached out to counsel for the Independent Trustees and asked them to attend a second mediation session held into the evening on February 8, 2013. Over the course of the next several weeks the parties and Judge Phillips exchanged several proposals and continued to vigorously negotiate a possible settlement. Finally, on February 27, 2013, a term sheet was entered setting forth the major points of a settlement between the Class, Defendants, and the Independent Trustees. *Id.* ¶¶91-98. Lead Counsel then engaged in significant, months'-long, albeit ultimately unsuccessful, efforts to achieve a global resolution with the SEC Action. *Id.* ¶¶99-109.

As noted above, Plaintiffs' Counsel have expended over 7,500 hours investigating, prosecuting and resolving this action with a total lodestar value of $3,759,958.50. The amount of time and effort necessarily devoted to this case by Plaintiffs' Counsel, and the efficient and effective management of the litigation, was critical in obtaining the excellent result achieved by the Settlement.

### B. The Risks Of The Litigation Support The Requested Fee

The risk of the litigation is often considered the most important *Goldberger* factor.  *See Goldberger*, 209 F.3d at 54; *Comverse*, 2010 WL 2653354, at *5; *Telik*, 576 F. Supp. 2d at 592. The Second Circuit has recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted), *abrogated on other grounds by Goldberger*, 209 F.3d 43.  When considering the reasonableness of attorneys' fees in a contingency action, the Court should consider the risks of the litigation at the time the suit was brought.  *See Goldberger*, 209 F.3d at 55; *Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 261 (E.D.N.Y. 2009) (courts consider "the contingent nature of the expected compensation" and the "risk of non-payment viewed as of the time of the filing of the suit").  Indeed, "[l]ittle about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Comverse*, 2010 WL 2653354, at *5.

While Lead Counsel believes that the claims of Lead Plaintiff and the Class have merit, it recognized that this case presented substantial risks and uncertainties from the outset, which made it far from certain that any recovery would be achieved.  Indeed, Defendants had substantial defenses to both liability and damages.  The Class also faced the risk that Defendants could be awarded all or most of their $72 million in claims asserted against the Expense Fund. The very real litigation risks present in this case were compounded by the fact that, as the litigation continued, claims against the Expense Fund increased.  *See* Browne Decl., ¶¶115-35.

First, there were numerous risks to liability in this case.  As an initial matter, the parties disagree on whether Defendants made any material misstatements.  For example, Defendants argued that their pre-September 15, 2008 statements accurately described the level of risk at the Primary Fund and, at best, amounted to nothing more than non-actionable "puffery."  They contend that the Primary Fund's small (approximately 1%) investment in Lehman commercial paper was fully disclosed to investors in multiple other public filings disseminated during the Class Period.  *Id.* ¶¶116-22.

Moreover, Defendants argued that nearly all investments made by the Primary Fund – including the Lehman debt – were Prime-rated and widely perceived to be safe investments.  At summary judgment and trial, Defendants would have advanced compelling arguments that the bankruptcy filing by Lehman and the subsequent panic in the financial markets was completely unanticipated, and prior to Lehman's bankruptcy, Defendants reasonably assumed, consistent with their public statements, that the approximately 1% Lehman investment was safe and would not endanger the Fund.  In short, Lead Plaintiff faced significant risks in establishing that Defendants made material misstatements prior to September 15, 2008.

The parties also disagree about whether Defendants made material misstatements on and after September 15, 2008.  As they did during the SEC trial, at summary judgment and trial in this case, Defendants would have argued vigorously that in the two days after the Lehman bankruptcy filing, they were doing their best to provide accurate information in light of a fast-changing and unpredicted market collapse.  Indeed, this Court has repeatedly recognized that Defendants were faced with unprecedented economic conditions "not seen since the Great Depression" and that "the ramifications of Lehman's bankruptcy were not initially well understood, even by sophisticated fund managers and Government regulators."  ECF No. 648 in

SEC Action, at p. 37.  Moreover, Defendants would have contended that they were misled by Lehman's publicly-filed financial statements, which were materially false and misleading in that they reported higher values for Lehman's assets than in fact turned out to be the case.  Indeed, it appears that these arguments had traction in the SEC Action, where the jury found that Bent did not make any misstatements, and found Bent II liable only for a single count of negligence under the securities laws (a claim that the SEC could pursue but is not available to private plaintiffs). Browne Decl., ¶¶74-81, 122.

In addition, the jury verdict in the SEC Action demonstrates the difficulties that Lead Plaintiff would have faced in establishing scienter.  For post-September 15 conduct, the jury in the SEC Action rejected all of the true fraud counts against Bent Sr. and Bent II, and although it added a scienter finding against RMCI and Resrv Partners, the jury also rejected the true fraud counts asserted against those entities.  *Id.* ¶¶74-81.  Because Lead Plaintiff – unlike the SEC – was enjoined from asserting negligence based claims, if a jury were to return a similar verdict in this Class Action, it would result in no recovery for the Class (and was likely lead to substantial claims for attorneys' fees and litigation expenses to be paid from investor funds).

Notably, Lead Plaintiff faced significant legal hurdles that the SEC did not.  For instance, in order to maintain this case as a class action, Lead Plaintiff would have had to rely on the "fraud on the market" theory of reliance.  Defendants, however, contended that the fraud on the market theory is not available here because the calculation of the NAV did not depend on information disseminated to the market.  Moreover, Defendants would have argued that the vast majority of potential Class Members either "held" their shares after September 15, 2008, or sold their shares notwithstanding any alleged misrepresentations, and therefore could not have relied on any misrepresentations in deciding to "purchase or sell" securities on or after that date.

21

Defendants would have argued that Lead Plaintiff was not permitted to bring Section 10(b) claims on behalf of these "holders." *Id.* ¶¶120-22.

Second, even if Lead Plaintiff had been successful in establishing liability after dispositive motions, trial and through any appeals, there were significant risks in establishing damages and collecting any judgment. Defendants contended that Lead Plaintiff would be unable to establish the required element of "loss causation" because the losses suffered by Primary Fund investors were not due to the revelation that prior statements by Defendants were materially false, but instead were attributable to market-wide phenomena stemming from the unexpected collapse of Lehman, which sent worldwide financial markets into a panic. Indeed, in its opinion and order on the post-verdict motions in the SEC Action, the Court held that Defendants' post-September 15 conduct, even if actionable, was not responsible for the collapse of the Primary Fund. *See* ECF No. 648 in SEC Action, at p. 28. Defendants also would have stressed to a jury that Class Members have recovered more than 99% of their investment, and contended that Defendants themselves contributed to that recovery through their own efforts to manage the Fund in the wake of the Lehman bankruptcy filing. Browne Decl., ¶¶123-26.

And even if Lead Plaintiff overcame Defendants' liability and damages arguments to achieve a substantial judgment, there were concerns that the Class would have difficulty collecting it. As set forth in the Phillips Declaration, the Settlement required Defendants to submit personal financial information to Judge Phillips, who verified that Defendants did not have sufficient assets to pay a judgment of the size sought by the Class in this case. Browne Decl., Ex. A, ¶5.

Finally, the proposed Settlement eliminates the risk that the Expense Fund would be depleted by Defendants' $72 million in expense, indemnity and management fee claims and by

the costs of ongoing litigation and future indemnity and expense claims that would have been lodged against the Expense Fund absent this Settlement.  *Id.* ¶¶127-35.

*First*, the Settlement eliminates the risk and uncertainty surrounding Defendants' $72 million in claims for indemnification, management fees, and expenses.  There was virtually no dispute between the parties that Defendants were likely to receive at least $11 million dollars in payment of out of pocket expenses that Defendants actually incurred in managing the Primary Fund.  The Court on prior occasions has recognized that the process of returning tens of billions of dollars to investors was quite complicated, and ordered that Defendants be reimbursed for their out-of-pocket expenses.  *See, e.g.,* ECF Nos. 343, 348 in SEC Action.  There was a significant likelihood that Defendants would be awarded additional amounts here.  Indeed, at an earlier stage of the case, the Court had ruled that:

> Here, it is undisputed that between September 15th, 2008, and November 2010, defendants managed the money of investors who had not sought to redeem or had not successfully redeemed as of September 15th, 2008.  During the period between September 15th, 2008, and November 2010, the Fund, under Court supervision, returned to investors approximately 99 percent of the monies they had invested in the Primary Fund.  But the process of returning tens of billions of dollars to investors was quite complicated, and the Fund's assets required care, custody and management during the time it took to accomplish that task.

(Mar. 28, 2012 Tr. 62:12-22.)

Moreover, the Court rejected the SEC's request that Defendants be ordered to disgorge any management fees that would have resulted in profits to Defendants (ECF No. 648 in SEC Action, at pp. 28-29), which illustrates the risk to investors that Defendants would have been awarded a substantial portion of their claimed management fees, and pre-judgment interest thereon.  There was also a risk that Defendants would have been awarded all (or at least a substantial portion) of the more than $26 million in legal fees and interest they sought.  This risk was particularly stark given the jury verdict in the SEC Action, which rejected each of the true fraud counts against Defendants (and completely exonerated Bent Sr.).

The Settlement not only eliminates the risk that Defendants may have been awarded much of the $42 million in expense, indemnity and management fee claims that they agreed to relinquish under the Settlement, but it also eliminates the uncertainty that would ensue if these issues were litigated.  As the Court has recognized many times, the legal and factual issues surrounding these claims were complex and unsettled.  If the Court were forced to rule on these issues, it was a virtual guarantee that one or more parties would appeal.  While those appeals ran their course, investors could receive no distribution from the Fund and operational costs and additional claims for fees and expenses would continue to be incurred.

*Second*, the Settlement eliminates a significant risk that *future* indemnity and expense claims would deplete the Expense Fund and delay a distribution to investors.  For instance, the Independent Trustees contend that they are entitled to indemnification and reimbursement of their attorneys' fees and expenses in connection with the claims asserted in Defendants' Third Party Complaint.  By securing the release and dismissal of these claims, the Settlement ensures that millions of dollars that otherwise would be held back (and potentially expended) to cover defense costs of those claims are instead promptly distributed to shareholders.  Similarly, Defendants have taken the position that, unless the Class is able to prove at trial that they acted with fraudulent intent, they are entitled to reimbursement from the Fund of defense costs and attorneys' fees incurred in defending this case.  Thus, absent the proposed Settlement, it is likely that tens of millions of dollars in shareholder funds also would be held back throughout the duration of this litigation to account for Defendants' indemnity claims.  Given the many hurdles to establishing fraud in this case, there was a significant risk that, absent the Settlement, this money eventually would have been paid to Defendants and their attorneys and never distributed to shareholders.  Browne Decl. ¶¶115-35.

In sum, the risks faced by Lead Counsel from the outset of the Action were very real.  In the face of these uncertainties, Lead Counsel undertook this case on a wholly contingent basis, knowing that the litigation could last for years and would require the devotion of a substantial amount of attorney time and a significant expenditure of litigation expenses with no guarantee of compensation.  "There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise." *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *6 (S.D.N.Y. Nov. 7, 2007).  Lead Counsel's assumption of this contingency fee risk strongly supports the reasonableness of the requested fee. *See FLAG Telecom*, 2010 WL 4537550, at *27 ("the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

### C.     The Magnitude And Complexity Of The Action Support The Requested Fee

The magnitude and complexity of the Action also support the requested fee.  Courts have long recognized that securities class action litigation is "notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *27 (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)).  There can be no doubt that the issues presented in this case are complex.  As a result of the complexity and uncertainty of the numerous issues surrounding the collapse of the Primary Fund, tens of millions of dollars of shareholder money have been effectively frozen since September 15, 2008.  This case has been pending for more than five years and, without a settlement, litigation would have continued for years.

There would have been extensive additional discovery and argument focusing on areas not covered in the SEC trial, such as Defendants' actions and statements for the two years before

September 15, 2008.  The Parties would have retained experts on damages and loss causation, as well as experts on valuing the Fund's investment in Lehman and other types of commercial paper investments.  There would have been additional discovery taken of the Independent Trustees and other, former board members.  The parties also would have engaged in a lengthy battle over whether the fraud-on-the-market theory of reliance was available in money market cases, and numerous other disputed issues would have been litigated at length.

Among those issues, of course, are Defendants' claims for payment of $72 million from the Expense Fund for indemnification, expenses and attorneys' fees.  The issues surrounding those requests raise enormously complex, unique and unsettled questions of law and fact.  As the Court is aware, they have been *sub judice* for nearly four years and have been the subject of multiple submissions by multiple parties.  Absent the Settlement, it is extremely difficult to predict when those complicated claims would be resolved by the Court, or the amount that Defendants ultimately would be awarded.  Moreover, no matter how the Court decided those applications, it was a virtual certainty that appeals would be lodged by Lead Plaintiff, Defendants, the Independent Trustees, or other interested parties – which would have resulted in potentially significant additional delays and costs before any shareholder funds could be distributed.

In contrast to the complex, lengthy, and uncertain litigation, the Settlement here provides an immediate, significant and certain recovery to investors.  Accordingly, the magnitude and complexity of this Action support the conclusion that the requested fee is reasonable and fair.

**D.    The Quality Of Lead Counsel's
      <u>Representation Supports The Requested Fee</u>**

The quality of the representation is another important factor that supports the reasonableness of the requested fee.  Lead Counsel believes that the quality of the representation

here is best evidenced by the quality of the result achieved. *See Goldberger*, 209 F.3d at 55; *Veeco*, 2007 WL 4115808, at *7; *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004). Lead Counsel respectfully submits that the quality of Lead Counsel's efforts in the litigation, together with its substantial experience in shareholder class actions and its commitment to the litigation, provided Lead Counsel with the leverage necessary to negotiate the significant Settlement.

The skill and substantial experience of counsel in the specialized field of shareholder securities litigation also support the reasonableness of the requested fee. *See Teachers' Ret. Sys. v. A.C.L.N., Ltd.,* 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004) (the skill and prior experience of counsel in the field is relevant to determining fair compensation). Lead Counsel specializes in complex shareholder litigation, and is highly-experienced in such litigation, with a successful track record in securities cases throughout the country. *See* Lead Counsel's Firm Resume, attached as Exhibit J to Browne Decl.

Finally, Courts have also repeatedly recognized that the quality of the opposition faced by plaintiffs' counsel should also be taken into consideration in assessing the quality of counsel's performance. *See, e.g., Marsh*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement"); *Veeco*, 2007 WL 4115808, at *7 (among the factors supporting a 30% award of attorneys' fees was that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. and Deriv. Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2005) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work"), *aff'd,* 272 F. App'x. 9 (2d Cir. 2008).

Here, at various times throughout this litigation, Defendants were represented by Willkie Farr & Gallagher LLP, WilmerHale LLP, Dewey Lebouf LLP, Duane Morris LLP, and Morgan, Lewis & Bockius LLP; and the Independent Trustees were represented by Goodwin Procter LLP. Lead Counsel's ability to present a strong case, and to demonstrate its willingness to continue to vigorously prosecute the Action, enabled Lead Counsel to achieve a favorable global settlement with Defendants and the Independent Trustees for the benefit of the Class.

> **E.**     **The Requested Fee In Relation To The Settlement**

Courts have interpreted this factor as requiring the review of the fee requested in terms of the percentage it represents of the total recovery.  As discussed above, the requested fee of $5 million, which equals less than 9.2% of the minimum direct financial benefit of the Settlement, is well within the range of percentage fees that courts in the Second Circuit and around the Country have awarded in comparable cases, and is fully justified by the work performed and the result obtained in the face of significant risk.

> **F.**     **Public Policy Considerations Support The Requested Fee**

A strong public policy concern exists for rewarding firms for bringing successful securities litigation.  *See FLAG Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *Hicks*, 2005 WL 2757792, at *9 ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding."). Accordingly, public policy favors granting Lead Counsel's fee and expense application here.

**G.    The Approval Of Lead Plaintiff And The**
**Reaction Of The Class To Date Support The Requested Fee**

Lead Plaintiff was actively involved in the prosecution, mediation and settlement of this Action and has approved the requested fee.  *See* Lead Plaintiff Decl., attached as Exhibit B to Browne Decl.  Third Avenue is precisely the type of sophisticated and financially interested investor that Congress envisioned serving as a fiduciary for the class when it enacted the PSLRA.  The PSLRA was intended to encourage institutional investors like Third Avenue to assume control of securities class actions in order to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. No. 104-369, at *27 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731.  Congress believed that these institutions would be in the best position to monitor the prosecution and to assess the reasonableness of counsel's fee requests.   In this Action, Third Avenue was one of the first investors to respond to the crisis, and played an active role throughout the litigation and settlement negotiations.   *See* Lead Plaintiff Decl. ¶¶2-13. Accordingly, Lead Plaintiff's endorsement of the fee request supports its approval as fair and reasonable. *See, e.g., Veeco*, 2007 WL 4115808, at *8 ("public policy considerations support the award in this case because the Lead Plaintiff . . . – a large public pension fund – conscientiously supervised the work of lead counsel and has approved the fee request").

The reaction of the Class to date also supports the requested fee.  As of October 31, 2013, the Claims Administrator disseminated the Notice to more than 27,000 potential Class Members and record holders (Grace Decl. ¶4), which informed them, among other things, that Lead Counsel intended to apply to the Court for an award of attorneys' fees in an amount not to exceed $5 million and up to $250,000 in expenses.  While the time to object to the fee and

expenses application has not passed, to date, not a single objection has been received. Should any objections be received, Lead Counsel will address them in its reply papers.

## III.   PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Lead Counsel also requests reimbursement of litigation expenses that were reasonably incurred by Plaintiffs' Counsel and necessary to the prosecution of this Action, in the total amount of $126,008.62. These expenses are properly recovered by counsel. *See, e.g.*, *In re China Sunergy Sec. Litig.,* 2011 WL 1899715, at *3 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation'"); *FLAG Telecom*, 2010 WL 4537550, at *30 ("counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class").

As set forth in the Browne Declaration (Section IX) and Exhibits D-1 and D-2 thereto, Plaintiffs' Counsel incurred $126,008.62 in litigation expenses in the prosecution of the Action. The expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, computerized research, mediation costs, court reporting and transcripts, photocopying, long distance telephone charges, and postage and delivery expenses. The foregoing expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in the firms' hourly billing rates.

The Notice informed potential Class Members that Lead Counsel would apply for reimbursement of litigation expenses in an amount not to exceed $250,000. The total amount of expenses requested is well below the amount set forth in the Notice and, to date, there has been no objection to the request for reimbursement of expenses.

## <u>CONCLUSION</u>

For the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees in the amount of $5 million, and $126,008.62 in reimbursement of the reasonable litigation expenses Plaintiffs' Counsel incurred in connection with the prosecution of this Action.

Dated: November 11, 2013
      New York, New York

                                      **BERNSTEIN LITOWITZ BERGER**
                                        **& GROSSMANN LLP**

                                         */s/ John C. Browne*
                                          JOHN C. BROWNE
                                  Max W. Berger
                                  John C. Browne
                                  1285 Avenue of the Americas
                                  New York, NY 10019
                                  Telephone: (212) 554-1400
                                  Facsimile: (212) 554-1444

                                  *Attorneys for Lead Plaintiff and the Class*